OPPO
PHILIP HELLER, ESQ.
California Bar No. 113938
FABELBAUM & HELLER LLP
2049 Century Park East, Suite 4250
Los Angeles, CA 90067-3254
Telephone: (310) 286-7666

C. STANLEY HUNTERTON, ESQ.
Nevada Bar No. 1891
PAMELA R. LAWSON, ESQ.
Nevada Bar No. 5044
HUNTERTON & ASSOCIATES
333 South Sixth Street
Las Vegas, Nevada 89101
Telephone: (702) 388-0098
Attorneys for Phase II Chin, LLC

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| PHASE II CHIN, LLC and LOVE & MONEY, LLC, (formerly dba O.P.M.L.V., LLC),<br><br>                  Plaintiffs,<br>vs.<br><br>FORUM SHOPS, LLC, FORUM DEVELOPERS LIMITED PARTNERSHIP, SIMON PROPERTY GROUP LIMITED PARTNERSHIP, SIMON PROPERTY GROUP, INC., CAESARS PALACE CORP, and CAESARS PALACE REALTY CORP.,<br><br>                  Defendants. | **CASE NO.: 2:08-cv-162-JCM-GWF**<br><br><u>OPPOSITION TO MOTION TO DISMISS THE CAESARS DEFENDANTS</u> |

## INTRODUCTION

Plaintiff Phase II Chin, LLC ("Chinois") respectfully submits this Opposition to the

Motion to Dismiss the Caesars Defendants (collectively, "Caesars"). As explained below,

HUNTERTON
&
ASSOCIATES
ATTORNEYS AT LAW
333 S. Sixth Street
Las Vegas, NV 89101

Caesars' memorandum of points and authorities ("Caesars' Brief")[1] fails utterly to establish that either of the two causes of action in the Complaint asserted against Caesars fails to state a claim.[2] Caesars' motion, therefore, should be denied *in toto*.

## FACTS[3]

At all times relevant to this action, Chinois has leased premises (the "Premises") in The Forum Shops[4] at the Caesars Palace complex in Las Vegas from defendant Forum Shops, LLC ("Forum") pursuant to a lease initially between Forum Developers Limited Partnership and GGH Restaurant, LLC, Forum's and Chinois' predecessors in interest, respectively (the "Lease"). Complaint ¶ 14.[5] Chinois operates a restaurant called Chinois-Las Vegas in the Premises. *Id.* Chinois-Las Vegas is a fine dining establishment serving Asian/Pacific Rim and American cuisine, including certain signature dishes of world-renowned chef Wolfgang Puck. *Id.* ¶ 15.

On December 1, 2002, Forum approved Chinois' plan for the operation of a nightclub, OPM, on the second level of the Premises to be managed by plaintiff Love & Money, at the time doing business as O.P.M.L.V., LLC ("O.P.M.L.V."). *Id.* ¶¶ 20-21.

---

[1] In its moving papers, Caesars "join[s] in and incorporate by reference the Motion to Dismiss filed by defendants Forum Shops, LLC, Forum Developers Limited Partnership, Simon Property Group Limited Partnership, and Simon Property Group, Inc. (collectively, "the Forum defendants") pursuant to Fed.R.Civ.P. 12(b)(6)." Caesars Brief at 1-2.

[2] Plaintiffs intend to file an amended complaint shortly that will, *inter alia*, add the Caesars entities as defendants on certain of its other claims.

[3] This section presents only a brief summary of the allegations of the Complaint. Chinois respectfully suggests that the Court should review the Complaint in full to obtain a comprehensive understanding of the parties' dispute.

[4] The Forum Shops consist of more than 160 upscale stores and restaurants in an ancient Rome-themed mall at the Caesars Palace complex. The mall is attached to the Caesars Palace casino (the "Casino") with a large archway providing access between the Casino and The Forum Shops. While most of the retail establishments in The Forum Shops close each night at or about 11 p.m. on weekdays and 12 midnight on weekends, the mall's common areas remain open to the public 24 hours per day, 7 days per week. Complaint ¶ 16.

[5] The Forum defendants submitted a copy of the Lease as Exhibit A to their moving papers.

Forum had been provided a copy of the Management Agreement pursuant to which O.P.M.L.V. was to manage the club (the "Management Agreement") on July 10, 2002. *Id.* ¶ 21.[6] OPM is an upscale dance club that plays a range of different types of music, including hip-hop; most of its patrons are African-Americans. *Id.* ¶ 22.[7]

Effective October 9, 2003, after OPM had been in operation for five months, at the Forum Defendants' suggestion, the parties executed an amendment to the Lease (the "Lease Amendment") to permit Chinois to operate OPM in part of the leased Premises Wednesdays through Sundays from 10 p.m. until 6 a.m. each following morning. *Id.* 22.[8]

Beginning in or about January 2005, defendants engaged in an ongoing and concerted campaign of harassment and misconduct against plaintiffs. *Id.* 27. Defendants' misconduct has been calculated to force plaintiffs out of business and has been driven by at least two motives. *Id.* One of these motives stems from defendants' hostility towards, and prejudice against, African-Americans, who comprise the majority of OPM's clientele. *Id.* Plaintiffs believe that defendants seek to force OPM out of business because, in defendants' view, it attracts "too many" African-Americans to The Forum Shops and the Caesars Palace complex generally. *Id.*[9]

---

[6]  The Forum Defendants submitted a copy of the Management Agreement as Exhibit C to their moving papers.

[7]  By March 2006, O.P.M.L.V. and Chinois had successfully operated the nightclub for nearly three years in compliance with the terms and conditions of the Lease, the Lease Amendment and the Management Agreement and amendments thereto. During that time, OPM was the recipient of several awards, including the #1 Zagat Rated Award in 2004 and 2005, the AOL Cityguide City's Best Award in 2005, and the #1 Yahoo! Readers' Poll Award in 2006. Complaint ¶ 26.

[8]  The Forum Defendants submitted a copy of the Lease Amendment as Exhibit B to their moving papers.

[9]  Defendants have previously been criticized for their treatment of minorities. For example, in March 2007, ACORN, a self-described community organization of low and moderate income families, published a report, "Racial Discrimination at Simon Malls: A Separate and Unequal Shopping Experience for People of Color," describing racial

HUNTERTON
&
ASSOCIATES
ATTORNEYS AT LAW
333 S. Sixth Street
Las Vegas, NV 89101

Chinois believes that defendants' other motive stems from the fact that the rent Chinois pays under the Lease is considerably below "market" for the type of space it occupies. *Id.* ¶ 29. Were defendants able to force Chinois out of The Forum Shops, they could then lease the Premises to a new tenant at a substantially higher rent, which would, of course, yield for them correspondingly higher profits than they currently receive under the Lease. *Id.*

As detailed in the Complaint, defendants' misconduct has taken a variety of forms. *Id.* ¶ 30. First, almost every time when there has been any sort of security problem in any way involving an African-American anywhere in the Caesars Palace complex, defendants have sought to blame plaintiffs, even, as explained below, when it can be clearly demonstrated that the persons involved were not OPM patrons, and when the problems have arisen in The Forum Shops' common areas or on Caesars property, where plaintiffs have no security obligations and, moreover, no right to provide security. *Id.*

Second, defendants have discriminated against Chinois and OPM, and treated Chinois, and by extension OPM, differently, and less favorably, than other similarly situated tenants of The Forum Shops. *Id.* ¶ 31.

Finally, defendants have missed no opportunity to serve Chinois with formal legal notices of purported defaults under the Lease for even the most minor perceived transgression, instead of simply bringing these issues to Chinois' attention informally, as is customarily done with other tenants of The Forum Shops. *Id.* ¶ 32.

Caesars attempts to minimize its involvement in defendants' concerted wrongdoing by mischaracterizing plaintiffs' allegations against it as being limited to its closure of the

discrimination at a "Simon Property Group" mall in Colorado. Similarly, in a December 2007 meeting before the Nevada Gaming Control Board, eleven groups representing minority communities criticized Harrah's Entertainment, Inc., Caesars' parent corporation, for its lack of transparency in its diversity efforts. Complaint ¶ 28.

HUNTERTON
&
ASSOCIATES
ATTORNEYS AT LAW
333 S. Sixth Street
Las Vegas, NV 89101

doorway between the Caesars Palace Casino (the "Casino") and The Forum Shops weekend evenings at 1 a.m. This unwarranted and racially-motivated conduct alone would easily be enough to keep Caesars in the case. But plaintiffs' allegations against Caesars are not nearly so limited. Those allegations are as follows:

- On Christmas Eve 2004, roughly seven months after OPM opened, there was an incident at Caesars in the Casino involving several African-American men. Based on nothing more than its racial suppositions regarding OPM's clientele, Caesars subsequently sent an e-mail to OPM along with a video of the incident, blaming OPM and its customers for this problem. On this particular evening, however, OPM was hosting a private party for Jewish singles and not one African-American person attended this event. Complaint ¶ 34.

- An altercation involving several African-American individuals occurred in the Caesars parking structure on a night in late February 2006. Without any evidence, Forum and Caesars simply assumed that those involved in the fight had been patrons of OPM (not Pure, or the Caesars bar across from OPM, or the Casino), and attempted to hold Chinois and O.P.M.L.V. responsible, despite the fact that security in the parking structure was the exclusive responsibility of Caesars. Complaint ¶ 40.

- Two or three days after the altercation, Michael Goodwin of OPM met with Caesars' two night security directors, Brian Renner ("Renner") and Wadell Bennett ("Bennett"). Renner and Bennett told Goodwin that the problem had not been caused by OPM, but was instead attributable to Caesars providing inadequate security in its parking structure. Renner and Bennett told Goodwin that Caesars employed only two security officers to cover its entire multi-level parking structure at night, and compared the Caesars garage to that at Imperial Palace, which they said was one-

HUNTERTON
&
ASSOCIATES
ATTORNEYS AT LAW
333 S. Sixth Street
Las Vegas, NV 89101

sixth the size of the Caesars garage, but had three times the number of night security officers on duty. Goodwin told Forum that Renner and Bennett were willing to meet with representatives of Forum to explain the security problem in the garage, and also that OPM would pay for one additional security officer, if Caesars and Pure would each do the same. Forum and Caesars ignored both of Goodwin's offers. Complaint ¶ 41.

- In February 2006, Gary Selesner ("Selesner") President of Caesars and Robert Fry, President of Pure Management Group, which operates Pure, visited OPM and spoke with Goodwin. They told Goodwin they did not have a problem with OPM, but rather, with the customers that OPM attracted. Complaint ¶ 42.

- On March 12, 2006, a fight broke out inside the Casino involving African-Americans, and, once again, defendants attempted to place the blame on plaintiffs, despite clear evidence that they were in no way at fault. The men who initiated the fight were not dressed in compliance with OPM's dress code, and so could not have been OPM patrons. They were loitering inside the Casino near the entrance to The Forum Shops, drinking alcohol out of bottles. Prior to the altercation, Jeanene Straitz, Simon's head of night security, asked Caesars security three times to remove the group because they were harassing women passing by, but nothing was done. Goodwin's partner, Paul Martinez, noticed the group shortly before the fight occurred, and he too pointed them out to Caesars security, but, again, no action was taken. The fight broke out when one of the loiterers accosted a woman who was with a group that had left OPM and were entering the Casino, bothering no one. Even after the fight began, Caesars security, which is wholly responsible for the Casino, did not respond. Complaint ¶ 51.

HUNTERTON
&
ASSOCIATES
ATTORNEYS AT LAW
333 S. Sixth Street
Las Vegas, NV 89101

- Beginning on August 17 2007, approximately two weeks after a highly publicized shooting that occurred inside Caesars' Casino, with the exception of the weekend of October 19, 2007, Caesars has closed the entrance between The Forum Shops and the Casino every weekend evening, each time without justification or appropriate prior notice. Complaint ¶ 58.

- The first time Caesars closed the entrance between the Casino and The Forum Shops was at or about 1 a.m. on August 17, 2007, with only a phone call's notice at 11 p.m. Caesars also posted a sign next to the closed entrance that read, "Forum Shops to Reopen at 8 a.m." The sign did not provide any additional information and more importantly, did not tell customers that OPM was open for business, or how to access OPM. With only one exception, since August 17, 2007, Caesars has closed the entrance and posted the sign every weekend evening beginning at or about 1 a.m., after every other Forum Shops' tenant has closed. Every closure was without justification and, with the exception of the first closure, without any notice. Complaint ¶ 59.

- Caesars' closing of the entrance is timed to limit and direct its impact solely to OPM. OPM is the only Forum Shops business open after 12 a.m., and the door closures occur during OPM's peak operating hours on Friday and Saturday nights. Typically, Caesars only closes the Casino entrance after 1 a.m., after every tenant in The Forum Shops other than OPM has closed. Approximately 70 percent or more of OPM's customers gain entry to OPM through the entrance door between The Forum Shops and Caesars' Casino, and a vast majority of OPM's patrons arrive at the club after 1 a.m. When OPM's customers see the closed door, however, along with the sign telling them that The Forum Shops will not reopen until the next morning, many

HUNTERTON
&
ASSOCIATES
ATTORNEYS AT LAW
333 S. Sixth Street
Las Vegas, NV 89101

assume either that OPM is also closed, or worse, no longer in business. The customers who have not been deterred by the sign and the closed entry, and who know or hope that OPM is open, have been forced to use an unmarked, poorly lit and potentially unsafe back hallway to gain entry to The Forum Shops and access OPM. Complaint ¶ 60.

- OPM is an upscale nightclub and forcing OPM's customers to use a back service hallway (and, at one point, an outside back alley) for entrance is inconsistent with, and damaging to, OPM's image, and insulting to OPM's customers. O.P.M.L.V. chose to locate the nightclub in The Forum Shops to reinforce the upscale image and clientele OPM attracts. This is contrary to having these customers walk through an unmarked and dimly lit service hallway or an outside back alley to gain access to the property when no other tenants' customers are forced to endure such treatment. Further, considering that the great majority of OPM's patrons are African-Americans, forcing them to use the back hallway is particularly degrading, and reminiscent of African-Americans historically being permitted to access restaurants and other places of public accommodation only through "service entrances." Complaint ¶ 61.

- In addition, plaintiffs are informed and believe, and on that basis allege, that Caesars surveys The Forum Shops prior to closing the Casino entrance to ensure that none of The Forum Shops' *other* tenants are affected by the door closure. For example, on the weekend of September 15, 2007, Caesars' security personnel kept the Casino entrance open at least an additional half-hour to accommodate customers of the Cheesecake Factory, another Forum Shops tenant. This practice demonstrates that

the closures are intended to target OPM and its minority and African-American customers only. Complaint ¶ 62.

- Caesars has stated that it would be willing to keep the door open only if O.P.M.L.V. paid the entire cost of increased security near the doorway. O.P.M.L.V. is not able to pay the cost of this additional security, and so the door between the Casino and The Forum Shops remains closed during OPM's peak hours of operation. Complaint ¶ 63.

- This door closure has caused OPM to suffer a significant reduction in its normal average number of patrons between its peak hours of 1 a.m. and 4 a.m., with a correspondingly substantial loss of income. Complaint ¶ 64.

- In addition to Caesars' closing the entrance between the Casino and The Forum Shops, for the past three years on New Year's Eve, one of busiest nights of the year for OPM, Caesars has closed off access to OPM's customers at its main entrance (not the Casino entrance), thereby forcing OPM's customers to walk along outside of the Casino, on a road with no sidewalk, to access OPM. Complaint ¶ 65.

- OPM has been required to hire Las Vegas Metropolitan Police Department officers to provide security at certain events while [Caesars' own night club ]Pure, which attracts much larger, mostly Caucasian crowds, has not been required to do the same. Complaint ¶ 68.

The Complaint states two causes of action against Caesars: (1) violation of 42 U.S.C. § 1981 (Fifth Cause of Action); and (2) civil conspiracy (Seventh Cause of Action).

# ARGUMENT

## I.    The Fed.R.Civ.P. 12(b)(6) Standard

In *Angel v. Eldorado Casino, Inc.*, 2008 U.S. Dist. LEXIS 37491, *4-*5 (D. Nev. April 25, 2008), Judge Sandoval of this district recently explained the standard for dismissal under Fed.R.Civ.P. 12(b)(6) as follows:

> In considering a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), the court  must accept as true all material allegations in the complaint as well as all reasonable inferences that may be drawn from such allegations. *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1150 (9th Cir. 2000). The allegations of the complaint also must be construed in the light most favorable to the nonmoving party. *Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000). The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). However, there is a strong presumption against dismissing an action for failure to state a claim. *See Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997) (citation omitted). Thus, upon being adequately stated, a claim may be supported by showing "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1969, 167 L. Ed. 2d 929 (2007) (citation omitted). However, the factual allegations included in a complaint "must be enough to raise a right to relief above the speculative level." Id. at 1964-65. "The pleading must contain something more ... than ... a statement of facts that merely creates a suspicion [of] a legally cognizable right of action ." *Id.* at 1965.

2008 U.S. Dist. LEXIS 37491, *4-*5; *accord Weber v. Dep't of Veterans Affairs,* 521 F.3d 1061, 1065 (2008) ("To avoid a Rule 12(b)(6) dismissal, a complaint need not contain detailed factual allegations; rather, it must plead 'enough facts to state a claim to relief that is plausible on its face.'" (quoting *Bell Atlantic Corp. v. Twombly,* 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007)); *McGrath v. Nevada Dep't of Public Safety*, 2008 U.S. Dist. LEXIS 38814, *3 (D. Nev. April 30, 2008) (citing *Wyler Summit Partnership v. Turner Broad. Sys., Inc.,* 135 F.3d 658, 661 (9th Cir. 1998) and *Gilligan v. Jamco Dev. Corp.,* 108 F.3d 246, 249 (9th Cir. 1997)).

HUNTERTON
&
ASSOCIATES
ATTORNEYS AT LAW
333 S. Sixth Street
Las Vegas, NV 89101

Defendants' incomplete recitation of this standard in the Forum Defendants' Brief belies their understanding that they cannot satisfy it.

## II. The Fifth Cause of Action States A Claim for Violation of 42 U.S.C. § 1981

### A. Chinois Has Standing to Assert Its § 1981 Claim

Through its incorporation of the Forum Defendants' arguments, Caesars contends that Chinois lacks standing to assert a claim under 42 U.S.C. § 1981 because Chinois has no "particular racial identity" and "cannot sue for the alleged deprivation of their customer's [sic] rights." Forum Defendants' Brief at 21. One of the very cases upon which defendants purport to rely, however, *Thinkjet Ink Information Resources, Inc. v. Sun Microsystems, Inc.*, 368 F.3d 1053 (9th Cir.), as well as many others treated below, prove Caesars wrong.

*Thinkjet* expressly holds "that if a corporation either suffers discrimination harm cognizable under § 1981, **or** has acquired an imputed racial identity, it is sufficiently within the statutory zone of interest to have prudential standing to bring an action under § 1981." *Id.* at 1055 (emphasis added). Caesars improperly ignores the first part of the *Thinkjet* holding. Elaborating on that holding later in the decision, the court stated that a "corporation ha[s] 'an implied right of action against any other person who, with a racially discriminatory intent, interferes with its right to make contracts with non-whites.'" *Id.* at 1058 (quoting *Des Vergnes v. Seekonk Water District*, 601 F.2d 9, 13-14 (1st Cir. 1979).

*Des Vergnes* is instructive. There, the corporate plaintiff, owner of a tract of land, sued defendant city water district under § 1981 for having refused to include the tract in the district because the district believed plaintiff intended to sell lots on the land to African-Americans. 601 F.2d at 11-12. The court reversed the district court's dismissal of plaintiff's § 1981 claim, explaining:

> The text of § 1981 does not explicitly give a cause of action to [plaintiff] inasmuch as it is "a corporation (which) has no racial identity and cannot be

HUNTERTON
&
ASSOCIATES
ATTORNEYS AT LAW
333 S. Sixth Street
Las Vegas, NV 89101

the direct target of . . . alleged discrimination." . . . But that is not the end of the matter.

After the Supreme Court in *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 237, 90 S. Ct. 400, 24 L. Ed. 2d 386 (1969) held that the parallel text of 42 U.S.C. § 1982 gave a cause of action to a white person against another who had injured the white person because he had made an assignment of property to a black, lower federal courts held that a white person had a cause of action under § 1981 against another who injured him because he made a contract with a black, *DeMatteis v. Eastman Kodak Co.*, 511 F.2d 306, *modified* 520 F.2d 409 (2nd Cir. 1975), or because he protested the racially discriminatory discharge of a black, *Winston v. Lear-Siegler, Inc.*, 558 F.2d 1266 (6th Cir. 1977), or because he associated with blacks, *Faraca v. Clements*, 506 F.2d 956 (5th Cir. 1975).

Those cases stand for two propositions: ***to invoke § 1981 or § 1982 one need not be a member of the racial class protected by the statute and one need not even be able to identify any specific member of the class who suffered or may suffer discrimination.***

\* \* \*

From *Sullivan* and from cognate cases under § 1981, ***we conclude that, in order to effectuate the public policy embodied in § 1981, and in order to protect the legal rights of non-whites expressly created by § 1981, a person has an implied right of action against any other person who, with a racially discriminatory intent, interferes with his right to make contracts with non-whites. A fortiori a person has an implied Right of action against any other person who, with a racially discriminatory intent, injures him because he made contracts with non-whites.***

601 F.2d at 13-14 (emphasis added; citation omitted).

Nor is *Des Vergnes* in any sense a fluke. Indeed, many other courts have held that corporations and/or non-minorities may sue under § 1981 when they are harmed by defendant's discriminatory actions against third-party minorities. *Humphries v. CBOCS West, Inc.*, 474 F.3d 387 (7th Cir. 2007), *aff'd*, 128 S. Ct. 1951 (2008) collects some of the relevant cases.[10] Under this authority, it is beyond reasonable argument that plaintiffs have

---

[10] *Id.* at 403 n. 11 (citing to *Johnson v. University of Cincinnati*, 215 F.3d 561, 575 (6th Cir. 2000) (holding it was clear under "well-settled" law that a plaintiff "need not have alleged discrimination based upon his race as an African-American in order to satisfy the protected status requirement of his claims[,]" but rather plaintiff's advocacy on behalf of

12

HUNTERTON
&
ASSOCIATES
ATTORNEYS AT LAW
333 S. Sixth Street
Las Vegas, NV 89101

standing to assert their § 1981 claim because, as alleged in the Complaint, they have

suffered direct harm as a result of defendants' unlawful discriminatory treatment both of

themselves and their patrons on the basis of race.

The two cases Caesars cites in support of its position are not to the contrary. The

court in *Benjamin v. Aroostook Medical Center, Inc.*, 57 F.3d 101 (1st Cir. 1995) upheld the

dismissal of a claim brought by certain patients of an African-American physician whose

staff privileges has been terminated by defendant hospital, reasoning that the patients'

claims were really "an assertion of [the physician's] third-party right to a race-neutral review

process." *Id.* at 105. The *Benjamin* court, however, specifically recognized that standing is

proper in cases such as *Des Vergnes*, "in which the plaintiff was the direct target of the

defendant's discriminatory action." *Id.*

Unlike the patient plaintiffs in *Benjamin*, who were not the targets of the hospital's

allegedly discriminatory termination of the physician's staff privileges, plaintiffs here have

unambiguously alleged that defendants' misdeeds, from the repeated service of unwarranted

default notices to the closure of the door between the Casino and The Forum Shops to the

minorities was sufficient to allege retaliation under § 1981); *Skinner v. Total Petroleum, Inc.*, 859 F.2d 1439, 1446-1447 (10th Cir. 1988) (white employee fired for helping African-American co-worker file an EEOC claim could state a claim under § 1981); *Pinkard v. Pullman-Standard, Div. of Pullman, Inc.*, 678 F.2d 1211, 1229 (5th Cir. 1982) (retaliatory discharge claim allowed under § 1981 where evidence showed plaintiff was discharged for lawful advocacy of minority and union rights); *Liotta v. Nat'l Forge Co.*, 629 F.2d 903, 906-907 (3d Cir. 1980) (summary judgment inappropriate where material issues of fact remained regarding § 1981 claim brought by plaintiff who claimed he was discharged for supporting rights of African-American co-workers); *Fiedler v. Marumsco Christian School*, 631 F.2d 1144, 1149 (4th Cir. 1980) (white student protected under § 1981 from retaliation by school because of her association with a black schoolmate); *Winston v. Lear-Siegler, Inc.*, 558 F.2d 1266, 1270 (6th Cir. 1977) (white plaintiff had standing under § 1981 for claim that employer fired him because he objected to discriminatory discharge of African-American co-worker); *DeMatteis v. Eastman Kodak Co.*, 511 F.2d 306, 312 (2d Cir. 1975) (white plaintiff could bring § 1981 claim based upon allegation that his employer "'forced' him into retirement solely because he had sold his house to a black person") (parentheticals by the *Humphries* court)).

HUNTERTON
&
ASSOCIATES
ATTORNEYS AT LAW
333 S. Sixth Street
Las Vegas, NV 89101

refusal to provide adequate air conditioning, while motivated by racial bias against plaintiffs' patrons, nonetheless targeted plaintiffs themselves, thereby bringing them well within "the statutory zone of interest to have prudential standing to bring an action under § 1981." *Thinkjet*, 368 F.3d at 1055.

Caesars' second case, *Ramirez v. City of Reno*, 925 F. Supp. 681 (D. Nev. 1996) was apparently tossed in for ornamental purposes—the court there stated that defendants were "entitled to judgment on Plaintiff's Section 1981 claim" because "[n]owhere in the complaint [did] Mr. Ramirez allege any racial discrimination."

## B. Chinois Has Adequately Stated Its § 1981 Claim

Caesars also contends that "Plaintiffs [c]annot [e]stablish the [r]equisite [e]lements of a § 1981 [p]rima [f]acie [c]ase," relying solely on an Eighth Circuit case that concerned a motion for summary judgment, not one under Rule 12(b)(6). Forum Defendants' Brief at 22 (relying on *Bediako v. Stein*, 354 F.3d 835 (8th Cir. 2004). Plaintiffs, however, are not required to "establish . . . a prima facie case" at the pleadings stage, before discovery has even begun. A Ninth Circuit panel recently described the pleading standard governing civil rights claims as follows:

> Federal Rule of Civil Procedure 8(a) states that a complaint only requires a "short and plain statement of the claim showing that the pleader is entitled to relief." This court has repeatedly held that "'[a] party need not plead specific legal theories in the complaint, so long as the other side receives notice as to what is at issue in the case.'" *Sagana v. Tenorio*, 384 F.3d 731, 736-37 (9th Cir. 2004) (quoting *Am. Timber & Trading Co. v. First Nat'l Bank*, 690 F.2d 781, 786 (9th Cir. 1982)). "[The] simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512, 152 L. Ed. 2d 1, 122 S. Ct. 992 (2002). ***Furthermore, civil rights complaints are liberally construed.*** *Holley v. Crank*, 386 F.3d 1248, 1256 (9th Cir. 2004).

HUNTERTON
&
ASSOCIATES
ATTORNEYS AT LAW
333 S. Sixth Street
Las Vegas, NV 89101

*Edwards v. County of San Diego*, 124 Fed. Appx. 547, 548, 2005 U.S. App. LEXIS 3595, *2 (9th Cir. 2005) (emphasis added). Chinois will therefore treat Caesars' arguments in this regard as going to the adequacy of the Complaint's allegations.

Caesars first argues that "[p]laintiffs have not allege that *they* are members of a protected class." Forum Defendants' Brief at 22. As acknowledged by reference back to Section IV(A)(4) of the Forum Defendants' Brief, however, this is simply the standing argument, redux. As explained above, plaintiffs unambiguously have standing to assert their § 1981 claim under the relevant authority.

Caesars next contends that "[p]laintiffs are unable to point to even one instance in which Defendants have committed racially motivated acts intended to harm Plaintiffs." Forum Defendants' Brief at 22. The short answer to this contention is that a civil rights plaintiff need not allege *any* facts regarding discriminatory intent at the pleadings stage. *See, e.g., Wang v. Office of Professional Medical Conduct*, 228 Fed. Appx. 17, 2007 U.S. App. LEXIS 7351 (2d Cir. 2007) ("Although Wang alleges no facts that would support a finding of discriminatory intent, he need not do so at the pleading stage.") (citing *Swierkiewicz v. Sorema*, 534 U.S. 506, 511-13, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)); *Duran v. Ashcroft*, 114 Fed. Appx. 368, 371 n.2 2004 U.S. App. LEXIS 23305 (10th Cir. 2004) ("At the pleading stage . . . plaintiff need not allege specific facts supporting a finding of discriminatory intent so long as he points to some circumstances, occurrences, or events underlying his claim of discrimination.").

The court in *Kim v. Nash Finch Co.*, 123 F.3d 1026 (8th Cir. 1997) explained:

[D]irect evidence of intentional discrimination was not required; case law recognizes that intentional discrimination may be proven by circumstantial evidence because "there will seldom be 'eyewitness' testimony as to the employer's mental processes." *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 714 n.3, 75 L. Ed. 2d 403, 103 S. Ct. 1478 (1983). "After all, the *McDonnell Douglas* framework exists to provide

HUNTERTON
&
ASSOCIATES
ATTORNEYS AT LAW
333 S. Sixth Street
Las Vegas, NV 89101

discrimination plaintiffs a way to prove their case when they do not have 'explicit, inculpatory evidence of discriminatory intent.'" *Shannon v. Ford Motor Co.*, 72 F.3d 678, 682 (8th Cir. 1996), *citing Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 776 (8th Cir. 1995).

123 F.3d at 1059.

But notwithstanding this liberal pleading standard, as already explained, plaintiffs point to *many* instances in which defendants have committed racially motivated acts intended to harm plaintiffs. *See* Complaint ¶¶ 34, 40, 41, 42, 51, 58-65 and 68, quoted above.

Caesars also contends that: (1) the absence of a contract between it and Chinois precludes the assertion of a claim under § 1981; and (2) it cannot have discriminated against plaintiffs with respect to the Lease. Caesars Brief at 5. With respect to (1), Caesars again simply ignores the relevant precedent. As quoted above, the court in *Des Vergnes* unambiguously held, and as cases since have recognized, "a person has an implied right of action against any other person who, with a racially discriminatory intent, interferes with his right to make contracts with non-whites. A fortiori a person has an implied Right of action against any other person who, with a racially discriminatory intent, injures him because he made contracts with non-whites." 601 F.2d at 13-14.

With respect to (2), plaintiffs unambiguously allege Caesars' involvement in a concerted, conspiratorial campaign with all the other defendants to terminate the Lease and interfere with its performance, *i.e.*, Chinois' right to the Lease's benefits.

Finally, Caesars asserts that "[t]he fact that the Forum Shops Mall is deserted after midnight, with plaintiffs' establishment the only one still open, is fatal to their section 1981 claim." Caesars Brief at 6. The sole authority Caesars cites for this odd position is *Benton v. Cousins Properties, Inc.*, 230 F. Supp. 2d 1351 (N.D. Ga. 2002). *Benton*, however, affords Caesars no support for several reasons.

HUNTERTON
&
ASSOCIATES
ATTORNEYS AT LAW
333 S. Sixth Street
Las Vegas, NV 89101

First, *Benton* arose in the summary judgment context, after the parties had engaged in discovery. As Caesars itself characterizes the case, plaintiff in *Benton* "failed to **establish** a prima facie case." Caesars Brief at 6 (emphasis added). Discovery here, in contrast, has yet to begin, and Caesars is seeking dismissal based on plaintiffs' Complaint. Plaintiffs clearly have no obligation to "establish a prima facie case" at this point.

Additionally, even to the extent that the outcome in *Benton* turned on plaintiff's inability to establish that she had been treated differently than similarly situated clients of the hotel it does not support Caesars, and for at least two reasons. First, §1981 does not require plaintiff to establish disparate treatment. Instead, as the *Benton* court itself recognized, disparate treatment is simply one way of establishing the discriminatory intent element of a §1981 claim. 230 F. Supp. at 1370 n. 12 ("the Supreme Court has made it clear that the plaintiff is not required to produce direct evidence of a discriminatory intent and she may instead support her claim through circumstantial evidence of disparate treatment" (and cases cited)).

Second, even if disparate treatment were a requirement, plaintiffs here clearly allege that they were singled out and treated differently than other tenants in The Forum Shops. *See, e.g.,* Complaint ¶ 62 ("Caesars surveys The Forum Shops prior to closing the Casino entrance to ensure that none of The Forum Shops' *other* tenants are affected by the door closure," citing example when door left open to accommodate Cheesecake Factory, another Forum Shops tenant). Indeed, Chinois notes in passing that even if **direct evidence** of discriminatory intent were required, they would meet that standard as to Caesars because they allege that Caesars' **president**, Gary Selesner, actually told Michael Goodwin of O.P.M.L.V. that Caesars had "a problem" with OPM's African-American clientele. Complaint ¶ 42.

HUNTERTON
&
ASSOCIATES
ATTORNEYS AT LAW
333 S. Sixth Street
Las Vegas, NV 89101

Finally, the African-American plaintiff in *Benton* contended that defendant hotel had discriminated against her directly in the performance of a contract between plaintiff and the hotel. The thrust of plaintiffs' claim against Caesars here is that, motivated by racial animus, Caesars has interfered with plaintiffs' relationships with their African-American patrons and with Chinois' rights under, and enjoyment of the Lease. Caesars is thus comparing apples and oranges.

Thus, *Benton* does not support Caesars' position in any way, much less does it require the dismissal of plaintiffs' § 1981 claim.[11]

## C. The § 1981 Claim Is Not Time-Barred

Caesars contends that Nevada's two-year statute of limitations governing personal injury actions applies to plaintiffs' § 1981 claim and that because plaintiffs allege that defendants' pattern of racially discriminatory misconduct began "in or about January 2005," their entire claim is time-barred because the Complaint was not filed until January 8, 2008. Forum Defendants' Brief at 23. Caesars is wrong for at least two reasons.

First, Caesars simply ignores the principle of "continuing violation" as it applies to limitations periods. The court in *Green v. Los Angeles County Superintendent of Schools*, 883 F.2d 1472 (9th Cir. 1989) explained:

> [A] systematic policy of discrimination is actionable even if some or all of the events evidencing its inception occurred prior to the limitations period. The reason is that the continuing system of discrimination operates against the employee and violates his or her rights up to a point in time that falls within the applicable limitations period.

---

[11]    Caesars' reliance on *CBOCS West v. Humphries*, 128 S.Ct. 1951 (2008) and *Gomez-Perez v. Potter*, 128 S.Ct. 1931 (2008) is also misplaced, and also puzzling. In *CBOCS*, the court held that "retaliation" claims are within the purview of § 1981. *Gomez-Perez* concerned the viability of retaliation claims under the "federal sector" provisions of the Age Discrimination in Employment Act.

HUNTERTON
&
ASSOCIATES
ATTORNEYS AT LAW
333 S. Sixth Street
Las Vegas, NV 89101

18

883 F.2d at 1480 (citing *Williams v. Owens-Illinois, Inc.*, 665 F.2d 918, 924 (9th Cir.) (citation omitted), *cert. denied*, 459 U.S. 971 (1982); *Domingo v. New England Fish Co.*, 727 F.2d 1429, 1443 (9th Cir. 1984), *modified* 742 F.2d 520 (1984); and *Reed v. Lockheed Aircraft Co.*, 613 F.2d 757, 760 (9th Cir. 1980)).

Plaintiffs here allege an "ongoing and concerted campaign of harassment and misconduct" that began in January 2005 and has yet to cease, *i.e.*, a "continuing violation" of § 1981. Complaint ¶ 27. No part of plaintiffs' claim, therefore, is time barred.

Second, even were the "continuing violation" doctrine inapplicable, Caesars offers no reason as to why the misconduct that occurred within the limitations period would be time-barred, and there is no reason.

## III.    The Seventh Cause of Action States A Claim for Civil Conspiracy

"An actionable civil conspiracy 'consists of a combination of two or more persons who, by some concerted action, intend to accomplish an unlawful objective for the purpose of harming another, and damage results from the act or acts.'" *Consolidated Generator-Nevada, Inc. v. Cummins Engine Co., Inc.*, 114 Nev. 1304, 1311, 971 P.2d 1251, 1256 (1998) (quoting *Hilton Hotels v. Butch Lewis Productions*, 109 Nev. 1043, 1048, 862 P.2d 1207, 1210 (1993) and citing Sutherland v. Gross, 105 Nev. 192, 196, 772 P.2d 1287, 1290 (1989)).

Caesars contends that plaintiffs have alleged only that "'defendants' have 'acted in concert . . . intentionally disrupting the contractual relationships between Chinois and O.P.M.L.V.'" Caesars' Brief at 7. Interestingly enough, the Forum Defendants identified a different set of "only" conspiracy allegations, stating that "[t]he Complaint alleges only that the 'Defendants, and each of them, acted in concert, directly or through their common agents.'" Forum Defendants' Brief at 26. Caesars and the Forum Defendants are both

HUNTERTON
&
ASSOCIATES
ATTORNEYS AT LAW
333 S. Sixth Street
Las Vegas, NV 89101

wrong. Plaintiffs allege that defendants acted in concert to further certain unlawful objectives, incorporating by reference the preceding 23 pages of allegations concerning the details of defendants' concerted wrongdoing. Complaint ¶ 98. In paragraph 27 of the Complaint, plaintiffs explain the motivations underlying the conspiracy.

Caesars also argues that the specialized pleading standard the U.S. Supreme Court articulated for conspiracies in restraint of trade under the Sherman Act in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1969, 167 L. Ed. 2d 929 (2007) must be applied to every mine run civil conspiracy claim. Not surprisingly, it cites no authority for this proposition. Indeed, the *Twombly* standard speaks in terms of "parallel conduct," an antitrust term of art with no bearing here. *See, e.g., Rowe Entertainment, Inc. v. William Morris Agency, Inc.*, 2000 U.S. Dist. LEXIS 9256, *20-*21, 2000-2 Trade Cas. (CCH) P72,971 (S.D.N.Y. July 6, 2000) ("certain 'parallel conduct is consistent with independent competitive decisions or at most reflects a non-consensual decision not to compete[, a]dditional facts or circumstances are needed to show that the decisions were interdependent and thus raise an inference of a tacit agreement to boycott.'" (quoting *Modern Home Institute, Inc. v. Hartford Accident & Indemnity Co.*, 513 F.2d 102, 110 (2d Cir. 1975) and citing Donald F. Turner, *The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal*, 75 Harv. L. Rev. 655, 658-59, 681 (1962)).

Much more to the point is *Hayes v. Arthur Young & Co.*, 1994 U.S. App. LEXIS 23608, *67-*68 (9th Cir. Aug. 26, 1994) ("To assert a conspiracy, the complaints must allege that [defendants] owed a duty to [plaintiffs] and that they breached this duty. . . . Both complaints do so. Therefore, the civil conspiracy allegations properly state a claim and should not have been dismissed." (citation omitted)).

HUNTERTON
&
ASSOCIATES
ATTORNEYS AT LAW
333 S. Sixth Street
Las Vegas, NV 89101

Finally, Caesars ludicrously contends that the standard allegations in paragraph 11 of the Complaint that defendants acted as each other's agents, servants, employees, etc. preclude plaintiffs from stating a claim for civil conspiracy, relying on *Collins v. Union Federal Savings & Loan Ass'n,* 99 Nev. 284, 303, 662 P.2d 610, 622 (1983) and *Laxalt v. McClatchy,* 622 F. Supp. 737, 745 (D. Nev. 1985). These cases, however, stand only for the unremarkable proposition that a corporation cannot conspire with its employees, a principle that has no application here. Plaintiffs do not allege that any corporate defendant conspired with its own employees. Plaintiffs allege that the corporate defendants conspired with each other, and nothing in the Complaint can reasonably be construed to say otherwise.

## IV.   None of Plaintiffs' Allegations Should Be Stricken

Caesars' request that certain allegations in plaintiffs' Complaint be stricken is frivolous. "As such, motions to strike are 'generally disfavored.'" *Quanta Specialty Lines Inc. Co. v. Investors Capital Corp.,* 2008 U.S. Dist. LEXIS 35319, *10 (S.D.N.Y. April 30, 2008) (quoting *Emmpresa Cubana Del Tabaco v. Culbro Corp.,* 213 F.R.D. 151, 155 (S.D.N.Y. 2003) and citing *Lipsky v. Commonwealth United Corp.,* 551 F.2d 887, 893 (2d Cir. 1976)); *accord Miller v. Group Voyagers, Inc.,* 912 F. Supp. 164, 168 (E.D.Pa. 1996). "To succeed on a motion to strike, one must demonstrate that no evidence in support of the allegation would be admissible, that the allegations have no bearing on the issues in the complaint, and that to permit the allegations to stand would result in prejudice to the movant." *Eldorado Stone, LLC v. Renaissance Stone, Inc.,* No. 04CV2562, 2006 U.S. Dist. LEXIS 96378, 2006 WL 4569360, at *5 (S.D.Cal. Feb. 6, 2006); *accord* 5C Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1382 (3d ed. 2004) (motions to strike denied unless allegations have "no possible relation or logical connection to the

HUNTERTON
&
ASSOCIATES
ATTORNEYS AT LAW
333 S. Sixth Street
Las Vegas, NV 89101

subject matter of the controversy and may cause some form of significant prejudice to one or more of the parties to the action.").

Caesars does not even attempt to satisfy this extremely high standard, nor could it satisfy that standard. There is no basis for any argument that "no evidence in support of" the allegations in question would be admissible. Moreover, far from having "no bearing on the issues in the complaint," the allegations concerning racial animus and racially discriminatory conduct Caesars seeks to strike are directly relevant to all of plaintiffs' claims, and central to its § 1981 claim. Finally, Caesars points to absolutely prejudice it would suffer if the allegations are not stricken.

## CONCLUSION

For the reasons explained above, Chinois respectfully requests that the Court deny Caesars' motion *in toto*. Should the Court find any of Chinois' claims to be inadequately pled, however, Chinois respectfully requests that it be permitted an opportunity to amend.

DATED this _2/_ day of July, 2008.

FAGELBAUM & HELLER LLP


_____/s/_____
Philip Heller
2049 Century Park East, Suite 4250
Los Angeles, CA 90067-3254
Counsel for Phase II Chin, LLC

HUNTERTON & ASSOCIATES


_____/s/_____
C. Stanley Hunterton
333 So. Sixth St.
Las Vegas, Nevada 89101
Counsel for Phase II Chin, LLC

## CERTIFICATE OF SERVICE

Pursuant to Fed.R.Civ.P. 5(b) and Section IV of District of Nevada Electronic Filing Procedures, I certify that I am an employee of HUNTERTON & ASSOCIATES and that the foregoing document was served via electronic service: OPPOSITION TO MOTION TO DISMISS to:

Samuel S. Lionel
LIONEL SAWYER COLLINS
300 So. Fourth St. #1700
Las Vegas, Nevada 89101
Counsel for Defendants Forum Shops, LLC, Forum Developers
Limited Partnership, Simon Property Group Limited Partnership
and Simon Property Group, Inc.

Harold Gewerter
GEWERTER LAW OFFICES
5440 W. Sahara Ave., Third Floor
Las Vegas, Nevada 89146
Counsel for Plaintiff Love & Money, LLC

Kristina Pickering
MORRIS PICKERING & PETERSON
900 Bank of America Plaza
300 South Fourth Street
Las Vegas, NV 89101
Counsel for Defendants Caesars Palace Corp. and
Caesars Palace Realty Corp.


_____
/s/
Jan Allen

HUNTERTON
&
ASSOCIATES
ATTORNEYS AT LAW
333 S. Sixth Street
Las Vegas, NV 89101