UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

PHASE II CHIN, LLC, *et al.*,         )
                                      )
                   Plaintiffs,        )   Case No. 2:08-cv-00162-JCM-GWF
                                      )
vs.                                   )   **ORDER**
                                      )
FORUM SHOPS, LLC, *et al.*,           )   **Motion to Disqualify Attorney**
                                      )   **Steve Morris and the Law Firm of**
                   Defendants.        )   **Morris, Pickering & Peterson - #70**
_____)

This matter is before the Court on Plaintiff's Motion to Disqualify Attorney Steve Morris and the Law Firm of Morris Peterson (#70), filed January 5, 2009; Defendants' [Corrected] Opposition to Plaintiff's Motion to Disqualify Attorney Steve Morris and the Law Firm Morris Peterson (#78), filed January 27, 2009; and Plaintiff's Reply in Support of its Motion to Disqualify Attorney Steve Morris and the Law Firm of Morris Peterson (#80), filed February 6, 2009. The Court conducted a hearing in this matter on February 12, 2009.

## BACKGROUND

In October 2007, attorney Philip Heller was retained by Plaintiff Phase II, Chin LLC ("Chinois") to represent it in a declaratory relief action filed by Forum Shops LLC in the Delaware state court. The declaratory relief action concerned the relationship between Forum Shops LLC as lessor and Chinois as lessee in the Forum Shops At Caesars Palace in Las Vegas, Nevada. As a result of the Delaware action, Chinois decided to file a more comprehensive action in Las Vegas, Nevada where both Chinois and Forum Shops LLC conduct business, other potential parties resided and relevant documents and witnesses were located. *Motion to Disqualify (#70), Heller Declaration,* ¶ 2. Mr. Heller is a California attorney and it was necessary for Chinos to obtain local Nevada counsel for the contemplated lawsuit.

Mr. Heller telephoned attorney Steve Morris of the law firm of Morris, Pickering & Peterson to inquire about Mr. Morris serving as Chinois's local counsel. Mr. Heller states that his law partner, Mr. Fagelbaum, had previously worked with Mr. Morris in other litigation and suggested him to Mr. Heller. *Heller Declaration*, ¶ 3.

According to Mr. Heller, after introducing himself, he told Mr. Morris that he represented Chinois in the action against Forum Shops LLC in Delaware and that Chinois planned to file an action in Las Vegas. *Id.* ¶ 4. Mr. Heller and Mr. Morris discussed the pros and cons of filing in state versus federal court, potential causes of action, that the proposed action in Nevada would contain eight causes of action for damages and injunctive relief, possible defendants, litigation strategy, prospects for settlement, other counsel expected to be included in the case and potential state and federal judges. According to Mr. Heller, "[i]n response, Mr. Morris provided legal and other advice on all these subjects and his personal and professional views on counsel and judges." *Id.* ¶ 4.

At some point during the conversation, Mr. Heller disclosed to Mr. Morris that Caesars Palace was one of the contemplated defendants in the lawsuit. *Id.* ¶ 5. Mr. Morris then revealed that his firm had represented Caesars. According to Mr. Heller, Mr. Morris did not state that he could not act as local counsel for Chinois, "but indicated it might be a problem." *Id.* It appears from Mr. Heller's declaration, that the telephone conversation then concluded. Chinois thereafter retained C. Stanley Hunterton of Hunterton & Associates, to act as local counsel in the Nevada action. *Id.*

On January 8, 2008, Chinois filed its complaint in the Nevada District Court against Forum Shops, LLC, Forum Developers Limited Partnership, Simon Property Group Limited Partnership, Simon Property Group, Inc., Caesars Palace Corp. and Caesars Palace Property Corporation. *Heller Declaration*, ¶ 6. *See also Petition for Removal (#1), Exhibit "A"*. On February 7, 2008, Defendant Caesars removed the action to Federal Court. Mr. Heller states that "[t]o my surprise, Caesars was represented by Mr. Morris' partner, Kris Pickering and MP&P." *Heller Declaration*, ¶ 6.

Mr. Heller states that he called Mr. Morris on February 13, 2008 to object to his firm representing Caesars because of their previous conversation regarding the case. According to Mr. Heller, "Mr. Morris responded by stating that he had only a vague recollection of the details of the call, that he had not taken any notes and had not discussed the call with anyone else." *Id.* ¶ 7. Mr. Morris

also assured Mr. Heller that he had no involvement in the case.

On February 14, 2008, Mr. Morris sent an email letter to Mr. Heller regarding their conversation on February 13, 2008. *Motion (#70), Exhibit "A."* In his letter, Mr. Morris stated he had thought about their conversation the previous day and Mr. Heller's belief that Mr. Morris's law firm and Ms. Pickering should not represent Caesars in this case. Mr. Morris stated that notwithstanding Mr. Heller's call (the day before), he was unable to recall anything about their earlier "conversation several weeks or months ago" which justified Mr. Heller's request that Mr. Morris and his firm not represent Caesars in the lawsuit. Mr. Morris further stated that he had only the faintest recollection of the conversation, that he recalled that Mr. Heller stated that he represented Chinois at the Forum Shops in some form of dispute with another tenant or subtenant involving a nightclub. Mr. Morris also stated that he recalled telling Mr. Heller that Simon is the lessor of the Forum Shops and would be a difficult party to litigate against. Mr. Morris also recalled that he told Mr. Heller that Simon leases the ground for the Forum Shops from Caesars and that his law firm represents Harrah's which owns Caesars.

Mr. Morris's letter further stated that he did not recall the context in which the remarks were made, but he probably said "we would not represent tenants at the Forum shops because of the relationship between the Forum and Caesar's." *Motion (#70), Exhibit "A."* Mr. Morris stated that he either recommended attorney Stan Hunterton, or confirmed another lawyer's recommendation of Mr. Hunterton to Mr. Heller as local counsel, and that they also discussed attorney Harold Gewerter. Mr. Morris indicated that he did not recall what he said about Mr. Gewerter, although he believed it would have involved his assessment of Mr. Gewerter's skills and experience based on Mr. Morris's knowledge of him. *Id.* Mr. Morris closed his letter by stating:

> That's about all I can recall. I took no notes when we spoke, and I did not make a record that we had spoken. I did not speak to anyone in the firm about our call, not even Kris. Frankly, I put the call completely out of mind and did not recall it from the message you left with my secretary yesterday to return your call, which, of course, I did. Until you told me yesterday that we had spoken some time ago, I did not associate you with litigation here. I did not speak with anyone in the firm about your earlier call, and I was, until you mentioned it yesterday, unaware that you have anything to do with the lawsuit in which Kris represents Caesar's. I am not familiar with the case or involved in it in any respect.
>
> For these reasons, I do not believe you have a basis to ask that the firm discontinue representing Caesar's in the case in which you and Stan are

> involved. I regret that our brief conversation last year which apparently resulted in you retaining Stan prompts you to believe otherwise.

*Motion (#70), Exhibit "A."*

Mr. Heller responded to Mr. Morris's email letter as follows:

> I [A?]good deal more about the Chinois dispute was discussed than you recall.
> However, in light of your very limited recollection of what was discussed, and the fact that you are not personally involved in the case, I see no problem with your partner's continued participation in the litigation.
> BTW, Stan Hunterton was recommended by a close friend and colleague in Los Angeles, but you recall correctly making some very favorable comments to me about Stan (all of which have proven to be true).
> My Partner Jerry Fagelbaum sends his warm regards.
> Hope we get to work together on the same side next time.

*Motion (#70), Exhibit "A."*

In response to Mr. Heller's email, attorney Kris Pickering sent the following email to Mr. Heller:

> Thank you,
>
> In the interest of full disclosure, you should also know that Steve and I are married.
>
> I can confirm, though, that he never discussed his conversation with me and, further, that I will keep this work separate from him.

*Id.*

Mr. Heller then responded to Ms. Pickering as follows:

> I really appreciate the clarification and your assurance. It was unnecessary but very kind of you to write. Caesars is very fortunate to have you in their corner.

*Id.*

In his Declaration in support of Plaintiff's motion to disqualify, Mr. Heller states that based upon the assurances in Mr. Morris's February 14 email response that "he had erected the equivalent to an ethical wall around himself and would have no involvement in the case, Chinois did not press its objections to Kris Pickering and MP&P representing Caesars in this case." *Heller Declaration,* ¶ 8.

Following these communications, the litigation proceeded. Co-Defendants Forum Shops, LLC, et. al., filed a motion to dismiss on March 17, 2008. The Caesar Defendants, through Ms. Pickering,

filed their motion to dismiss on July 1, 2008. Various extensions to file reply briefs and other briefs were thereafter granted and the hearing on the motions to dismiss was continued to December 2, 2008. In the meantime, Ms. Pickering ran for and was elected to the Nevada Supreme Court on November 4, 2008. As a result, she was required to withdraw from her law practice before her swearing in on January 5, 2009. Other counsel were apparently unavailable for the December 2, 2008 hearing on the motions to dismiss. Ms. Pickering attempted to get the motion rescheduled prior to her departure from the law firm but was unable to do so. During December, Ms. Pickering indicated that Mr. Morris would be taking over Defendant Caesars' defense. In response to that information, Plaintiff's counsel sent a letter to Ms. Pickering on December 23, 2008 objecting to Mr. Morris now becoming involved as counsel for Caesars. *Motion (#70), Exhibit "C."* Ms. Pickering responded that Mr. Morris's communication with Mr. Heller prior to the lawsuit did not disqualify him or the firm from continuing to represent Caesars. Ms. Pickering also suggested that Plaintiff had waived its objections to Mr. Morris or his law firm representing Caesars in the case. Plaintiff thereupon filed its instant Motion to Disqualify (#70).

In his Declaration in support of Defendant Caesars' Opposition to the Motion to Disqualify (#78), Mr. Morris indicated that his conversation with Mr. Heller occurred "sometime in or about October 2007." He described it as "brief, but cordial." *Morris Declaration (#78)*, ¶ 2. He states that Mr. Heller told him that he represented Chinois and that he was looking for local counsel. Mr. Morris also states that Mr. Heller indicated that he was considering other Las Vegas counsel besides Mr. Morris. *Id.* ¶ 3. Mr. Heller told him that the Simon parties had sued Chinois in Delaware and he was thinking of filing a lawsuit on Chinois's behalf against Simon in Las Vegas. *Id.* ¶ 4. Mr. Heller asked him about his experience with the local courts, his assessment of the calendars and the quality of the judiciary in the state and federal court. Mr. Morris states that he responded to these inquiries and provided his opinions. Mr. Morris denies, however, that Mr. Heller informed him that the Delaware action was limited to declaratory relief or that the proposed Nevada action would involve eight causes of action. *Id.* ¶ 5. While he and Mr. Heller did discuss Mr. Morris's prior litigation experience with the Simon parties, and Mr. Morris told him that they would be formidable opponents, Mr. Morris denies that they discussed "litigation strategy," possible defendants beyond the Simon entities, or the prospects

5

for settlement. *Id.* ¶ 6.

Mr. Morris believes that he remarked during the conversation that Caesars was the ground lessor for the Forum Shops and that his law firm represents Harrah's, the owner of Caesars. Mr. Morris states: "It is in this context I believe Mr. Heller, for the first and only time, suggested that Caesars might be drawn into the litigation being contemplated for a reason he did not express." *Id.* At that point, Mr. Morris states that he advised Mr. Heller that he could not represent tenants at the Forum because of the relationship between Forum and Caesars. *Id.* According to Mr. Morris, they then discussed other potential local counsel, including Mr. Hunterton or Mr. Gewerter and the conversation concluded. *Id.* ¶¶ 7-8.

Defendant has also provided a declaration of Michael Kostrinsky, the Chief Litigation Officer of Harrah's Operating Company, who states that he contacted Ms. Pickering in late January 2008 and requested that she represent Caesars in this lawsuit. *Kostrinsky Declaration (#78)*, ¶ 3. Ms. Pickering thereafter handled the case until after she was elected to the Nevada Supreme Court. Following her election, Mr. Kostrinsky requested that the case be transferred to Mr. Morris. Mr. Kostrinsky notes that Mr. Morris and Ms. Pickering have represented Caesars and/or its parent, Harrah's, in many matters for the ten years he has been the Chief Litigation Officer. Mr. Kostrinsky states that he was not aware of Mr. Morris's communication with Mr. Heller in October 2007 until the motion for disqualification was filed.

In his Supplemental Declaration (#80), Mr. Heller disputes the assertions made by Mr. Morris in his affidavit as follows: (1) The conversation between he and Mr. Morris occurred shortly before Plaintiff consulted with attorney Hunterton in December 2007; (2) Mr. Heller told Mr. Morris that the Simon entities were the operators and lessors of the Forum Shops of which Chinois was a tenant -- Mr. Morris did not communicate that information to him; (3) Mr. Heller advised Mr. Morris of Chinois intention to file a more comprehensive lawsuit in Nevada than the declaratory relief action that Simon filed in Delaware. This included naming additional defendants, including Caesars; (4) Mr. Heller discussed the eight causes of action that Chinois planned to allege in its Nevada action and he specifically raised with Mr. Morris how adding Caesars as a defendant could affect the prosecution of the case and the prospects for settlement; (5) Mr. Morris was equivocal as to whether Caesars'

6

involvement as a defendant in the action would prevent him from handling the representation. Mr. Heller inferred that Mr. Morris might obtain a waiver of the conflict; and (6) Mr. Heller discussed his thoughts on litigation strategy and settlement especially in light of Caesars potentially being added as a defendant, and Mr. Morris gave his views on these subjects, and legal advice regarding venue, possible claims, counsel and judges. *Heller Supplemental Declaration (#80)*, ¶3.

## DISCUSSION

Plaintiff argues that an implied attorney-client relationship arose between Chinois and Mr. Morris as a result of the confidential information and advice that Mr. Heller and Mr. Morris exchanged during their pre-lawsuit telephone conversation. Although Plaintiff waived its objection to Ms. Pickering and the Morris Pickering & Peterson law firm representing Caesars in February 2008, Plaintiff argues that the waiver was based on the representations that Mr. Morris would have no involvement in the case. Now that Defendant Caesars intends to have Mr. Morris defend the case, Plaintiff argues that the waiver of objection no longer applies and Mr. Morris and his law firm should be disqualified.

LR IA 10-7(a) of the Local Rules of Practice for this District provides that an attorney admitted to practice in this District shall adhere to the standards of conduct prescribed in the Model Rules of Professional Conduct as adopted and amended from time to time by the Supreme Court of Nevada, except as such may be modified by this court. Thus, the Nevada Rules of Professional Conduct generally govern the issue of attorney disqualification. *See In re County of Los Angeles,* 223 F. 3d 990, 995 (9th Cir. 2000); *United States v. Walker River Irrigation Dist.*, Not Reported in F.Supp.2d, 2006 WL 618823 (D. Nev. 2006); *In-N-Out Burger v. In & Out Tire & Auto, Inc.*, 2008 WL 2937294 *2 (D.Nev. 2008).

In *United States v. Walker River Irrigation Dist.,* the court recited the standards applied by federal courts in considering attorney disqualification motions. The court states:

> Disqualification is a "drastic measure which courts should hesitate to impose except when absolutely necessary[,]" *Freeman v. Chicago Musical Instrument Co.,* 689 F.2d 715, 721-22 (7th Cir.1982), because it takes away one party's ability to chose his own representation, and it is often a tactic used to create delay or harassment, *Miller v. Alagna,* 138 F.Supp.2d 1252, 1258-59 (C.D.Cal.2000). Motions to disqualify are therefore subject to strict judicial scrutiny, *Optyl Eyewear Fashion Intern.*

7

*Corp. v. Style Companies, Ltd.,* 760 F.2d 1045, 1050 (9th Cir.1985), and courts have wide discretion in their rulings to further the interests of fairness to all parties, *Int'l Bus. Mach. Corp. v. Levin,* 579 F.2d 271, 279 (3d Cir.1978).

Close cases, however, are resolved in favor of disqualification. *In-N-Out Burger v. In & Out Tire & Auto, Inc.*, 2008 WL 2937294 at *2 (D.Nev. 2008), citing *Palmer v. Pioneer Ins. Assocs.*, 19 F.Supp.2d 1157, 1162 (D.Nev. 1998). *See also Nevada Yellow Cab Corp. v. Eighth Judicial Dist. Court*, 123 Nev. 44, 152 P.3d 737, 743 (2007).

Rule 1.9(a) of the Nevada Rules of Professional Conduct provides that a lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which the person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing. The party seeking disqualification must establish three elements under Rule 1.9(a): (1) that it had an attorney-client relationship with the lawyer, (2) that the former matter and the current matter are substantially related, and (3) that the current representation is adverse to the party seeking disqualification. *Nevada Yellow Cab Corp., supra*, 152 P.3d at 741. If these three elements are established then the court will presume that the attorney received confidential information during the representation of the former client that will be harmful to its interests. *North American Deed Co., Inc. v. Joseph*, 334 B.R. 443, 451 (Bk. D.Nev 2005). This presumption is irrebuttable. *Id.*

There is no question that Mr. Heller communicated with Mr. Morris about representing Chinois in the lawsuit it was planning to file in Nevada and that Mr. Morris's partner, Ms. Pickering, and their law firm were subsequently retained to represent the Defendant Caesars in that action. The disputed issue is whether an implied attorney-client relationship was formed during the telephone conversation between Mr. Morris and Mr. Heller, or alternatively, whether Mr. Morris received confidential information from Mr. Heller that disqualifies him from representing Defendant Caesars in this action.

Rule 1.18 of Nevada Rules of Professional Conduct governs in regard to consultations between an attorney and a prospective client. Subsection (a) of the rule provides that a person who discusses with a lawyer the possibility of forming a client-lawyer relationship with respect to a matter is a prospective client. Subsection (b) provides that even when no client-attorney relationship ensues, a

lawyer who has had discussions with a prospective client shall not use or reveal information learned in the consultation except as Rule 1.19 would permit with respect to information of a former client. Subsection (c) further states:

> A lawyer subject to paragraph (b) shall not represent a client with interests materially adverse to those of a prospective client in the same or a substantially related matter if the lawyer received information from the prospective client that could be significantly harmful to that person in the matter, except as provided in paragraph (d).

Under paragraph (d), representation is permissible even when the lawyer has received disqualifying information, if (1) both the affected client and the prospective client have given informed consent confirmed in writing, or (2) the lawyer who received the information took reasonable measures to avoid exposure to more disqualifying information than was reasonably necessary to determine whether to represent the prospective client and the disqualified lawyer is timely screened from any participation in the matter and is apportioned no part of the fee therefrom. Written notice must also be promptly given to the prospective client.

Prior to the adoption of ABA Model Rule 1.18, courts evaluated disqualification motions involving an attorney's preliminary discussions with a prospective client in regard to whether an implied attorney-client relationship arose. *Polyagro Plastics, Inc. v. Cincinnati Milacron, Inc.*, 903 F.Supp. 253, 256 (D. Puerto Rico 1999), states in this regard:

> A party does not need to produce a formal contract or fee payment to establish an attorney-client relationship. *Westinghouse Elec. Corp. v. Kerr-McGee*, 580 F.2d 1311, 1319 (7th Cir.), *cert. denied,* 439 U.S. 955, 99 S.Ct. 353, 58 L.Ed.2d 346 (1978). A fiduciary relationship in which client confidences must be protected may arise from a "preliminary consultation by a prospective client with a view to retention of a lawyer, although actual employment does not result." *Id.* Accordingly, a party may establish an implied attorney-client relationship if (i) the party submitted confidential information to the attorney, and (ii) the party did so with the reasonable belief that his lawyer was acting as the party's attorney. *Nelson*, 823 F.Supp. at 1445; *Nemours Fdtn.*, 632 F.Supp. at 423-24.[1]

. . .

---

[1] *Nelson v. Green Builders, Inc.*, 823 F.Supp. 1439, 1445 (E.D. Wis. 1993); and *Nemours Fdtn. v. Gilbane, Aetna, Federal Ins. Co.*, 632 F.Supp. 418, 423-24 (D. Del. 1986).

As *People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.*, 980 P.2d 371, 380 (Cal. 1999) states, "[t]he primary concern is whether and to what extent the attorney acquired confidential information. (citation omitted). That question is not necessarily answered by the amount of time involved. 'Even the briefest conversation between a lawyer and a client can result in the disclosure of confidences.' (*Novo Trapeutisk etc. v. Baxter Travenol Lab.*, (7th Cir. 1979) 607 F.2d 186, 195)."

In contrast to cases in which there was an explicit attorney-client relationship which gives rise to a presumption that confidences were divulged, the question of whether confidential information passed between the prospective client and the attorney is crucial in determining whether an implied attorney-client relationship existed, and therefore must be proved rather than assumed. *Polyagro,* 903 F.Supp. at 257. *See also Guerrero v. Bluebeard's Castle Hotel, Inc.*, 982 F.Supp.343, 347 (D. Virgin Islands 1997) ("[a]n implied attorney-client relationship arises, however, only if confidential information **is in fact** transmitted from the prospective client to the lawyer . . ." (emphasis in original)); *Laryngeal Mask Company Ltd. v. Ambu A/S*, 2008 WL 558561 *4 (S.D.Cal. 2008) (the party seeking disqualification must show that the meeting went beyond "initial or peripheral contacts" and involved the disclosure of some confidential information).

The court in *Polyagro* also stated that the "definition of 'confidential information' for purposes of a disqualification motion is information that if revealed could put the plaintiff at a disadvantage or the other party at an advantage." *Id.* at 258. Rule 1.18(c) similarly provides that in order for disqualification to apply, the lawyer must have "received information from a prospective client that could be significantly harmful to that person in the matter." In *ADP, Inc. v. PMJ Enterprises, LLC*, 2007 WL 836658 *5 (D.N.J. 2008), the court stated that under Rule 1.18(c) "the moving party must proffer compelling evidence that significantly harmful information was disclosed." This is probably an overly strict interpretation of the rule. In *Sturdivant v. Sturdivant*, 241 S.W.3d 740 (Ark 2006), the court affirmed an order disqualifying a lawyer in a child custody case pursuant to Rule 1.18. The court stated:

> As to whether May received information that "could be significantly harmful" to Timothy, we agree with the circuit court that a lawyer who consults with a prospective client about a change-of-custody proceeding

10

>    will necessarily become privy to information that could be used to the
>    disadvantage of that person in the same proceeding. Similarly, the circuit
>    court could reasonably conclude that a prospective client would not know
>    whether the information disclosed during the consultation "could be
>    significantly harmful."

*Sturdivant*, 241 S.W.3d at 747.

As *Sturdivant* indicates, a court may be more likely to infer that potentially harmful confidential information was disclosed where the consultation was with a lay person who may not fully appreciate the significance of the disclosures. This factor can cut the other way, however, where attorneys engaged in substantive, detailed discussions about a case. In *People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.*, for example, the consultation included a one to two hour meeting between the lawyers during which the case was discussed in substantial detail. The consulted attorney also performed some preliminary research on issues that were discussed during the meeting. The court found that confidential information was exchanged and that disqualification was proper. In *Laryngeal Mask Company Ltd. v. Ambu A/S*, the plaintiff's in-house counsel engaged in a one-hour consultation with two attorneys whom they were considering retaining in a patent infringement lawsuit. Although there was a dispute whether confidential information and advice was disclosed and rendered during the meeting, the court concluded that the moving party met its burden for disqualification:

>    [T]he Court finds that the undisputed facts strongly indicate that an
>    implied attorney-client relationship was formed. The November meeting
>    was conducted in private with the client representatives, both of whom
>    were lawyers, and the Finnegan lawyers at their office. The stated
>    purpose of the meeting was to determine if Finnegan was interested in
>    and qualified to represent Plaintiffs in anticipated patent litigation against
>    Ambu. All participants were knowledgeable, not only about the subject
>    matter of the patent law, but also about the ethical duties of the legal
>    profession. The prospective client brought documents and sample
>    products to explain the case to the lawyers. Though most of these
>    materials were publicly available (*e.g.*, the prosecution of the patent and
>    the two devices), Plaintiffs did bring some confidential notes with them
>    *i.e.* Marzen brought notes from his meeting with the board of directors.
>    Finally, it is not disputed that Plaintiff sought in good faith to retain
>    Finnegan.

*Laryngeal* at *4.

In deciding whether disqualification is required, the courts also consider whether information discussed during the consultation was later publicly disclosed before the lawyer or law firm was retained. In *Polyagro*, the plaintiff's attorney testified that he informed the attorney about the facts of

the case regarding equipment that did not function properly, including the opinions of one of plaintiff's experts. Plaintiff's counsel also told the attorney that the matter was putting financial pressure on the plaintiff and there was a sense of urgency in moving the case along. He also informed the attorney of the various legal theories that he was planning to pursue and that plaintiff had discovered that it had been sold a prototype machine which was contrary to the defendant's representations. Plaintiff's counsel also discussed damages theories. The defendant's attorney testified that the discussion was much more general and did not involve specific information about the alleged defects in the machinery. In holding that plaintiff's counsel did not communicate confidential information, the court found that most of the topics were discussed in more detail in plaintiff's complaint which was filed before the attorney was retained as local counsel by the defendant. In holding that plaintiff did not meet its burden to justify disqualification of defendant's counsel, the court also stated:

> ... [E]veryone is entitled to the judicial process being one of integrity. Because the information passed by Ginsberg to Cespedes was less specific than that information contained in the complaint, which was filed prior to the representation of defendants by Cespedes' law firm, there has been no damage to the integrity of this process. Defendants could not have discovered any information from Cespedes that was not available upon the filing of this action.

*Polyagro*, 903 F.Supp. at 259.

In *ADP, Inc. v. PMJ Enterprises, LLC*, the court also held that most of the information discussed in the meeting was not confidential or harmful and was disclosed in the plaintiff's complaint. This included the causes of action alleged by plaintiff. The court also held that much of the information that plaintiff's counsel allegedly disclosed regarding his client's settlement position was not confidential or significantly harmful. As to confidential settlement information that would have been significantly harmful, the court held that plaintiff had not met his burden to show that the information was, in fact, disclosed during the meeting.

In this case, Mr. Heller and Mr. Morris disagree about several matters concerning their telephone conversation. First, they have different recollections as to when the conversation occurred. While Mr. Morris recalls the telephone call as "brief," Mr. Heller indicates that it lasted up to twenty minutes. While both attorneys agree that the purpose of the call was to see whether Mr. Morris could serve as local counsel, Mr. Morris states that he understood that he was only one of the lawyers that

Plaintiff was considering retaining. Mr. Heller states, however, that his intention was to retain Mr. Morris as local counsel if he was available and willing. Both attorneys agree that they discussed the fact that Chinois had been sued in Delaware and that it intended to sue Simon in Nevada. They both agree that they discussed whether the suit should be filed in state or federal court and they discussed the local judiciary and Mr. Morris gave advice on those matters. Although Mr. Heller states that he discussed the eight causes of action to be alleged in Plaintiff's complaint, Mr. Morris recalls no such discussion. Nor does he recall any discussion about "litigation strategy" in regard to the particulars of the case or discussions regarding Plaintiff's settlement position. Mr. Morris, however, recalls that he told Mr. Heller that the Simon entities would be a difficult opponent. Mr. Heller, however, states that they also discussed the effect that naming Caesars as a defendant would have on Chinois's settlement position.

As indicated above, Plaintiff has the burden of showing that confidential information was disclosed to Mr. Morris that could be significantly harmful to Plaintiff in this lawsuit. Given the participants' disputed versions of what was discussed, the Court considers other relevant facts and circumstances which either tend to support or undermine the parties' positions. First, while the length of the conversation is not determinative, the telephone conversation between Mr. Heller and Mr. Morris lasted no more than 20 minutes according to Mr. Heller, and was arguably much briefer according to Mr. Morris. This was not a planned face-to-face meeting to discuss representation such as occurred in *SpeeDee Oil* or *Laryngeal Mask* in which it is more likely that confidential information will be disclosed. Mr. Morris was not provided with documents, confidential or otherwise, to review.

It also appears that the conversation involved fairly general matters such as Mr. Morris's evaluation of the local courts, judges and other attorneys who might serve as local counsel.[2] While Mr. Heller and Mr. Morris dispute the extent to which the specific claims in the lawsuit were discussed, the

---

[2] It appears that Mr. Morris engaged in discussions with Mr. Heller about the planned lawsuit and related matters before he determined whether he might have a conflict of interest in representing Plaintiff. Comment 4 to Rule 1.18 states that in order to avoid acquiring disqualifying information, the lawyer should limit the initial interview to only such information as appears reasonably necessary for that purpose.

13

claims were subsequently publicly disclosed in the filed complaint. Other than generalities, Plaintiff has not indicated what if any additional information was conveyed about the eight causes of action that would be harmful to Plaintiff if Mr. Morris represented Defendant Caesars. *See Polyagro* and *ADP, supra.* Plaintiff has also failed to show that specific confidential information about its settlement position was disclosed to Mr. Morris that could be harmful to its position in this case.

The circumstances regarding Caesars' subsequent retention of Ms. Pickering and the communications that occurred between counsel in February 2008 are also relevant in assessing whether confidential information was disclosed to Mr. Morris. Contrary to Plaintiff's suggestion, it does not appear that Ms. Pickering or Caesars attempted to construct an ethical barrier concerning Mr. Morris based on their knowledge that he had obtained confidential information during his telephone conversation with Mr. Heller. Instead, it appears that Caesars and Ms. Pickering were unaware of Mr. Morris's telephone conversation with Mr. Heller at the time she was retained to defend the action. It also appears that Mr. Morris was unaware that Caesars had retained Ms. Pickering or his law firm prior to his phone call with Mr. Heller on February 13, 2008. In response to Mr. Heller's phone call, Mr. Morris and Ms. Pickering informed Mr. Heller that Mr. Morris was not involved in the case and had not discussed the telephone conversation with Ms. Pickering or other members of the law firm. They also indicated that Mr. Morris would have no future involvement in the case. This appears to have been a reasonable resolution of the issue at the time since Ms. Pickering was handling the case. It does not, however, constitute an implied admission that Mr. Morris actually received confidential information from Mr. Heller.

Mr. Heller's response to Mr. Morris's and Ms. Pickering's February 14, 2008 emails, however, casts some doubt on his assertion that he and Mr. Morris discussed confidential information that could be significantly harmful to Chinois if Mr. Morris or his law firm represented Caesars. In response to Mr. Morris's email letter, Mr. Heller stated that a "good deal more about the Chinois dispute was discussed than you recall." However, he accepted Mr. Morris's representation that he had little recollection of their conversation. Perhaps more tellingly, even after being informed that Ms. Pickering is not only Mr. Morris's law partner, but also his spouse, Mr. Heller did not express any concern about her handling Caesars' defense. Regardless of Ms. Pickering's and Mr. Morris's assurances that they

14

1 would not discuss the case with each other, it seems doubtful that Mr. Heller would have so readily
2 agreed to Ms. Pickering's continued representation if he had, in fact, disclosed significant confidential
3 information to her partner/husband Mr. Morris.

4       The Court also concludes that whatever confidential information, if any, may have been
5 disclosed during the conversation between Mr. Morris and Mr. Heller, it was substantially rendered
6 moot by Plaintiff's agreement that Ms. Pickering could defend Caesars in the lawsuit. In this regard,
7 Plaintiff's counsel argued that Plaintiff has been prejudiced because Mr. Heller and Mr. Morris
8 discussed the pros and cons of filing the action in state or federal court. Plaintiff notes that Caesars
9 thereafter removed the action to federal court --- the implication being that it may have done so with
10 knowledge of Plaintiff's forum preferences. There is, however, no evidence that Mr. Morris discussed
11 this matter with Ms. Pickering or other members of the firm. In addition, Mr. Heller was aware that the
12 case had been removed to federal court at the time he waived Plaintiff's objection to Ms. Pickering
13 handling the case. The Court also does not believe that Mr. Heller's and Mr. Morris's discussion of the
14 local judges, the courts, and other counsel, absent something more specific to the handling of the case
15 itself, is the type of information that could be significantly harmful to Plaintiff in this action. Thus,
16 while Plaintiff did not waive its right to subsequently object to Mr. Morris handling the case, Plaintiff
17 has not demonstrated that any information provided to him in late 2007 could be significantly harmful
18 to its position at this point in the litigation.

## CONCLUSION

20       The Court would not hesitate to disqualify Mr. Morris and his law firm if it was reasonably
21 convinced that confidential information was disclosed to Mr. Morris by Mr. Heller in their 2007
22 conversation that could be significantly harmful to Plaintiff. Plaintiff has not shown, however, that
23 confidential information was communicated to Mr. Morris which would have justified his or his law
24 firm's disqualification in February 2008. The basis for such disqualification is even less apparent one
25 year later. Under these circumstances the competing interests weigh heavily in favor of Defendant
26 Caesars's right to be represented by counsel of its choice. Accordingly,

27 . . .

28 . . .

**IT IS HEREBY ORDERED** that Plaintiff's Motion to Disqualify Attorney Steve Morris and the Law Firm of Morris Peterson (#70) is **denied.**

DATED this 19th day of February, 2009.

_____
GEORGE FOLEY, JR.
United States Magistrate Judge