1   MORRIS PETERSON
    Steve Morris, No. 1543
2   Jean-Paul Hendricks, No. 10079
    900 Bank of America Plaza
3   300 South Fourth Street
    Las Vegas, Nevada 89101
4   Telephone:  (702) 474-9400
    Facsimile:   (702) 474-9422
5

6   Attorneys for Defendants
    Caesars Palace Corp. and
7   Caesars Palace Realty Corp.

8                UNITED STATES DISTRICT COURT
                      DISTRICT OF NEVADA
9

| | |
|---|---|
| 10   PHASE II CHIN, LLC and LOVE & MONEY, LLC, (formerly dba O.P.M.L.V., LLC, | CASE NO. 2:08-cv-162-JCM-GWF |
| 11 | NOTICE OF FILING [CORRECTED] OPPOSITION TO PLAINTIFF PHASE II CHIN, LLC'S MOTION TO DISQUALIFY ATTORNEY STEVE MORRIS AND THE LAW FIRM OF MORRIS PICKERING & PETERSON (NOW MORRIS PETERSON) |
| 12             Plaintiffs, | |
| 13   vs. | |
| 14   FORUM SHOPS, LLC, FORUM DEVELOPERS LIMITED PARTNERSHIP, SIMON PROPERTY GROUP LIMITED PARTNERSHIP, SIMON PROPERTY GROUP, INC., and CAESARS PALACE CORP., and CAESARS PALACE REALTY CORP., | |
| 19            Defendants. | |

20         Defendants Caesars Palace Corp. and Caesars Palace Realty Corp.

21  ("Caesars") hereby give notice of filing its [Corrected] Opposition to Plaintiff Phase

22  II Chin, LLC's Motion to Disqualify Attorney Steve Morris and the Law Firm of

23  Morris Pickering & Peterson (now Morris Peterson).  This corrected version

24  supercedes the Opposition filed yesterday which, because of drafting and editing

25  errors, had several incorrect and incomplete citations and a dropped footnote on

26  page 4.  The erroneous citations have been corrected and footnote 2 added in the

27  [Corrected] Opposition.  No text has been changed, nor has anything substantive

28  been added to the corrected version.   The corrections are:

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

Dockets.Justia.com

| Page | Line: | CORRECTION: |
|------|-------|-------------|
| 1 | Line 25 | Declarations of Steve Morris and Michael Kostrinsky, |
| 2 | Line 17 | Phillip Heller Declaration ¶5 ("Heller Decl.") |
| 3 | Line 5 | Decl. |
| 4 | Line 6 | Morris Decl. ¶2, Heller Decl. ¶¶3-4, |
| 4 | Line 11-12 | Deleted: (Plaintiff Phase II Chin LLC is herein referred to as Chinois). |
| 4 | Line 15 | Deleted: "January 26, 2009" |
| 4 | Line 16 | not |
| 4 | Line 22 | Footnote 2 added |
| 4 | Line 28 | court," Heller Decl. ¶4, |
| 5 | Line 13 | Deleted: "in" |
| 6 | Line 9 | Added space |
| 10 | Line 8 | Ex. 1 hereto. |
| 10 | Line 11 | *U.S. v. Walker River Irrigation District* |
| 10 | Line 19 | court |
| 11 | Line 27 | Ex. 2 hereto. |
| 12 | Line 9 | Polyargo." |
| 16 | Line 3 | Motion at 5, |
| 16 | Line 18 | Heller Decl. ¶5; Motion at 5. |
| Exhibit 4 | | *Laryngeal Mask v. Ambu*, 2008 WL 558561 (S.D. Cal. 2008) |
| Exhibit 5 | | *Leathem v. City of Laprote, Indiana*, 2008 WL 1804150 (N.D. Ind. 2008) |

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

2

EXHIBIT B

1        Please disregard the opposition you received on January 26 and refer

2  to the [Corrected] Opposition being filed with this notice.

3                          MORRIS PETERSON

4

5                    By:

6                          Steve Morris, No. 1543

7                          Jean-Paul Hendricks, No. 10079
                              900 Bank of America Plaza

8                          300 South Fourth Street
                              Las Vegas, Nevada 89101

9                          Attorneys for Defendants

10                       Caesars Palace Corp. and
                          Caesars Palace Realty Corp.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

3

EXHIBIT B

1      CERTIFICATE OF SERVICE

2      Pursuant to Fed. R. Civ. P. 5(b) and Section IV of District of Nevada

3  Electronic Filing Procedures, I certify that I am an employee of Morris Peterson,

4  and that the following documents were served via electronic service: **NOTICE OF**

5  **FILING [CORRECTED] OPPOSITION TO PLAINTIFF PHASE II CHIN, LLC'S**

6  **MOTION TO DISQUALIFY ATTORNEY STEVE MORRIS AND THE LAW**

7  **FIRM OF MORRIS PICKERING & PETERSON (NOW MORRIS PETERSON)**

8  TO:

9  C. Stanley Hunterton                 Samuel S. Lionel
   Pamela R. Lawson                     LIONEL SAWYER & COLLINS
10  HUNTERTON & ASSOCIATES              300 S. Fourth St., #1700
   333 South Sixth Street               Las Vegas, Nevada 89101
11  Las Vegas, Nevada 89101

12                                       Attorneys for Defendants
   Philip Heller                        Forum Shops, LLC, Forum Developers
13  FAGELBAUM & HELLER, LLP             Limited Partnership, Simon Property
   2049 Century Park East, Suite 4250   Group Limited Partnership, and Simon
14  Los Angeles, CA 90067               Property Group, Inc.

15  Attorneys for Plaintiff
   Phase II Chin, LLC                   Harold Gewerter
16                                       GEWERTER LAW OFFICES
                                         5440 W. Sahara Ave. Third Floor
17                                       Las Vegas, Nevada 89146

18                                       Attorneys for Plaintiff
19                                       Love & Money, LLC

20      DATED this 27th day of January, 2009.

21

22      By: [signature]

23

24

25

26

27

28

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

4

EXHIBIT B

1  MORRIS PETERSON
   Steve Morris, No. 1543
2  Jean-Paul Hendricks, No. 10079
3  900 Bank of America Plaza
   300 South Fourth Street
4  Las Vegas, Nevada 89101
   Telephone: (702) 474-9400
5  Facsimile: (702) 474-9422

6  Attorneys for Defendants
   Caesars Palace Corp. and
7  Caesars Palace Realty Corp.

8              UNITED STATES DISTRICT COURT

9                  DISTRICT OF NEVADA

10 PHASE II CHIN, LLC and LOVE &     ) CASE NO. 2:08-cv-162-JCM-GWF
11 MONEY, LLC, (formerly dba         )
   O.P.M.L.V., LLC,                  )
12                                   ) [CORRECTED] OPPOSITION
                   Plaintiffs,       ) TO PLAINTIFF PHASE II
13                                   ) CHIN, LLC'S MOTION TO
   vs.                               ) DISQUALIFY ATTORNEY
14                                   ) STEVE MORRIS AND THE
   FORUM SHOPS, LLC, FORUM           ) LAW FIRM OF MORRIS
15 DEVELOPERS LIMITED                ) PICKERING & PETERSON
   PARTNERSHIP, SIMON PROPERTY       ) (NOW MORRIS PETERSON)
16 GROUP LIMITED PARTNERSHIP,        )
17 SIMON PROPERTY GROUP, INC.,       )
   CAESARS PALACE CORP., and         )
18 CAESARS PALACE REALTY CORP.,      )
19                                   )
                   Defendants.       )
20 _____)

21       Defendants Caesars Palace Corp. and Caesars Palace Realty Corp.

22 ("Caesars") hereby oppose plaintiff Phase II Chin, LLC's ("Chinois") motion to

23 disqualify Steve Morris and the law firm of Morris, Pickering & Peterson (now

24 Morris Peterson). This opposition is based on the following memorandum of

25 points and authorities, the Declarations of Steve Morris and Michael Kostrinsky,

26 and the papers and pleadings on file, including Chinois's motion and the exhibits

27 thereto.

28

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

                                              EXHIBIT B

Index to Exhibits

Declaration of Steve Morris

Declaration of Michael Kostrinsky

Exhibit 1    *In-N-Out Burger v. In & Out Tire & Auto, Inc.,* 2008 WL 2937294, *2
            (D. Nev. 2008)

Exhibit 2    *ADP, Inc. v. PMJ Enterprises,* 207 WL 836658 at 4 (D.N.J., Hedges,
            M.J.)

Exhibit 3    *United States v. Walker River Irrigation, Dist.* 2006 WL 618823 at 8 (D.
            Nev. 2006, McQuaid, M.J.)

Exhibit 4    *Laryngeal Mask v. Ambu,* 2008 WL 558561 (S.D. Cal. 2008)

Exhibit 5    *Leathem v. City of Laprote, Indiana,* 2008 WL 1804150 (N.D. Ind. 2008)

EXHIBIT B

**POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

   This motion to disqualify is based on a single and brief telephone call in October 2007 for which there is neither a record nor an estimate of duration by Chinois counsel. The call did not result in an attorney-client relationship of any nature or duration between Steve Morris or his law firm and Chinois or any person or entity associated with this plaintiff. No documents or pleadings were sent to or received by Morris to obtain legal advice or an opinion from him with respect to litigation then pending in Delaware against Chinois by the Forum Shops or contemplated by Chinois against the Forum Shops and/or Simon Property Group in Las Vegas.

   During the October telephone call, Morris told Heller that Morris Peterson (then Morris Pickering & Peterson) represented Harrah's, Caesars parent, and could not represent Chinois in a dispute in which Caesar's would be an adverse party. Steve Morris Declaration ¶6, attached hereto ("Morris Decl."). Heller describes this bar to representation of Chinois merely as something that "might present a problem." Phillip Heller Declaration ¶5 ("Heller Decl."). In doing so, he omits the fact that during their single conversation Morris recommended Stan Hunterton as a "very capable and experienced litigator," whom Heller was also considering and who might be able to advise and represent Chinois in Las Vegas. Exhibit A to Motion to Disqualify at 2. There was no discussion or communication with Morris thereafter, as Heller implies, in which "it was . . . decided that in order not to place Mr. Morris or Chinois in the middle of a potential conflict Chinois would select other attorneys (Hunterton & Associates) as local counsel." Heller Declaration ¶5, attached to the Motion to Disqualify as page 24. The decision to consult and "select other attorneys" was made when Heller identified Caesars as a potential defendant in the telephone discussion.

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

2

1        Against these facts Chinois claims Heller and Morris discussed,

2  among other things, not merely litigation but "potential causes of action" in

3  Nevada and "eight causes of action for damages and injunctive relief, possible

4  defendants, litigation strategy, [and] prospects for settlement . . . "!, Heller Decl. at

5  24, ¶4, without a scintilla of evidence to confirm these conclusory allegations. Not

6  only is it improbable that such a discussion took place, Chinois has not

7  demonstrated that an attorney-client relationship was established in a ten minute

8  telephone call that would confer "former client" status on Chinois under Nevada

9  Model Rule 1.9 sufficient to support disqualification of Morris and his firm.[1]

10        More to the point, however, Chinois, as a "prospective client" in

11  October 2007, must establish that it disclosed confidential information under

12  Nevada Model Rule 1.18 (Duties to Prospective Client) to qualify it to invoke

13  Model Rule 1.9. Without demonstrating that Phillip Heller disclosed information

14  from Chinois to Morris "that could be significantly harmful to that person in the

15  matter," Model Rule 1.18(c), Rule 1.9 is irrelevant *in this lawsuit*. No such

16  demonstration of disclosure harmful to Chinois is made in the pending motion,

17  nor is Model Rule 1.18 even acknowledged in the motion. This failure of evidence

18  and authority to support disqualification is not overcome by the conclusory

19

20       [1] The motion to disqualify relies largely on the assumption that in
speaking to Morris for several minutes about a contemplated lawsuit in Las
Vegas and whether to file it in state or federal court, Heller necessarily disclosed
significantly harmful confidential information to Morris about this lawsuit. This
assumption distinguishes most of the case authority relied on by Chinois to
invoke Model Rule 1.9, which applies to communications with *former clients* and
depends on evidence of disqualifying confidences disclosed by the client and/or
legal advice given in response thereto. *See, e.g., Trone v. Smith*, 621 F.2d 994, 998
(9th Cir. 1980) (involving Mr. Fagelbaum's prior law firm under several
provisions of the Model Code that are not found in the Model Rules applicable
here. The confidences in question in *Trone* came from admitted former
representation and were shown to be ones that could be used against the firm's
*former client*); *Green v. Montgomery County*, 784 F. Supp. 841, 845 (M.D. Ala. 1992)
(lawyer consulted by former client heard his story and advised client not to sue
and then appeared for the defendant when client went elsewhere for
representation. *Evidence* established that Green was an actual former client and
his belief that he was consulting his former attorney about a new case).

MORRIS PETERSON
ATTORNEYS AT LAW
700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

3

EXHIBIT B

1  declarations of either Phillip Heller or Jerold Fagelbaum, and for this reason the
2  motion to disqualify should be denied.

3  II.    RELEVANT FACTS

4   At some time in or about October 2007, on a date not recorded by
5  either party, Morris Decl. ¶2; Heller Decl. ¶¶3-4, Morris received a telephone call
6  from Heller to discuss a lawsuit he was contemplating against the Forum Shops
7  and the Simon parties on behalf of Chinois, a lessee at the Forum Shops. Morris
8  Decl. ¶2. The content of this single conversation is the issue in this case.

9   Heller said he represented Chinois in some sort of dispute with
10  Simon, Chinois's lessor, or another tenant or subtenant involving a nightclub.
11  Morris Decl. ¶¶2-3. Morris told Heller that Simon was the operator/ground lessor
12  of the Forum Shops. Morris Decl. ¶2. Morris did not make a record or notes of the
13  call or speak to anyone in his law firm about the call. Morris Decl. ¶10(4). He
14  estimates that it was ten to fifteen minutes in duration. *Id.*

15   During the course of this brief but cordial telephone conversation,
16  Morris was asked about and discussed his experience as a litigator in Las Vegas
17  and of his familiarity with the local and state federal district courts and their
18  calendars, Morris Decl. ¶4, which he freely discussed. *Id.* Heller told Morris that
19  Chinois had been sued in Delaware by the Forum Shops/Simon and that Chinois
20  had hired Heller to represent this Las Vegas lessee, and he was considering a
21  counter-suit here against Simon for various reasons. Morris Decl. ¶¶3-4; Heller
22  Decl. ¶4.[2]

23   In the course of their discussion about the "pros and cons of state
24  versus federal court," Heller Decl. ¶4, Heller mentioned Caesars as a possible
25  additional defendant in the action he was considering, and Morris informed him

26

27   [2] It is incredible that Heller could have discussed "eight causes of action"
with Morris in October 2007. Heller Decl. ¶4. That discussion must have
28  occurred with Stan Hunterton, who filed Chinois's 8-count complaint in January
2008, three months after Heller spoke to Morris.

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

4

EXHIBIT B

1  that Caesars/Harrah's were clients of his firm and recommended he speak to
2  another Las Vegas attorney about acting as local counsel, in particular Stan
3  Hunterton and Harold Gewerter. Morris Decl. ¶¶6, 7; Heller Decl. ¶5. The call
4  then concluded. Morris Decl. ¶8.

5       In January 2008, Chinois sued the defendants in this lawsuit,
6  including Caesars, with Stan Hunterton as local counsel. Caesars requested
7  Kristina Pickering to represent it in the lawsuit, and she removed the case to this
8  Court. Michael Kostrinsky Declaration ¶3 ("Kostrinsky Decl."), attached hereto;
9  Morris Decl. ¶8. Heller thereafter called Morris to complain of the firm's
10  representation of Caesars. Morris Decl. ¶8; Ex. A to Motion to Disqualify. Morris
11  told Heller he had no knowledge of the lawsuit and had very little recollection of
12  their telephone conversation the preceding October and no record of it. Morris
13  Decl. ¶8; Ex. A, at 2-3, email 2/14/08 Morris to Heller.

14       This was the last contact between Morris and Heller. When
15  Ms. Pickering was elected to the Nevada Supreme Court, she began transferring
16  her pending cases to others in December. Caesars requested that this case be
17  transferred to Morris. Kostrinsky Decl. ¶4. Ms. Pickering so informed
18  Mr. Fagelbaum and Mr. Heller and other counsel in the case on December 19. On
19  December 23, Heller objected to Morris replacing Pickering. Exs. G and C to
20  Motion to Disqualify. This motion to disqualify was filed on January 5, 2009.

21       Morris Peterson has consistently maintained that no disabling
22  confidential information was received by Morris during his call with Heller in
23  October 2007. Morris Decl. ¶9. The record, such as it is, does not support that in
24  speaking to Heller 15 months ago for 10 to 15 minutes, Morris was acting as
25  Chinois's attorney and delivering legal advice to this litigant through Heller.

26
27
28

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

5

EXHIBIT B

III.    STANDARD OF REVIEW FOR THIS MOTION

Federal courts apply state law in determining whether attorney disqualification is warranted. *In-N-Out Burger v. In & Out Tire & Auto, Inc.*, 2008 WL 2937294 at *2 (D. Nev. 2008), *citing In re County of Los Angeles*, 223 F.3d 990, 995 (9th Cir. 2000) ("because we apply state law in determining matters of disqualification, we must follow the reasoned view of the state supreme court when it has spoken on the issue."). Exhibit 1 hereto. Therefore Nevada Rules of Professional Conduct ("NRPC") are directly applicable to this case. *See also* Local Rule IA 10-7(a) ("Model Rules of Prof. Conduct, as adopted and amended . . . by the Supreme Court of Nevada" govern lawyers practicing in this federal District Court).

Counsel for Chinois correctly points out that NRPC 1.9(a) says "A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing." Rule 1.9, however, is inapplicable in this case *unless* Chinois was formerly Morris Pickering's client, which it was not. Chinois was merely a "prospective client" when Morris and Heller spoke in October 2007. Thus NRPC 1.18 (Duties to Prospective Clients) governs the application of NRPC 1.9 in respect this proceeding. Rule 1.18(c) requires the party moving for disqualification to demonstrate that the target lawyer (Morris) received "information from the prospective client that could be significantly harmful to that person in the matter."

The receipt by Morris of such disqualifying information is not presumed, nor has the receipt of such information been shown or otherwise established by Phillip Heller's conclusory declaration. Motions to disqualify are not favored: "To overcome the court's disfavor of motions to disqualify, the moving part must proffer compelling evidence that significantly harmful

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

6

EXHIBIT B

1    information was disclosed. *ADP, Inc. v. PMJ Enterprises*, 207 WL 836658 at *5

2    (D.N.J., Hedges, M.J.) (depositions that elicited testimony that a lawyer disclosed

3    "specific background information" in a conversation that the target lawyer "had

4    difficulty recalling," including settlement discussions and claims the lawyer *did*

5    recall, did not establish receipt of "significantly harmful" under Mode Rule 1.18(c).

6    *Id.* at *1, 5). Exhibit 2 hereto.

7         "In addressing a motion to disqualify, the threshold question is

8    whether there existed an attorney-client relationship that subjects a lawyer to the

9    ethical obligation of preserving confidential communications." *Nelson v. Green*

10   *Builders*, 823 F.Supp. 1439, 1445 (E.D. Wisc. 1993) *(citing Westinghouse Elec. Corp. v.*

11   *Kerr McGee Corp.*, 580 F.2d 1311 (7th Cir. 1978)). To determine whether Morris is

12   Chinois's former attorney, it is first necessary to determine if he "formerly

13   represented" Chinois as a consequence of the October call between Morris and

14   Heller. The fact that one lawyer who represents a client speaks to another lawyer

15   about the client's affairs does not make the second lawyer co-counsel with the first.

16        "The burden of establishing an attorney-client relationship rests on

17   the claimant of the privilege . . . ." *United States v. Gartner*, 474 F.2d 297, 298 (9th

18   Cir. 1973). Here, there is no agreement to establish that Morris was Chinois's

19   attorney for any reason at any time, nor do the declarations of Heller and

20   Fagelbaum say that there was. They do not say, either, that they or Chinois

21   believed Morris was acting as counsel to Chinois when Heller spoke to him.

22        Courts also consider that "opposing one party's interest in preserving

23   confidential communications is another party's interest in being represented by the

24   counsel of his choice." *Nelson v. Green Builders*, 823 F.Supp. 1439, 1445 (E.D. Wisc.

25   1993) *citing Schiessle v. Stephens*, 717 F.2d 417, 420 (7th Cir. 1993). Kostrinsky Decl.

26   ¶5. Moreover, "motions to disqualify counsel . . . should be resolved with extreme

27   caution because they may be used abusively as a litigation tactic, when, for

28   example, a movant is facing a formidable opponent." *Nelson v. Green Builders*, 823

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

7

EXHIBIT B

1  F.Supp. 1439, 1444 (E.D. Wisc. 1993) (citing Freeman v. Chicago Musical Instrument

2  Co., 689 F.2d 715, 721 (7th Cir. 1982)). "Because of the potential for abuse,

3  disqualification motions should be subjected to "particularly strict scrutiny." Optyl

4  Eyewear Fashion Int'l Corp. v. Style Co., LTD., 760 F.2d 1045, 1050 (9th Cir. 1985); see

5  ADP, Inc. v. PMJ Enterprises, 2007 WL836658 (D.N.J.). This means a party's right to

6  counsel of its choice must be balanced against another party's right to disqualify

7  that counsel because of contact with the moving party. Polyargo Plastics, Inc., v.

8  Cincinnnati Milacron, Inc., 903 F. Supp. 253, 258 (D. P.R. 1995)(citing Kevlik v.

9  Goldstein, 724 F.2d 844, 850 (1st Cir. 1984)).   Disqualification is not accomplished

10  merely by requesting it.

11  **IV.   NO ATTORNEY-CLIENT RELATIONSHIP WAS CREATED BETWEEN**

12  **MORRIS PETERSON AND CHINIOS**

13    A. *Morris Did Not Receive Confidential Information from Chinois that Chinois Did Not Publish by Filing This Lawsuit.*

14     The unspecified information alleged in the Motion to Disqualify does

15  not rise to the level of confidential client information that warrants denying

16  Caesars its counsel of choice. From the description of the information Chinios

17  alleges as confidential, most if not all of it has been disclosed in the complaint that

18  was filed on January 8, 2008. Information that is public cannot be, by definition,

19  confidential, much less can public information – such as facts alleged, claims made

20  in a complaint – be "significantly harmful" to Chinois if also "disclosed" by Morris

21  or any member of Morris Peterson.

22     1. *No Confidential Client Information Was Disclosed*

23     In addition to Model Rule 1.18, courts say that " 'confidential

24  information' for the purposes of a disqualification motion is information that if

25  revealed could put the plaintiff at a disadvantage or the other party at an

26  advantage." *Polyargo Plastics, Inc., v. Cincinnati Milacron, Inc.*, 903 F. Supp. 253, 258

27  (D. P.R. 1995). What could that be here? Chinois has not established that Morris

28  Peterson obtained any confidential fact from Chinois that could put Caesars at an

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

8

EXHIBIT B

1  advantage in this lawsuit or disadvantage Chinois. To confirm this conclusion,

2  "the court should . . . undertake a realistic appraisal of whether confidences might

3  have been disclosed in the prior matter that will be harmful to the client in the

4  later matter." *Robbins v. Gillock*, 109 Nev. at 1018, 862 P.2d at 1197 (1993).

5        When undertaking this appraisal, the Court should consider that

6  "unless there is evidence to the contrary . . . [it] must assume that an attorney will

7  observe his responsibilities to the legal system, as well as to his client." *United*

8  *States v. Walker River Irrigation, Dist.* 2006 WL 618823 at *5 (D. Nev. 2006, McQuaid,

9  M.J.) (*citing Geders v. United States*, 425 U.S. 80, 93 (1976)(internal quotations

10  omitted). Exhibit 3 hereto. This Court and others also say, that in assessing

11  disqualification for conflict of interests that "a party is presumptively entitled to

12  the counsel of his choice, [and] that right may be overridden only if compelling

13  reasons exist." *In re BellSouth Corp.*, 334 F.3d 941, 961 (11th Cir. 2003) (internal

14  quotations omitted); *accord, United States v. Walker River Irrigation Dist.*, 2006 WL

15  618823 at *3 (D. Nev.) ("disqualification is a 'drastic measure which courts should

16  hesitate to impose except when absolutely necessary' ").

17        It is not "absolutely necessary" to disqualify Morris Peterson and/or

18  Morris for Morris speaking to Heller in October 2007 for a few minutes about

19  litigation for Chinois in Las Vegas until Morris elicited a potential conflict from

20  Heller. *See* 1 Restatement of the Law Governing Lawyers (Third) § 15, comment c,

21  at 140 (personal disqualification for dealing with a prospective client "occurs only

22  when the subsequent matter presents the opportunity to use information obtained

23  from the former prospective client that would be 'significantly harmful' "). Heller's

24  declaration does not support the "drastic measure" of disqualification.

25        2.   *The Case Law Relied on by Chinois*

26        Chinois cites *In Re Rossana*, 359 B.R. 697, 706 (D. Nev. 2008) for the

27  proposition that it may be implied under Nevada law that a lawyer received

28  confidential information during a previous representation. However, in *Rossana*,

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

9

EXHIBIT B

1    the prior representation was actual motion practice and obtaining a judgment in

2    Rossana's favor by the targeted lawyer. These facts of *real* representation by the

3    lawyer in *Rossana* distinguish it from the phone conversation in this case.

4    Moreover, this Court has observed that the burden of proof falls on the movant for

5    disqualification, which means " 'that party must have evidence to buttress the

6    claim that a conflict exists' "). *In-N-Out-Burger v. In & Out Tire & Auto, Inc.*, 2008

7    WL 2937294 at *4 (D. Nev. Leavitt, M.J.) (citing *Robbins v. Gillock*, 109 Nev. 1015,

8    1017). Ex. 1 hereto. This means here and in California, where Chinois counsel

9    originated the call to Morris, that "a motion to disqualify should be accompanied

10    by declarations and admissible evidence sufficient to establish the factual

11    predicate on which the motion depends." *U.S. v. Walker River Irrigation District*,

12    *supra*, at *3. This evidence is missing in the pending motion.

13         Similarly, in *Laryngeal Mask v. Ambu*, 2008 WL 558561 (S.D. Cal. 2008),

14    Exhibit 4 hereto, and *The people ex rel Dept. Of Corps. v. Speedy Oil Change Systems*,

15    20 Cal. 4th 1135 (1999), cited by plaintiffs for the proposition that even the briefest

16    of client meetings can result in an attorney-client relationship, are inapposite here.

17    First, these cases do not reflect application or consideration of Model Rule 1.18 that

18    is an integral part of the Nevada Rules that address attorney-client relationships in

19    this Nevada federal court. More importantly, however, these two California cases

20    involved an extended face-to-face meeting and a *series* of telephone calls

21    concerning the subject lawsuits, which are absent here.

22         The matters alleged to have been disclosed in *Speedy Oil* included "the

23    background of the case, Mobil's theories in the case, Mobil's discovery strategy

24    and an analysis of the procedural and substantive issues which had arisen to date,

25    and [were] likely to arise in the future the state of the case, experts, and

26    consultants, and specific factual issues." This is significantly more information

27    than Chinois alleges was disclosed to Morris in one telephone call of short

28    duration. Furthermore, Chinois has not met its burden to show that confidential

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

10

EXHIBIT B

1  information was in fact passed between Heller and Morris.  Absent evidence to

2  support the conclusory and self-serving affidavits of Heller and Faglebaum, *see In*

3  *re Marriage of Zimmerman*, 16 Cal. App. 4th 556, 565 (1993), the instant motion to

4  disqualify must be denied.  *See Robbins v. Gillock*, 109 Nev. at 1017 ("party must

5  have evidence to buttress the claim that a conflict exists"); *Colyer v. Smith*, 50 F.

6  Supp. 2d 966, 967 (C.D. Cal. 1999).

> 3.  *Even If the Court Believes the Information Conferred by Heller Was*
> 7  *Confidential, it Has Now Been Publicly Disclosed and Is No Longer*
> 8  *Privileged*

9       Even if Heller discussed the facts of this case and his claims for relief,

10  these facts were made public in the complaint he and Stan Hunterton filed on

11  January 8, 2008.  A similar situation was before the court in *Leathem v. City of*

12  *Laprote, Indiana*, 2008 WL 1804150 (N.D. Ind. 2008), attached as Exhibit 5 hereto,

13  where plaintiff Leathem alleged that in telephone conversation with attorney

14  Friedman he disclosed numerous facts about his cause of action.  Representation

15  did not result.  Thereafter, Leathem filed a motion to disqualify attorney Friedman

16  from representing one of the defendants sued by Leathem through another

17  lawyer.  In denying Laethem's motion to disqualify attorney Friedman the court

18  said the "facts of this case have been disclosed in Leathem's complaint and various

19  other filings by Leathem.  Leathem's recitation of facts cannot reasonably be

20  construed as confidential information." *Id.* at *2.

21       The same is true here.  We are not dealing with "confidential" facts

22  that Morris could disclose that would be harmful to Chinois.  These "facts," even if

23  disclosed by Morris, would not be significantly harmful to Chinois because they

24  are not "confidential facts." *ADP, Inc. v. PMJ Enterprises*, 2007 WL 836658 at *5

25  (D.N.J.) (discussion of plaintiff's business, the history of its dispute with the

26  defendant, and the factual basis of anticipated counterclaim is not significantly

27  harmful information under Mode Rule 1.18).  Ex. 2 hereto.

28

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

11

EXHIBIT B

1    The opinion in *Polyagro Plastics, Inc. v. Cincinnati Milacron, Inc.*, 903

2    F.Supp 253 (D. P.R. 1995), is also instructive here: at the hearing on plaintiffs'

3    motion to disqualify counsel based on a single 10-minute phone conversation, the

4    court asked the plaintiffs what information disclosed to the targeted attorney

5    would actually prejudice them in the present case.  The plaintiff testified, "that the

6    confidential information that would prejudice plaintiffs entailed the disclosure

7    that there was an engineer who had been monitoring the problem, the identity of

8    the father and son who own Polyargo, the reasons for the defects in the machinery,

9    the theories for damages and the financial situation of Polyargo." *Id.* at 255.  In

10   denying Polyagro's motion to disqualify, the court relied on the fact that "most of

11   the information was revealed in the complaint prior to [the attorney's]

12   representation of defendants in this case." *Id.* at 258.  The same is true here.  It

13   would be unfair and contrary to sound judicial policy to grant the pending motion

14   to disqualify Morris and his firm for allegations made in Chinois complaint.

15       **B.    It Was And Is Not Reasonable for Chinois to Believe Morris Was Its**
         **Attorney for Ten Minutes in October 2007.**
16

17       An attorney-client relationship cannot be established absent facts to

18   support a reasonable belief that the targeted lawyer was acting as the moving

19   party's attorney: "Before a duty arises on the party [sic] of an attorney based upon

20   implied or inferred attorney-client relationship or upon foreseeable reliance by one

21   other than the actual client, more is required than an individual's subjective

22   unspoken belief that the attorney is his attorney." 2001 WL 1699685 (Bkrtcy.

23   M.D.N.C. May 30, 2001) (*quoting Sheinkopf v. Stone*, 927 F.2d 1259, 1265 (1st Cir.

24   1991))(internal quotations omitted). "The test for determining the existence of [an

25   attorney-client] relationship is a subjective one and "hinges on the client's belief

26   that he is consulting a lawyer in that capacity and his manifested intention is to

27   seek professional legal advice." *Green v. Montgomery County Alabama*, 784 F.Supp.

28   841, 845-46 (M.D. Ala. 1992)(*citing Westinghouse Electric Corp.*, 580 F.2d at 1319).

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

12

**EXHIBIT B**

1   This subjective belief must, however, be reasonable.  If the evidence reflects the

2   prospective client should have known that the relationship with the attorney had

3   not developed to a point at which it could be deemed representation, there is no

4   attorney-client relationship, notwithstanding the prospective client's subjective

5   belief.  The evidence here of an attorney-client relationship between Morris and

6   Chinois is not equivocal – it is non-existent.

7        1.   *It Was Not Reasonable for Heller, a Seasoned Attorney, to Believe*
            *That an Attorney-Client Relationship Had Been Created, and He*
8            *Does Not Say Otherwise in His Declaration.*

9             Nearly all the cases cited by Chinios to support the allegation that an

10   attorney-client relationship was established with Morris are based on the fact that

11   a lay person, without experience with the law or knowledge of the Rules of

12   Professional Conduct to which lawyers are subject, provided information to an

13   attorney with the expectation the attorney would become the lay person's

14   attorney.  *Lovell v. Winchester*, 941 S.W.2d 466 (Ky. 1997) (lay land purchasers

15   sought to disqualify opposing counsel based on prior consultation); *Bays v. Theron*,

16   418 Mass. 685 (1994)(*pro se* condominium owners motion to disqualify counsel

17   previously consulted about the case); *Burton v. Burton*, 139 A.D.2d 554 (1988)

18   (divorce action appealing grant of motion to disqualify wife's attorney); *Kearns v.*

19   *Fred Lavery Porsche Audi Co.*, 745 F.2d 600 (1985) (upholding disqualification of a

20   lay patent holder's attorney based on a prior consultation).  These cases are simply

21   inapposite here.  Heller was an experienced counsel for Chinois, and he knew

22   when he spoke to Morris that a conflict with an existing client of Morris would

23   prevent establishing an attorney-client relationship with him.  Heller does not say

24   otherwise in his declaration.

25             *Guerrero v. Bluebeard's Castle Inc.*, 982 F.Supp. 343 (D. V.I. 1997), is in

26   point for this discussion.  There, the plaintiff sought to disqualify defendant's

27   counsel based on a telephone conversation between plaintiff's counsel and

28   defendant's counsel before defense counsel was retained by defendants.  During

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

13

EXHIBIT B

1    this call plaintiff's counsel sought assistance from defendant's counsel with

2    plaintiff's case. Plaintiff argued that an attorney-client relationship was formed

3    during that call, as Chinois contends here. In finding that no confidential

4    information had passed between the participants in the call, the court said "the

5    participants to this conversation were both sophisticated counsel well trained in

6    the law. ...[This was not] an untrained layperson approaching a member of the bar

7    for help in time of need." *Id.* at 347. Clearly in the instant case, both parties were

8    aware of their obligations under the Nevada Model Rules. Chinois, through

9    Heller, was informed that there was a disabling conflict once he disclosed Caesars

10    as a potential party to the contemplated lawsuit. When the conversation

11    concluded between Heller and Morris, both Heller and Fagelbaum treated the

12    conflict as a bar to further discussions with Morris. It is disingenuous and

13    unprofessional for them to now suggest that they turned to other Las Vegas

14    lawyers for assistance "in an effort not to place Mr. Morris or Chinois in the middle

15    of a potential conflict. . . ." Fagelbaum Decl. ¶4, Motion to Disqualify at 27.

16        The only case that Chinois tenders to the court that involves attorney-

17    to-attorney contact, *The People ex rel. Dept. of Corps. v. Speedee Oil Change Sys., Inc.,*

18    20 Cal. 4th 1135 (1999) is altogether dissimilar to this case because the attorneys in

19    *Speedee Oil* engaged in several telephone conversations to discuss the

20    representation and then met in person for an extended two hour face-to-face

21    discussion of the case. At that meeting, the attorneys discussed "the background

22    of the case, Mobile's theories in the case, Mobile's discovery strategy and an

23    analysis of the procedural and substantive issues which had arisen to date and

24    [were] likely to arise in the future, the state of the case, experts, and consultants,

25    and specific factual issues." *Id.* at 1141.

26        The telephone call of several minutes between Heller and Morris does

27    not invoke *Speedee Oil.* The discussion here between two experienced attorneys

28

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

14

EXHIBIT B

1  did not go into "discovery strategy" the "state of the case," "experts, consultants,

2  and specific factual issues."

> 2. *Chinois Was Put on Notice That No Attorney-Client Relationship Could Be Established with Morris.*

Chinois acknowledges that Morris immediately indicated a potential

conflict in response to Heller mentioning Caesars. Heller Aff. ¶5. NRPC 1.18(f)

allows an attorney "to condition conversations with a prospective client on the

person's informed consent that no information disclosed during the consultation

will prohibit the lawyer form representing a different client in the matter." Under

to NRPC 1.0(e), informed consent is defined as "the agreement by a person to a

proposed course of conduct after the lawyer has communicated adequate

information and explanation about the material risks of and reasonably available

alternatives to a proposed course of conduct." Once Morris advised Heller that a

conflict would be presented by including Caesars as a party, any information

divulged thereafter by Heller makes it unreasonable for Heller or Chinois to

believe that Morris Peterson was speaking as Chinois's lawyer.

## V.    CHINOIS'S MOTION TO DISQUALIFY IS TACTICALLY MOTIVATED

This Court has previously observed that "Tactical considerations often

motivate such motions," *In-n-Out Burger v. In & Out Tire & Auto*, 2008 WL 2937294

at *3 (D. Nev. July 24, 2008), and went on to say, "courts must prevent parties from

misusing motions for disqualification as instruments of harassment or delay.

Courts therefore approach the issue of whether to disqualify opposing counsel as a

drastic measure which courts should hesitate to impose except when absolutely

necessary." *Id.* (Internal quotations and cites omitted.)  When the spare facts of

this case are evaluated, they simply do not support Chinois's allegations that

Morris was its former attorney and received "significantly harmful information

during [his] . . . one telephone conversation with [Heller]." *ADP v. PMJ Enterprises,*

*supra.* The facts suggest that this motion is tactically motivated.

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

15

EXHIBIT B

1    Chinois alleges that Heller called Morris and disclosed to him "the

2  strategy behind the litigation, venue, possible defendants (including Caesars) and

3  the selection and assessment of co-counsel to represent Chinois," Motion at 5,

4  without first telling him that Caesars, which is not a lessor to the plaintiff or the

5  developer and operator of the Forum Shops, would be a defendant in the lawsuit

6  Heller was considering in retaliation for Simon's suit against Chinois in Delaware.

7  An experienced lawyer, like Heller, could be expected to say who he was

8  contemplating suing in addition to Simon in Las Vegas before discussing the

9  proposed lawsuit with Las Vegas counsel. But he did not disclose that fact at the

10  same time he disclosed Simon as his proposed defendant. Motion at 10.

11    Chinois also claims that Morris was given an overview of the existing

12  Delaware litigation and the anticipated Las Vegas litigation including, "the

13  addition of new parties and potential claims, litigation strategy and prospects for

14  settlement, and Morris provided legal advice on these subjects as well as on other

15  topics including current and possible counsel and judges." Motion at 13. What

16  Heller does not say is that in disclosing "possible defendants" he disclosed

17  Caesars. He *does* say that *after* he disclosed Caesars, "Morris revealed that his firm

18  had represented Caesars." Heller Decl. ¶5; Motion at 5. It is preposterous and

19  altogether disingenuous for Heller to suggest that Morris continued to provide

20  "legal and other advice," against his own client, once Caesars had been disclosed,

21  Heller Decl. ¶4, Motion at 24. It is also contradicted by Heller's response to

22  Morris's 2/14/08 email in which Heller does not contest Morris's statement that

23  "we would not represent tenants at the Forum Shops because of the relationship

24  between the Forum and Caesars." Ex. A to Motion at 2 (page 56 of Motion papers).

25  And Heller agreed with Morris's statement of referral to Stan Hunterton: "you

26  recall correctly making some very favorable comments to me about Stan (all of

27  which have proven to be true)." *Id.*

28

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

16

EXHIBIT B

1  These facts suggest that Chinois's assertion that Morris should have

2  invoked "conflicts avoidance procedures" is misleading at best and a deliberate

3  distortion at worst. Mr. Heller, an experienced attorney, knew Morris Peterson

4  could not be involved in his lawsuit with Caesars as a party. If he continued his

5  conversation with Morris after that disclosure and received legal advice, which

6  Morris denies, it could only have been for the purpose of providing support for

7  this motion. This is an inappropriate basis on which to seek Morris's

8  disqualification.

9  **V.    CONCLUSION**

10  Chinois has not met its burden to establish that confidential

11  information was disclosed to Morris in the brief telephone conversation initiated

12  by Heller in October 2007. Even if the information – whatever it was – could be

13  considered confidential, Chinois has not established that the information was not

14  made public in the complaint if filed herein in January 2008. Nor has Chinois

15  established that Nevada Model Rule of Professional Conduct 1.18(c) should not

16  apply to and bar this motion because the alleged information in question, which

17  Morris does not have or know, has not been shown to be information "that could

18  be significantly harmful" to Chinois if disclosed in this lawsuit.

19  For these reasons the motion to disqualify Steve Morris and his law

20  firm should be denied.

21  MORRIS PETERSON

22

23  By:
Steve Morris, No. 1543
24  Jean-Paul Hendricks, No. 10079
900 Bank of America Plaza
25  300 South Fourth Street
Las Vegas, Nevada 89101
26

27  Attorneys for Defendants
Caesars Palace Corp. and
28  Caesars Palace Realty Corp.

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

17

**EXHIBIT B**

1    CERTIFICATE OF SERVICE

2        Pursuant to Fed. R. Civ. P. 5(b) and Section IV of District of Nevada

3    Electronic Filing Procedures, I certify that I am an employee of Morris Peterson,

4    and that the following documents were served via electronic service:

5    **[CORRECTED] OPPOSITION TO PLAINTIFF PHASE II CHIN, LLC'S**

6    **MOTION TO DISQUALIFY ATTORNEY STEVE MORRIS AND THE LAW**

7    **FIRM OF MORRIS PICKERING & PETERSON (NOW MORRIS PETERSON)**

8    TO:

9    C. Stanley Hunterton
    Pamela R. Lawson

10   HUNTERTON & ASSOCIATES
    333 South Sixth Street

11   Las Vegas, Nevada 89101

12

13   Philip Heller
    FAGELBAUM & HELLER, LLP
    2049 Century Park East, Suite 4250

14   Los Angeles, CA 90067

15   Attorneys for Plaintiff
    Phase II Chin, LLC

16

Samuel S. Lionel
LIONEL SAWYER & COLLINS
300 S. Fourth St., #1700
Las Vegas, Nevada 89101

Attorneys for Defendants
Forum Shops, LLC, Forum Developers
Limited Partnership, Simon Property
Group Limited Partnership, and Simon
Property Group, Inc.

17   Harold Gewerter
    GEWERTER LAW OFFICES
    5440 W. Sahara Ave. Third Floor
    Las Vegas, Nevada 89146

18

19   Attorneys for Plaintiff
    Love & Money, LLC

20       DATED this 27th day of January, 2009.

21

22   By: _____

23

24

25

26

27

28

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

18

EXHIBIT B

# DECLARATION
# OF MICHAEL KOSTRINSKY

EXHIBIT B

## DECLARATION OF MICHAEL KOSTRINSKY

I, Michael E. Kostrinsky, declare as follows:

1.      I am the Chief Litigation Officer for Harrah's Operating Company, Inc. (Harrah's), the indirect parent company of Caesars Palace Corporation, which is the parent company of Caesars Palace Realty Corporation. I have personal knowledge of each of the facts set forth in this declaration and can competently testify thereto.

2.      I am familiar with the lawsuit filed by *Phase II Chin LLC, et al. v. Forum Shops, LLC, Caesars Palace Corp., Caesars Palace Realty Corp.* ("Caesars"), and others. I am the person with whom counsel for Caesars communicates in planning and executing the defense of this case in the United States District Court for the District of Nevada.

3.      I retained Morris Pickering & Peterson (now Morris Peterson) to defend Caesars in late January, 2008, by speaking to Kristina Pickering and requesting her to represent Caesars. She did so from inception through the end of 2008. During the time Ms. Pickering represented us, I did not know of or speak to Ms. Pickering about any communication between her partner Steve Morris and attorney Phillip Heller in October 2007, until the underlying motion for disqualification was filed. Other than from the declaration of Morris in opposition to the pending disqualification motion, I have no knowledge of what Morris and Heller may have said to each other 15 months ago.

1

4.    Steve Morris and Kristina Pickering have represented Caesars and/or Caesars' indirect parent, Harrah's in many matters for all of the ten years I have been Chief Litigation Counsel for Harrah's.  After Ms. Pickering was elected to the Nevada Supreme Court, she discussed transfer of the defense of this lawsuit with me, and I requested that she transfer it to her partner/husband Steve Morris, who has represented Harrah's and its related properties over the years.

5.    I wish to confirm by this declaration that Morris Peterson and Steve Morris are Harrah's/Caesars counsel of choice in this litigation.  It would unduly delay presentation and decision on our pending motion to dismiss, which has been scheduled and rescheduled several times since last October, and unfairly increase the expense of defending this lawsuit if our counsel of choice, if Morris Peterson and/or Steve Morris were disqualified because Phillip Heller called Mr. Morris in October 2007.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my ability.

Dated: January 26, 2009

Michael Kostrinsky

2

# DECLARATION
# OF STEVE MORRIS

EXHIBIT B

## DECLARATION OF STEVE MORRIS

I, Steve Morris, declare:

1.      I am counsel of record for Defendant Caesars Palace
Corporation and Caesars Palace Realty Corporation (collectively "Caesars"). I
submit this declaration based on my personal knowledge of the facts set forth
below and, if called upon as a witness herein, could and would competently
testify thereto.

2.      Sometime in or about October 2007 I had a brief but cordial
conversation by telephone with California attorney, Phillip Heller. He told me he
represented a lessee at the Forum Shops, which he identified as Chinois. I know
Chinois as a restaurant, and I knew from prior unrelated litigation with and
against Simon entities that Simon Property Group, or a Simon-related entity, was
the operator and lessor of the Forum Shops, all of which I told Mr. Heller. (I
sometimes refer to the Forum Shops and the Simon defendants as "Simon" in this
declaration.)

3.      Mr. Heller said he was considering several Las Vegas
attorneys to act as local counsel for Chinois in a lease-dispute lawsuit he was
contemplating filing here against Simon. He told me his partner, Jerold
Fagelbaum, with whom I had worked for a time in the MGM fire litigation in the
1980s, suggested that he speak to me along with other Las Vegas lawyers he was
considering as possible local counsel. This did not cause me to question him
about the identity of "possible defendants" and conflicts because I knew Simon
Property Group and the Forum Shops and had litigated against them for others
in the recent past, and I knew Simon would not pose a conflict, which I also told
Mr. Heller. Neither Caesars or any other Harrah's entity was involved in the
earlier lawsuits involving the Forum Shops.

4.      Following introductory remarks between us, Mr. Heller told
me that Simon had sued Chinois in Delaware over the lease dispute. Because the
Forum Shops and Chinois were in Las Vegas, he was thinking of an action here

**EXHIBIT B**

against Simon. He asked about my experience in the local courts and for my assessment of the calendars and the quality of the judiciary in the state and federal district courts, which I freely provided. Inquiries of this nature are routine to me. I have practiced in the Las Vegas state and federal courts for many years. I am frequently asked by lawyers elsewhere who are contemplating litigation here the same questions posed to me by Mr. Heller.

5.    In discussing what Mr. Heller describes in ¶4 of his declaration as "the pros and cons of filing in state versus federal court in Nevada," he did not, as he misleadingly implies, tell me that the Delaware action was "limited to Declaratory Relief" or that "the proposed [Las Vegas] action would contain eight causes of action for damages and injunctive relief." He did not send me any papers to review, such as the Delaware pleadings or a draft of his contemplated "eight causes of action." We *did*, however, discuss my prior litigation experience with Simon Property Group and the Forum Shops, and in doing so I told Mr. Heller they would be formidable and difficult opponents. We did *not* discuss "litigation strategy," whatever that means, if anything, beyond the "pros and cons" of "state versus federal court," and the possibility of an action here, as I recount in the preceding paragraphs of this declaration.

6.    In the context of discussing my experience with the Forum Shops, Mr. Heller and I did not discuss "possible defendants" beyond Simon and Simon-related entities, as he suggests in his declaration, nor did we discuss "prospects for settlement" because, at least as I understood his remarks, there was nothing to settle – no lawsuit had been filed in Nevada or even prepared for filing when Mr. Heller and I spoke on that one occasion for several minutes last October. As we discussed the courts and local practice, I remarked that Caesars was the ground lessor for the Forum Shops and that we represent Harrah's, the owner of Caesars. It is in this context I believe Mr. Heller, for the first and only time, suggested that Caesars might be drawn into the litigation being

2

contemplated for a reason he did not express. In response, I said then, as I recall now and said in an email last year to Mr. Heller on February 14, 2008, that "we would not represent tenants at the Forum Shops because of the relationship between the Forum and Caesars." Ex. A to Motion to Disqualify at 2.

7.    At this point, I told Mr. Heller to speak to the other Las Vegas lawyers he had in mind. I recommended, among others, Stan Hunterton as a highly capable and experienced trial lawyer known in and knowledgeable about our local state and federal courts. Mr. Heller said Mr. Hunterton had been recommended by others and that he would probably speak to him. He also asked me about another Las Vegas lawyer, Harold Gewerter, and I apparently recommended him to Mr. Heller. Ex. A to the Motion to Disqualify at 2.

8.    Our conversation concluded at this point. I did not expect Mr. Heller or Mr. Fagelbaum to thereafter make a decision "to seek alternative local counsel," Fagelbaum Declaration, Motion to Disqualify at 27, ¶4, l. 25, because I had not been offered, nor had I accepted, the role of Chinois's local counsel. I had, by terminating the conversation with Mr. Heller and recommending Mr. Hunterton, declined to consider serving in that capacity. I did not hear from Mr. Heller thereafter or know he and Mr. Hunterton filed suit here for Chinois until I received a call from him on February 13, 2008, the substance of which is summarized in an exchange of emails on February 14, that are Exhibit A to the pending motion. I also say in my email to him that I had not communicated with anyone in the firm, including Kris Pickering, about my October 2007 telephone call with Mr. Heller, except as I set out in that email to Mr. Heller and in this declaration.

9.    Except as set out in this declaration and in my February 2008 email to Mr. Heller, I cannot recall or think of anything Mr. Heller told me in confidence other than "Chinois' confidential plan to file an action of its own in Las Vegas, Nevada," which, with the filing of this lawsuit, became public

3

EXHIBIT B

knowledge in January 2008 without my knowledge or my disclosure to anyone that I had spoken to Mr. Heller three months earlier.

10. In preparing this declaration I have reviewed the pending Motion to Disqualify and the exhibits attached to it. I wish to confirm what that review and my recollection aided by the review confirm:

(1) I have not read and am unaware of the claims made in the Delaware litigation or the facts or legal theories asserted by any party thereto, nor have I received confidential information from or given legal advice to Chinois in connection with that legal proceeding.

(2) Except as set out in this declaration, I have not discussed this Nevada lawsuit with anyone. I have not read the pleadings or the pending motions to dismiss. Prior to receiving the motion to disqualify me and my firm, I did not receive information – confidential or otherwise – from Chinois except as set out in this declaration and in my email of February 14, 2008, to Mr. Heller.

(3) Prior to and following my telephone conversation with Mr. Heller in October 2007, I did not receive from or send to Mr. Heller information pertaining to this Las Vegas lawsuit.

(4) I did not make a record or notes of the October 2007 telephone call. I did not open a file to reflect a request for or the giving of legal advice to Chinois. My best estimate is that the call lasted no more than ten to fifteen minutes.

4

EXHIBIT B

I declare under penalty of perjury under the laws of the State of Nevada that the foregoing is true.  Executed this 26th day of January, 2009 in Las Vegas, Nevada.

STEVE MORRIS

5

**EXHIBIT B**

# EXHIBIT 1

# EXHIBIT 1

EXHIBIT B

Westlaw.

Slip Copy
Slip Copy, 2008 WL 2937294 (D.Nev.)
(Cite as: 2008 WL 2937294 (D.Nev.))

Page 1

**H**

Only the Westlaw citation is currently available.
United States District Court, D. Nevada.
IN-N-OUT BURGER, Plaintiff,
v.
IN & OUT TIRE & AUTO, INC., Defendant.
No. 2:07-cv-01556-LRH-LRL.

July 24, 2008.

M. Kelly Tillery, Pepper Hamilton LLP, Philadelphia, PA, Michael J. McCue, Jonathan W. Fountain, Lewis & Roca, LLP, Las Vegas, NV, Michael A. Rule, Becky Hsiao, Pepper Hamilton LLP, Irvine, CA, for Plaintiff.
Michael D. Rounds, Matthew D. Francis, Watson Rounds, PC, Reno, NV, for Defendant.

### ORDER

LAWRENCE R. LEAVITT, United States Magistrate Judge.
*1 Before the court is plaintiff's Motion to Disqualify Watson Rounds and Michael Rounds (# 25). The court has considered the motion, defendant's Opposition (# 30), and plaintiff's Reply (# 32). The court has also considered the Declaration of Robert Lauson (# 26) filed in support of plaintiff's motion. A hearing on the motion was conducted on June 27, 2008. For the following reasons, the motion will be denied.

### BACKGROUND

Plaintiff In-N-Out Burger ("INO Burger") filed the above-titled trademark infringement action on November 20, 2007, alleging causes of action against defendant In & Out Tire & Auto, Inc. ("INO Tire") for Trademark Infringement, a violation of 15 U.S.C. § 1114 and NRS 600.430, Unfair Competition, a violation of 15 U.S.C. § 1125 and Nevada common law, and Trademark Dilution, a violation of NRS 600.435, based on INO Burger's

federally registered marks-United States Patent and Trademark Office ("U.S.P.T.O.") Registration Nos. 2217307, 2285823, 1525982, 1522799, 1101628, 1085163, 1101638, 2291183, 2121178, and 2035491.Compl. (# 1).

On January 17, 2008, INO Tire retained the Nevada law firm of Watson Rounds as counsel in this case. Opp'n (# 30) at 14 ¶ 3. Michael Rounds, a partner at Watson Rounds, has often served as local counsel for out-of-state law firms and companies in intellectual property disputes. Id. at 14 ¶ 2. Later that day, Michael Rounds advised INO Burger's local counsel, Michael McCue ("McCue"), via e-mail that Watson Rounds had been retained by the California law firm of Lauson & Associates in May 2005 to represent INO Burger as local counsel in a trademark infringement action against a Nevada business then known as In & Out Car Wash, Inc. (the "prior matter"). Decl. (# 26) at ¶ 3. Robert Lauson ("Lauson"), who has represented INO Burger in approximately 150 trademark infringement cases since 1999, was lead counsel in the prior matter. Id. at ¶ 2-3.

In his January 17, 2008 e-mail, Michael Rounds further advised McCue that he did not believe there was a conflict of interest under Nevada law given the narrow and limited nature of Watson Rounds' involvement in the prior matter. Exh. A to Opp'n (# 30). Michael Rounds informed McCue that the only time Watson Rounds recorded on the prior matter was for work billed by a former associate, Samantha Greene. Id., Exh. A. The record showed that Ms. Greene spent one (1) hour (generating a $150 fee) to review and (minimally) edit a complaint against In & Out Car Wash, Inc. for compliance with local court rules and Nevada state law. Id., Exh. A, B.

In that complaint, INO Burger sought injunctive relief for Trademark Infringement, a violation of 15 U.S.C. § 1114, Trademark Dilution, a violation of 15 U.S.C. § 1125(c) and NRS 600.435, and Decept-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT B

Slip Copy
Slip Copy, 2008 WL 2937294 (D.Nev.)
(Cite as: 2008 WL 2937294 (D.Nev.))

ive Trade Practices, a violation of NRS 598.0903 *et seq.*, based on INO Burger's federally registered trademarks–U.S.P.T.O. Registration Nos. 1101638, 1085163, 2217307, 2291183 and 930203, most of which are at issue in present case. *See* Exh. 1 to Decl. (# 26). The complaint that Ms. Greene had reviewed and edited was ultimately not filed because the parties settled the case. Decl. (# 26) at ¶ 9. In & Out Car Wash, Inc. agreed to, and did, change its name. *Id.* The settlement agreement also included confidential terms, which INO Burger contends were communicated to Watson Rounds. *Id.* INO Tire disagrees with this assertion, arguing that no confidential information was shared, and that Watson Rounds did not participate in settlement discussions. Opp'n (# 30) at 4:9-13.

*2 INO Burger bases many of its assertions of fact on a Declaration (# 26) made by Lauson, who states therein that he had six (6) detailed discussions with Michael Rounds in the course of Watson Rounds' representation of INO Burger in the prior matter. Decl. (# 26) at ¶ 4. During these conversations, Michael Rounds ostensibly became privy to confidential information relating to INO Burger and its trademarks. *Id.* At the initial interview and engagement stages, Lauson and Michael Rounds are said to have discussed the factual background, legal claims and issues, potential affirmative defenses and relative strengths and weaknesses of the trademark infringement claims against In & Out Car Wash, Inc. *Id.* at ¶ 5. Finally, Lauson states that he and Michael Rounds discussed the former's long-standing relationship with INO Burger as the backdrop for disclosing certain additional confidential information about the types of trademark infringement cases INO Burger generally pursued, INO Burger's attitude and philosophy regarding trademark prosecution and enforcement, and INO Burger's general litigation strategy in trademark infringement cases. *Id.* at ¶ 6.

On February 14, 2008, INO Burger requested that Watson Rounds withdraw from the present litigation immediately. Exh. C to Opp'n (# 30). Five (5)

days later, Michael Rounds advised McCue that, after reviewing the February 14, 2008 letter and Lauson's Declaration (# 26) attached thereto, he had no recollection of the conversations Lauson referred to. *Id.*, Exh. A at ¶ 6. Michael Rounds asked McCue to provide him with Lauson's time records so he could determine whether they corroborated the statements made in the Declaration (# 26).*Id.*, Exh. A at ¶ 6. On February 25, 2008, McCue sent Lauson's time records to Michael Rounds. *Id.*, Exh. D. The records noted that Lauson had conducted "[t]elcons and exchanged emails with possible local counsel and re complaint (.8 [hours] )."*Id.*, Exh. D. On February 26, 2008, Watson Rounds denied INO Burger's request to withdraw as counsel for INO Tire. *Id.*, Exh. E. INO Burger filed the present motion (# 25) the next day.

## DISCUSSION

INO Burger argues that Watson Rounds must be disqualified from representing INO Tire in the instant litigation because it previously represented INO Burger in a substantially similar matter. Mot. (# 25) at 6. INO Tire responds that in view of the narrow scope of Watson Rounds' representation in the prior matter disqualification is not warranted. Opp'n (# 30) at 5. INO Burger replies that (1) the scope of Watson Rounds' representation of INO Burger in the prior matter is substantially similar to its representation of INO Tire; (2) it is reasonable to infer that confidential information would have been disclosed to local counsel in the prior matter; and (3) such confidential information is relevant to the issues raised in the present litigation. Reply (# 32) at 32-36.

Federal courts apply state law in determining whether attorney disqualification is warranted. *In re County of Los Angeles,* 223 F.3d 990, 995 (9th Cir.2000) ("Because we apply state law in determining matters of disqualification, we must follow the reasoned view of the state supreme court when it has spoken on the issue.") (citations omitted). The Supreme Court of Nevada has stated that

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT B

Slip Copy
Slip Copy, 2008 WL 2937294 (D.Nev.)
(Cite as: 2008 WL 2937294 (D.Nev.))

"[c]ourts deciding attorney disqualification motions are faced with the delicate and sometimes difficult task of balancing competing interests: the individual right to be represented by counsel of one's choice, each party's right to be free from the risk of even inadvertent disclosure of confidential information, and the public's interest in the scrupulous administration of justice." *Brown v. Eighth Judicial Dist. Court,* 116 Nev. 1200, 1205 (Nev.2000) (citation omitted). Close cases are resolved in favor of disqualification. *Palmer v. Pioneer Inn Assocs.,* 19 F.Supp.2d 1157, 1162 (D.Nev.1998) ("Where disqualification is contemplated, 'any doubt is resolved in favor of disqualification.' " (citing *Faison v. Thornton,* 863 F.Supp. 1204, 1216 (D.Nev.1993))), *overruled on other grounds,* 338 F.3d 981 (9th Cir.2003).

\*3 Nevertheless, "[p]articularly strict judicial scrutiny" should be given to a motion to disqualify opposing counsel because there is a significant possibility of abuse for tactical advantage. *Optyl Eyewear Fashion Int'l Corp. v. Style Cos., Ltd.,* 760 F.2d 1045, 1050 (9th Cir.1985) (citing *Freeman v. Chicago Musical Instrument Co.,* 689 F.2d 715,721-22 (7th Cir.1982)) (other citation omitted). Tactical considerations often motivate such motions. *In re Marvel,* 251 B.R. 869, 871 (Bkrtcy.N.D.Cal.2000) (citation omitted). As such, courts must prevent parties from misusing motions for disqualification as "instruments of harassment or delay." *Brown,* 116 Nev. at 1205. Courts therefore approach the issue of whether to disqualify opposing counsel as "a drastic measure which courts should hesitate to impose except when absolutely necessary." *United States v. Titan Pac. Const. Corp.,* 637 F.Supp. 1556, 1562 (W.D.Wash.1986) (quoting *Freeman,* 689 F.2d at 721).

Under the Local Rules, attorneys practicing before this court are required to act in accordance with the Model Rules of Professional Conduct as adopted and amended by the Supreme Court of Nevada. LR IA 10-7(a). Under those rules, the general authority regarding conflicts of interest is that "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing."Supreme Court Rule 1.9(a) (replacing former Supreme Court Rule 159); *see also*Supreme Court Rule 1.10(b) (when a lawyer has terminated an association with a firm, the firm is prohibited thereafter from representing a person with interests materially adverse to those of a client represented by the formerly associated lawyer and not currently represented by the firm, when the matter "is the same or substantially related to that in which the formerly associated lawyer represented the client and any lawyer remaining in the firm has confidential information that is material to the matter").

The language of Rule 1.9(a) is nearly identical to the language of the former applicable rule, Rule 159. The only difference is that the language of the former rule was "unless the former client consents, preferably in writing, after consultation," while the language of the current rule is "unless the former client gives informed consent, confirmed in writing."Such a difference is not material given the facts of this case. Thus, disqualification under Rule 1.9(a) is governed by the three (3)-part inquiry set forth in *Waid v. Eighth Judicial District Court,* 119 P.3d 1219 (Nev.2005), which considered the disqualification issue under the previous version of the rule. Under *Waid,* to determine when a former and present matter are substantially related, the court must (1) make a factual determination concerning the scope of the former representation, (2) evaluate whether it is reasonable to infer that the confidential information allegedly given would have been given to a lawyer representing a client in those matters, and (3) determine whether that information is relevant to the issues raised in the present litigation. *Id.* at 1223 (adopting Seventh Circuit's test).

\*4 The record in this case reflects that Watson Round's work in the prior matter was quite limited

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT B

Slip Copy
Slip Copy, 2008 WL 2937294 (D.Nev.)
(Cite as: 2008 WL 2937294 (D.Nev.))

in nature and scope. The firm's records show that it charged INO Burger $150 for only one (1) hour of work, which consisted of a simple review and edit of the form of the complaint to comply with local rules and Nevada law. *See* Exhibit E to the Opposition (# 30), which shows that the caption to the complaint was edited, minor formatting was done, and citations to Nevada state statues were added. Further, neither Watson Rounds' nor Lauson's time records reflect that substantive conversations took place between lead and local counsel in the prior matter. INO Burger provides no documentation directly supporting Mr. Lauson's claim that he had six (6) substantive discussions with Michael Rounds about various aspects of the prior matter, a contention that might normally be reflected in detailed time records.

On the other hand, "[i]n proving that a prior representation is substantially related to the matter at bar, the moving party need not divulge the actual confidences revealed to opposing counsel in the earlier matter." *Robbins v. Gillock*, 109 Nev. 1015, 1018 (Nev.1993) (citations omitted). The prior matter and the case at hand are based on similar allegations concerning virtually identical trademarks. Both involve allegations of trademark infringement, dilution, and unfair or deceptive trade practices, and U.S.P.T.O. Registration Nos. 1101638, 1085163, 2217307, and 2291183 are at issue in each case. It is reasonable to assume that Michael Rounds and Mr. Lauson talked generally about the legal and factual bases of the prior case. The court finds it implausible, however, that Mr. Lauson would have disclosed to Michael Rounds confidential information regarding INO Burger's philosophy, approach, attitude, goals, and litigation and/or settlement strategies for the handling of its trademark matters.

The court may "undertake a realistic appraisal of whether confidences might have been disclosed in the prior matter that will be harmful to the client in the later matter." *Robbins*, 109 Nev. at 1018 (citations omitted). There is no evidence that in the prior matter Watson Rounds' representation of INO Burger involved anything more than making a few cosmetic changes to the complaint, none of which required knowledge of litigation strategy or possession of other confidential information. Lauson's Declaration (# 26), which forms the factual basis for plaintiff's motion, is uncorroborated by detailed time entries, correspondence, or any other material to directly substantiate INO Burger's disqualification claims. INO Burger has therefore failed to meet its burden of demonstrating that the two cases at issue are substantially related, or that Watson Rounds' involvement in the present case gives rise to a conflict of interest. *See Robbins*, 109 Nev. at 1017 ("The burden of proving whether two matters are the same or substantially related falls on the party moving for disqualification and that party must have evidence to buttress the claim that a conflict exists.") (citations omitted).

*5 Accordingly, and for good cause shown,

IT IS ORDERED that plaintiff's Motion to Disqualify Watson Rounds and Michael Rounds (# 25) is DENIED.

D.Nev.,2008.
In-N-Out Burger v. In & Out Tire & Auto, Inc.
Slip Copy, 2008 WL 2937294 (D.Nev.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT B

EXHIBIT 2

EXHIBIT 2

EXHIBIT B

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 836658 (D.N.J.)
(Cite as: 2007 WL 836658 (D.N.J.))

Page 1

**C**

Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.
ADP, INC.
v.
PMJ ENTERPRISES, LLC.
Civil Action No. 06-2042 (PGS).

March 14, 2007.

Joshua S. Bratspies, Riker, Danzig, Scherer, Hyland & Perretti, LLP, Morristown, NJ.
Steven R. Klein, Cole, Schotz, Meisel, Forman & Leonard, PA, Hackensack, NJ.

### LETTER-OPINION AND ORDER ORIGINAL FILED WITH CLERK OF THE COURT

RONALD HEDGES, United States Magistrate Judge.

### INTRODUCTION

*1 This matter comes before me on the motion of Plaintiff ADP Commercial Leasing, LLC ("ADP"), to disqualify the law firm of Cole, Schotz, Meisel, Forman & Leonard, PA ("Cole Schotz") as counsel for defendant PMJ Enterprise, LLC ("PMJ"). PMJ opposes the motion. The motion was referred to me by Judge Sheridan. I have considered the papers submitted in support of and in opposition to the motion. There was no oral argument. Rule 78.

### BACKGROUND

ADP is a designer and provider of integrated computer operating systems that automobile dealerships use to manage their day-to-day operations. It is a Delaware corporation with a principal place of business in New Jersey. PMJ owns and operates a Lincoln Mercury dealership. It is incorporated and has a principal place of business in Florida. Between 2002 and 2005 the parties entered into agreements pursuant to which ADP leased to PMJ a computer operating system.

ADP alleges that sometime in the fall of 2005 PMJ defaulted under the terms of the parties' agreements by failing to make payments due to ADP. In 2006, ADP decided to sue PMJ to collect the amounts PMJ allegedly owes it and began looking for attorneys. ADP developed an interest in retaining Steven Klein, a partner at Cole Schotz, as counsel because it was "impressed with the types of cases he handles" (Sudha Kantor Dep. 17:5) and believed his "credentials were along the lines of what [ADP] was looking for."(Kantor Dep. 46:4-5). On April 24, 2006, ADP's in-house counsel, Sudha Kantor, telephoned Edward Kiel, a partner at Cole Schotz with whom she was acquainted. Kantor expressed to Kiel ADP's desire to retain Cole Schotz in this matter and the parties engaged in a preliminary conversation. Kiel alleges that the conversation was very brief because he was rushing to get to a meeting. Their accounts of the conversation are as follows:

#### A. The Nature of ADP's Business

Kantor alleges that she provided Kiel with "specific background information "about ADP Dealer Services and ADP Commercial Leasing."(Kantor Dep. 20:9-10). Kiel had difficulty recalling many details the conversation, but did confirm discussing "what ADP does" and "the services that ADP provides." (Kiel Dep. 18:20-19:3).

#### B. The Nature of ADP's Dispute with PMJ

Kantor alleges that she disclosed the "complex" history of ADP's dispute with PMJ. (Kantor Dep. 21:18). Kiel stated that Kantor told him: (i) there was a "potential matter involving a Florida auto Dealership" (Kiel Dep. 10:21-22) known as "PMJ" (Kiel Dep. 11:23-25); (ii) the case involved "some type of software that was developed by ADP" (Kiel

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT B

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 836658 (D.N.J.)
(Cite as: 2007 WL 836658 (D.N.J.))

Dep. 19:9-10); (iii) there were "some licensing fees that were due" (Kiel Dep. 19:11-12), totaling several hundred thousand dollars (Kiel Dp. 14:25-15:3); and (iv) "there had been discussions before with the parties about trying to settle the case" (Kiel Dep. 15:15-16) but now "it wasn't going to settle" (Kiel.Dep.15:20-21).

### C. *Disclos ure of a n Ant icipated Count erclaim by PMJ*

*2 Kantor alleges that she disclosed the factual basis of a counterclaim that PMJ could file. (Kantor Dep. 34:10-13). According to Kantor, PMJ claimed that: "ADP had caused [its dealership] all these proble And made all kids of wild accusations, one of which was that one of [ADP's] salesperson was having an affair with [PMJ's] office manager or controller ... [and she] was able to bilk [PMJ] out of millions of dollars."(Kantor Dep. 25:5-10). Kantor also stated that she discussed the "strengths and weaknesses of the case, the counterclaim, the potential counterclaim ..." (Kantor Dep. 33:4-7).

Kiel alleges that he and Kantor discussed: (i) ADP's belief that "the other side would probably file a counterclaim" (Kiel Dep. 15:3-4); (ii) "the nature of the counterclaim" (Kiel Dep. 22:4) involving allegations that "the software didn't do what it was supposed to do" (Kiel Dep. 22:2-3) and "some allegation about an intimate relationship between some of the parties" (Kiel Dep. 21:13-14); and (iii) ADP's belief that these "claims were without merit" (Kiel Dep. 30:22-23).

### D. *Disclosure of ADP's Litigation Strategy*

Kantor allegedly disclosed that (i) ADP "needed to move rather quickly" to file a complaint (Kantor Dep. 26:9-16); (ii) ADP "had a Florida counsel" that had "prepared a draft complaint" (Kantor Dep. 33:9-13), but it "was not as strong as [ADP] needed it to be" ( Kantor Dep. 34:3); and (iii) there were "more claims" that ADP wanted to assert (Kantor Dep. 38:16-17).

Kiel alleges:

> [Kantor told me] they were concerned that the other party may file down in Florida first. She also told me that they had Florida counsel, and I'm trying to remember this conversation, they had Florida counsel who may have drafted up a preliminary draft of the complaint already and would be able to use that as a framework so that would speed up the process to file the complaint. [Kiel Dep. 12:7-14].

### E. *Disclosure of ADP's Settlement Position and Strategy*

Kantor alleges that she disclosed (i) ADP's strong desire to settle this action (Kantor Dep. 25:13-16) because ADP predicted, based on its prior dealings with PMJ, that it "would be very litigious" (Kantor Dep. 26:23-27); (ii) that ADP will try to settle at every step (Kantor Dep. 27:12); (iii) that ADP sought to file the Complaint in New Jersey, hoping the threat of additional litigation costs PMJ would incur in trying this action here rather than in Florida would compel it to settle (Kantor 48:8-12); (iv) the percentage of settlement under the contracts that ADP is willing to accept (Kantor Dep. 48:25-49:13); and (v) the concessions ADP is willing to make if PMJ files the anticipated counterclaim (Kantor Dep. 48:25-49:13).

Kiel alleges that he does not remember discussing ADP's settlement position and strategy. Kiel does remember discussing ADP's desire to file the Complaint in this Court (Kiel Dep. 10:25-11:1) to "get jurisdiction here" (Kiel Dep. 11:16) under the "jurisdictional provisions in the contracts." (Kiel Dep. 18:17-19).

*3 At the end of their conversation, Kantor informed Kiel that her supervisor, Randie Berman, would ultimately decide whether or not to retain Cole Schotz. Kantor stated that Kiel should speak with Berman directly to obtain a final decision on retention. Kantor and Kiel scheduled a telephone

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT B

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 836658 (D.N.J.)
(Cite as: 2007 WL 836658 (D.N.J.))

conference for the next morning with Berman and David Kohane, a Cole Schotz partner who Kiel recommended should represent PMJ because of his expertise in computer law. Kiel informed Kantor that Cole Schotz would have to conduct a conflict of interest check before agreeing to represent ADP in this matter.

Kantor and Kiel subsequently exchanged several emails. Kantor reiterated ADP's desire that new counsel move quickly to revise the Florida counsel's draft complaint and file it in this Court and listed the names and addresses of the parties to this action so that Kiel could conduct a conflict check. Kiel apologized for stepping away from their conversation to attend a meeting.

The next morning, on April 25, 2006, Kiel learned that Cole Schotz was representing a party adverse to an ADP subsidiary in a bankruptcy action. Kiel advised Kantor of the conflict. ADP declined to give Cole Schotz a conflict waiver and, instead, retained ADP's present counsel, Riker, Danzig, Scherer, Hyland & Perretti LLP.

On or about May 2, 2006, ADP filed the Complaint against PMJ. In June of 2006, Cole Schotz alleges that PMJ contacted its partner, Klein, and expressed an interest in retaining him as counsel in this action. Klein met with Kiel to discuss Kiel's conversation with Kantor and to determine whether it created a conflict of interest. Kiel alleges:

> I told [Klein] that I had a conversation where we had some discussion about what the case was about. I found out about the conflict he next morning and we didn't get into the sum or substance of what that conversation was.... I said I didn't believe that any of the discussions we had were confidential. [Kiel Dep. 50:16-24].

Klein decided to represent PMJ in this action and attempted to build an ethics screen around Keil by allegedly instructing him not to discuss the case with anyone in the firm. (Kiel Dep. 50:15-51:2). Kiel stated that he does not recall any one in the

firm sending a memo to Cole Schotz attorneys, advising them of the ethics screen and prohibiting them from discussing the case with Kiel. (Kiel Dep. 51:10-19). Cole Schotz did not seek written, informed consent to its representation of PMJ from ADP and PMJ.

Cole Schotz entered a formal appearance on June 30, 2006, by filing a motion for extension of time to answer. This was the first time ADP learned that Cole Schotz is representing PMJ. ADP did not object to Cole Schotz's representation of PMJ until October 16, 2006, when it sent a letter advising Cole Schotz of the conflict of interest and requesting that Cole Schotz withdraw as counsel. Cole Schotz did not respond. ADP subsequently sent three follow-up letters. On November 16, 2006, Cole Schotz responded, stating that the firm does not have a conflict of interest and will not withdraw as counsel.

### DISCUSSION

*4 ADP seeks to disqualify Cole Schotz from representing PMJ in this action. The New Jersey Rules of Professional Conduct ("RPC") govern the conduct of attorneys admitted to practice before this Court. L.Civ.R. 6A. "Motions to disqualify are viewed with disfavor as disqualification is a drastic remedy with often far-reaching, sometimes devastating implications." *Essex Chemical Corp. v. Hartford Acc. & Indem. Co.*, 993 F.Supp. 241, 246 (D.N.J.1998). Courts should decline to disqualify counsel, unless it is absolutely necessary. *Alexander v. Primerica Holdings, Inc.*, 822 F.Supp. 1099, 1114 (D.N.J.1993)."Although doubts are to be resolved in favor of disqualification, the party seeking disqualification must carry a 'heavy burden' and must meet a 'high standard of proof' before a lawyer is disqualified." 822 F.Supp. at 1114 (citing *Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791 (2d Cir.1983)).

RPC 1. 18, entitled "Prospective Client," governs the present motion. It provides:

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT B

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 836658 (D.N.J.)
(Cite as: 2007 WL 836658 (D.N.J.))

(a) A lawyer who has had discussions in consultation with a prospective client shall not use or reveal information acquired in the consultation, even when no client-lawyer relationship ensues ... [and]

(b) ... shall not represent a client with interests materially adverse to those of a former prospective client in the same or a substantially related matter if the lawyer received information from the former prospective client that could be significantly harmful to that person in the matter, except as provided in paragraph (c).

(c) If a lawyer is disqualified from representation under (b), no lawyer in a firm with which that lawyer is associated may knowingly undertake or continue representation in such a matter, except that representation is permissible if (1) both the affected client and the former prospective client have given informed consent, confirmed in writing, or (2) the disqualified lawyer is timely screened from any participation in the matter and is apportioned no part of the fee therefrom and written notice is promptly given to the former prospective client.

### A. "Former Prospective Client"

Pursuant to RPC 1.18(d), "A person who discusses with a lawyer the possibility of forming a client-lawyer relationship with respect to a matter is a 'prospective client,' and if no client-lawyer relationship is formed, is a 'former prospective client.' "

On April 24, 2006, Kantor, telephoned Kiel to discuss the possibility of retaining Cole Schotz as ADP's counsel in this action. Their actions during and subsequent to this conversation were aimed at forming a client-lawyer relationship. They discussed the nature of ADP's claims against PMJ. Then, they scheduled a telephone conference for the following morning between Berman, who makes the final decisions on retention of counsel

and Kohane, a Cole Schotz partner who Kiel recommended to represent PMJ because of his expertise in computer law. That evening, Kantor and Kiel exchanged several emails, wherein Kantor provided Kiel with the names and addresses of the parties to this action, which he needed to conduct a conflict-of-interest check.

*5 On April 25, 2006, Kiel conducted the conflict-of interest check, which revealed that Cole Schotz was representing a party adverse to another ADP subsidiary in a bankruptcy action. No client-lawyer relationship was formed. Therefore, ADP is Cole Schotz's "former prospective client."

### B. "Significantly Harmful" Information

Information exchanged during a preliminary consultation between a prospective client and an attorney may be "significantly harmful" under RPC 1.18 to warrant disqualification of that attorney from representing any party with interests adverse to the prospective client. KEVIN H. MICHELS, NEW JERSEY ATTORNEY ETHICS, THE LAW OF NEW JERSEY LAWYERING 21:2-3 (2007). However, to overcome the courts' disfavor of motions to disqualify, the moving party must proffer compelling evidence that significantly harmful information was disclosed.

ADP relies on the deposition testimonies of Kantor and Kiel to meet its heavy burden of proof. ADP argues that Kantor disclosed significantly harmful information during her one telephone conversation with Kiel.

Most of the information allegedly disclosed to Kiel is not significantly harmful to ADP. Kantor and Kiel generally agree discussing the nature of ADP's business, the history of its dispute with PMJ and the factual basis of an anticipated counterclaim. This information is not significantly harmful to ADP because it is not confidential. ADP disclosed the nature of its business and the history of its dispute with PMJ in the Complaint. Also, PMJ obviously

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT B

knows the factual basis of its counterclaim.

Kantor and Kiel agree discussing ADP's desire to file the Complaint quickly by revising the draft complaint that ADP's Florida counsel had prepared. Cole Schotz cannot use this information to significantly harm ADP because at the time PMJ retained Cole Schotz as counsel, ADP had already filed the Complaint.

Most of the information Kantor allegedly disclosed regarding ADP's settlement position and strategy is not significantly harmful either. Kantor alleges disclosing (i) that ADP has a strong desire to settle this action and will try to settle it at every step; (ii) that ADP sought to file the Complaint in New Jersey, hoping that the threat of additional litigation costs PMJ would incur in trying this action here rather than in Florida would compel it to settle; (iii) the percentage of settlement under the contracts that ADP is willing to accept; (iv) and the concessions that ADP is willing to make if PMJ files the anticipated counterclaim.

Kiel denies discussing ADP's strong desire to settle. Even if this information were disclosed, it is not significantly harmful to ADP because it is not confidential. ADP's desire to settle is evidenced from the numerous settlement discussions it had with PMJ.

Kiel confirms discussing ADP's desire to file the Complaint in this Court. This information is not significantly harmful to ADP because ADP already filed the Complaint in this Court and PMJ consents to this Court's jurisdiction over all but one clai *See* PMJ's Brief in Opposition to Motion to Disqualify, p. 18; Complaint, Tenth Affirmative Defense. PMJ only objects to this Court's jurisdiction over the replevin claim on the grounds that this Court does not have jurisdiction over personal property held in Florida.

*6 Kiel denies discussing the percentage of settlement that ADP is willing to accept and the concessions that ADP is willing to make. If Kantor dis-

closed this information, Cole Schotz could use it to significantly harm ADP. However, PMJ's only evidence is Kantor's controverted deposition testimony. PMJ's evidence is not sufficiently compelling to overcome the Court's presumption against disqualifying counsel, except when absolutely necessary.

The circumstances surrounding Kantor and Kiel's conversation do not support Kantor's allegations. First, given the preliminary nature of the conversation, Kantor had no need to specify the percentage of settlement that ADP would accept or the concessions that ADP would make. Kantor did not have the final authority to retain Cole Schotz. The purpose of her phone call was to investigate whether Cole Schotz was interested in representing ADP and capable of proceeding quickly. Kantor could have accomplished her purpose by disclosing the nature and history of ADP's dispute with PMJ.

Second, the information at issue is highly confidential and, as such, it is improbable that Kantor had revealed it before Kiel conducted a conflict-of-interest check. Third, Kiel alleges that the conversation was brief. Kiel's allegation is buttressed by the email he sent to Kantor shortly after they got off the phone, apologizing for stepping away from the conversation to attend a meeting. Kiel raises a doubt as to whether Kantor had enough time to disclose all of the information that she purports to have disclosed.

In conclusion, ADP failed to prove that Kantor disclosed significantly harmful information. Cole Schotz is not disqualified pursuant to RPC 1.18(b); therefore, I will not address whether its attempt to create an ethics screen satisfied RPC 1.18(c).

### CONCLUSION

For the reasons set forth above, the motion to disqualify counsel is hereby **DENIED**.

**SO ORDERED.**

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT B

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 836658 (D.N.J.)
**(Cite as: 2007 WL 836658 (D.N.J.))**

D.N.J.,2007.
ADP, Inc. v. PMJ Enterprises, LLC
Not Reported in F.Supp.2d, 2007 WL 836658
(D.N.J.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT B

EXHIBIT 3

EXHIBIT 3

EXHIBIT B

Westlaw.

Not Reported in F.Supp.2d                                                                                         Page 1
Not Reported in F.Supp.2d, 2006 WL 618823 (D.Nev.)
(Cite as: 2006 WL 618823 (D.Nev.))

C
Only the Westlaw citation is currently available.
United States District Court, D. Nevada.
UNITED STATES OF AMERICA, Plaintiff,
WALKER RIVER PAIUTE TRIBE, Plaintiff, Inter-
venor
v.
WALKER RIVER IRRIGATION DISTRICT, et
al., Defendants.
No. 3:73CV127ECR (RAM).

March 10, 2006.

David L. Negri, USDOJ c/o Attorneys Office,
Boise, ID, Gregory W. Addington, U.S. Attorney's
Office, Reno, NV, Susan L. Schneider, U.S. DOJ,
Denver, CO, for Plaintiff.
Wes Williams, Law Offices of Wes Williams Jr.,
Schurz, NV, for Plaintiff, Intervenor.
Gordon H. Depaoli, Woodburn and Wedge, Reno,
NE, Ken Spooner, Walker River Irrigation District,
Stephen B. Rye, Lyon Count District Attorney,
Yerington, NV, John W. Howard, JW Howard/
Attorneys, San Diego, CA, William E. Schaeffer,
Battle Moutain, NV, Erin K.L. Mahaney, Office of
the Chief Counsel, John Kramer, Department of
Water Resources, Nathan Goedde, California De-
partment of Fish and Game, Sacramento, CA, Mi-
chael Neville, Attorney General, San Francisco,
CA, George N. Benesch, Reno, NV, Cheri K. Emm-
Smith, Hawthorne, NV, Stacey Simon, Mammoth
Lakes, CA, Alan Biaggi, Director of Conservation
and Natural Resources, Hugh Ricci, Division Water
Resources, Jeff E. Parker, Nevada Attorney Gener-
al's Office, Carson City, NV, Simeon Herskovits,
Taos, NM, Michael F. MacKedon, MacKedon, Mc-
Cormick & King, Fallon, NV, for Defendants.
Dianne Borsin-Burk, Montara, CA, pro se.
Donna K. Clark, Carson City, NV, pro se.
Diane L. Smith, Carson City, NV, pro se.
Gary J. Garms, Smith, NV, pro se.
Toni J. Garms, Smith, NV, pro se.
Betti George, pro se.
Garmsland Ltd., Smith, NV, pro se.

Carl George, Sr., pro se.
Jerry Gideon, pro se.
Laverne Gideon, pro se.
Loranne Gregoris, pro se.
Martha A. Griffin, pro se.
Carrol Richard Haskins, Yerington, NV, pro se.
Carl E. Hill, Wellington, NV, pro se.
David R. Hoover, pro se.
Tammy L. Hoover, pro se.
Bruce A. Horstmanshoff, pro se.
La Cinda Johnson, pro se.
Hal Johnston, Yerington, NV, pro se.
Charles R. Jones, pro se.
Linda C. Jones, pro se.
Betty Joplin, Yerington, NV, pro se.
Clyde W. Jurey, pro se.
Sandra D. Jurey, pro se.
Loretta Kalata, pro se.
Ted Kalata, pro se.
Geraldine S. Keeley, pro se.
M. Kienbaum, Yerington, NV, pro se.
Karen Klock, Wellington, NV, pro se.
Madeleine M. Knight, pro se.
Charles Lang, pro se.
Debra S. Lang, pro se.
Mike Ledsing, pro se.
Deborah Mae Lerg, pro se.
Roy D. Lerg, pro se.
A.J. Locklear, pro se.
Clarice Elizabeth Lommori, Yerington, NV, pro se.
Paul E. Lunsford, pro se.
Marianne J. Masterson, Bonsall, CA, pro se.
Gayle Mattice, pro se.
Lewis W. Mattice, pro se.
Frances L. McCandless, Yerington, NV, pro se.
Robert R. McCandless, Yerington, NV, pro se.
Judith McKay, pro se.
Lewis McKay, pro se.
Barbara A. McMurray, pro se.
Carole A. Michelsen, pro se.
Ronald J. Michelsen, pro se.
Owen J. Miller, pro se.
Jimmy R. Moffin, pro se.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT B

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 618823 (D.Nev.)
(Cite as: 2006 WL 618823 (D.Nev.))

Marcia B. Moffitt, pro se.
Daniel J. Monahan, pro se.
Senorino Montes, Yerington, NV, pro se.
Nelda R. Mottin, pro se.
Barbara J. Mouchou, pro se.
Abraham K. Murray, pro se.
John E. O'Connor, pro se.
Marlene A. O'Connor, pro se.
Nancy A. Oxsen, pro se.
Peter K. Oxsen, pro se.
Dan Pedersen, pro se.
Karen P. Pedersen, pro se.
Clark N. Postal, pro se.
Lynda C. Reese, Yerington, NV, pro se.
Andrew R. Schendrel, Yerington, NV, pro se.
Steven D. Schultz, Minden, NV, pro se.
Theresa Schultz, Minden, NV, pro se.
Jeffrey S. Seldonridge, pro se.
Larry Simmons, pro se.
Richelene Simmons, pro se.
Dennis R. Slater, pro se.
Kimberly Ann Slater, pro se.
Bryan Stevens, pro se.
Pamela M. Stevens, pro se.
Charles L. Sullivan, Wellington, NV, pro se.
Cary Towery, pro se.
Diana Wallin, Yerington, NV, pro se.
Murl E. Williams, Yerington, NV, pro se.
David V. Zahradnik, pro se.
Catherine M. Zohradnik, pro se.
Joseph M. Airoso, Sr., pro se.
Joseph T. Ammons, pro se.
Royce Anderson Family Trust, pro se.
Teresa M. Aquila, pro se.
Darlene M. Ashdown, pro se.
Geraldine S. Babcock, pro se.
Richard E. Babcock, pro se.
J.F. Bawden, pro se.
Kay M. Bradley, pro se.
Brandstetter Family Trust, pro se.
Robert C. Brewer, pro se.
Sandra L. Brewer, pro se.
Bruce Brueggemann, pro se.
Sherilyn E. Brueggemann, pro se.
Betty Buchanan, pro se.

Madeline K. Buettner, pro se.
Wilhelm F. Buettner, pro se.
Bull Family Trust, pro se.
Gary R. Butler, pro se.
Theresa A. Butler, pro se.
Roxanne L. Jones-Cartwright, pro se.
Tommy W. Cartwright, pro se.
Michael J. Chilton, pro se.
Susan A. Clay, pro se.
Clemens Family Trust, pro se.
Donald R. Cochran, pro se.
Susan J. Cochran, pro se.
Gilbert E. Cook, pro se.
Linda L. Cook, pro se.
Antoinette Damron Crabtree, pro se.
Philip W. Crabtree, pro se.
Sherrie D. Criqui, pro se.
Arlien R. Crist, pro se.
Charles J. Crist, pro se.
John H. Davenport, pro se.
Susan R. Davenport, pro se.
Norman R. Fabian, pro se.
Bud S. Fell, pro se.
Shirley A. Fielding, pro se.
Fred Fulstone, Jr., pro se.
Carole A. Giacomini, pro se.
Joseph T. Giacomini, pro se.
Becky L. Goodwill, pro se.
Richard K. Goodwill, pro se.
Kathleen J. Gordon, pro se.
Robert Gordon, pro se.
Gr8 Deal, LLC, pro se.
Vincent N. Greene, pro se.
Gerard Gregoris, pro se.
Michael Gregoris, pro se.
Yvette P. Gregoris, pro se.
Catherine L. Guild, pro se.
Clark J. Guild, III, pro se.
Albert E. Hatala, pro se.
Mary Sue Hatala, pro se.
David B. Herrand, pro se.
Diane M. Herrand, pro se.
Frank E. Hunewill, pro se.
Randi Jo Hunewill, pro se.
Richard A. Ichord, pro se.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT B

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 618823 (D.Nev.)
(Cite as: 2006 WL 618823 (D.Nev.))

Page 3

Shirley M. Ichord, pro se.
Debra L. Johns, pro se.
Michael P. Johns, pro se.
Carol A. Johnston, pro se.
John M. Johnston, pro se.
Michael W. Johnston, pro se.
Rosann M. Johnston, pro se.
Jones Family Trust, pro se.
Martha J. Jones, pro se.
Michael L. Jones, pro se.
Donald Joy, pro se.
Lori J. Joy, pro se.
Carlene D. Kay, pro se.
Frank E. Kay, pro se.
Leroy C. Kay, pro se.
Rita J. Kelley, pro se.
Francis A. Kelley, pro se.
Robert F. King, Jr., pro se.
Jerome H. Kleve, pro se.
Verna Lee Kleve, pro se.
Steven G. Kostenbader, pro se.
Kotler Living Trust, pro se.
Russell Kozerski, pro se.
Constance M. Kretschmer, pro se.
Edward L. Kretschmer, pro se.
Alexander Kropelnicki, pro se.
Marlene R. Kropelnicki, pro se.
Nicolee Kuzmicki, pro se.
Edith Labelle, pro se.
Gary L. Labelle, pro se.
Debra C. LeFleur, pro se.
Gary P. LeFleur, pro se.
Grace R. Lamb, pro se.
Robert W. Lamb, pro se.
Helen Lamkin, pro se.
James M. & Betty L. Lasater Trust, pro se.
Danny L. Lawrence, pro se.
Diane L. Lawrence, pro se.
Jerry W. Lee, pro se.
Robert Lee, pro se.
Frankie L. Lemos, pro se.
Rodney J. Lemos, pro se.
James Levay, pro se.
Helen Leveille, pro se.
William E. Leveille, pro se.

Cameron J. Lewis, pro se.
Donald H. Lindberg, Sr., pro se.
Janice M. Lindberg, pro se.
Catherine Loori, pro se.
Fredrick Lopez, pro se.
Dale E. Luers, pro se.
Devon S. Luers, pro se.
Robert A. Lumbard, pro se.
Stanley Lyman and Bonnie Lyman Revocable Trust, pro se.
Douglas W. Maddock, pro se.
Stacey L. Maddock, pro se.
Margaret E. Mandeville, pro se.
Walter F. Mandeville, pro se.
Jon E. Mason, pro se.
Norene E. Mason, pro se.
Joe Robinson and Eleanor Margherite Mathis Trust, pro se.
Christopher A. McAviney, pro se.
John N. McAviney, Jr., pro se.
Shirley J. McDermott 2000 Trust, pro se.
Bettie M. McGuire, pro se.
Melanie McGuire, pro se.
Michael S. McGuire, pro se.
Doris J. McLaughlin, pro se.
Joan M. Medaris, pro se.
Leland H. Medaris, pro se.
Richard O. Meerly, pro se.
Patricia Sue Megenity, pro se.
Jorge Negrete Mendoza, pro se.
Joe Menesini, Jr., Yerington, NV, pro se.
Wanda M. Menesini, pro se.
Cynthia Mestressat, pro se.
George J. Mestressat, pro se.
Patti A. Midyett, pro se.
Bruce E. Milam, pro se.
Sylvia L. Milam, pro se.
Kris C. Miller, pro se.
Mary Ann Miller, pro se.
Edward C. Montanaro, pro se.
Mary M. Montanaro, pro se.
Maria B. Montes, pro se.
Taurino R. Montes, pro se.
Jeffrey Howard Moore, Yerington, NV, pro se.
Robbin Rose Moore, pro se.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT B

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 618823 (D.Nev.)
(Cite as: 2006 WL 618823 (D.Nev.))

Sandra H. Moore, pro se.
Janet Moreda, pro se.
Muniain Family Trust, pro se.
Mary K. Muniain, pro se.
Raymond O. Muniain, pro se.
Francine L. Myers, pro se.
Travis E. Myers, pro se.
Linda L. Nagy, pro se.
Michael E. Nagy, pro se.
John M. Newman, pro se.
Jesse Nish, pro se.
Noles Trust, pro se.
Todd J. O'Banion, pro se.
Gerald F. Olsen, pro se.
Rochelle L. Olsen, pro se.
Debra L. Pellegrini, pro se.
Steven W. Pellegrini, pro se.
Lenda Lou Pierman, pro se.
Jimmy D. Pipkin, pro se.
Rose M. Pipkin, pro se.
Charles R. Price, pro se.
Andrew S. Proud, pro se.
Wendy E. Proud, pro se.
Rggs Land & Minerals, Ltd. LP, pro se.
Barbara J. Reed, pro se.
Ardenna K. Rienstra, pro se.
Paul E. Rienstra, pro se.
Rightway Investments Smith Valley, LLC, pro se.
Christine A. Roberts, pro se.
William P. Roberts, pro se.
George F. Robinson, pro se.
Kimberly J. Robinson, pro se.
Michael G. and Paula L. Rosaschi Trust, pro se.
James H. Ruble, pro se.
Pauline H. Ruble, pro se.
Frederick C. Sebald, pro se.
Leona Lucille Sebald, pro se.
Alden Henry Sipes, pro se.
Nancy Jean Sipes, pro se.
Barbara L. Smith, pro se.
Thomas H. Smith, pro se.
Robert L. Stewart, pro se.
Terrie L. Stewart, pro se.
Dale A. Theiss, pro se.
Sharon F. Theiss, pro se.

John J. Wilder, pro se.
Lin C. Wilder, pro se.
Maudy E. Wilders, pro se.
Ada L. Willingham, pro se.
Dale Lackore, Yerington, NV, pro se.
Robert Wilders, pro se.

## ORDER

MCQUAID, Magistrate J.

*1 This case centers around a water rights dispute and involves a multitude of parties. The court established confidential mediation proceedings to take place every six months in order to facilitate the settlement of certain issues. (Doc. # 566, Attach.1.[FN1]) The mediating parties also entered into a private contract to that effect, the Mediation Process Agreement (hereinafter "MPA").(*Id.* at Attach. 2.) Individual stakeholders were not invited to participate. (*Id.* at Attach 1.)

> FN1. The citations to the court's order governing the mediation process and the Mediation Process Agreement are to attachments of Docket # 566 in case 3:73-CV-00125-ECR-RAM. All other docket citations are to case number 3:73-CV-00127-ECR-RAM.

Attorney Gordon DePaoli represents the Walker River Irrigation District (hereinafter "WRID") and several individual stakeholders in this case. Defendants Joseph and Beverly Landolt (hereinafter "the Landolts") filed a Motion to Disqualify Mr. DePaoli from participating in this case on November 28, 2005 due to his multiple representation. (Doc. # 795.) A Joint Response was filed on January 26, 2006 (Doc. # 824) by the United States, the States of Nevada and California, the Walker River Paiute Tribe, Mono County, Lyon County, Mineral County, and the Walker Lake Working Group. WRID filed a separate response on January 30, 2006 (Doc. # 826). The Landolts replied on February 21, 2006. (Doc. # 835.) Oral argument was heard on the motion on March 7, 2006.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT B

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 618823 (D.Nev.)
(Cite as: 2006 WL 618823 (D.Nev.))

### STATEMENT OF FACTS

Briefly, the Walker River is an unnavigable stream beginning on the eastern slopes of the Sierra Nevada mountains in California. *United States v. Walker River Irr. Dist.,* 104 F.2d 334, 335 (9th Cir.1939). Lands along the river require irrigation in order to be productive. *Id.* There are numerous claimants to the Walker River's water rights. This case involves claimants to both the surface and underground water. (Doc. # 826 at p. 8.)

#### A. The Parties

This case involves many parties, such as the United States, the Walker River Paiute Tribe, the WRID, the State of Nevada, the State of California, Mineral County (Nevada), Lyon County (Nevada), Mono County (California), the Walker River Working Group, and numerous individual stakeholders. The following is only a brief summary of the relevant parties to this Motion, WRID and the individual stakeholders.

#### (1) Walker River Irrigation District

WRID is being represented in this matter by Mr. DePaoli. WRID was created by statute in 1919. *See*Nev.Rev.Stat. §§ 539.010, 539.013(2) (2005). It owns, operates, and holds legal title to the water rights for Bridgeport and Topaz Reservoirs. *See Mineral County v. Nevada ex rel. Dept. of Conservation & Natural Res.,* 117 Nev. 235, 20 P.3d 800, 804 (Nev.2001); 45 Am.Jur.2d *Irrigation* § 56 (2005). WRID also holds several permits relating to the Walker River surface water in Nevada called "State Certified Rights." (Doc. # 826.) Generally, WRID's powers range from the ability to contract with the federal, state, and local governments, Nev.Rev.Stat. §§ 539.270, 539.273, 539.333 (2005), construct improvements, *id.* at § 539.363, buy property, *id.* § 539.207, and lease out district lands, *id.* § 539.213, among other things.

\*2 All of the district's members must be "holders of

title, or evidence of title, to land susceptible of one mode of irrigation from a common source or combined sources...."Nev.Rev.Stat. § 539.020(1) (2005); *see id.* §§ 539.023, 539.123; *see also id.* §§ 539.037(1), 539.107. Thus, the members are the beneficial owners of the water rights held by WRID, and they are responsible for electing, *id.* § 539.123, a five member (Doc. # 826), Nev.Rev.Stat. § 539.063 (2006), board of directors from within their own membership, Nev.Rev.Stat. §§ 539.045, 539.055(2)(b), 539.113 (2006); *see also*45 Am.Jur.2d *Irrigation* §§ 58, 63 (2005).

#### (2) Individual Stakeholders

Mr. DePaoli also represents several individual clients who are members of WRID. (Doc. # 827, ¶¶ 5, 13.) No evidence has been presented by Mr. DePaoli regarding his individual clients, not even their identities. The Landolts only item of evidence in support of their Motion to Disqualify is a list of Mr. DePaoli's clients. (Decl. of Elisa Marino.) The list does not contain any information other than the clients' names. There is no information, for example, regarding what kind of water rights these people may have, or whether they are WRID board members.

#### B. The Confidential Mediation Process

Due to the size and complexity of this case, the court ordered the case to be bifurcated on April 18, 2000. (Doc. # 108.) The bifurcation separated the Tribal claims from the rest of the case based on the reasoning that most parties may have "many of the [same or similar] defenses to the claims of the U.S./Tribe claims...."(*Id.*)The court expressly recognized, however, that "[e]xactly how the defense which overlap the claims for the [Tribe] will play out ... is uncertain...."(*Id.*)

The confidential mediation process at the focus of this controversy was established by a court order (Doc. # 566, Attach.1.) and private contract (Doc. # 566, Attach.2). These procedures were established

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT B

for case management purposes, and to identify the threshold issues to the Tribal claims. (Doc. # 108.) During the mediation, all proceedings and discovery have been stayed by court order. (*Id.*, Doc. # 566, Attach 1.)

According to the court order entered on May 27, 2003:

> The Mediation Process is a confidential process. That process shall be treated as compromise negotiations under Rule 408 of the Federal Rules of Evidence[FN2].... This Mediation Process is a "mediation" within the meaning of California Evidence Code § 1115(a).[FN3] The Parties to the Mediation Process are bound by and shall comply with the confidentiality provisions set forth in Paragraphs 8 and 9.3 of the [MPA]. Except as provided in Paragraph 8.3.1 of the [MPA], all Parties to the Mediation Process shall be protected from being required to disclose any information regarding the substance of the Mediation Process to any party to the C-125 case, whether or not such party is also a Party to the Mediation Process. Except as provided in Paragraph 8.3.1 of the [MPA], all information that is confidential within the Mediation Process and under the [MPA] shall not be admissible for any purpose in the C-125 case or in any judicial or administrative proceeding for any purpose, including but not limited to impeachment.

> FN2.Rule 408 states that:

> > Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence

otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

> FN3.California Evidence Code § 1115(a) defines "mediation" as a "process in which a neutral person ... facilitates communication between the disputants to assist them in reaching a mutually acceptable agreement."

*3 (Doc. # 566, Attach 1.)

Paragraph 8 of the MPA discusses the confidentiality provisions of the mediation process. (Doc. # 566, Attach 2.) There are several notable exceptions, such as disclosures to decision-makers and governing bodies (section 8.3.3), disclosure to constituents (section 8.3.4), communications with elected officials (section 8.3.5), and a general catch-all provision (section 8.3.6).

The mediation process only involves certain parties, including WRID. Individual stakeholders, like the Landolts, are not invited to participate. However, the interests and input of individual stakeholders are not completely disregarded in this process. If the mediating parties negotiate a settlement agreement it can only become final and effective when all parties to this suit and the court give their approval. (Doc. # 566, Attach 2 (section 9.1).)

## *LEGAL STANDARD*

Attorney disqualification is a matter of state law. *In re County of Los Angeles,* 223 F.3d 990, 995 (9th Cir.2000). The burden of proof is on the moving party to present sufficient facts justifying disqualification. *Colyer v. Smith,* 50 F.Supp.2d 966, 967 (C.D.Cal.1999); *Weeks v. Samsung Heavy Indus.*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT B

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 618823 (D.Nev.)
(Cite as: 2006 WL 618823 (D.Nev.))

Co., 909 F.Supp. 582, 583 (N.D.Ill.1996); *see also Frazier v. Superior Court*, 97 Cal.App.4th 23, 36, 118 Cal.Rptr.2d 129 (2002) ("the courts should start off with the presumption that ... lawyers will behave in an ethical manner"). Thus, "[a] motion to disqualify should be accompanied by declarations and admissible evidence sufficient to establish the factual predicate upon which the motion depends." *Colyer*, 50 F.Supp.2d at 967.

Disqualification is a "drastic measure which courts should hesitate to impose except when absolutely necessary[,]" *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 721-22 (7th Cir.1982), because it takes away one party's ability to chose his own representation, and it is often a tactic used to create delay or harassment, *Miller v. Alagna*, 138 F.Supp.2d 1252, 1258-59 (C.D.Cal.2000). Motions to disqualify are therefore subject to strict judicial scrutiny, *Optyl Eyewear Fashion Intern. Corp. v. Style Companies, Ltd.*, 760 F.2d 1045, 1050 (9th Cir.1985), and courts have wide discretion in their rulings to further the interests of fairness to all parties, *Int'l Bus. Mach. Corp. v. Levin*, 579 F.2d 271, 279 (3d Cir.1978).

The rule for concurrent client conflicts is set forth in Nevada Supreme Court Rule 157 (hereinafter "NSCR").FN4 NSCR 157, which closely mirrors ABA Model Rule of Professional Conduct 1.7, *Duval Ranching Co. v. Glickman*, 930 F.Supp. 469, 472 (D.Nev.1996), states:

> FN4. The ABA Model Rules' preamble and comments were not adopted, but may be used as guidance to construe the Nevada Rules of Professional Conduct. Nev. Sup.Ct. R. 150.

1. A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

(a) The lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

(b) Each client consents, preferably in writing, after consultation.

*4 2. A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(a) The lawyer reasonably believes the representation will not be adversely affected; and

(b) The client consents, preferably in writing, after consultation. When consultation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

Nev. Sup.Ct. R. 157.

## DISCUSSION

As a general rule, only former and current clients have standing to bring a motion to disqualify counsel on the basis of a conflict of interest. *In re Yarn Processing Patent Validity Litig.*, 530 F.2d 83, 88 (5th Cir.1976); *Colyer v. Smith*, 50 F.Supp.2d 966, 971 (C.D.Cal.1999). In the absence of an attorney-client relationship the "powerful presumptions" designed to protect current or former clients and encourage public confidence in the legal profession are inappropriate. *In re Yarn*, 530 F.2d at 89-90. Thus, the threshold issue presented in the Motion to Disqualify is whether the Landolts have standing to seek the disqualification of Mr. DePaoli under federal law, *Colyer*, 50 F.Supp.2d at 968 n. 2, and the burden rests upon the Landolts to prove standing exists, *id.* at 968.

The current standard applied to non client motions to disqualify articulated in *Colyer v. Smith* requires a non client to show they have a "personal stake in the motion," *id.* at 971, because of an "ethical breach [that] so infects the litigation ... that it impacts the moving party's interest in a just and lawful

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT B

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 618823 (D.Nev.)
(Cite as: 2006 WL 618823 (D.Nev.))

determination of her claims...."*Id.*This is a two-step inquiry, and the alleged injury to the non client movant must be "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."*Id.* at 973 (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). This standard assures that non clients will not abuse the state rules of professional responsibility by using them as tactical measures to harass the opposition or cause delay. *Id.; see Optyl Eyewear Fashion Intern. Corp. v. Style Companies, Ltd.,* 760 F.2d 1045, 1050 (9th Cir.1985) ("The cost and inconvenience to clients and the judicial system from misuse of the rules for tactical purposes is significant").

*1. Ethical Breach*

The Landolts' position is that an ethical breach has occurred by virtue of Mr. DePaoli's multiple representation in this matter. (Docs.# 795, 835.) According to the Landolts, Mr. DePaoli has necessarily breached his duties of loyalty, *see* NSCR 157, and communication, *see* NSCR 154, to his individual stakeholder clients by keeping information from the court ordered mediation confidential. (Doc. # 835.) The Landolts contend that all individual stakeholder clients, including themselves, have a real and substantial interest in the details of the mediation because of the potential consequences it would have on their water rights. (*Id.*) Alternatively, the Landolts allege that if Mr. DePaoli has kept his individual clients informed and shared information with them, then he has necessarily violated his duty of confidentiality to WRID, *see* NSCR 156, and is in violation of the court's order and the MPA. (*Id.*)

*5 Although there is some sense in the Landolts' argument, the court cannot find that an ethical violation has occurred. There is no evidence that Mr. DePaoli has even obtained information that would cause a conflict amongst his clients under NSCR 154 and 157, and there is no evidence that WRID and Mr. DePaoli's individual clients have adverse interests. *Colyer,* 50 F.Supp.2d at 967;*accord In re*

*Discipline of Schaefer,* 117 Nev. 496, 25 P.3d 191, 204 (Nev.2001); *see, e.g., United States v. Linton,* 502 F.Supp. 871, 877 (D.Nev.1980). All the Landolts have to offer are their own assumptions and speculations. However, the court is unwilling to presume Mr. DePaoli has acted improperly based on bald allegations.

Courts "must assume that an attorney will observe his responsibilities to the legal system, as well as to his client[,]" *Geders v. United States,* 425 U.S. 80, 93, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976) (Marshall, J., concurring), unless there is evidence to the contrary, *In re Discipline of Schaefer,* 25 P.3d at 204; *Colyer,* 50 F.Supp.2d at 967. To that extent, the only evidence the Landolts submitted in support of their motion is a list of Mr. DePaoli's clientele (Doc. # 796), and the MPA's confidentiality clause. The list itself, however, is inadequate because it does not establish that Mr. DePaoli has information that would cause an ethical violation. *See* NSCR 154, 157. A bare list of names does not necessarily prove that Mr. DePaoli has divided interests. *See* NSCR 157. Nothing about the mediation proceedings can be inferred from the list. *See In re Discipline of Schaefer,* 25 P.3d at 204 (requiring that ethical violations be proven by clear and convincing evidence with "tangible facts").

Likewise, neither does the mere existence of a confidentiality clause governing the mediation proceedings establish that Mr. DePaoli has information that would put him in a position of conflict. The court acknowledges that there are many sound reasons for keeping certain matters confidential that have little or nothing to do with the sharing of secret and harmful information. In a case of this size and nature, a confidentiality clause may exist for case management purposes-in the simplification of issues and saving of judicial resources-or to encourage negotiations.[FN5]Also, it may be important to keep discussions confidential so that information is not inaccurately publicized by the media.

FN5. In *Lake Utopia Paper Ltd. v. Connelly Containers, Inc.,* 608 F.2d 928, 930

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT B

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 618823 (D.Nev.)
(Cite as: 2006 WL 618823 (D.Nev.))

(2d Cir.1979), the Second Circuit discussed the value of confidential settlement discussions, stating that:

[C]onfidentiality permits and encourages counsel to discuss matters in an uninhibited fashion often leading to "settlement, [and] the simplification of the issues...." [Without it,] ... counsel of necessity will feel constrained to conduct themselves in a cautious, tight-lipped, non-committal manner more suitable to poke players in a high-stakes game than to adversaries attempting to arrive at a just resolution of a civil dispute.

Altogether, the court finds there is no real evidence, direct or circumstantial, to support this motion to disqualify. (See, e.g., Doc. # 795 at pp. 7-9, 25 P.3d 191; Doc. # 835 at pp. 12-15, 25 P.3d 191.) The Landolts cannot prove Mr. DePaoli has breached his ethical duties by merely pointing to his list of clients, or the MPA's confidentiality provision. Allowing the Landolts to "make [their position more] concrete by speculating" further (Doc. # 835 at p. 11, 25 P.3d 191) would be illogical.[FN6]Furthermore, the court will not allow the Landolts to completely avoid their burden of proof by arguing that because the mediation proceedings are confidential they cannot articulate what information has been obtained by Mr. DePaoli. (Doc. # 835.)

FN6. The Landolts attempt to justify their use of a speculative analysis by comparison to Judge Edward C. Reed, Jr. in Duval Ranching Co. v. Glickman, 930 F.Supp. 469 (D.Nev.1996). (Doc. # 835 at p. 11.)This gross mischaracterization of Judge Reed's opinion is unconvincing. Judge Reed did not speculate in reaching his conclusion, which by the way, found that disqualification was not required under the circumstances. Duval Ranching, 930 F.Supp. at 473. What the Landolts call Judge Reed's analytical "speculations" are in fact only his recitations of the law taken

from the ABA Model Rule comments. Id. (citing ABA Model Rule 1.7 Official Comment).

In Duval, Judge Reed acknowledged the "reasonable likelihood that, at some point in the course of this litigation, the needs of desires of the County Commissioners may diverge from those of the private plaintiffs," but did not speculate further. Id. Rather, considering the lack of evidence of an actual conflict at that moment, Judge Reed stopped at "advis[ing]" the district attorney to use "great vigilance" in providing his private clients with independent representation. Id.

2. The Impact on the Landolts

*6 Non client standing to move to the disqualification of an attorney exists only if there is an "ethical breach [that] so infects the litigation ... that it impacts the moving party's interest in a just and lawful determination of her claims...." Colyer, 50 F.Supp.2d at 971. The Landolts have not been able to prove Mr. DePaoli has committed an ethical violation, see id. at 967; In re Discipline of Schaefer, 25 P.3d at 204; however, even if the court were to assume the Landolts had some evidence of a breach, they would still lack standing because they cannot show how it would affect the just determination of their claims.

For instance, the Landolts argue the threat to them may occur if the court were to:

Suppose the mediating parties learn that a settlement is imminent and that it will mean a loss of some of their existing water rights.... Armed with such inside information, the mediating parties could sell off their water rights before [their] decline [in value]. Further, without disclosing the confidential information, Mr. DePaoli could alert his nonmediating clients to sell off water rights before they take a tumble in the marketplace.... One can specu-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT B

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 618823 (D.Nev.)
(Cite as: 2006 WL 618823 (D.Nev.))

late like this *ad infinitem* to illustrate the potential inequity presented....

(Doc. # 835 at pp. 11-12, 25 P.3d 191.) However, the threat of injury to the Landolts as non clients must be concrete and particularized, and actual or imminent. *Colyer,* 50 F.Supp.2d at 973 (citing *Lujan,* 504 U.S. at 560). In this case, there is no evidence that any of Mr. DePaoli's clients have recently sold their water rights based on confidential information from the mediation proceedings. There is no evidence of the increasing or declining value of Walker River water rights. The court cannot presume the Landolts suffer from an actual or imminent harm based on " 'a chain of speculative contingencies....' " *Eggar v. City of Livingston,* 40 F.3d 312, 316 (9th Cir.1994) (quoting *Nelsen v. King County,* 895 F.2d 1248, 1252 (9th Cir.1990)). Their concerns are purely hypothetical, not concrete. *Colyer,* 50 F.Supp.2d at 973.

Next, the Landolts argue that their interests are at risk because Mr. DePaoli's clients may discover and use certain defenses that they and other non-DePaoli clients will not know about because of his participation in the confidential mediation proceedings. (Docs.# 795, 835.) To that extent, the Landolts seem to misunderstand the structure of the mediation process, (*e.g.,* Doc. # 835 at pp. 12-13;*but see* Doc. # 824 at pp. 4-5;*see, e.g.,* Doc. # 824, Exhs. A, B), and that this is a "phased" case. That is, this case is so large and complex the court bifurcated · the larger and preliminary issues involving the Paiute Tribe claims from the rest of the case in 2000. (Doc. # 108.) The mediation procedures were designed to organize, simplify, and possibly settle many of the Pauite Tribe claims. (*See* Doc. # 10; *I see also* Doc. # 566, Attachs. 1, 2.) Although individual stakeholders were not included in the mediation procedures,[FN7] for case management purposes, no settlement will actually become "final and effective [until]: (1) it has been executed by *all of the Parties* or their designated representatives; and (2) the District Court has approved [it]...." (Doc. # 566, Attach 2 (section 9.1) (emphasis ad-

ded).) The Landolts cannot claim there is an actual or imminent danger to the just determination of their claims given those preconditions to settlement. The fact that settlement discussions have not even concluded also goes against the Landolts, because the role of individual stakeholders has not yet come into play.

> FN7. It should be noted, however, that the MPA and the mediating parties expressly recognized "the need to keep decision-makers, governing boards, constituents, elected officials and the public in general informed...." (Doc. # 566, Attach. 2 (section 8.1).) The confidentiality provisions are therefore not without exceptions. Of course, the Landolts argue that they "are not exceptions at all[,] but an accurate statement of the law which is that anything that is already known cannot be made confidential by a confidentiality agreement."(Doc.# 835 at p. 5.) This is simply not true. Section 8.3.1 of the MPA discusses that exact proposition, but section 8.3.3 and its subsections discuss other types of disclosures that would keep interested parties meaningfully informed. (*See* Doc. # 566, Attach 2.)

> The Landolts also contend that the provision allowing for certain disclosures to constituents is "so narrow that nothing of substance can be disclosed under their terms."(Doc. # 835 at p. 5.) Granted, the MPA does not authorize the Landolts to receive a play-by-play of the mediation (*id.* at p. 4), but their characterization of section 8.3.4 of the MPA is simply incorrect. They, along with the rest of WRID's members, may be informed of the " solutions being considered or not considered, including proposals for the allocation of water between Nevada and California; work assignments; and the date or dates of the next negotiating ses-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT B

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 618823 (D.Nev.)
(Cite as: 2006 WL 618823 (D.Nev.))

sion."(Doc. # 566, Attach 2 (section 8.3.4).) This is no small deal. It is not readily apparent to the court, nor has it been explained by the Landolts, why it would be necessary for them to know more, such as "who said what," and "how these solutions were negotiated between the parties."

*7 Furthermore, the Landolts' fear of being at a tactical disadvantage completely ignores the court's order, which stated:

As soon as [it is] convenient, ... the Magistrate Judge shall consider and make a preliminary determination of the threshold issues to be addressed at the *outset* of the litigation on the U.S./Tribe [claims].... The list ... will not be finally resolved and settled by the Magistrate Judge until *all* appropriate parties are joined.

(Doc. # 108 (emphasis added).) The list will be compiled through the joint efforts of all parties to this case, including Mr. DePaoli's clients. (*Id.*) Thus, since everyone will know what defenses are available, for example, and that "many of the defenses to the claims of the U.S./Tribe claims ... may be the same or similar[,]"(*id.*) the court fails to see how the Landolts' alleged injury is concrete or particularized, *Colyer*, 50 F.Supp.2d at 973.

Based on the overwhelming lack of evidence, the Motion for Disqualification must be denied. There is no proof that Mr. DePaoli has committed an ethical violation, and the Landolts have not provided the court with any legal principle that would justify a presumption otherwise. *See United States v. Linton*, 502 F.Supp. at 877 ("[A] trial court must be able to rely upon the good faith and judgment of counsel, for they are in the best position to know when a conflict exists or probably will develop"); *see, e.g., Duval Ranching Co.*, 930 F.Supp. at 473 (refusing to disqualify an attorney even when there was a "reasonable likelihood that, at some point in the course of [the] litigation, the needs or desires of County Commissioners may diverge from those of

the private plaintiffs"). However, even if the court were to assume a conflict existed, the Landolts cannot sufficiently articulate how the just determination of their claims is actually at risk. *Colyer*, 50 F.Supp.2d at 973. Every alleged potential situation depended on multiple assumptions (*e.g.*, Doc. # 835 at pp. 11-12), and failed to consider the court's bifurcation of this litigation and the mediation proceedings.

The court emphasizes, however, that this case is a phased litigation. (Doc. # 108.) The mediation proceedings are only the introduction towards the identification of the issues in "Phase I" that their final resolution in "Phase II." (Doc. # 108.) The Landolts' objections are premature now, but may be appropriate in the future. *See, e.g., United States v. Linton*, 502 F.Supp. at 877.

Accordingly, the court finds that at this time the Landolts have failed to establish either prong of the *Colyer* standard and, therefore, have failed to establish standing to bring this Motion.

### ORDER

IT IS HEREBY ORDERED that the Landolts' Motion to Disqualify Gordon DePaoli (Doc. # 795) is *DENIED.*

D.Nev.,2006.
U.S. v. Walker River Irr. Dist.
Not Reported in F.Supp.2d, 2006 WL 618823 (D.Nev.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT B

# EXHIBIT 4

# EXHIBIT 4

EXHIBIT B

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 558561 (S.D.Cal.)
(Cite as: 2008 WL 558561 (S.D.Cal.))

C

Only the Westlaw citation is currently available.
United States District Court, S.D. California.
The LARYNGEAL MASK COMPANY LTD. and
LMA North America, Inc., Plaintiffs,
v.
AMBU A/S, Ambu, Inc., Ambu Ltd., and Ambu
Sdn, Bhd., Defendants.
and Related Counterclaim.
No. 07-CV-1988-DMS (NLS).

Feb. 25, 2008.

Frederick S. Berretta, Knobbe Martens Olson and
Bear, San Diego, CA, for Plaintiffs.
John H. L'Estrange, Jr., Wright and L'Estrange, San
Diego, CA, Bryan C. Diner, Gerald F. Ivey, P. An-
drew Riley, Sarah J. Sladic, Finnegan, Henderson,
Farabow, Garrett & Dunner, LLP, Washington, DC,
Robert L. Burns, Finnegan, Henderson, Farabow,
Garrett & Dunner LLP, Reston, VA, for Defend-
ants.

ORDER GRANTING PLAINTIFFS' MOTION TO
DISQUALIFY FINNEGAN HENDERSON FARA-
BOW GARRETT & DUNNER, LLP AS DEFEND-
ANTS' COUNSEL

DANA M. SABRAW, District Judge.
*1 This matter comes before the Court on Plaintiffs'
motion to disqualify Defendants' counsel, Finnegan
Henderson Farabow Garrett & Dunner, LLP, on the
ground that a conflict of interest arose when
Plaintiffs interviewed the law firm as possible
counsel in this same patent infringement law suit.
The Court found the motion suitable for decision
without oral argument. Civ. Local Rule 7.1(d)(1).
The Court grants the motion because Plaintiffs have
shown that they revealed confidential information
and obtained legal advice during the preliminary in-
terview which prevents the law firm from repres-
enting Defendants in the same action. The Court
emphasizes that this is *not* a disciplinary matter and

no unethical conduct has occurred; rather, disquali-
fication is a discretionary matter for the Court to
decide after taking into account the interests of the
parties as well as preserving the "public trust in the
scrupulous administration of justice and the integ-
rity of the bar." *Department of Corps. v. SpeeDee
Oil Change Sys., Inc.,* 20 Cal.4th 1135, 1144-47, 86
Cal.Rptr.2d 816, 980 P.2d 371 (1999). It is axio-
matic that an attorney must avoid even the appear-
ance of a conflict of interest. *Trone v. Smith,* 621
F.2d 994, 1000 (9th Cir.1980) (strict ethical code
"is what distinguishes a professional relationship
from one involving merely a barter and sale").

*Background*

The two patents in this infringement action are as-
signed to Plaintiff The Laryngeal Mask Company,
Ltd., and licensed to Plaintiff LMA North America,
Inc. The first patent, U.S. No. 5,303,697, issued in
1994; and the second patent, U.S. Patent No.
7,156,100, issued on January 2, 2007. Compl. ¶ 5.
The patents pertain to a a medical device known as
a "laryngeal mask airway," which maintains an air-
way while a patient is under anesthesia. Defendants
Ambu A/S, Ambu Inc., Ambu Ltd., and Ambu Sdn.
Bhd. manufacture, import, and sell a competing
product, which Plaintiffs allege infringes its two
patents.[FN1] Compl. ¶ 11.

> FN1. For instance, on October 23, 2006, a
> German court had determined that Defend-
> ants infringed one of Plaintiffs' European
> Patents. Marzen Decl. ¶ 4.

Prior to the commencement of this action, Plaintiffs
interviewed two lawyers at the Finnegan law firm
as possible representatives against Defendants
Ambu; simultaneously, Defendants Ambu hired a
different lawyer from the same office to represent
them. The parties dispute whether the preliminary
interview between Plaintiffs and Finnegan created
an attorney-client relationship that would give rise

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT B

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 558561 (S.D.Cal.)
(Cite as: 2008 WL 558561 (S.D.Cal.))

Page 2

to fiduciary duties to maintain confidences, avoid the appearance of impropriety, and prevent representation adverse to Plaintiffs. The parties dispute the nature and extent of the preliminary interview, specifically, whether confidences were disclosed or legal advice was given that would disqualify Finnegan from this action.[FN2]

> FN2. Defendants object to the Plaintiffs' expert declaration, but the Court did not consider it; thus, the objection is moot.

*Plaintiffs' Version*

Stephen J. Marzen, a partner at Shearman & Sterling LLP in Washington, D.C., serves on Plaintiffs' parent corporation's Board of Directors as the Chair of the Intellectual Property Committee. Marzen Decl. ¶ 1-2. In October 2006, Marzen learned that the United States Patent and Trademark Office would allow the '100 patent. Ex. A to Marzen Decl. Plaintiffs knew that Defendants Ambu marketed a competing device. At the October 2006 Board of Directors meeting, Plaintiffs instructed Marzen to investigate the possibility of bringing a patent infringement action against Defendants Ambu once the patent issued.*Id.*

*2 Marzen enlisted the assistance of Wendy Ackerman, another lawyer at Shearman & Sterling's District of Columbia office. Ackerman Decl. ¶ 1-3. On November 20, 2006, Ackerman called Charles Lipsey, a partner in Finnegan's Reston, Virginia office to ask whether he or another lawyer at his firm "might be a good fit to serve as trial counsel in the case."*Id.* ¶ 4. Lipsey recommended J. Michael Jakes in Finnegan's Washington, D.C. office because he had substantial experience in medical device patent litigation. *Id.* Ackerman called Jakes to discuss whether he had any interest in representing Plaintiffs in the potential patent infringement action. *Id.* ¶ 5. A meeting was set for November 22, 2006, the Wednesday before the Thanksgiving weekend, in Finnegan's District of Columbia office. Both Marzen and Ackerman understood that Fin-

negan would be conducting a conflicts check before the meeting. Marzen Decl. ¶ 7; Ackerman Decl. ¶ 5.

At the meeting with the two Finnegan lawyers, Marzen described the background of the Ambu-Laryngeal dispute, reviewed their claim constructions, showed both masks, and summarized the Notice of Allowance and prior art. Marzen Decl. ¶ 8; Ackerman Decl. ¶ 6. Marzen asserts that "numerous confidences and secrets" were disclosed to Finnegan. Marzen Decl. ¶ 10. According to Marzen and Ackerman, the Finnegan lawyers provided advice about which entities should be involved in the patent litigation; what counterclaims Ambu might bring; and the possible amount of recovery. Marzen Decl. ¶ 9; Ackerman Decl. ¶ 6. Both Marzen and Ackerman "understood that all our discussions would be treated as privileged attorney-client communications," and Marzen confirmed that in writing. Marzen Decl. ¶ 7, 18 & Ex. D; Ackerman Decl. ¶ 7. The meeting ended with Marzen's comment that he would discuss the matter with Plaintiffs and then contact Finnegan about Plaintiffs' decision as to which firm would be hired. Marzen Decl. ¶ 12; Ackerman Decl. ¶ 8.

*Finnegan's Version*

According to the two lawyers at Finnegan, the meeting was a "meet and greet session to aid [Plaintiffs] in shopping for potential counsel."Jakes Decl. ¶ 4. Jakes had understood Ackerman's clients to be "Orthofix" and "Intavent" and ran conflicts checks on those names. Jakes Decl. ¶ 3. Jakes prepared for the meeting by conducting an internet search on the companies and gathering some marketing materials about the firm, but otherwise "walked into the room knowing nothing of substance about the case."Jakes Decl. ¶ 4-5. Similarly, the associate that Jakes invited to the meeting, John Williamson, "did not conduct any research or otherwise prepare for the meeting."Williamson Decl. ¶ 2.

Both Jakes and Williamson deny that Plaintiffs dis-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT B

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 558561 (S.D.Cal.)
(Cite as: 2008 WL 558561 (S.D.Cal.))

Page 3

closed any confidential information during the exploratory meeting. Jakes Decl. ¶ 10 & Ex. A (in January 3 e-mail, Jakes states that Plaintiffs "didn't actually identify the patent, only the product"); Williamson Decl. ¶ 3. Both attorneys further stated that they did not provide any legal advice on any topic; instead, Jakes gave "a general overview of patent litigation similar to those I have delivered at public speaking engagements for other lawyers or industry gatherings."Jakes Decl. ¶ 6-8; *accord* Williamson Decl. ¶ 4 ("broad brush overview"), 6, 8. Jakes states that "[n]othing happened during the meeting to suggest" that an attorney-client relationship had been or would be established, because he believed Plaintiffs would not select Finnegan. Jakes Decl. ¶ 9, 12.

*Undisputed Events After Meeting*

*3 On January 3, 2007, another partner at Finnegan's District of Columbia office was retained by Defendants Ambu. Jakes Decl. ¶ 13. On January 5, 2007, Finnegan circulated a memorandum throughout the firm establishing an "ethical wall" around Jakes and Williamson on the Ambu-Laryngeal Matter. Ex. H to Berretta Decl.

During that same time period, Marzen obtained permission from the Board of Directors to retain Finnegan. Marzen Decl. ¶ 13-14 (Marzen recommended Finnegan on December 4, and Plaintiffs supported that recommendation on January 11). Marzen and Jakes exchanged voice mail messages, and when they spoke on January 24, 2007, Jakes stated that Finnegan now had a non-waivable conflict of interest. Marzen Decl. ¶ 17; Jakes Decl. ¶ 15. On January 30, 2007, Marzen wrote a letter reminding Finnegan "to maintain in strict confidence all information obtained from your prospective client."Ex. D to Marzen Decl.

In October 2007, Plaintiffs filed this patent infringement action. In November, Finnegan attorneys filed *pro h ac v ice* applications to appear for Defendants. The day after Defendants answered,

Plaintiffs filed this motion to disqualify Finnegan.

*In Camera Declaration*

The motion and opposition briefs were supported by declarations that recited the facts described above. In support of their reply brief, Plaintiffs provided a supplemental declaration from Marzen for *in c amera* review by the Court that contained specific confidential information and legal advice.[FN3]A redacted version of the supplemental declaration was provided to Defendants Ambu. Defendants Ambu object to the *in camera* supplemental declaration and ask the Court to disclose it to the outside attorneys that Finnegan hired to represent Jakes and Williamson in this disqualification motion.

> FN3. Defendants Ambu also object to the supplemental declaration on the ground that it raises new matters in a reply. The Court denies the ex parte application because the supplemental declaration merely provided additional details on the matters at issue. The Court has also reviewed the supplemental declarations provided by the Finnegan attorneys.

*Discussion*

This Court is "committed to the highest standards of professionalism and expects those standards to be observed by lawyers who practice before it."Civ. Local Rule 83.4(a). This Court adopts "the standards of professional conduct required by members of the State Bar of California, and decisions of any court applicable thereto"; moreover, attorneys must note the ABA's Model Rules of Professional Conduct and shall not "engage in any conduct that degrades or impugns the integrity of the court."*Id.* (b). The attorney-client privilege that protects confidential communications is a paramount ethical obligation that is supported by sound public policy. *See generally Mitchell v. Superior Ct.*, 37 Cal.3d 591, 599-600, 609-11, 208 Cal.Rptr. 886, 691 P.2d 642

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT B

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 558561 (S.D.Cal.)
(Cite as: 2008 WL 558561 (S.D.Cal.))

Page 4

(1984) ( "The attorney-client privilege has been a hallmark of Anglo-American jurisprudence for almost 400 years.").

A. *Ethical Duties arising out of Preliminary Meeting*

The threshold question in this motion for disqualification is whether an attorney-client relationship was formed during the preliminary consultation. It is well established that a lawyer's fiduciary obligations exist "even in the earliest stages of the relationship," including " 'preliminary consultations by a prospective client with a view to retention of the lawyer, although actual employment does not result.'" *SpeeDee,* 20 Cal.4th at 1147-48, 86 Cal.Rptr.2d 816, 980 P.2d 371 (quoting *Westinghouse Elec. Corp. v. Kerr-McGee Corp.,* 580 F.2d 1311 (7th Cir.1978)); *Beery v. State Bar,* 43 Cal.3d 802, 811-12, 239 Cal.Rptr. 121, 739 P.2d 1289 (1987); *In re Dupont's Estate,* 60 Cal.App.2d 276, 288-89, 140 P.2d 866 (1943) (noting universal acceptance that client who gives preliminary statement of his case to an attorney is privileged even if the attorney is not hired).[FN4]"When a party seeking legal advice consults an attorney at law and secures that advice, the relation of attorney and client is established *prima facie.*" *SpeeDee,* 20 Cal.4th at 1148, 86 Cal.Rptr.2d 816, 980 P.2d 371 (quotation and citation omitted)."The primary concern is whether and to what extent the attorney acquired confidential information."*Id.* ("An attorney represents a client-for purposes of a conflict of interest analysis-when the attorney knowingly obtains material confidential information from the client and renders legal advice or services as a result.").

> FN4.*See generally* Susan Martyn, *Accidental Clients,* 33 Hofstra L.Rev. 913, 921-29 (2005); Bridget Hoy, *Watch What You Say: Avoiding the Accidental Attorney-Client Relationship,* 93 Ill. B.J. 22, 24-25 (2005); Kenneth D. Agran, *The Treacherous Path to the Diamond-studded Tiara: Ethical Dilemmas in Legal Beauty Contests,* Note, 9 Geo. J. Legal Ethics 1307 (1996); A.B.A. Standing Comm. on Ethics and Prof. Resp., *Protection of Information Imparted by Prospective Client,* Formal Op. 90-358 (Sept. 13, 1990).

**\*4** The party seeking disqualification must show that the meeting went beyond "initial or peripheral contacts." *Id.; Trone,* 621 P.2d at 1000 (possible distinction if initial discussion limited to the "bare preliminaries of the representation"); *Med-Trans Corp., Inc. v. City of California City,* 156 Cal.App.4th 655, 688 n. 8, 68 Cal.Rptr.3d 17 (2007). Some decisions refer to this as an "implied," "temporary," or "tentative" attorney-client relationship to distinguish situations when the client formally retains an attorney's services. *E.g., Kearns v. Fred Lavery Porsche Audi Co.,* 745 F.2d 600, 603 (Fed.Cir.1984)."The burden is on the party seeking disqualification to establish the attorney-client relationship." *Koo v. Rubio's Restaurants, Inc.,* 109 Cal.App.4th 719, 729, 135 Cal.Rptr.2d 415 (2003); *compare In re Zimmerman,* 16 Cal.App.4th 556, 565, 20 Cal.Rptr.2d 132 (1993) (brief meeting was "clearly of a preliminary and peripheral nature" when attorney referred prospective client to another lawyer with relevant expertise and client did not make any confidential disclosure) *with Henriksen v. Great Am. Sav. & Loan,* 11 Cal.App.4th 109, 112-12, 14 Cal.Rptr.2d 184 (1992) (partners received some confidential information in brief, exploratory discussion about possibly hiring the firm).[FN5]

> FN5. There are not many disqualification cases analyzing preliminary consultations, but the California rule is consistent with the approach taken by other jurisdictions. *E.g., Lovell v. Winchester,* 941 S.W.2d 466, 467-69 (Ky.Sup.Ct.1997) (private initial consultation with informal discussion of claims and some type of value judgment obligated attorney to decline representation of opponent); *Bays v. Theran,* 418 Mass. 685, 639 N.E.2d 720, 722-24

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**EXHIBIT B**

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 558561 (S.D.Cal.)
(Cite as: 2008 WL 558561 (S.D.Cal.))

(Mass.Sup.Ct.1994) (respecting potential client's belief that consultation was confidential, when attorney shared basic legal considerations based on plaintiff's background summary); *Burton v. Burton,* 139 A.D.2d 554, 555, 527 N.Y.S.2d 53 (N.Y.App.1988) (accepting reasonable inference that potential client revealed "confidential or strategically valuable information" during initial consultation to preclude attorney from representing adversary); *DCA Food Indus., Inc. v. Tasty Foods Inc.,* 626 F.Supp. 54, 58-60 (W.D.Wis.1985) (applying Seventh Circuit law to patent infringement case, question is whether client submitted confidential information with reasonable belief that lawyer was acting as his attorney, who shared impressions of strengths and weaknesses of litigation position); *Kearns,* 745 F.2d at 603-05 (in patent infringement case, client, who knew that attorney represented opponent but thought a waiver was possible, established attorney-client relationship during initial consultation); *Westinghouse,* 580 F.2d 1311 (evaluating implied attorney-client relationship, but noting common situation when fiduciary relationship extends to preliminary consultation by a prospective client with a view toward retention of the lawyer); *Taylor v. Sheldon,* 172 Ohio St. 118, 173 N.E.2d 892, 895 (Ohio Sp.Ct.1961) ("[C]ommunications made by a person to an attorney with the view of retaining the attorney to act on his behalf constitute privileged communications. It might well be said that a tentative attorney-client relationship exists during such period.").

Despite the Finnegan attorneys' statements that no specific confidences were received and no legal advice was rendered, the Court finds that the undisputed facts strongly indicate that an implied attorney-client relationship was formed. The November

meeting was conducted in private with the client representatives, both of whom were lawyers, and the Finnegan lawyers at their office. The stated purpose of the meeting was to determine if Finnegan was interested in and qualified to represent Plaintiffs in anticipated patent litigation against Defendants Ambu. All participants were knowledgeable, not only about the subject matter of patent law, but also about the ethical duties of the legal profession. The prospective client brought documents and sample products to explain the case to the lawyers. Though most of these materials were publicly available (*e.g.,* the prosecution of the patent and the two devices), Plaintiffs did bring some confidential notes with them (*i.e.,* Marzen brought notes from his meeting with the Board of Directors). Finally, it is not disputed that Plaintiffs sought in good faith to retain Finnegan. The Court concludes that the setting was appropriate and conducive to establishing an attorney-client relationship and that the clear intent was to keep the communications private.

The meeting lasted over one hour. Although the parties dispute the actual length, it is not a determinative factor as confidences can be shared during a brief meeting. *SpeeDee,* 20 Cal.4th at 1148, 86 Cal.Rptr.2d 816, 980 P.2d 371 (" 'Even the briefest conversation between a lawyer and a client can result in the disclosure of confidences.'") (quoting *Novo Terapeutisk Lab. v. Baxter Travenol Labs.,* 607 F.2d 186, 195 (7th Cir.1979) (en banc)). Similarly, the passage of seven weeks between the November meeting and the January telephone calls is not a critical fact.

\*5 In sum, although the participants offer credible but divergent recollections of the content of the November 2006 meeting, the context suggests that an attorney-client relationship may have arisen on these facts for the purpose of a disqualification motion.[FN6]

FN6. It bears repeating that the Court does not suggest that Finnegan acted improperly. Moreover, Finnegan reports that the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT B

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 558561 (S.D.Cal.)
(Cite as: 2008 WL 558561 (S.D.Cal.))

ethics rules in the District of Columbia permit lawyers to accept a representation that is adverse to a prospective client when an ethical screen has been implemented.

### B. *In Camera Review of Supplemental Declaration*

At this point, the Court turns to the dispute about the supplemental declaration that Marzen submitted for *in camera* review. The Finnegan law firm hired outside legal counsel to represent the two attorneys who were personally involved in the preliminary meeting, and they ask that the confidential declaration be turned over to them as well as to Finnegan's General Counsel. They argue that fairness dictates they have access to the evidence so they can respond to any factual allegations. They contend that Plaintiffs will not be harmed because Jakes and Williamson are subject to the ethical screen, thus, there is no risk that the disclosure will reach the Finnegan attorneys who are currently representing Defendants Ambu in this case. In addition, Jakes and Williamson provided opposing declarations to the redacted version of Marzen's supplemental declaration in which they repeat that they did not receive confidences on any topic and did not offer legal advice on any subject.

The Court has given careful consideration to the request and concludes that *in camera* review is an appropriate method for a moving party to present its evidence concerning the confidences and legal advice discussed at the preliminary interview. *See In re Grand Jury Investigation,* 974 F.2d 1068, 1072 (9th Cir.1992); *Clarke v. Am. Commerce Nat'l Bank,* 974 F.2d 127, 129 (9th Cir.1992). The Court holds that Plaintiffs are not required to remind Defendants of specific statements that constitute confidences in order to meet their burden of proof on the disqualification motion. It is sufficient for the moving party to substantiate its claim by describing the nature of the relevant information or the general topics of discussion. *Elliott v. McFarland Unified School Dist.,* 165 Cal.App.3d 562, 572, 211 Cal.Rptr. 802 (1985); *accord NYU v. Simon,* 130

Misc.2d 1019, 1023, 498 N.Y.S.2d 659 (N.Y.Civ.Ct.1985) (court could not accept party's conclusions that matters discussed were "significant" without evidence of the "nature of information revealed ... without necessarily stating the specific facts revealed on the issue"); *cf. Bays,* 639 N.E.2d at 725 (applying Massachusetts law to allow potential client to testify as to nature, topics, and extent of communications but not requiring *in camera* review of specific content so as to preserve any privilege plaintiff might have).

Moreover, the Court will not require the moving party to disclose the actual content of those confidences to outside counsel or attorneys behind an ethical screen. Though the Finnegan attorneys' do not presently recall the details of the confidences, courts have wisely avoided even the "prospect of a swearing contest" between the client and attorney. *Civil Serv. Comm'n v. Superior Court,* 163 Cal.App.3d 70, 79, 209 Cal.Rptr. 159 (1984) (declining to probe and sift confidences, as that would defeat purpose and spirit of rule); *Trone,* 621 F.2d at 999; *Donohoe v. Consolidated Operating & Prod. Corp.,* 691 F.Supp. 109, 112 (N.D.Ill.1988).

\*6 The Court has in mind the legitimate interests of Defendants Ambu to oppose a strategic disqualification motion of its counsel of choice, but the Court discerns no abuse in Plaintiffs' prompt request concerning a consultation on the same case. In addition, the question of whether a particular communication is privileged is largely a question for the Court. Accordingly, the Court overrules Defendants Ambu's objection to Marzen's supplemental declaration.

### C. *Finnegan Formed an Attorney-Client Relationship with Plaintiffs*

The Court has read the supplemental declaration and finds that Marzen, on behalf of Plaintiffs, revealed confidential information concerning the subjects of venue, claim construction in relation to the theory of their case, and settlement, and that the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT B

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 558561 (S.D.Cal.)
(Cite as: 2008 WL 558561 (S.D.Cal.))

Finnegan lawyers provided strategic legal advice about how to proceed on those topics. *See Grand Jury*, 974 F.2d at 1070 (defining privileged information); *Hitachi, Ltd. v. Tatung Co.*, 419 F.Supp.2d 1158, 1164 (N.D.Cal.2006) (noting critical importance of client's claim construction strategy in patent litigation). Although the Court finds that certain statements were matters of public record or concerned issues that would become moot upon filing the lawsuit and the required initial disclosures, the Court has identified specific, narrow confidences that could give Defendants Ambu a strategic advantage. The Court views as reasonable the potential clients' belief that the disclosures on November 22 were confidential and would be treated as such. *Hearn v. Rhay*, 68 F.R.D. 574, 579 (E.D.Wash.1975); *Kevlik v. Goldstein*, 724 F.2d 844, 849 (1st Cir.1984) (key question is intent of client); McCormick on Evidence § 91 (6th ed.2006) (privilege applies to "communications which the client either expressly made confidential or which he could reasonably assume under the circumstances would be understood by the attorney as so intended"); *see also Westinghouse*, 580 F.2d at 1319 n. 14 ("The deciding factor is what the prospective client thought when he made the disclosure, not what the lawyer thought") (quotation omitted). The Court also finds that Finnegan provided legal advice on the topics of venue, damages, and remedies. While the attorneys' limited knowledge of the facts necessarily tempered the strength of their impressions, in the context of a private interview to retain lawyers for a specific litigation, Plaintiffs reasonably accepted it as legal advice. Thus, the Court finds that Plaintiffs have shown that they disclosed actual confidential information and that the Finnegan lawyers offered some legal advice. The preliminary interview therefore created an implied or temporary attorney-client relationship that is sufficient to treat Plaintiffs as former clients of the Finnegan law firm. Consequently, the two lawyers are automatically disqualified from representing Plaintiffs' opponent in the same litigation.

Even if the disqualification arising from a "tentative" attorney-client relationship were subject to an exception, the Court would exercise its discretion to disqualify Finnegan from this case. *Trone*, 621 F.2d at 999 (disqualification is within trial court's discretion); *Gas-A-Tron of Ariz. v. Union Oil Co. of Calif.*, 534 F.2d 1322, 1325 (9th Cir.1976). The Court has the duty and responsibility of supervising ethical conduct of attorneys appearing in the district court and these facts do not warrant an exception. *Trust Corp. of MT v. Piper Aircraft Corp.*, 701 F.2d 85, 87 (9th Cir.1983); *Trone*, 621 F.2d at 999. The Court is committed to the *highest* standards of professional conduct. *Kevlik*, 724 F.2d at 849 ("We think it more important that unethical conduct be prevented than that defendant have an unfettered right to counsel of choice [in civil action]."). The Court concludes that a prophylactic rule is the most effective measure to preserve the integrity of the judicial system.[FN7]

> FN7. Notably, the informed consent exception that might be available to waive certain conflicts of interest is not available here because Plaintiffs did not provide written consent to Finnegan to represent Defendants Ambu with an ethical screen. *See City and County of San Francisco v. Cobra Solutions, Inc.*, 38 Cal.4th 839, 847, 43 Cal.Rptr.3d 771, 135 P.3d 20 (2006); A.B.A. Model Rule of Prof. Conduct 1.18 (2007).

### D. Disqualification of Entire Finnegan Law Firm

\*7 When an attorney is disqualified due to a relationship that amounts to prior representation on the same lawsuit, then the entire firm is disqualified. *Flatt v. Superior Court*, 9 Cal.4th 275, 283, 36 Cal.Rptr.2d 537, 885 P.2d 950 (1994); *a ccord Hitachi*, 419 F.Supp.2d at 1161-64 (reviewing decisions and concluding that California courts do not use ethical screens to prevent disqualification from being imputed to members of firm).

Finnegan asks the Court to make a pragmatic ex-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT B

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 558561 (S.D.Cal.)
(Cite as: 2008 WL 558561 (S.D.Cal.))

Page 8

ception because the firm created an ethical wall around the two attorneys who met with Plaintiffs' representatives. Finnegan relies on the Ninth Circuit Court of Appeals decision observing that the California Supreme Court may have signaled a more flexible approach to vicarious disqualification, such as using an ethical screen. *In re County of Los Angeles,* 223 F.3d 990, 995-96 (9th Cir.2000). In that decision, the Ninth Circuit permitted a private law firm to continue its representation despite the personal disqualification of a retired magistrate judge who had conducted settlement discussions on a related litigation during his public service employment with the federal courts.

The Court finds that vicarious disqualification is appropriate in this case. Even if California law permitted ethical walls to prevent disqualification of other attorneys in a law firm, the Court would not extend that exception to this case where the lawyers are in the same District of Columbia office and the clients are opponents in the same patent litigation. *Id.* at 995 (Ninth Circuit notes that "*SpeeDee Oil* was the kind of case most likely to give rise to automatic disqualification because the same firm represented adverse parties in the same litigation"); *City of Nat'l Bank v. Adams,* 96 Cal.App.4th 315, 327-28, 117 Cal.Rptr.2d 125 (2002) (even if limited exception available, it does not apply to adverse representation on same matter); *accord Analytica, Inc. v. NPD Research, Inc.,* 708 F.2d 1263, 1267 (7th Cir.1983) (ethical wall exception is not available when "law firm itself changed sides"); *see Henriksen v. Great Am. Sav. & Loan,* 11 Cal.App.4th 109, 111-15, 14 Cal.Rptr.2d 184 (1992) (imputed disqualification was "clear cut" when new associate had worked on same case but had been screened, despite hardship of hiring new counsel on eve of trial). The risk of inadvertent disclosure of confidential information through casual conversation is too great and the appearance of divided loyalty is too strong to make an exception on these facts.[FN8] *Trone,* 621 F.2d at 1001 (an actual abuse of confidential information is not required given "the sensitivity of client confidence and the

profession's institutional need to avoid even the appearance of a breach of confidence").

> FN8. For example, the single memorandum circulated in January 2007 did not prevent the lead attorney from asking Williamson to join the Ambu team in October. Williamson Decl. ¶ 11 & Ex. A. Although Williamson reminded the partner about the ethical wall, *id.,* this event illustrates the weakness of a wall in an office where lawyers routinely seek informal advice from colleagues. Similarly, when Jakes was notified on January 3, 2007 that Defendants Ambu had hired Finnegan, Jakes described the topics of conversation as including "various district courts, transfer motions, preliminary injunctions, etc."Jakes Decl. Ex. A. While not confidential communications, the information certainly relayed clues as to issues that might concern Plaintiffs in the litigation with Ambu. Moreover, Finnegan's ethical screen lacks necessary protections such as locking computer files with passwords or labeling files with notices not to communicate about the case with Jakes and Williamson. E.g., *Cobra Solutions,* 38 Cal.4th at 844, 43 Cal.Rptr.3d 771, 135 P.3d 20.

*E. Defendants Shall Promptly Secure New Counsel*

In light of the Court's ruling that Finnegan is disqualified as defense counsel, the Court will permit Defendants Ambu a reasonable time to secure new counsel. Because Defendants Ambu answered the complaint, the next appearance will be the Early Neutral Evaluation Conference ("ENE") with the Magistrate Judge. The Court requests the Magistrate Judge to schedule an ENE on this matter in approximately 30 days. If Defendants Ambu have secured new counsel who are able to appear at the ENE, they shall file substitution of counsel forms; however, if they require additional time to locate an attorney or the new attorney requires time to pre-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT B

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 558561 (S.D.Cal.)
(Cite as: 2008 WL 558561 (S.D.Cal.))

Page 9

pare for the ENE, they may contact the Magistrate
Judge for an additional continuance.

### Conclusion

*8 Having reviewed the papers and legal authorit-
ies, and for the reasons stated above:

1. The Court grants Plaintiffs' motion to disqualify
Finnegan Henderson Farabow Garrett & Dunner,
LLP, as Defendants' counsel in this patent infringe-
ment action. [# 17] Finnegan Henderson Farabow
Garrett & Dunner, LLP shall not represent or assist
Defendants with this lawsuit and shall not consult
or share work product with new counsel. Defend-
ants shall promptly locate new counsel and file the
appropriate substitution of counsel form.

2. The next court date will be set by the Magistrate
Judge for an ENE conference in approximately 30
days. The Magistrate Judge shall issue a scheduling
order setting out all dates, including a trial date.

3. The Court denies Defendants' ex parte applica-
tion. [# 32]

**IT IS SO ORDERED.**

S.D.Cal.,2008.
Laryngeal Mask Co. Ltd. v. Ambu A/S
Not Reported in F.Supp.2d, 2008 WL 558561
(S.D.Cal.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**EXHIBIT B**

# EXHIBIT 5

# EXHIBIT 5

EXHIBIT B

Westlaw.

Slip Copy                                                                              Page 1
Slip Copy, 2008 WL 1804150 (N.D.Ind.)
(Cite as: 2008 WL 1804150 (N.D.Ind.))

**H**
Only the Westlaw citation is currently available.
United States District Court, N.D. Indiana, South
Bend Division.
Douglas LEATHEM, Plaintiff,
v.
CITY OF LAPORTE, INDIANA, et al., Defendants.
No. 3:07-CV-220 PPS.

April 17, 2008.

Douglas Leathem, Laporte, IN, pro se.
Jerry E. Huelat, Michael A. Kreppein, Huelat &
Mack, Michigan City, IN, Michelle K. Bazin-
Johnson, Friedman & Associates PC, Shaw R.
Friedman, Friedman & Associates PC, Laporte, IN,
for Defendants.

### OPINION AND ORDER

Christopher A. Nuechterlein, United States Magistrate Judge.
*1 On May 11, 2007, Plaintiff Douglas Leathem
(Leathem), proceeding *pro se*, filed his complaint in
this Court against several Defendants. On March
11, 2008, Leathem filed a "verified motion to recuse"
attorney Shaw Friedman (Friedman). This
Court construes Leathem's motion as a motion to
disqualify. On March 18, 2008, Friedman filed a response
in opposition to this motion, and on March
26, 2008, Leathem filed his reply.

On June 22, 2006, shortly after commencing this
lawsuit, Leathem claims he had a lengthy discussion
with Friedman about representing him.
Leathem claims he told Friedman the facts of the
case, and after which, Friedman advised Leathem
that he could not take the case. On March 5, 2008,
Friedman entered his appearance on behalf of a Defendant
in this case.

While Leathem cites to various axioms of law, such
as the attorney-client privilege, it appears that

Leathem is alleging that Friedman should be disqualified
for having a conflict of interest. More specifically,
Leathem believes that he and Friedman
formed some sort of legal relationship, and that
Friedman learned information that could be used to
Leathem's detriment if Friedman is allowed to continue
representing one of the Defendants.

Friedman does not dispute that the telephone conversation
between Leathem and himself took place,
and Friedman admits that he heard Leathem recite a
number of facts about his lawsuit before informing
him that he could not represent him. However,
Friedman contends that he learned nothing that
would warrant disqualification due to a conflict of
interest.

The 7th Circuit warns that disqualification "is a
drastic measure which courts should hesitate to impose
except when absolutely necessary." *Cromley
v. Bd. of Educ.*, 17 F.3d 1059, 1066 (7th Cir.1994)
(quoting *Freeman v. Chi. Musical Instrument Co* .,
689 F.2d 715, 721 (7th Cir.1982)). However, the
7th Circuit has also instructed that courts should resolve
doubts in favor of disqualification. *See
United States v. Goot*, 894 F.2d 231, 235 (7th
Cir.1990).

The Local Rules of this Court utilize both the
standards from the Rules of Professional Conduct
as adopted by the Supreme Court of Indiana and the
Standards for Professional Conduct as adopted by
the 7th Circuit. *See* N.D.L.R. 83.5(f). In the 7th Circuit,
the clearly settled test in disqualification matters
is the "substantial relationship" test as established
by *T.C. Theatre Corp. v. Warner Bros. Pictures,
Inc.*, 113 F.Supp. 265, 268 (S.D.N . Y.1953).
*Westinghouse Elec. Corp. v. Gulf Oil Corp.*, 588
F.2d 221, 223 (7th Cir.1978).

The substantial evidence test is often used in situations
dealing with potential conflicts between a
current client and a former client. *See e.g. Exterior
Systems, Inc. v. Noble Composites, Inc.*, 175

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT B

Slip Copy
Slip Copy, 2008 WL 1804150 (N.D.Ind.)
(Cite as: 2008 WL 1804150 (N.D.Ind.))

Page 2

F.Supp.2d 1112 (N.D.Ind.2001). The 7th Circuit's inquiry under the substantial relationship test is composed of a three part inquiry. First, this Court must make a factual reconstruction of the scope of the prior legal representation. Second, this Court must determine whether it is reasonable to infer that the confidential information allegedly given would have been given to a lawyer representing a client in those matters. Third, this Court must determine whether that information is relevant to the issues raised in the litigation pending against the prior client. *LaSalle Nat'l Bank v. Lake County*, 703 F.2d 252, 255-56 (7th Cir.1983); *Exterior Systems, Inc.*, 175 F.Supp.2d at 1115-16.

*2 An attorney-client relationship only exists after both the attorney and client have consented to its formation. *Matter of Anonymous*, 655 N.E.2d 67, 70 (Ind.1995). Attorney-client relationships are formed when a person seeks legal advice or assistance, when the advice pertains to the attorney's professional competence, and when the attorney gives the desired advice. *Id.*

In the present case Leathem and Friedman both admit that they had a discussion, but both also admit that Friedman provided no legal advice to Leathem. In fact, it is undisputed that Friedman informed Leathem he could not and would not represent him after hearing Leathem recite the facts of his case. It appears, therefore, that there was no attorney-client relationship to begin with.

However, the fact that there was not an explicit attorney-client relationship is not conclusive on the issue because there may be an implicit attorney-client relationship, which derives from the nature of the parties' interview. *See Bridge Products, Inc. v. Quantum Chemical Corp.*, 1990 WL 70857 at *3 (N.D.Ill.1990). A party that seeks to establish an implied attorney-client relationship must demonstrate that 1) he submitted confidential information to a lawyer and 2) that he did so with a reasonable belief that the lawyer was acting as his attorney. *DCA Food Industries, Inc. v. Tasty Foods, Inc.*, 626 F.Supp. 54, 59 (W.D.Wis.1985) (citing *Analytica,*

*Inc. v. NPD Research, Inc.* 708 F.2d 1263 (7th Cir.1983)).

To determine whether there was an implicit attorney-client relationship, this Court must focus upon Leathem's understanding of the situation rather than Friedman's. *Livers v. Wu*, 6 F.Supp.2d 921, 926 (N.D.Ill.1998). Even under this analysis, however, Leathem still fails to establish an implicit attorney-client relationship. Leathem contends that he disclosed the facts of the case to Friedman and nothing more. Facts of the case have been disclosed in Leathem's complaint and various other filings by Leathem. Leathem's recitation to Friedman of facts cannot reasonably be construed as confidential information. *See Hoban v. Strata Marketing, Inc.*, 1991 WL 204965 at *2 (N.D.Ill.1991).

As a result, this Court concludes that Leathem and Friedman were not involved in an attorney-client relationship or an implicit attorney-client relationship. As a consequence, there is no substantial relationship between the two to warrant disqualification. Leathem's motion is **DENIED** [Doc. No. 80].

**SO ORDERED.**

N.D.Ind.,2008.
Leathem v. City of Laporte, Ind.
Slip Copy, 2008 WL 1804150 (N.D.Ind.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT B