Philip Heller, PLC (CA State Bar No. 113938)
ph@philipheller.com
Jerold Fagelbaum, Esq. (CA State Bar No. 92584)
office@fhllplaw.com
**FAGELBAUM & HELLER LLP**
2049 Century Park East, Suite 4250
Los Angeles, CA 90067
Telephone: 310.286.7666
Facsimile: 310.286.7086

C. STANLEY HUNTERTON, ESQ
Nevada Bar No. 5044
**HUNTERTON & ASSOCIATES**
333 S. Sixth Street
Las Vegas, NV 89101
Telephone: 702.388.0098
Facsimile: 702.388.0361

Attorneys for Plaintiff Phase II Chin, LLC

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| PHASE II CHIN, LLC and LOVE & MONEY LLC (formerly dba O.P.M.L.V., LLC),<br><br>Plaintiffs,<br><br>and<br><br>FORUM SHOPS, LLC, FORUM DEVELOPERS LIMITED PARTNERSHIP, SIMON PROPERTY GROUP LIMITED PARTNERSHIP, SIMON PROPERTY GROUP, INC., CAESARS PALACE CORP., and CAESARS PALACE REALTY CORP.<br><br>Defendants | Case No. 2:08-cv-00162-JCM-GWF<br><br>**PLAINTIFF PHASE II CHIN LLC'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES AND SUPPLEMENTAL DECLARATION OF PHILIP HELLER IN FURTHER SUPPORT OF ITS MOTION TO DISQUALIFY ATTORNEY STEVE MORRIS AND THE LAW FIRM OF MORRIS PICKERING & PETERSON (NOW MORRIS PETERSON)**<br><br>**DATE: 02/12/09**<br>**TIME: 9:30 a.m**<br>**CTR: Hon. George W. Foley, Jr.**<br>**Magistrate Judge** |

1

Exhibit C

Dockets.Justia.com

# TABLE OF CONTENTS

I.  INTRODUCTION ............................................................................................... 2

II. STEVE MORRIS' PRIOR CONSULTATION WITH COUNSEL FOR
    CHINOIS  DURING WHICH CONFIDENCES WERE DISCLOSED AND
    LEGAL ADVICE WAS RECEIVED PRECLUDES MR. MORRIS AND
    HIS FIRM FROM REPRESENTING CAESARS ADVERSE TO CHINOIS
    IN THIS CASE ................................................................................................ 4

    A. The Communication Of Confidential Information To Steve Morris ..... 4

    B. The Establishment Of An Attorney Client Relationship ....................... 7

        1.    If No Attorney Client Relationship Was Formed ................8

        2.    If An Attorney Client Relationship Was Formed ..................... 9

    C. The Appearance Of Impropriety............................................................ 13

    D. Chinois' Motion Is Not Tactically Motivated ...................................... 14

III. CONCLUSION............................................................................................... 15

SUPPLEMENTAL DECLARATION OF PHILIP HELLER

i

Exhibit C

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*ADP Inc. v. PMJ Enterprises, LLC*
  2007 WL 836658 (D.NJ 2007) .......................................................................... 8,9

*Bluebeard's Castle Inc, v. Delma Marketing Inc.*
  886 F. Supp. 1204 (D.V.I 1995) ........................................................................ 11

*Coles v. Arizona Charlie's*
  973 F. Supp. 971, 973 (D. Nev. 1997) .............................................................. 14

*Guerro v. Bluebeard's Castle Hotel, Inc.*
  982 F. Supp. 343 (D.V. I. 1997), ...................................................................... 11

*In-N-Out Burger v. In & Out Tire & Auto, Inc.,*
  2008 U.S. Dist. LEXIS 63883*7 (D. Nev. ........................................................... 5

*Leathem v. City of Laporte Indiana.,*
  2008 WL 1804150 (N.D. Ind. 2008 ................................................................... 11

*Local v. Winchester,*
  941 S.W. 2d 466, 468 (Ky. Sup. Ct. 1997) ........................................................ 13

*Polygon Plastics Inc. v. Cincinnati Milacron, Inc.*
  903 F. Supp. 253 (D.P. R. 1995) ...................................................................... 10

*The Laryngeal Mask Company Ltd. v. Ambus A/S*
  2008 U.S.Dist. LEXIS 15320 *17-18 (S.D.Ca.2008) ............................................. 5

**STATE CASES**

*American Insurance Association v. Kentucky Bar Association*
  917 S.W. 2nd 568, 573 (Ky. Sup. Ct. 1996) ...................................................... 13

*Chemcraft Holdings Corporation v. Shayban*
  (N.C. Sup. Ct. Guilford Cty 2006) ...................................................................... 9

*Doucette v. Dlugolecki*
  2006 Conn. Super. LEXIS 52825
(Sup. Ct. Conn., New Britain Jud. Dist., 2006): ................................................... 11

*Robbins v. Gillock*
  (1993) 109 Nev. 1015, 1118 ............................................................................ 5

ii

Exhibit C

*Sturdivant v. Sturdivant*
    (2006) 367 Ark. 514, 241 S.W. 3d 740, 746 ...............................8, 9

*Todd v. The State of Nevada*
(1997) 117 Nev. 18, 24-25.................................................................... 12

**RULES**

Nevada Rule 1.18 ........................................................... 8, 12,13
       Rule 1.18 (b).......................................................... 8
       Rule 1.9 ........................................................ 8, 12,13
       Rule 1.9(a).......................................................... 10
       Rule 1.9 (c) .......................................................... 8
       Rule 1.9 (c) (1) .................................................8, 9

Exhibit C

# I.    INTRODUCTION

Plaintiff Phase II Chin LLC ("Chinois") submits this Memorandum of Points and Authorities in further support of its Motion to Disqualify Attorney Steve Morris and his law firm Morris Peterson from any further involvement in this case on behalf of the "Caesars Defendants" (Caesars Palace Corp. and Caesars Palace Realty Corp.).

Morris Peterson concedes that Chinois' counsel, Fagelbaum & Heller LLP ("FHLLP") partner Philip Heller contacted Steve Morris for the purpose of retaining him as local counsel for Chinois in this very case. Recognizing his predicament, Mr. Morris now attempts to minimize the conversation between Chinois's counsel and himself by alternatively referencing to the duration of the discussion as "brief", "several minutes", a ten minute telephone call"; and "ten or fifteen minutes in duration". However, the issue is not the duration of the call, but rather, whether confidential information was disclosed to, and legal advice was received from, Mr. Morris. While for purposes of his Opposition, Mr. Morris says no such confidences were disclosed or advice rendered, his previous actions demonstrate otherwise.

When Morris Peterson (then known as Morris Pickering & Peterson) first appeared in this case, Chinois' counsel immediately raised objection to Steve Morris' participation in this case based upon his prior consultation with Mr. Heller. At that time, Mr. Morris stated that, notwithstanding the conversation he had with Chinois' counsel, he "was not familiar with the case or involved in it in any respect." (Ex. A) Moreover, his partner, Kris Pickering who was counsel of record and involved in the case, represented: "I can confirm . . . that he never discussed his conversation with you with me and, further, that I will keep this work from him". (Ex. A)

2

Exhibit C

If, as Morris Peterson now claims, there had been no confidential disclosures and legal advice given, why was Ms. Pickering promising to "keep this work from [Mr. Morris]"? Even Mr. Morris did not contend in February, 2008 that *he* could work on this case. Rather, he argued that he did not believe there was any "basis to ask that *the firm* discontinue representing Caesars in this case ..." (Ex. A)

All that changed, however, when Ms. Pickering left the firm and, in order not to lose the business, Ms. Pickering broke her commitment to Chinois and appointed her husband to take her place in this case. Ethical rules apply whether it is convenient or not. There is no exception based on the law firm losing some business.

Morris Peterson tries to re-frame and limit the issue as Caesars' choice of counsel, on the one hand, and the breach of Steve Morris' twin duties to maintain client confidences and loyalty to a former client, on the other.   It is more than that, however, because Mr. Morris' conduct also implicates the public's confidence in the integrity of the bar. This is especially true when, as here, the abandonment of express commitments based on ethical principles was facilitated by a new Justice of the Nevada Supreme Court whose parting words upon election were:

> *"Since this takes me out, I've asked my partner, Steve Morris, to step in (which you on the plaintiff's side will come to regret)".* (Ex. B)

In fact, Chinois is regretting it. Chinois regrets that its confidences were not maintained. It regrets the duty of loyalty owed to it by Mr. Morris has been betrayed.  Chinois regrets that Mr. Morris has switched sides and now has flip-flopped on his promise to stay out of this case.

Mr. Morris and his law firm should be disqualified from any future involvement in this case. Upon examination, none of the authorities relied upon by

3

Exhibit C

Morris Peterson compel a contrary result. Caesars' choice of counsel must give way when it comes at the expense of providing it with an unfair litigation advantage.

## II. STEVE MORRIS' PRIOR CONSULTATION WITH COUNSEL FOR CHINOIS DURING WHICH CONFIDENCES WERE DISCLOSED AND LEGAL ADVICE WAS RECEIVED PRECLUDES MR. MORRIS AND HIS FIRM FROM REPRESENTING CAESARS ADVERSE TO CHINOIS IN THIS CASE

Morris Peterson argues that: (1) no confidential information was imparted to it by Chinois, and ever if it was, it now has been publically disclosed; 2.) that it was not reasonable to believe an attorney client relationship had been created, but rather, to the contrary, Chinois was placed on notice that it had not been created; and 3.) that Chinois' Motion is tactically motivated.[1] Upon closer analysis, it is apparent that none of these contentions are borne out.

### A. The Communication Of Confidential Information To Steve Morris

Although selectively professing limited recall of what occurred during his conversation with Chinois' counsel, and contrary to Chinois' counsel Mr. Heller's Declaration, Mr. Morris concludes that he neither received any confidential information (which did not become public upon the filing of the Complaint in this action), nor provided any legal advice. In resolving disputed issues of fact in disqualification cases, courts have held that the client is not required to reveal the details of the privileged communications they seek to protect and that doubts are resolved in favor of disqualification:

> . . . Plaintiffs are not required to remind Defendants of specific statements that constitute confidences in order to meet their burden of proof on the disqualification motion. It is sufficient for the moving party to substantiate its claim by

---

[1] Morris Peterson has abandoned its frivolous contention that disqualification has been waived in exchange for a motion continuance.

describing the nature of the relevant information or the general topics of discussion.

\* \* \*

Moreover, the Court will not require the moving party to disclose the actual content of those confidences to outside counsel or attorneys behind an ethical screen. Though the Finnegan attorney's do not presently recall the details of the confidences, courts have wisely avoided even the "prospect of a swearing contest" between the client and attorney. (Internal citations omitted.)

*The Laryngeal Mask Company Ltd. v. Ambus A/S* 2008 U.S.Dist. LEXIS 15320 \*17-18 (S.D.Ca.2008)

Instead, context and the likelihood that confidences were disclosed are determinative:

In proving that a prior representation is substantially related to present litigation, however, the moving party is not required to divulge the confidences actually communicated, nor should a court inquire into whether an attorney actually acquired confidential information in the prior representation which is related to the current representation.

\* \* \*

The court should instead undertake a realistic appraisal of whether confidences might have been disclosed in the prior matter that will be harmful to the client in the later matter. (Internal citations omitted.)

*Robbins v. Gillock* (1993) 109 Nev. 1015, 1118. Moreover, as stated in *In-N-Out Burger v. In & Out Tire & Auto, Inc.*, 2008 U.S. Dist. LEXIS 63883\*7 (D. Nev. 2008), "close cases are resolved in favor of disqualification."

Here Mr. Morris concedes that confidential information was disclosed to him, but seeks to escape responsibility by contending that it all became public when the Complaint was filed. However, due to Mr. Morris' selective memory, at most all he has done is establish that some of the confidential information

5

Exhibit C

imparted to him was subsequently disclosed in the Complaint. Although Mr. Morris cannot recall the rest, Mr. Heller does and has so testified by way of declaration. (See the accompanying Supplemental Heller Declaration refuting on a point by point basis Mr. Morris' Declaration.) While the facts that the Caesars Defendants were added as defendants and eight causes of action, were pled were disclosed upon filing, the strategy behind the adding of these defendants and the selection of specific causes of action and the effect it would have upon the possible settlement of this case were not. Similarly, legal advice was provided by Mr. Morris regarding the parties, proposed parties, venue, claims, and selection and assessment of counsel and judges which was not disclosed by the filing of the Complaint.

Was it plausible for these subjects to all be covered in one telephone call? Yes. The very purpose of the call was to elicit the input of experienced local counsel who was familiar with local law and practice in order to provide Chinois with the best defenses and strongest claims. While Mr. Morris attempts to trivialize the conversation due to its alleged 15 minute duration (Mr. Heller disputes this and states on his Supplemental Declaration that the call was close to 20 minutes), the fact that Chinois' counsel made the call and as a lawyer was able to immediately "cut to the chase" in one telephone call does not diminish its substantive content. Moreover, the portion of the confidences which were subsequently disclosed (regarding the identity of Caesars as a potential defendant and the nature of the contemplated eight cause of action) help place the call in context and make it more likely than not that other confidences, not disclosed, also were reasonably expected to have been (and in fact were) discussed.

Indeed, had the conversation been as innocuous as Mr. Morris now would have the Court believe, then why did Mr. Morris agree to step aside in February, 2008 when Chinois first raised objections to his participation in this case? Both

6

Exhibit C

Mr. Morris and his partner Kris Pickering agreed in February 2008 that Mr. Morris would have no involvement in this case. What changed between February and December 2008? Ms. Pickering was elected to the Nevada Supreme Court and Morris Peterson decided to place its own economic interests ahead of its duty to maintain client confidences and loyalty to a former client. Neither excuse justifies a betrayal of client confidences and loyalty.

**B.     The Establishment Of An Attorney Client Relationship**

Steve Morris was not unknown to Chinois' counsel when first contacted regarding this matter. As Mr. Morris acknowledges, he had worked before with FHLLP partner Jerold Fagelbaum in connection with the MGM Grand Fire Litigation in the 1980's. Accordingly, when Mr. Morris was contacted by FHLLP partner Philip Heller it was for the purpose of retaining experienced local counsel for Chinois who was well-known to FHLLP. Being able to work with an old trusted colleague and provide him with a business opportunity were added extras.

Given the prior professional relationship, and Mr. Morris' failure to invoke any conflict avoidance procedures, Chinois' counsel felt comfortable in providing Mr. Morris with a focused and insider's perspective of the facts and strategy underlying the claims asserted by Chinois in this case. Moreover, even after Mr. Heller disclosed that Caesars was a potential defendant in this case, Mr. Morris did not say: "stop, I represent Caesars and cannot represent Chinois in any case potentially adverse to Caesars". Rather, he indicated his firm had represented Caesars in the past and that might present a problem. He left open the possibility it also might *not* be a problem (*e.g.* if a conflict waiver was obtained). He did not terminate the conversation or suggest that further disclosures not be made. Nevertheless, since confidential disclosures already had been made, by the end of the conversation Chinois counsel's reasonable expectation and understanding was it was *possible* that Mr. Morris might not be able to represent Chinois, but that it

Exhibit C

was *certain* Mr. Morris would not represent Caesars adverse to Chinois. Upon further reflection, Chinois' counsel elected to avoid a potential conflict and selected other local counsel.

Morris Peterson suggests that Nevada Rule 1.18 referring to Duties to Prospective Clients (as opposed to Nevada Rule 1.9 covering Duties to Former Clients) somehow changes the result in this case. It does not. *See Sturdivant v. Sturdivant* (2006) 367 Ark. 514, 241 S.W. 3d 740, 746 ("... the duty May owed to Timothy as a prospective client under Rule 1.18 (b) would be coextensive with the duty an attorney owes to a former client under Rule 1.9 (c)".) Pursuant to either analysis, Mr. Morris has breached his duties to Chinois and he and his firm should be disqualified.

1. **If No Attorney Client Relationship Was Formed**

    a. Mr. Morris concedes that, at a minimum, he owes to Chinois those duties owed to a prospective client. Rule 1.18 (b). Consequently, he cannot use information obtained in the consultation except as would be used in connection with a former client (*i.e.* not to the disadvantage of the former client). Rule 1.9(c) (1).

    b. Moreover, if the information received "could be significantly harmful" to Chinois, Mr. Morris cannot represent a client material adverse to Chinois in the same or substantially related matter. Rule 1.18 (c).

Morris Peterson relies upon *ADP Inc. v. PMJ Enterprises, LLC* 2007 WL 836658 (D.NJ 2007) where plaintiff's in-house counsel, contacted defendants counsel (pre-complaint) to discuss possible retention. In considering whether confidential information was disclosed, the court noted that the in-house counsel did not have final authority to retain the firm and that the short duration of the call

8

Exhibit C

raised doubts as to whether the information disclosed was as extensive as represented after the fact. The court concluded that generally discussing the nature of plaintiff's business, the history of the dispute with defendant and the factual basis of an anticipated counterclaim was not "significantly harmful" because it was not confidential (some of the information was subsequently disclosed in the complaint and other information already was known to defendant).

Here, however, Chinois' counsel was authorized to select and retain local counsel, and the confidential information disclosed to Mr. Morris, aside from the factual elements subsequently disclosed in the complaint, covered information advantageous to Caesars and disadvantageous to Chinois, including Chinois litigation and settlement strategy, and candid assessments of the parties, co-counsel and judges. Moreover, here, unlike the lawyer in *ADP*, Mr. Morris provided legal advice to Chinois.

Accordingly, even if an implied attorney-client relationship was not formed, Morris Peterson should be disqualified, *See Sturdivant v. Sturdivant*, *supra,* 241 SW. 3d at 747; and *Chemcraft Holdings Corporation v. Shayban* (N.C. Sup. Ct. Guilford Cty 2006) 2006 N.C.B.C.13,42, 2006 NCBC LEXIS 15, 20 ("The type of information prohibited by Rule 1.18 is exactly the type of information to which Mr. Rossabi has had access since receiving Mr. Gottlieb's email - - a client's personal thoughts and impression regarding the facts of his case and possible strategies for a lawsuit. The Court cannot allow Plaintiffs to be represented by counsel who has had access to such potentially damaging information".)

## 2. If An Attorney Client Relationship Was Formed

a. If an attorney-client relationship was formed, Mr. Morris cannot use any information disclosed to him which is to the disadvantage of the former client. Rule. 1.9 (c) (1).

      b.     Moreover, if an attorney-client relationship was formed, Mr. Morris cannot represent a person in the same, or a substantially related, matter which is materially adverse to the former client. Rule 1.9(a)

Morris Peterson also refers to several cases where there is no discussion of (Model) Rule 1.18, but rather, the courts relied upon (Model) Rule 1.9 in finding no implied attorney client relationship because no confidential information was given and no legal advice was received. For example, ***Polygon Plastics Inc. v. Cincinnati Milacron, Inc.*** 903 F. Supp. 253 (D.P. R. 1995) involved a 9-10 minute pre-lawsuit telephone call between defendants' counsel and plaintiffs' counsel, like here, wherein plaintiff's counsel had contacted defendants' counsel for the purpose of possibly retaining defendant's counsel to represent plaintiff (in a suit subsequently filed against defendants' clients). To determine whether an implied attorney-client relationship existed, the court concluded it needed to determine whether confidential information was passed from plaintiffs' counsel. To that end, the court found that, in addition to information of a general nature, whatever meager confidential information was disclosed with defendants' counsel it was disclosed in more detail in the subsequently filed complaint. Without the disclosure to defendants' counsel of confidential information which could disadvantage plaintiff if disclosed, the court found an absence of an implied attorney client relationship. In comparison, here confidential information advantageous to Caesars was disclosed to Mr. Morris (and not published in the Complaint), including the strategy behind selecting specific defendants, prospects for settlement and the selection of co-counsel. In addition, legal advice was rendered by Mr. Morris regarding venue, claims, and the selection of counsel and judges which was relied upon by Chinois.

For similar reasons, **Leathem v. City of Laporte Indiana.**, 2008 WL 1804150 (N.D. Ind. 2008) is distinguishable. In that case, the plaintiff telephoned defendants' lawyer to discuss retaining him (prior to his appearance in this case on behalf of defendants). However, Plaintiff acknowledged he only disclosed that facts of the case and nothing else. Moreover, no legal advice was given by defendants' lawyer. The court found that an attorney-client relationship had not been created. Once again, by contrast, here confidential information, not just the facts of the case, was disclosed to, and legal advice was received from, Mr. Morris.

Lastly, in **Guerro v. Bluebeard's Castle Hotel, Inc.** 982 F. Supp. 343 (D.V. I. 1997), plaintiff's counsel had a conversation with defendant's counsel (before defendant's counsel appeared representing defendant in the case). In that case, defendant's counsel approached plaintiff's counsel who received a "sales pitch". No evidence was presented that any confidential information was disclosed by plaintiff's counsel to defendant's counsel, rather, there were two law firms discussing various fee arrangements. Under those circumstances, not present in this case, the court found no establishment of an attorney-client relationship which would support a disqualification motion. [2]

By contrast, when, as here, confidences were disclosed and legal advice was received, a fifteen minute telephone conversation was sufficient to create an implied attorney-client relationship precluding the initially contacted attorney from subsequently representing another client adverse to the first client. *See* **Doucette v. Dlugolecki** 2006 Conn. Super. LEXIS 52825 (Sup. Ct. Conn., New Britain Jud. Dist., 2006):

---

[2] *Compare,* **Bluebeard's Castle Inc, v. Delma Marketing Inc.** 886 F. Supp. 1204 (D.V.I 1995) where an attorney client relationship was found due to a prior consultation during which confidences were disclosed and legal advice was given.

The Tenant believes that he revealed confidences to Onore that now put him at a disadvantage. Onore argues that the Tenant's call was like many other he receives from people seeking advice but unable to retain his services. He gave the Tenant general information. Their contact was limited to that one phone call which probably lasted approximately fifteen minutes. The Tenant never met with Onore in person and never retained him.

\*      \*      \*

"The Authority of any attorney begins with his or her retainer, but the relation of attorney and client is not dependent on the payment of a fee, nor is a formal contract necessary to create this relationship. The contract may be implied from conduct of the parties. The employment is sufficiently established when it is shown that the advice and assistance of the attorney are sought and received in matters pertinent to the attorney's profession." 7 *Am.Jur.2*$^{nd}$*, Attorney at Law, § 136,* Retainer.

\*      \*      \*

The advice and assistance of Onore was sought and received. Based on the evidence presented, the court finds that an attorney-client relationship arose.

*Id.* at 2,7,8-9

Mr. Heller on behalf of Chinois may have been a prospective client when he initiated his call to Mr. Morris, however, as a result of the disclosures made and advice given, by the conclusion of the call there was an implied attorney-client relationship and Rule 1.9 governing duties to a former client controlled. (Nevada recognizes the concept of an implied attorney-client relationship. (*See Todd v. The State of Nevada* (1997) 117 Nev. 18, 24-25).Nevertheless, whether viewed from the perspective of Nevada Rule 1.18 or Nevada Rule 1.9, Mr. Morris and his firm should be disqualified because, at a minimum, he received confidential information advantageous to Caesars which could be significantly harmful to Chinois in this case.

12

Exhibit C

## C.    The Appearance Of Impropriety

For the reasons discussed above, Steve Morris and his law firm should be disqualified pursuant to either Nevada Rule 1.18 or Rule 1.9. In addition, the facts in this case also raise the specter of the appearance of impropriety.

Other courts have held generally that "the mere appearance of impropriety is just as egregious as any actual or real conflict." *American Insurance Association v. Kentucky Bar Association* 917 S.W. 2nd 568, 573 (Ky. Sup. Ct. 1996). Still others, pursuant to Model Rule 1.9, have applied that principle to motions to disqualify attorneys based upon a prior consultation:

> Even thought the comment to Rule 1.9 specifically rejects the "appearance of impropriety" standard in favor of a fact-based test applied to determine whether the lawyer's duty of loyalty and confidentiality to a former client will likely to be compromised by the subsequent representation, the appearance of impropriety is still a useful guide for ethical decisions.
>
> \*         \*         \*
>
> Lawyers still must avoid the appearance of impropriety because such is an integral component of professional responsibility. *First American Carriers, Inc. v. Kroger Co.*, 302 Ark. 86, 787 S.W. 2d 669(Ar.1990).

*Local v. Winchester*, 941 S.W. 2d 466, 468 (Ky. Sup. Ct. 1997)

Here not only is the conduct of attorneys before the Bench under review, the prior conduct of an attorney now sitting as a Justice of the Nevada Supreme Court has come under scrutiny. Public confidences are shaken when it appears that ethical rules are being circumvented for the sake of expediency because an attorney has been elected to the Bench.

Nevada law recognizes that the Court has the power to disqualify an attorney from representing a particular client in order to maintain public

13

Exhibit C

confidence in the integrity of the bar. *Coles v. Arizona Charlie's* 973 F. Supp. 971, 973 (D. Nev. 1997). For this additional reason, Mr. Morris and his firm should be disqualified.

**D.    Chinois' Motion Is Not Tactically Motivated**

Morris Peterson's argument that this Motion is tactically motivated is not true and makes no sense. Morris Peterson states that, if after learning that Mr. Morris firm had represented Caesars Mr. Heller continued the telephone conversation and received legal advice from Mr. Morris, it was done "for the purpose of providing support for this motion." (Opp. Br. at 17.)

If that had been Chinois' motivation, then when Morris Pickering & Peterson first appeared in this case in February 2008 Chinois would have moved to disqualify Mr. Morris and his firm. Instead, upon written assurances from both Mr. Morris and Ms. Pickering that Mr. Morris had initiated appropriate screening measures, including confirmation that Mr. Morris had no involvement in this case on behalf of Caesars and would have none in the future, Chinois withdrew its objections to other lawyers in the firm (then known as Morris Pickering & Peterson) representing Caesars. (Ex. A)

To that end, Mr. Morris did step aside. This act alone distinguishes this case from all the other cases cited by Morris Peterson. Clearly, Mr. Morris recognized that his involvement would trigger an objection from Chinois and, therefore, had no involvement in this case from at least February 2008 through December 2008.

However, when his wife and partner left the firm in January, 2009, Mr. Morris did a 180° turn and decided to represent Caesars against Chinois in the very same matter for which he was consulted in late 2007. The timing of the filing of this Motion had nothing to do with obtaining any tactical advantage (there is none), but rather, was dictated by the substitution of Mr. Morris in place of Ms. Pickering, an event over which Chinois had no control. In light of Mr.

14

Exhibit C

Morris' conduct over the preceding 10 months (keeping himself away from this case) his current revisionist statements now ring decidedly hollow.

## III.   CONCLUSION

Notwithstanding Mr. Morris' attempt to minimize the nature and scope of his prior consultation with counsel for Chinois, Mr. Morris' own actions speak louder than his words. For over ten months Mr. Morris ostensibly honored his obligations to Chinois and stayed away from this case pursuant to promises made to Chinois by him and his former partner Kris Pickering. Now that it is no longer convenient for Mr. Morris to honor those promises, he wants back in. However, for all the reasons discussed above, under the compelling circumstances found in this case, Plaintiff Chinois' Motion to Disqualify Steve Morris and his firm should be granted in its entirety.

Respectfully submitted,

Dated:  February 6, 2009          **FAGELBAUM & HELLER LLP**

By: _____
Jerold Fagelbaum
2049 Century Park East, Suite 4250
Los Angeles, CA 90067-3254
Attorneys for Phase II Chin, LLC

Dated:  February 6, 2009          **HUNTERTON & ASSOCIATES**

By:_____
C. Stanley Hunterton
333 S. Sixth Street
Las Vegas, NV 89101
Attorneys for Phase II Chin, LLC   .

Exhibit C

## SUPPLEMENTAL DECLARATION OF PHILIP HELLER

I, Philip Heller, declare:

1.    I am co-counsel of record herein for Plaintiff Phase II, Chin LLC ("Chinois "). I submit this supplemental declaration based upon my own first hand personal knowledge of the facts set forth below and, if called upon as a witness herein, could and would competently testify thereto.

2.    I have reviewed the declaration of Steve Morris, filed in Opposition to Chinois' Motion to Disqualify. As detailed below, it is clear to me that Mr. Morris has conflated statements made by him and me during my telephone consultation with him regarding this matter. In addition, other statements made by Mr. Morris in this declaration are just inaccurate. Finally, despite a professed hazy recollection of the telephone call, Mr. Morris purports to have clear recollection of only these alleged statements which tend to support his argument, not those statements which do not. Mr. Morris' current and enhanced recollection is at odds with the February 14, 2008 skeletal e-mail he sent to me (Ex. A) when he was trying to minimize the content and significance of the prior consultation.

3.    For ease of comparison, I shall address Mr. Morris' statements in the order they appear in his declaration (all paragraph reference are to Mr. Morris' January 26, 2009 declaration attached to his Opposition Memorandum):

Paragraph 2:  The consultation occurred later than October 2007, shortly before local counsel Stan Hunterton was consulted in December 2007 and subsequently retained. Contrary to Mr. Morris' recollection, I told him (Mr. Morris did not tell me) that the Simon entities were the operators and lesssors of the Forum Shops of which Chinois was a tenant.

16

Exhibit C

Paragraphs 3-4: When I first indicated to Mr. Morris that I was looking to retain local counsel, I did not characterize the Chinois matter as a "lease dispute". To the contrary, I disclosed to Mr. Morris Chinois' intention to file a more comprehensive action in Las Vegas than the Declaratory Relief action filed by the Simon entities in Delaware. In this connection, I mentioned a broader group of potential defendants, including Caesars.

Paragraph 5: Mr. Morris is mistaken when he said I did not tell him the Delaware action was limited to Declaratory Relief and that Chinois' plan was to file an expanded action contemplated to include eight causes of action for damages and injunctive relief. At the time I consulted with Mr. Morris, drafting of the complaint already was in progress. In addition, with regard to Caesars, I specifically raised with Mr. Morris how adding Caesars as a defendant could effect the prosecution of the case and prospects for settlement.

Paragraph 6: Again, I told Mr. Morris (he did not tell me) that Caesars was the ground lessor for Forum Shops. Mr. Morris did indicate his firm had represented Harrahs' (the owner of Caesars) but he did *not* unequivocally state he would not represent tenants at the Forum Shops due to the relationship between Forum and Caesars. As I previously have stated, Mr. Morris framed the issue in terms of his representation *might* be a problem (which I viewed as a hedge in the event he could obtain a conflict waiver).

Paragraph 7: Given Mr. Morris equivocation, I mentioned to him (not the other way around) another lawyer, Stan Hunterton, who had been

17

Exhibit C

referred to me by another attorney in Los Angeles, Thomas P. Nolan of Skadden Arps, Slate Meagher & Flom. At that point, Mr. Morris advised me of his views concerning Mr. Hunterton and counsel for Love & Money LLC (formerly OPM) Harold Geweter.

Paragraph 8: Contrary to Mr. Morris' characterization, he had not declined to act as local counsel. Based upon our conversation, he indicated it might be possible. However, I decided not to embroil Mr. Morris or Chinois in a potential conflict dispute, and instead, retained Mr. Hunterton. Cognizant of the confidential information he had received, Mr. Morris confirmed in his declaration that he represented to me in his 2/14/08 e-mail that he had not communicated with anyone at his firm, including his wife and partner Kris Pickering, about our telephone consultation.

Paragraph 9: While Mr. Morris contends he "cannot recall" any other confidences shared by me with him during the telephone call, he does not say there were none. In fact, there were others which I clearly remember. Without actually disclosing the confidences Chinois is now trying to protect, these confidences included, among other things, my thoughts on litigation strategy and settlement especially in light of Caesars potentially being added as a defendant, Mr. Morris views on these subjects, and legal advice from Mr. Morris regarding venue, possible claims, counsel and judges.

Paragraph 10: Mr. Morris raises the red-herring that he received no confidential information or gave legal advice regarding the ***Delaware action***. The issue is whether he received confidential information and

18

gave legal advice in the *Nevada action* (which he did). Mr. Morris continues to proclaim he has not discussed the contents of our telephone call with anyone. This was only relevant if he received confidential information (which he did) and he was trying to establish he erected an "ethical screen" around the conversation. Once Mr. Morris participates in this action adverse to Chinois the "ethical screen" is meaningless. Finally, contrary to Mr. Morris' recollection, the telephone conversation with me was closer to 20 minutes.

4. Following the telephone consultation, I had not yet decided whether to pursue retaining Mr. Morris or retain someone else. What I did feel certain about, however, was that my conversation with Mr. Morris was confidential, that I received (and subsequently acted upon) advice I obtained form him, and that he would not represent a client (including Caesars) adverse to Chinois in the same matter upon which I had consulted with him.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 5th day of February, 2009 at Los Angeles, California.


Philip Heller

Exhibit C

# CERTIFICATE OF SERVICE

[US DISTRICT COURT –NEVADA]

CASE NO. 2:08-CV-00162 JCM (GWF)

I hereby certify that on February 6, 2009 I caused a true and correct copy of the foregoing document **PLAINTIFF PHASE II CHIN LLC'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES AND SUPPLEMENTAL DECLARATION OF PHILIP HELLER IN FURTHER SUPPORT OF ITS MOTION TO DISQUALIFY ATTORNEY STEVE MORRIS AND THE LAW FIRM OF MORRIS PICKERING & PETERSON (NOW MORRIS PETERSON)**

to be served on counsel for all parties via electronic filing the Court's ECF System.

| | |
|---|---|
| Samuel S. Lionel, Esq.<br>Charles McCrea, Esq.<br>**LIONEL SAWYER & COLLINS**<br>300 So. Fourth Street, # 1700<br>Las Vegas, Nevada 89101<br><br>Attorneys for Defendants Forum Shops, LLC<br>Forum Developers Limited Partnership, Simon<br>Property Group Limited Partnership and Simon<br>Property Group, Inc. | **(FORMER ATTORNEYS)**<br>Kristina Pickering, Esq.<br>**MORRIS PICKERING & PETERSON**<br>900 Bank of America Plaza<br>300 So. Fourth Street<br>Las Vegas, Nevada 89101<br><br>Attorneys for Defendants Caesars Palace<br>Corp. and Caesars Palace Realty Corp. |
| Harold Gewerter, Esq.<br>**GEWETER LAW OFFICES**<br>5440 W. Sahara Avenue, Third Floor<br>Las Vegas, Nevada 89146<br><br>Attorneys for Plaintiff Love & Money, LLC | C. Stanley Hunterton, Esq.<br>Pamela R. Lawson, Esq.<br>333 SO. Sixth Street<br>Las Vegas, Nevada 89101<br><br>Attorneys for Plaintiff Phase II Chin, LV. |
| George W. Foley, Jr.<br>**Magistrate Judge**<br>Court Room 3A<br>United States District Court – District of Nevada<br>333 Las Vegas Blvd. South<br>Las Vegas, Nevada 89101 | **(NEW ATTORNEYS)**<br><br>Steve Morris, Esq.<br>**MORRIS PETERSON**<br>900 Bank of America Plaza<br>300 So. Fourth Street<br>Las Vegas, Nevada 89101<br><br>Attorneys for Defendants Caesars Palace<br>Corp. and Caesars Palace Realty Corp. |

_Zorina Shah-Sohl_

Zorina Shah-Sohl

-1-

Exhibit C