UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
LAS VEGAS DIVISION


PHASE II CHIN, LLC., ET AL., ) CASE NO: 2:08-CV-162-JCM-GWF
                             )
            Plaintiffs,      )
                             )                CIVIL
    vs.                      )
                             )        Las Vegas, Nevada
FORUM SHOPS, LLC., ET AL.,   )
                             )    Thursday, February 12, 2009
            Defendants.      )     (9:27 a.m. to 10:36 a.m.)


HEARING ON
PLAINTIFFS' MOTION TO DISQUALIFY ATTORNEY STEVE MORRIS

BEFORE THE HONORABLE GEORGE FOLEY, JR.,
UNITED STATES MAGISTRATE JUDGE


Appearances:              See next page

Court Reporter:           Recorded; FTR

Courtroom Administrator: Donna Smith

Transcribed by:           Exceptional Reporting Services, Inc.
                          14493 S. Padre Island Drive
                          Suite A-400
                          Corpus Christi, TX 78418-5940
                          361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

EXHIBIT D
Dockets.Justia.com

**APPEARANCES FOR:**


Plaintiffs:                    JEROLD FAGELBAUM, ESQ.
                               Fagelbaum & Heller
                               2049 Century Park East
                               Los Angeles, CA 90067

                               PAMELA LAWSON, ESQ.
                               Hunterton & Associates
                               333 S. Sixth Street
                               Las Vegas, NV 89101

                               HAROLD GEWERTER, ESQ.
                               5440 W. Sahara Avenue, Third Floor
                               Las Vegas, NV 89146

Defendants:                    STEVE MORRIS, ESQ.
                               Morris Peterson
                               900 Bank of America Plaza
                               300 S. Fourth Street
                               Las Vegas, NV 89101

EXHIBIT D

1    **Las Vegas, Nevada; Thursday, February 12, 2009; 9:27 a.m.**

2                              **(Call to Order)**

3              **THE COURT:**  This is the time set for *Phase II Chin,*

4    *LLC, et al. versus Forum Shops, LLC, et al.*, case number 2:08-

5    CV-162-JCM/GWF.

6              Counsel, please make your appearances for the record.

7              **MR. FAGELBAUM:**  Good morning, your Honor; Jerold

8    Fagelbaum representing the plaintiff, Phase II Chin, LLC.

9              **THE COURT:**  Thank you.

10             **MR. MORRIS:**  Steve --

11             **MS. LAWSON:**  Pamela Lawson -- I'm sorry.

12             **MR. MORRIS:**  Sorry.

13             **MS. LAWSON:**  Local counsel for Chin Hua.

14             **MR. GEWERTER:**  Good morning, your Honor; Harold

15   Gewerter for plaintiff, Love and Money, LLC.

16             **THE COURT:**  Thank you, counsel.

17             **MR. MORRIS:**  Steve Morris on behalf of the Caesars

18   defendants.

19             **THE COURT:**  Thank you, counsel.

20             This time is set for hearing on the plaintiffs'

21   motion to disqualify attorney Steve Morris and the law firm of

22   Morris Peterson as counsel for the Caesars defendants in this

23   case.

24             I have read the briefs and I read nearly all of the

25   cases cited by the parties and some additional cases that I

EXHIBIT D

1  found by shepardizing those, and I will hear further argument

2  at this time.  But I have read everything, so if you want to

3  sort of formulate your arguments in terms of anything new or

4  points that you wish to highlight or call to the Court's

5  attention, I would appreciate it.

6        **MR. FAGELBAUM:**  Good morning again, your Honor.

7        **THE COURT:**  Good morning.

8                      **ARGUMENT OF PLAINTIFF**

9        **MR. FAGELBAUM:**  Your Honor, I'm reminded of Lloyd

10  Bentsen's opening remarks in the debate with Dan Quayle when he

11  referred to Mr. Quayle and said, 'I knew Jack Kennedy, and sir,

12  you're not Jack Kennedy.'

13        I know Steve Morris.  He's an excellent lawyer.  He's

14  so good we wanted to use him.  He's a formidable opponent.

15  He's so good that he cannot be given the additional edge of

16  having an insider's perspective of our litigation and

17  settlement strategy.

18        Mr. Morris' initial instincts in this case were the

19  correct ones.  He stepped aside and he agreed to have nothing

20  to do with this case.  His belated change of heart is wrong,

21  and it's wrong for all the wrong reasons.  Economic self-

22  interest and expediency does not justify breaching a duty of

23  loyalty and the duty to protect a client's confidences.

24        The heart of Chin Hua's motion is that the

25  confidences that were disclosed and the legal advice that was

EXHIBIT D

1   received from Mr. Morris resulted in the creation of an implied

2   attorney-client relationship; that as a result of that

3   relationship Mr. Morris and his firm cannot now represent

4   Caesars adverse to Chin Hua in this case, the same case in

5   which Mr. Morris was initially consulted.

6           We have presented evidence in the form of Mr.

7   Heller's declarations probative of the nature and extent of the

8   disclosures that were made, the advice received and the harmful

9   effect it would have upon Chin Hua if Mr. Morris remains in

10  this case adverse to it.

11          In the opposition papers, Mr. Morris tries to but

12  does not succeed in refuting the evidence.  His memory is

13  selective and he parses his words and his statements very

14  carefully.  What Mr. Morris does not tackle, however, is the

15  800-pound gorilla that's in the middle of the room.  Mr.

16  Morris's own conduct belies all the arguments he's now making.

17          Based upon his initial consultation with Mr. Heller,

18  both Mr. Morris and Ms. Pickering agreed that Mr. Morris would

19  have no involvement in this case.  For more than ten months,

20  when it was convenient to do so, Mr. Morris honored that

21  commitment and stayed out.  After Ms. Pickering was elected to

22  the bench, it was no longer convenient to honor that promise,

23  and Mr. Morris now wants back in.  However, ethics are not a

24  matter of convenience.  Client loyalty and protection of client

25  confidences trump convenience and Caesars's desire to select

1   Mr. Morris as its lawyer.

2       What is true for lawyers is especially true for

3   lawyers who become judges. They must avoid the appearance of

4   appearance of impropriety. Here, public confidence and the

5   integrity of the bar are shaken when ethical rules are ignored

6   for the sake of expediency.

7       The previous consultation which is at the heart of

8   this motion reflects that, number one, this is unrefuted, no

9   conflict avoidance measures were taken by Mr. Morris in

10   connection with that phone call. Two, Mr. Heller disclosed

11   confidential information regarding the strategy behind filing

12   the second suit here in Las Vegas, potential claims, venue,

13   possible defendants, selection and assessment of co-counsel and

14   prospects for settlement.

15       While it is true some of those items were

16   subsequently disclosed in the filing of the complaint, the

17   value of that disclosure is not that they were disclosed and

18   therefore there are no more confidences; it helps place in

19   context the nature of that initial prior consultation.

20       This was not a situation where counsel encountered

21   another lawyer at a cocktail party and engaged in some

22   innocuous chit-chat. This is a situation where counsel who was

23   well-known to our offices was contacted because of his

24   experience and his expertise. And Mr. Heller quickly cut to

25   the chase when it came to disclosing the information that was

EXHIBIT D

1  necessary to see whether or not Mr. Morris could assist us as

2  local counsel.

3        During the course of that conversation, legal advice

4  was given by Mr. Morris regarding parties and perspective

5  parties, venue, claims, selection and assessment of counsel and

6  judges.  Now, the difficult part of this type of emotion is

7  that you cannot disclose what you're trying to protect, so you

8  cannot disclose and say verbatim what happened in the course of

9  that initial consultation.  However, context is key.  What was

10  the purpose of that call?  The purpose of that call was to

11  retain local counsel.

12        Mr. Morris, in his opposition papers and in his

13  declaration, concedes that there were confidences disclosed.

14  However, he seeks to trivialize those conversations and say

15  whatever confidences were disclosed were subsequently published

16  in the complaint.  While there is some truth to that, some of

17  those confidences, by the very nature filed in the complaint

18  were disclosed the identity of the defendants, the identity of

19  the various causes of action, the strategy behind the selection

20  of those causes of action, the weight of those causes of

21  action, the selection of defendants, why they were selected.

22        Litigation strategy and settlement strategy was not

23  disclosed in that document.  The courts do not have an

24  insurmountable standard when it comes to evaluating what was

25  discussed.  *In Re: Rosanna*, which is a Nevada Bankruptcy Court

EXHIBIT D

1  case, says that the inquiry is not whether an attorney actually

2  received confidential information but whether attorneys

3  potentially acquire confidential information that would be

4  harmful to the previous client in the current matter.

5  As I led off with, your Honor, Mr. Morris is a

6  skilled attorney.  It is unfair to provide him with the

7  additional insight of an insider and then allow him to take a

8  position adverse to Chin Hua in this case.

9  The comments of Ms. Pickering, one of the last

10  comments she made before she took the bench was that Mr. Morris

11  was coming in and that the plaintiffs would regret it.  And we

12  are regretting it.  It was a mistake.  It should not have been

13  done.  The appropriate thing to do was to have honored the

14  commitment that was honored in fact for over ten months.

15  Now that this has been done, the appropriate remedy,

16  with all due respect, your Honor, is that not only Mr. Morris

17  but his law firm should be disqualified.

18  **THE COURT:**  Thank you, Mr. Fagelbaum.

19  Mr. Morris?

20  **MR. MORRIS:**  Judge Foley, good morning.

21  **THE COURT:**  Good morning.

22  **ARGUMENT OF DEFENDANT**

23  **MR. MORRIS:**  It is an unpleasant task for a lawyer

24  who has been, as Mr. Fagelbaum describes, praised as a

25  formidable opponent, and it would be, without those remarks, to

EXHIBIT D

1   come here and defend myself and my firm against conclusions

2   that are not supported by anything in the way of admissible

3   evidence to establish the proposition that, in speaking for a

4   few minutes in October of 2007, I received and retained

5   confidences which, if revealed in this representation now,

6   would be significantly harmful to Chin Hua.  That is the

7   standard by which a motion of this type should be judged.

8          And in coming to the cases and the opinions that you

9   have read in those cases, I believe it is necessary to at least

10  point out what the evidence that we do know from the

11  declarations the parties have filed and the statements they

12  have made with respect to what they did or said to each other

13  indicate, one, I wasn't consulted nor was I called in the

14  belief that, in speaking to me, I would be Chin Hua's lawyer.

15         I was called in the course of an inquiry of more than

16  one lawyer as a possible representative for a client called

17  Chin Hua, as I said in my declaration, I know as a restaurant

18  at the Forum Shops, who wish to litigate with Simon Properties

19  or one of the Simon entities that conducts business at the

20  Forum Shops, and that fact was disclosed at the outset, and it

21  is a significant fact, because I have had years of experience

22  with Simon as an adverse party.

23         I know for a fact that in speaking to Mr. Heller, and

24  I knew it then, that if the defendant or the defendants that he

25  had in mind were Simon Property entities, I would have no

EXHIBIT D

1  conflict, and he did not disclose otherwise.

2  Let's be perfectly clear in what was disclosed by Mr.

3  Heller when he started speaking to me.  I don't know him, I

4  have never seen him, and I've only had the one conversation

5  with him.  I haven't seen nor spoken to Mr. Fagelbaum before I

6  saw him in the courtroom this morning, and I didn't recognize

7  him when I saw him since, I believe, 1981.

8  Mr. Heller called me and said, as Mr. Fagelbaum puts

9  in his declaration, 'We're looking for local counsel to

10  represent our client with us, Chin Hua', and Mr. Fagelbaum

11  suggested that in considering local counsel, and we've had some

12  recommendations of others, and another one is sitting at this

13  table, Harold Gewerter, and he is sitting next to another one

14  that they interviewed and hired, Stan Hunterton and Pam Lawson.

15  And it is in that context that Mr. Heller said, 'We

16  have been sued by Simon in Delaware, and I want to file a suit

17  against Simon in Las Vegas, and let me tell you how I came to

18  speak to you.  I spoke to my partner, Mr. Fagelbaum, and he

19  said', and so on and so forth.  We exchanged some social

20  pleasantries.  We even reminisced a bit about the MGM fire

21  litigation which is the basis for my former association with

22  Mr. Fagelbaum, although Mr. Heller wasn't involved in it.  It

23  was that association that prompted Mr. Fagelbaum, as he says in

24  his declaration, to suggest to Mr. Heller that he speak to me,

25  among others, about representation.  And we did.

EXHIBIT D

1      We spoke about, among other things, the court system

2  here; the state and federal courts, the judges, the calendars,

3  the congestion, and so on and so forth, and we did so in the

4  context of 'I've been sued in Delaware by Simon and I want to

5  sue Simon in Las Vegas.'  In the course of that conversation,

6  and I took that to be, to use a phrase, and you've seen it in

7  the decisions you've read, I took that to mean I was a

8  participant in a beauty contest.  We're looking around for

9  lawyers, and a number of them have been recommended to us and

10  you're one of them.  We want to file a lawsuit in Las Vegas,

11  and we want to file it against Simon.

12      In the course of that discussion, I said to Mr.

13  Heller, and I can tell you he is simply dead wrong in his

14  declaration when he says otherwise, I remarked to him that the

15  ground lessor, because I knew this from years of litigation

16  involving Simon, the ground lessor of the Forum Shops is

17  Caesars, and Caesars is owned by Harrah's, and that is a long-

18  time and continuing client of mine and my firm.  It is in that

19  context that Caesars arose.

20      I suggested in my papers and I wish to suggest it to

21  you again this morning, it is preposterous to assume that at

22  the outset of this conversation Mr. Heller said, in words or

23  substance, 'I want to sue one of your current clients, Mr.

24  Morris', and I said, 'Gee, that's fine.  Let's talk about that

25  and let me give you all sorts of advice and answer all sorts of

EXHIBIT D

1  questions that you may have about litigation strategy and

2  parties and claims, and then maybe I can get the client to

3  waive a conflict so you can employ all of this information and

4  my advice against my client in a lawsuit in which I would be

5  your co-counsel.'  That's the proposition that is being urged

6  here.

7      Mr. Fagelbaum told you that as a consequence of suing

8  Caesars some months later, and my firm appearing as counsel for

9  Caesars -- not me, my firm -- Mr. Heller protested, and he did,

10  and it is of consequence to examine the text of the two e-mails

11  we exchanged on this subject, because, among other things, Mr.

12  Heller's response to mine, which you have an Exhibit A to the

13  motion to disqualify me and my law firm, is a single paragraph,

14  and it does not dispute this statement that I made in my e-mail

15  to him.

16      I'm unable to recall anything from our conversation

17  several weeks or months ago that justifies your request.  I

18  have only the faintest recollection of our previous

19  conversation.  I recall you said you represented Chin Hua at

20  the Forum Shops in some sort of dispute with another tenant or

21  sub-tenant involving a night club.  I do recall telling you

22  that Simon is the lessor at the Forum Shops, and that it would

23  be a difficult party to litigate against, and I know that from

24  experience; and that he leases ground for the Forum Shops from

25  Caesars.  I told you we represent Harrah's, which owns Caesars.

EXHIBIT D

1   I don't recall the context in which these remarks were made but

2   I probably said we would not represent tenants at the Forum

3   Shops because of their relationship between Forum and Caesars.

4           In any event, I either recommended Stan Hunterton to

5   you as local counsel or confirmed another lawyer's

6   recommendation of him to you as a very favorable and

7   experienced litigator.'  Mr. Heller agrees with that.  He

8   doesn't dispute any of that.  Now, in his declarations in this

9   case and in particular his supplemental declaration, he

10  embellishes on a number of conclusions by asserting even more

11  conclusions with respect to what it is in the way of

12  confidences he disclosed to me.

13          He hasn't said to you either *in camera*, and he hasn't

14  asked for an evidentiary hearing to demonstrate what those

15  confidences were.  He just simply says to you in his two

16  declarations, 'Take my word for it; I disclosed them.  I have

17  no evidence of it.  I can't even tell you when I telephoned Mr.

18  Morris.'  And as a consequence, your Honor, of me identifying

19  October 2007 as the date of that conference, Mr. Heller, in his

20  supplemental declaration, not in the moving papers, comes back

21  and says, 'I believe that telephone conference was much closer

22  in time to December when I retained Stan Hunterton.'

23          That is contradictory to Mr. Fagelbaum's declaration

24  which he filed in support of the motion to disqualify me in

25  which he acknowledges that shortly after Chin Hua had been sued

EXHIBIT D

1  by Simon in Delaware, he suggested to Mr. Fagelbaum -- I'm

2  sorry, Mr. Heller -- that he speak to me about acting as local

3  counsel in Las Vegas.  That lawsuit in Delaware was filed in

4  early October 2007, and it is a fact that Mr. Heller disclosed

5  to me, although he didn't tell me what the claims made in that

6  lawsuit against Chin Hua were.  But he did disclose it.  I put

7  that in my declaration.

8       We start from this premise, I believe.  I speak to

9  lawyers frequently, both in this community and from outside the

10 community, about potential litigation in Las Vegas, and

11 oftentimes the questions of lawyers who are unfamiliar with Las

12 Vegas center on, as they did in this case, the court system;

13 state court, federal court, number of judges, congestion, time

14 to hearing, so on and so forth.  And I freely answer those

15 questions based on my experience.

16      But I didn't answer those questions and discuss those

17 subjects with Mr. Heller in the course of speaking to him in

18 October 2007 for the purpose of rendering legal advice in

19 connection with a particular problem or series of problems that

20 he said he had, because he didn't, and he has no evidence

21 otherwise to show that he discussed with me his eight causes of

22 action.  He didn't even have a complaint, or, if he did, he

23 didn't disclose it to me.  He didn't send me anything.  He

24 didn't tell me what those eight causes of action were.  I

25 didn't tell him what I thought of those causes of action which

EXHIBIT D

1  he didn't disclose to me.

2      It is, I used the word 'preposterous' a few minutes

3  ago with respect to Mr. Heller telling me, alleging that he

4  told me he was going to sue my client, and I said, 'Fine, let's

5  talk about it.'  It is preposterous also to suggest that Mr.

6  Heller, in the course of a very short telephone conversation,

7  discussed with me such subjects as litigation strategy

8  underlying eight causes of action, settlement considerations

9  with respect to a lawsuit that had not been filed, the identity

10 of parties and the addition of defendants.  The only thing I

11 knew about the defendants in the case was that Simon, or a

12 Simon-related company with whom I would have no conflict and

13 had not previously represented, Simon would not be a problem

14 for me.

15      If Mr. Heller had said, 'Look Morris, I'm thinking of

16 suing Simon and Harrah's or Caesars or another client that I've

17 represented', I would have said at that point, 'You know, this

18 is a problem for me.  I can't do this', and that is exactly

19 what I said to Mr. Heller, and it's confirmed in these

20 declarations when it came to light that he said, 'Well, Caesars

21 is a potential defendant.'

22      Mr. Fagelbaum told you a few minutes ago that as a

23 consequence of my conversation as described in the

24 declarations, there was an implied attorney-client relationship

25 created between me and Chin Hua in October of 2007 even though

EXHIBIT D

1  Mr. Heller would like to say it's sometime later.  That arises
2  under the model rules.

3          The rules we currently operate under and which, by
4  your local rules, are the operative rules with respect to
5  attorney conduct in this Court, became effective in September
6  2007.  They are the revisions to the model rules that were
7  first enacted in Nevada in the 1980s, in 1983.  That was as a
8  consequence of the ABA's 2000 commission which studied the
9  model rules for several years in order to recommend revisions
10 to the rules and improvement in the procedures that would be
11 put in motion by application of the rules.

12          One of those provisions is in Nevada model rule
13 1.18(c).  That rule says, with respect to the contention made
14 here that I became Chin Hua's implied attorney because of my
15 conversation with Mr. Heller, is that disqualification of an
16 attorney who discusses with a client representation that does
17 not come about is only warranted when the disclosures to the
18 attorney by the client would be significantly harmful in the
19 litigation that follows and in which the attorney -- in this
20 case, me -- was spoken to on a prior occasion.

21          That codifies the law that was in effect in Nevada at
22 the time the current model rules were implemented, and you can
23 find that in, among other places, the cases cited by Chin Hua.
24 For example, *Robbins versus Gillock* (phonetic), the Court
25 there, in discussing the nature of confidences -- by the way,

EXHIBIT D

1  it didn't say and neither do the rules, any confidence

2  disclosed results in disqualification. The Court said there

3  that a confidence to merit disqualification or to support

4  disqualification, and I'm now quoting, 'must be one that will

5  be harmful to the client in a later matter.' The rule codifies

6  that and adds to it the modifier 'significantly harmful.'

7        Cases before this Court by other magistrate judges,

8  and we appended some of those to our opposition, point out that

9  when addressing matters like this and trying to determine

10 whether a client's choice of lawyer should be set aside because

11 the lawyer in question has significantly harmful information

12 that could be used against that client, the courts say -- your

13 fellow magistrate judges say, and Magistrate Judge McQuaid said

14 it in *United States versus Walker River Irrigation District*,

15 'There must be admissible evidence of confidential facts

16 disclosed.'

17       Here we have, without knowing what those confidential

18 facts are that could be significantly harmful in this

19 representation, we simply have the conclusions, the declaration

20 of attorney Philip Heller, that I disclosed such things to

21 Morris. And Mr. Fagelbaum, in his papers and in his argument

22 this morning, elides that just a bit. And he says because of

23 the nature of what we're talking about, those disclosures do

24 not have to be demonstrated. We don't have to say what they

25 are; we just have to look at the context in which Mr. Morris

EXHIBIT D

1    and Mr. Heller spoke and we can presume from that that Mr.

2    Heller, in his declaration, is describing something that we

3    don't have to say.

4              So we do not have to, for example, your Honor, we

5    don't have to honor rule 1.18(c). We want you to presume from

6    Mr. Heller's after-the-fact description of the conversation

7    that significantly harmful information was disclosed. And we

8    are doing that in furtherance of the public's interest in the

9    integrity of the judicial system and the lawyers' interest in

10   being participants of integrity in the same system.

11             My memory in this case, and it's indulgent and it's

12   somewhat embarrassing for me to speak of myself, but I have

13   been accused of, in oral argument and in the papers, of

14   selective memory. 'Mr. Morris' memory is selective', Mr.

15   Fagelbaum says. Well, the memory of my brief conversation with

16   Mr. Heller in October of 2007 is encapsulated in Exhibit A to

17   their motion to disqualify me when I said to him, much closer

18   to the conversation in time than we are today, what in

19   substance I remember of it.

20             And in my declaration in support of the opposition

21   that we filed to this motion, I further develop my recollection

22   and the basis for it of that one telephone conversation. I

23   have been aided to some extent, and I acknowledge this in my

24   declaration, I've been aided to some extent by reviewing the

25   papers and the allegations that have been made, but I haven't

EXHIBIT D

1   been aided to the extent that I recall things which did not

2   occur.

3           I can tell you that I did not discuss, for example,

4   settlement strategy with Mr. Heller.  I did not discuss eight

5   causes of action with him.  I did not discuss the facts or the

6   theories by which those eight causes of action might be

7   supported.  I've given you, in my declaration, and I gave him

8   in my e-mail to him, my best recollection of the substance of

9   what we discussed.  And when it came to the point in our

10  discussion that he said Caesars would be, or could be, a

11  potential defendant in the case, the conversation concluded.

12  That is why I said in my e-mail to him, 'I do not believe you

13  have a basis to ask that the firm discontinue representing

14  Caesars in the case in which you and Stan are involved.'

15          I didn't reach an agreement with them, and they

16  didn't negotiate one with me by which I said, 'I received

17  confidences from you that would be significantly harmful to you

18  in this litigation, but I will Chinese wall myself and not

19  discuss them with anyone else.'  I said in my declaration, and

20  it remains true today; with the exception of these papers I

21  haven't discussed this case with anyone else.  I hadn't

22  discussed my conversation with Mr. Heller with anyone else.  I

23  still have not except as it's set out in my declaration and in

24  these papers.  And I certainly did not retain and carry around

25  with me and come here before you today the facts, the legal

EXHIBIT D

1 strategy and legal advice I gave to Mr. Heller in formulating

2 that strategy, whatever it is with respect to litigating

3 against my own client.

4 These matters have consequence, and they led the

5 restatement of the law governing lawyers which is independent

6 of the ABA 2000 commission but which on this point came to

7 recommendations consistent with one another. We cite those in

8 our moving papers. I don't do so for the proposition that I'm

9 an indispensable or a great lawyer, that I terrify the other

10 side just by appearing here or some such thing as that. I'm

11 not that vain and I'm not that egotistical. I am here to say

12 to you that with respect to what we have, the very spare facts

13 of what we have here, I did not receive from Mr. Heller and do

14 not retain as a result of that receipt, confidences that would

15 be harmful or significantly harmful in this litigation.

16 Now, one of the things that Mr. Heller did say to me,

17 and it's acknowledged in these declarations when we spoke, I

18 have a plan to sue Simon, and at the time he spoke to me, that

19 was confidential. It hadn't been filed yet; the suit had not

20 been filed. The suit has now been filed. It didn't get filed

21 or was not influenced in any manner by anything he said to me,

22 but the fact that he intended to file a lawsuit against Caesars

23 is now a public fact.

24 The eight causes of action that he said he discussed

25 with me, even if he had done so, and that's significant under

EXHIBIT D

1    some of the cases you've read -- the *Poly Agro* (phonetic), for

2    example -- the facts that were alleged by the movant to

3    disqualify the lawyer have now become public facts, so I

4    discussed with Morris eight causes of action, and I filed them

5    through Mr. Hunterton.

6         I discussed adding defendants to Simon in this

7    lawsuit, and I've done so.  Those are matters of public record.

8    They wouldn't be significantly harmful to Chin Hua.  They

9    couldn't be because they're now before the Court and the

10   public.

11        Let's take a look at, and we won't take a look at all

12   of them, a couple of the cases under which this motion is made.

13   Now remember, one of the cases first urged was *Tyrone versus*

14   *Smith*, and when we pointed out in our response that *Tyrone*

15   *versus Smith* involved Mr. Fagelbaum's former law firm and that

16   it involved actual representation and an actual former client,

17   C. Arnold Smith, the Ninth Circuit said, 'Given that fact, that

18   you had a no-kidding, real relationship with this client, you

19   cannot now sue this client's company.'  That case, and the

20   reasoning underlying it, drops out of the reply.

21        Just as *Speedy Oil*, the California case that occupied

22   so much attention or got so much attention in the motion, where

23   lawyers spoke to each other by telephone, the result of which

24   was a client who hired one of those lawyers in a conversation

25   was sued to disqualify that lawyer because the lawyer had

EXHIBIT D

1  talked with the client -- the other client -- as an adversary.

2  *Speedy Oil* involved a series of telephone

3  conversations, not one in October of 2007, and it involved a

4  sit-down, face-to-face two-hour meeting at which subjects such

5  as experts, timing of disclosure, claims, strategy, all those

6  subjects were discussed in depth following a telephone

7  conversation or a series of telephone conversations between the

8  lawyers in question.  That didn't happen here.  Nothing

9  remotely approaching that happened here.

10  This case, if it has an analogue with respect to

11  what's at issue here, can be found in the decision written in

12  the *ADP* case by the magistrate judge in New Jersey in which he

13  analyzed claims identical to those, or almost identical, to

14  those being made here under rule 1.18(c), and he dismissed out

15  of hand and denied a motion to disqualify saying that claims

16  discussed which later became matters of record, settlement

17  strategy or the subject of settlement were not matters that

18  would be significantly harmful in the litigation and therefore

19  would not support disqualification.

20  The Chin Hua lawyers meet this by just a shake of the

21  hand and a nod saying, 'Well, that case is different.'  They

22  don't dispute that it applies 1.18(c); what they want to turn

23  your attention to is the proposition that if this matter

24  proceeds with me as counsel, an appearance of impropriety will

25  be created that would be inimical to the justice system, and

EXHIBIT D

1  they cite a variety of cases that apply the appearance of

2  impropriety as a factor in determining whether to disqualify a

3  lawyer.

4      Those cases go against two things: the trend of

5  authority that recognizes that the old standard, because it

6  exemplifies the problem we have here with Mr. Heller's

7  declaration, the old standard of cannon nine of the Code of

8  Professional Responsibility was the source for the appearance

9  of impropriety, and that has been abandoned.  It is

10  specifically rejected by the model rules.  Why?  Because it is

11  subjective; it doesn't, and as one court, the Arkansas Supreme

12  Court, said last year, 'It lends itself to lawyers crafting

13  arguments that will, they say, and can argue, give the

14  appearance of impropriety.'  And that is the subjective basis

15  for Mr. Heller's declarations.

16      He doesn't tell you, as the courts say and as the

17  rule requires he must establish, he has the burden of proof if

18  he means to disqualify and moves to do so, a prospective

19  counsel that was not retained, he has to demonstrate, as

20  Magistrate McQuaid put it, 'by admissible evidence what it is

21  that would be significantly harmful to carry this on.'  He

22  doesn't do that.  He resorts to embellishing on his declaration

23  that he filed in support of the motion by simply embroidering

24  the conclusions, the subjective conclusions that he reached to

25  spawn the argument that unless you accept these as a basis for

EXHIBIT D

1  disqualifying Morris, you, Judge Foley, will be presenting or

2  fostering an appearance of impropriety. That just isn't the

3  law, and it shouldn't be. The law is as it is declared in rule

4  1.18(c).

5  I am history in this case if the evidence establishes

6  that significantly harmful confidences were disclosed to me.

7  And to put it in the words of *Robbins versus Gillock*, will be

8  harmful to the client in the later matter.

9  I acknowledge that, but I also point out to you, as

10  I've said to you this morning and as I have attempted to say in

11  the papers that I filed, I didn't get, I'm not the recipient

12  of, and there isn't any proof to the contrary that I got

13  confidential information that would be harmful, or

14  significantly harmful to quote the rule, in this matter if I am

15  permitted to continue acting as Chin Hua's counsel.

16  This motion arises in the context of a motion to

17  dismiss is pending. A motion to dismiss is a proposition of

18  law, and that is the context or asks the Court to decide and

19  will decide it as a matter of law, that's the context in which

20  this arises. That's a motion that should have been and could

21  have been heard last year but, for one reason or another, and

22  I'm not faulting anyone here, it wasn't.

23  So when this matter came to conclusion with Ms.

24  Pickering because she went to the Supreme Court, the client

25  with whom I'm acquainted and whom I've represented for years,

EXHIBIT D

1  asked that I take this case, thereby exercising his choice or

2  the client's choice of counsel.

3       As the cases point out to you, to overcome and to set

4  aside a client's interest in being represented by choice of

5  counsel, the proponent of disqualification has the burden of

6  proof to demonstrate that the client's choice of counsel has

7  and can use, or could use in the future in this case,

8  confidences that were disclosed by Heller to Morris in October

9  of 2007 which would be significantly harmful to it.

10      That is the situation that brings us here, and those

11  confidences, whether we describe them in Robbins' terms as

12  harmful or under Rule 1.18(c) as significantly harmful or, as

13  they were discussed in the ADP case, are simply not present

14  here and do not support this motion for disqualification. If I

15  am permitted to go ahead with and present the argument on the

16  motion to dismiss, the legal system will not disintegrate and

17  the prestige of the courts will not be eroded and disappear as

18  a consequence of me doing so. It would be otherwise if I had

19  received and I was going to employ, or had the opportunity to

20  employ, attorney-client confidences that were disclosed to me

21  by Mr. Heller.

22      One last point, and that's this: We do discuss this a

23  bit in our papers, and I call it to your attention only to

24  remind you of the fact. This isn't a case in which a client,

25  unacquainted with the legal system, unsophisticated in the way

EXHIBIT D

1  of lawyers and representations, called a lawyer and said, 'I

2  need help. Can you give me some advice?' I got a call from a

3  lawyer of many years' standing, just as Mr. Fagelbaum is, who

4  said to me, in words and in substance, 'We're shopping around

5  for lawyers in Las Vegas. My partner, Fagelbaum, said I should

6  talk to you.'

7        And in the course of that conversation, when Caesars

8  came up, I said, 'That is a client. It will present a problem

9  for me, and I can't go ahead with this. I suggest you talk to

10  him. Mr. Heller quarrels with this point but he doesn't

11  disagree with the conclusion I reached. He says that he raised

12  the name of Stan Hunterton. You know that doesn't mean

13  anything at all to me because we both know Mr. Hunterton.

14        I believe when Caesars came up, I suggested, among

15  others, Stan Hunterton as a person who is knowledgeable in the

16  court system, who appears in both state and federal courts and

17  who would be perfectly capable of giving Mr. Heller and Chin

18  Hua whatever advice they believe they needed to make a

19  determination in which court to proceed; and for that matter,

20  what claims to assert. That is the extent of what we have

21  here, and that summarizes, in more than a few minutes, my

22  opposition to this motion. Thank you.

23        **THE COURT:** Thank you, Mr. Morris.

24        Mr. Fagelbaum?

25        **MR. GEWERTER:** Your Honor, may I just make a point of

EXHIBIT D

1  clarity?  I believe Mr. Morris stated, inadvertently, I was

2  local counsel.  I am not.  I represent solely the Poetry

3  Nightclub.  I am not co-counsel for the other --

4       **THE COURT:**  I think the context in which your name

5  comes up is in the conversations, as I understand from the

6  affidavit, as you potentially being another choice for local

7  counsel.

8       **MR. GEWERTER:**  Okay.  Well, just for clarity, I don't

9  represent them; they have their separate counsel.  I represent

10 solely Poetry Nightclub --

11      **THE COURT:**  Okay.

12      **MR. GEWERTER:**  -- just so there's no

13 misunderstanding.

14      **THE COURT:**  Okay.  Mr. Fagelbaum?

15            **REBUTTAL ARGUMENT OF PLAINTIFF**

16      **MR. FAGELBAUM:**  Your Honor, I don't underestimate for

17 a moment the task that's before us on this motion and the

18 decision that the Court has to make this morning.  It is a

19 difficult type of motion in the best of circumstances, and when

20 you add to it the fact that I have the utmost regard for Mr.

21 Morris.  Mr. Morris is not a bad person.  I like Mr. Morris,

22 and this is not about my affinity towards Mr. Morris.

23           The point is Mr. Morris, like all of us, is human,

24 and as a result of that, his recollection of events is subject

25 to human frailties.  I believe in many instances, Mr. Morris

EXHIBIT D

1  just doesn't remember, or has forgotten, what the facts are.

2          Now, I don't know how important the issue has become

3  as to whether or not the telephone call to Mr. Morris was in

4  October of some other time, but Mr. Morris is adamant on the

5  point that the call took place in October 2007.  That's the way

6  he remembers it.

7          Your Honor, in preparation for the argument today, I

8  went back to the firm's telephone records, and the call that

9  Mr. Heller placed to Mr. Morris was on December 26th, 2007.  It

10 actually lasted one minute and 19 seconds because Mr. Morris

11 wasn't available to take the call.  Mr. Morris then had to

12 return the call to our offices.  So I don't have in my records

13 the duration of the substantive call which both sides concede

14 was 15 minutes or more.  But I do know when it took place.  It

15 was December 26th, 2007.

16         Now, the significance of that is only to show that

17 memories can play tricks on people.  There's no ulterior motive

18 there.  It's just, with the passage of time, there are errors.

19         There are also errors --

20         **THE COURT:**  You know, one thing I would comment on

21 frankly that, obviously from the briefs in this matter that

22 there was no contemporaneous record of when this phone call was

23 made, either on your side or on Mr. Morris' side, his firm's

24 side.  And frankly, I would think that it's something you don't

25 save for a reply argument at the hearing as to records that you

EXHIBIT D

1  have verifying when the call may have occurred.

2          **MR. FAGELBAUM:**  Your Honor, the --

3          **THE COURT:**  I offered that as a comment.  I think

4  it's not helpful to bring that out for the first time in a

5  reply argument at the hearing.

6          **MR. FAGELBAUM:**  The point is well taken, your Honor.

7  The question was, given the fact that that information just

8  came to our attention, whether or not we should just keep it to

9  ourselves or provide it to the Court.

10          **THE COURT:**  Well, I think it's something that you

11  could have known quite a while ago.  The motion we're here on

12  February the 12th, when was the response filed?  The response

13  was filed on January 27th and the reply brief filed on February

14  the 6th.  Again, I'm just -- you know, it's not determinative

15  of the Court's ruling; it's just the kind of evidence or

16  information that I don't think a party saves for its reply

17  argument at a hearing when obviously it's been an issue

18  probably since the motion was first filed.

19          **MR. FAGELBAUM:**  You're correct, your Honor.  And I do

20  want to point out that this particular item is consistent with

21  the declaration of Mr. Heller which was filed as part of the

22  reply papers in refuting the specific time frame that Mr.

23  Morris raised for the first time in his opposition.  Where Mr.

24  Morris said it took place in October, Mr. Heller indicated it

25  was shortly before Mr. Hunterton was retained, which was in

EXHIBIT D

1 late December, and he was actually retained the first part of
2 January 2008.

3    With respect to what occurred following that
4 telephone conversation, a couple of months later in February,
5 Caesars appeared in this case. They made a motion to remove
6 the case from state court to federal court, and that's when we
7 learned for the first time that Mr. Morris' firm would be
8 involved in this case. As Exhibit A to our moving papers do
9 indicate, at that time, in February of 2008, Mr. Morris
10 referred to his recall as 'the faintest recollection.' And in
11 going through his e-mail, he says, 'I probably said'. That's
12 not the strongest state of mind even back last February.

13    He also goes on to say, 'That's about all I can
14 recall'; a very, very skeletal recollection of what happened.
15 Now, if there has been any further embellishment of that
16 recollection, it has come now, many, many months later, in
17 opposition to this motion.

18    The point that Mr. Morris made in February of 2008 is
19 that, quote, 'I am not familiar with the case or involved in
20 any respect.' As a result of that comment, he concludes, 'I do
21 not believe you have a basis to ask that the firm discontinue
22 representing Caesars.' He said, 'I have limited recall of what
23 occurred, I've had no involvement; therefore -- and I've spoken
24 to nobody about this; therefore, you don't have a basis to ask
25 that the firm not represent Caesars.'

EXHIBIT D

1    Even Mr. Morris, back in February of 2008, did not

2    take the position that he personally could represent Caesars.

3    And as a matter of point, in February of 2008, he indicated he

4    would not represent Caesars, and his partner, Kris Pickering at

5    the time, committed in writing to us her statement that, 'I

6    will confirm that I will keep this work separate from him.'

7    Why?  Why their sensitivity back then in February of 2008?

8    Because based upon that prior consultation, both Mr. Morris and

9    Ms. Pickering knew that Mr. Morris had placed himself in a

10   position where he had received client confidences, he had a

11   duty of loyalty and a duty not to use that information adverse

12   to this client.

13        Now, Mr. Morris is an ethical and honorable lawyer.

14   When he stated to us, 'I will have no involvement in this case.

15   I have spoken to no one and I will not speak to anyone about

16   this case', we relied on that statement and we said, 'If you

17   continue to do that, this so-called ethical screen or ethical

18   wall, then we withdraw our objection to your firm and Ms.

19   Pickering representing Caesars.'

20        Had in fact this been a tactical motive, had we been

21   trying to set up Mr. Morris, that was the time for us to make a

22   motion and say, 'Too late, you're tainted; you no longer can

23   represent Caesars and neither can your firm.'  We didn't do

24   that.  We relied at face value on the representations of Mr.

25   Morris and Ms. Pickering, and for ten months that's exactly

EXHIBIT D

1  what they did.  They honored those representations and they

2  complied with their ethical responsibilities.  That fact

3  distinguishes all the cases that Mr. Morris puts in his

4  opposition brief.

5       In those cases that he relies on, there was a

6  dispute; one lawyer says one thing, the other says something

7  else, and the judge is left in the middle to try to figure out

8  what's the right thing to do in that particular instance.  What

9  distinguishes this case is that Mr. Morris and Ms. Pickering

10  knew what the right thing to do in this case was back in

11  February of 2008 when they said, 'Mr. Morris will have no

12  involvement in this case', and they honored that commitment and

13  there was no problem.

14       The only thing that happened since then that changed

15  the whole dynamic was Ms. Pickering leaving the firm.  And when

16  Ms. Pickering left the firm, she said, 'New rules.  I'm

17  leaving; Mr. Morris is coming in to substitute in', and that

18  point, we went back and said, 'Wait a second.  What about what

19  you told us last February?  You said Mr. Morris would stay out

20  of the case', and that was the reason we didn't bring a motion

21  to disqualify back in February 2008.  Ms. Pickering's response

22  was, 'Well, this is just a tactic.'

23       It's not a tactic, your Honor.  Mr. Morris is an

24  accomplished attorney.  He doesn't need, and the law does not

25  allow, him to have an added advantage in this case.  He has

EXHIBIT D

1 | that added advantage. He has an insider's perspective of our
2 | thinking with respect to this case. By the time December came
3 | around, the end of December, the drafts of the complaint were
4 | ready to go, it was filed less than a week later. Mr. Heller
5 | was certainly in a position to discuss with Mr. Morris in depth
6 | what the case was about, what the strategy was and what he
7 | could add to that point. And Mr. Morris did, and there are
8 | certain actions that his firm has taken which are based upon
9 | those discussions which are adverse to us.

10 | We filed this case in state court. This case is now
11 | in federal court because Mr. Morris and Ms. Pickering removed
12 | the case, and that was based on discussions that were held with
13 | Mr. Heller. It is significantly harmful. They know our
14 | perspective on settlement, and we do not have to disclose that,
15 | your Honor. The evolution of the law is clear on this point.
16 | You can't burn down the village to save the village. You can't
17 | disclose the confidence to protect the confidence.

18 | We're not trying to be semantic here or be cute or
19 | avoid our burden of proving that this was a confidential
20 | situation. The courts have developed tests to prevent this
21 | from becoming a swearing contest between lawyers. What was the
22 | context? The context here was we were seeking seasoned,
23 | veteran attorneys that would be able to effectively represent
24 | our interest, our client's interest, in this proceeding in Las
25 | Vegas.

EXHIBIT D

1    A lot of information went by.  Twenty minutes is a

2  long time when two lawyers cut to the chase and talk about the

3  merits and the procedures and the law and the parties and the

4  issues involved in a case.  A lot of information can exchange

5  hands, and we've pointed that out.

6    Now Mr. Morris says, 'Well, some of the cases that we

7  refer to in our opening brief are not repeated in our reply

8  brief.'  That's true.  We didn't repeat everything.  Otherwise,

9  there would be no need for a reply brief.  But what we did do

10  is we added additional cases for the Court's enlightenment

11  which point out, among other things, that a telephone call, in

12  as little as 15 minutes, can satisfy the necessary context

13  whereby confidences are disclosed and legal advice is received.

14  That's the *Doucette* (phonetic) case that we mentioned, your

15  Honor.

16    Now, in this type of a situation, we have to look at

17  what the conduct was between the parties, not just the words.

18  I mean, now, when we're in the throes of making the motion and

19  writing it and putting in self-serving declarations, what was

20  the conduct that guided the parties before the motion was made?

21  The conduct was that Mr. Morris initially got it right.  He

22  knew he could not represent Caesars adverse to Chin Hua and, as

23  a result, he took himself out of this case.  He had no

24  involvement in the case.  There's no dispute as to that.

25    Now, ten months later he says, 'I'm back in because

EXHIBIT D

1  my wife can no longer handle it.  I have to come back.'  That

2  doesn't provide him with the justification to come back.  For

3  him now to say, 'I don't remember exactly what you told me' is

4  not enough, and the cases are very clear about that.  The cases

5  try to give the Court some protocol that eliminates the need to

6  say, 'Well, this person's telling the truth and this person is

7  lying.'  The point is: Was this a situation which would lend

8  itself to the exchange of confidences and the giving of advice?

9       This was not a beauty contest as Mr. Morris suggests.

10  The designated person we wanted to hire was Steve Morris.  He

11  was the first one that was called, a discussion was held.  It

12  was during the course of that discussion that Mr. Morris

13  disclosed that there might be a problem in this case because of

14  his prior and concurrent relationship with Caesars.  As a

15  result of that, he was then asked about his opinion with

16  respect to some other lawyers who we had heard about but who

17  had not been contacted and would not have been contacted had

18  Mr. Morris accepted the position as local counsel.

19       It's only when he left it ambivalent at the end of

20  the conversation and the potential for conflict was clearly

21  front and center that the decision was made to move on and

22  select other counsel to avoid the very thing that Mr. Morris is

23  in right now, which is an actual conflict which would involve

24  his client, the Court and our client.  We tried to avoid that.

25  We tried to avoid that initially, we tried to avoid that back

1   last February; but at this point we can't ignore it anymore.

2         It's not right, your Honor, for the lawyer who's in

3   this case to say, 'Mr. Morris is going to come in now and the

4   plaintiffs are going to regret it.' It's not right. There's

5   an appearance of impropriety.

6         Now, Mr. Morris says, 'Well, that's not the law.' We

7   were very careful, your Honor, when we put that comment in our

8   papers. We indicated that it is not part of the commentary to

9   rule 1.9. So clearly 1.9 is not dependent upon a determination

10   of appearance of impropriety, but that doesn't mean that this

11   Court cannot consider it. The *Lovell* case which we cite stands

12   for that proposition.

13         There's something not right here, your Honor. It

14   doesn't feel right. It doesn't pass the red face test. This

15   is a situation where there was -- again, this distinguishes it

16   from the cases cited by Mr. Morris -- where not only were

17   discloses made but legal advice was given. The joinder of

18   those two principles establish that there was a confidence and

19   the establishment of an implied attorney-client relationship.

20         As we said in our papers, when Mr. Heller first made

21   the phone call, 1.18 might have been in play with respect to

22   prospective clients, but during the course of that phone call,

23   because of the nature of the disclosures and the receipt of the

24   legal advice, that relationship converted into an implied

25   attorney-client relationship, and therefore 1.9 applies to this

EXHIBIT D

1  situation.

2         Nevertheless, whether it's 1.18 or 1.9, there's

3  enough of an overlap that disqualification is required in this

4  case.  The difference is, in 1.18, we have to show significant

5  harm; in 1.9, the threshold is much lesser: material

6  information adverse to your client.

7         There is significant harm here, your Honor.  Mr.

8  Morris demonstrated right before the Court this morning how

9  effective he is as an attorney.  He cannot add to that the

10  additional information that he learned about strategic elements

11  of Chin Hua's case.  It's because of that that the law says you

12  do not now have to go into the details of those disclosures.

13         The fact is the context was there.  Was it likely

14  that confidences were disclosed?  Yes.  How do we know?  Well,

15  Mr. Morris admits that there were at least some confidences,

16  but he quickly adds, 'They were subsequently published in the

17  complaint.'  But that does set up the context that there were

18  additional confidences.  It was a 20-minute phone call.  A lot

19  can be said in 20 minutes in addition to just identifying a

20  potential defendant and eight causes of action.

21         And there were disclosures.  Mr. Heller said back in

22  February in response to Mr. Morris' e-mail, 'There's a lot more

23  that took place in that conversation but we need not get into

24  it since you have already agreed to step aside.'  He can't come

25  back in right now.  Thank you.

EXHIBIT D

1          **THE COURT:**   Thank you, Mr. Fagelbaum.

2          I'm not going to entertain any more argument.  I'll

3   take it under submission.  Except that I would, if you wish,

4   Mr. Morris, allow you to respond to this information that Mr.

5   Fagelbaum brought up about the phone records and the date of

6   the phone conversation.

7          But just to be clear, both counsel have, I think,

8   argued your cases and your respective positions very well, and

9   I've got it in the briefs.

10                   **REBUTTAL ARGUMENT OF DEFENDANT**

11          **MR. MORRIS:**   I do not have other than, as I indicated

12   in my declaration on February the 13th, I do not have a record

13   of having called Mr. Heller.  I was surprised and heard for the

14   first time when Mr. Fagelbaum said, 'I've got a phone record

15   that shows a 17-second duration phone call' made to me after

16   Christmas.  But I wasn't there as the basis for establishing

17   the date the conversation took place.

18          I believe that conversation took place in October,

19   and I believe, before Mr. Fagelbaum found the 17-second record

20   of a call that I didn't -- I don't recall -- I didn't get and I

21   don't recall returning, unless I returned it on February the

22   13th.   I was relying on my recollection and his declaration,

23   and I explained that to you in my opening remarks about the

24   October case in (indiscernible).

25          **THE COURT:**   All right.  Then we'll leave it at that.

EXHIBIT D

1          I'll take this matter under submission, and I'll

2  issue a written order shortly.

3          **ATTORNEYS:**  Thank you, your Honor.

4          **THE CLERK:**  All rise.

5      **(This proceeding was adjourned at 10:36 a.m.)**

EXHIBIT D

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____          February 23, 2009

         Signed                                    Dated

*TONI HUDSON, TRANSCRIBER*

EXHIBIT D