**FAGELBAUM &**    ATTORNEYS    LOS ANGELES
**HELLER LLP**    AT LAW    NEW YORK
                                     BOSTON

2049 Century Park East  *  Suite 4250  *  Los Angeles, California 90067 * USA
Telephone (310) 286-7666 * Facsimile (310) 286-7086 * E-mail: office@fhllplaw.com

March 5, 2009

Jerold Fagelbaum
jf@fhllplaw.com
Admitted in N.Y. and CA

Hon. James C. Mahan
United States District Court Judge
Lloyd D. George U.S. Courthouse-U.S. District Court
333 Las Vegas Blvd., NV 89101

       Re:    *Phase II Chin LLC et. al. v. Forum Shops LLC et. al.*
                *Case No. 2:08-cv-00162-JCM-GWF*
                *Motions to Dismiss (Hearing 3/12/09)*

Dear Judge Mahan:

       In connection with our final preparation for the March 12, 2009 hearing on Defendants' Motions to Dismiss, we have come across a published decision which is relevant to the issue of standing under 42 U.S.C. §1981 (Plaintiffs' Fifth Cause of Action). Because the case has striking similarities to the facts in this case and will be discussed by Plaintiffs' counsel at oral argument, we are enclosing a copy of the decision. *Yesteryears, Inc., et. al. v. Waldorf Restaurant, Inc.*, et. al., 730 F. Supp. 1341 (D. Md. 1989) so that both the Court and Defendants' counsel will have an opportunity to familiarize themselves with the case prior to the hearing.

                                                 Very truly yours,

                                                 FAGELBAUM & HELLER LLP

                                                 By: _____
                                                     Jerold Fagelbaum

JF/zs
Encl.

c. Charles McCrea, Esq.
    Harold Gewerter, Esq.
    C. Stanley Hunterton, Esq.
    Steve Morris, Esq.

Dockets.Justia.com

YESTERYEARS, INC., ETC., ET AL. v. WALDORF RESTAURANT, INC., ETC., ET AL.
Civil No. HM-88-444

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

730 F. Supp. 1341; 1989 U.S. Dist. LEXIS 16269

June 28, 1989, Decided

SUBSEQUENT HISTORY: MEMORANDUM AND ORDER December 11, 1989.

CASE SUMMARY:

PROCEDURAL POSTURE: Defendant lessors filed a motion for summary judgment of plaintiff sublessees' racial discrimination action under *42 U.S.C.S. § 1981, 1982, 1983, 1985(3)* based on lessors' actions preventing the operation of the leased premises because it catered to black patrons. Lessors also filed a counterclaim to recover a default judgment entered in an eviction action against sublessees.

OVERVIEW: Sublessees filed a racial discrimination action under *42 U.S.C.S. § 1981, 1982, 1983, 1985(3)* against lessors based on their actions preventing the operation of the leased premises because it catered to black patrons. Lessors sought summary judgment and filed a counterclaim to recover a default judgment in eviction entered against sublessees. The court declined to exercise jurisdiction over sublessees' pendent state law claims and lessors' ancillary counterclaim because they were being pursued in state court. The court denied lessors' motion for summary judgment holding that sublessees were not precluded from asserting their civil rights claims by their failure to raise them as counterclaims in the eviction action because the fact that sublessees' may not have paid rent as due did not negate the possibility that lessors conspired to deprive them of their civil rights. The court found that sublessees had standing to vindicate the rights of third-party black patrons where they had a commercial relationship, sublessees alleged economic loss from lessors' conduct, which a damage award would have redressed, and the patrons had a transient interest making them unlikely to bring suit.

OUTCOME: Lessors' motion for summary judgment of sublessees' federal racial discrimination action based on lessors' actions preventing the operation of the leased premises because it catered to black patrons was denied. Sublessees' pendent state law claims and lessors counterclaim to recover a default judgment entered in an eviction action against sublessees were dismissed.

CORE TERMS: counterclaim, restaurant, patrons, lease, nightclub, civil rights, musicians, tenants, bands, leased premises, summary judgment, res judicata, conspiracy, state-law, business operations, preclusive effect, discriminatory, preclusion, racially, landlord's, cause of action, pendent jurisdiction, eviction, pendent, rink, alcoholic beverages, white man, developer's, estoppel, default

LexisNexis(R) Headnotes

Civil Procedure: Jurisdiction: Jurisdictional Sources: General Overview
Civil Procedure: Jurisdiction: Subject Matter Jurisdiction: Supplemental Jurisdiction: Pendent Claims
Governments: Courts: Judicial Comity
[HN1] Pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. A federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims. The doctrine of pendent jurisdiction thus is a doctrine of flexibility, designed to allow courts to deal with cases involving pendent claims in the manner that most sensibly accommodates a range of concerns and values.

Civil Procedure: Federal & State Interrelationships: Erie Doctrine
Governments: State & Territorial Governments: Relations With Governments
[HN2] State courts are the preferred forum for resolution of state-law issues.

Civil Procedure: Jurisdiction: Subject Matter Jurisdiction: Supplemental Jurisdiction: Ancillary Jurisdiction

[HN3] Ancillary, like pendent, jurisdiction is a discretionary doctrine, in which the court should be guided by the principles enunciated in Gibbs.

Civil Procedure: Judgments: Preclusion & Effect of Judgments: Res Judicata
Constitutional Law: Relations Among Governments: General Overview
Criminal Law & Procedure: Double Jeopardy: Res Judicata
[HN4] The full faith and credit statute, *28 U.S.C.S. § 1738*, provides that judicial proceedings of any state, territory or possession of the United States shall have the same full faith and credit in every court within the United States and its territories and possessions as they have by law or usage in the courts of such state, territory or possession from which they are taken. Thus, *§ 1738* requires federal courts to give the same preclusive effect to state court judgments that those judgments would be given in the courts of the state from which the judgments emerged. Federal courts are required to give preclusive effect both to particular issues that have been determined by the state courts, under the doctrine of collateral estoppel or issue preclusion, and to whole controversies decided by state courts, under the doctrine of res judicata or claim preclusion. Moreover, this preclusive effect can apply even when an issue arises under the federal constitution, even though it wasn't raised in the state court proceedings, or even if the state court decided the federal issue erroneously.

Civil Procedure: Judgments: Preclusion & Effect of Judgments: Estoppel: Collateral Estoppel
Civil Procedure: Judgments: Preclusion & Effect of Judgments: Full Faith & Credit: General Overview
Civil Procedure: Judgments: Preclusion & Effect of Judgments: Res Judicata
[HN5] The extent of the preclusive effect in federal court of a state court adjudication is to be determined by examining the law of former adjudication as it stands in the particular state where the judgment arose, and not by reference to general principles of res judicata or collateral estoppel. However, a federal court will not apply the doctrines of issue and claim preclusion against a litigant unless that litigant had a "full and fair opportunity" to litigate the issue or claim in state court. To satisfy this requirement, state proceedings need do no more than satisfy the minimum procedural requirements of the *Fourteenth Amendment's Due Process Clause*.

Civil Procedure: Pleading & Practice: Pleadings: Counterclaims: General Overview
Civil Procedure: Pleading & Practice: Pleadings: Cross-Claims: General Overview
[HN6] A party may assert as a counterclaim any claim that party has against any opposing party, whether or not arising out of the transaction or occurrence that is the subject matter of the opposing party's claim. A counterclaim may or may not diminish or defeat the recovery sought by the opposing party. It may claim relief exceeding in amount or different in kind from that sought in the pleading of the opposing party. Md. R. Civ. P., Dist. Ct. 3-331.

Civil Procedure: Pleading & Practice: Pleadings: Counterclaims: General Overview
Civil Procedure: Pleading & Practice: Pleadings: Cross-Claims: General Overview
[HN7] If a matter is not in the nature of a defense but constitutes a counterclaim, the general rule is that the party is not required to assert the claim unless the subject matter is such an integral part of the issue being litigated that a judgment would necessarily negate the existence of facts essential to its maintenance.

Civil Procedure: Pleading & Practice: Pleadings: Counterclaims: General Overview
Civil Procedure: Pleading & Practice: Pleadings: Cross-Claims: General Overview
Civil Procedure: Judgments: Preclusion & Effect of Judgments: Res Judicata
[HN8] The general rule is that a defendant, having a claim available by way of set-off, counterclaim, or cross petition, has an election so to plead it, or to reserve it for a future independent action, and a prior action in which a claim might have been asserted as a set-off, counterclaim, or cross petition is no bar to a subsequent independent action thereon. Where the defendant does not interpose a counterclaim although he is entitled to do so, he is not precluded thereby from subsequently maintaining an action against the plaintiff on a cause of action which could have been set up as a counterclaim.

Civil Procedure: Pleading & Practice: Pleadings: Cross-Claims: General Overview
Civil Procedure: Judgments: Preclusion & Effect of Judgments: Res Judicata
[HN9] In the absence of a contrary statute, a defendant having an independent claim available as a cross-demand, whether in contract or tort, has the option either to plead it as such or to reserve it for a future independent action, and in the latter event the former judgment will not operate as a bar or estoppel.

Civil Procedure: Justiciability: Standing: General Overview
[HN10] A plaintiff must personally suffer some actual or threatened injury as a result of the putatively illegal conduct of the defendants, which likely will be redressed by a favorable decision, and it may not assert the legal rights or interests of third parties so as to obtain relief from injury to itself; an abstract, generalized grievance

Page 6

730 F. Supp. 1341, *; 1989 U.S. Dist. LEXIS 16269, **

will not suffice, and plaintiff's injury must fall within the zone of interests protected by the statute in question.

Civil Rights Law: Contractual Relations & Housing: Equal Rights Under the Law (sec. 1981): General Overview
Constitutional Law: Equal Protection: Full & Equal Benefit
[HN11] All persons within the jurisdiction of the United States shall have the same right in every state and territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other. *42 U.S.C.S. § 1981.*

Civil Rights Law: Contractual Relations & Housing: Property Rights (sec. 1982): Protected Rights
Contracts Law: Types of Contracts: Lease Agreements: General Overview
[HN12] All citizens of the United States shall have the same right, in every state and territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property. *42 U.S.C.S. § 1982.*

Civil Procedure: Justiciability: Standing: General Overview
Civil Rights Law: General Overview
[HN13] White people can assert civil rights claims when they are harmed by someone's discrimination against blacks.

Civil Procedure: Justiciability: Standing: General Overview
Civil Rights Law: Contractual Relations & Housing: Equal Rights Under the Law (sec. 1981): Proof of Discrimination
[HN14] In order to effectuate the public policy embodied in *42 U.S.C.S. § 1981*, and in order to protect the legal rights of non-whites expressly created by *§ 1981*, a person has an implied right of action against any other person who, with a racially discriminatory intent, interferes with his right to make contracts with non-whites. A fortiori a person has an implied right of action against any other person who, with a racially discriminatory intent, injures him because he made contracts with non-whites.

Civil Procedure: Justiciability: Standing: General Overview
Civil Rights Law: Section 1983 Actions: Scope
[HN15] A state must not discriminate against a person because of his race or the race of his companions, or in any way to compel or encourage racial segregation. Therefore a state may not punish a non-white for having social contacts with a black. Likewise it may not through one of its creatures, punish or discriminate against a corporation for its willingness, past or present, to make contracts with blacks. And if it does so, then the person so punished or discriminated against has *42 U.S.C.S. § 1983* right of action.

Civil Rights Law: Section 1983 Actions: Scope
[HN16] Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any state or territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. *42 U.S.C.S. § 1983.*

Civil Rights Law: Conspiracy: Elements
Civil Rights Law: Private Discrimination
Criminal Law & Procedure: Criminal Offenses: Inchoate Crimes: Conspiracy: General Overview
[HN17] If two or more persons in any state or territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the law, or of equal privileges and immunities under the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators. *42 U.S.C.S. § 1985(3).*

Civil Procedure: Justiciability: Standing: General Overview
Civil Rights Law: General Overview
[HN18] A non-minority plaintiff, be it a corporation or an individual, has standing to bring suit under the Reconstruction Civil Rights Acts when racially discriminatory actions have injured plaintiff due to plaintiff's relationship with minority citizens. This

Page 7

730 F. Supp. 1341, *; 1989 U.S. Dist. LEXIS 16269, **

relationship may be social, contractual, commercial, ideological, or even prospective.

COUNSEL: [**1] Dushko Zdrakovich, Esq. of Upper Marlboro, Maryland.

Roger D. Redden, Esq., James P. Gillece, Jr., Esq., Lynette M. Phillips, Esq., Piper & Marbury, of Baltimore, Maryland, and John F. Hyland, Jr., Esq., Trainum, Holland & Hyland of Washington, District of Columbia

JUDGES: Herbert F. Murray, Senior United States District Judge.

OPINION BY: MURRAY

OPINION

[*1342] MEMORANDUM

HERBERT F. MURRAY, SENIOR UNITED STATES DISTRICT JUDGE.

Now before the Court are motions for summary judgment that have been filed by the defendants regarding the plaintiffs' claims and the defendants' counterclaim. The Court has reviewed all the papers in this case, n1 has determined that no hearing is necessary, Local Rule 6, and is now prepared to rule.

------------------Footnotes------------------

n1 Plaintiffs submitted "Supplementary Points and Authorities in Opposition to Motions for Summary Judgment" after all deadlines for briefing had passed. The Court has not considered this untimely memorandum in the preparation of this opinion.

---------------End Footnotes---------------

I. Facts

As defendants did not attack the factual allegations of plaintiffs' complaint in their motions for summary judgment, for present purposes they must be accepted as true. The following facts are therefore taken substantially verbatim from plaintiffs' complaint.

On or about August 9, 1983, Jean F. Kingham, Valerie [**2] Ellsworth, Patricia Roberts and Joseph Mona ("Lessees") entered into a lease agreement with defendants Tim S. Brown and Margaret P. Brown ("defendants Brown") for the second floor of the building known as the Waldorf Restaurant, Waldorf, Charles County, Maryland ("leased premises"). Immediately thereafter, the Lessees assigned their lease as tenants to the plaintiff, Yesteryears, Inc.

Yesteryears, Inc. is a Maryland Corporation with its principal place of business in Prince George's County, State of Maryland. The Charter of Yesteryears, Inc. has been forfeited by the Maryland State Department of Assessments & Taxation. The plaintiffs Joseph F. Mona and Jean Mona (the former Jean F. Kingham) are the last acting directors of Yesteryears, Inc., and bring this suit in the name of the Corporation as authorized by Section 3-515(c) of the Corporations and Associations Article of the Annotated Code of Maryland. The Monas are United States citizens of the white race.

The defendants Brown had leased the Waldorf Restaurant building, in turn, from the defendant Waldorf Restaurant, Inc. Waldorf Restaurant, Inc. is the owner of the real property which contained the restaurant building and the Waldorf [**3] Motel building. The defendant Francis H. Chaney, II was the chief operating officer of Waldorf Restaurant, Inc., and defendant Thomas F. Goldsmith was President of that company. Defendant Chaney Enterprises, Inc. is a corporation affiliated with Waldorf Restaurant, Inc.

Yesteryears began operations as a nightclub on the leased premises, after spending substantial amounts of money to adapt the [*1343] premises for that purpose. The nightclub traded under the name "The Penthouse."

The Waldorf Restaurant building and Penthouse are located on U.S. Route 301 and Maryland Route 5, a heavily traveled highway used by persons traveling from the District of Columbia and Maryland to Virginia. Many of the patrons of The Penthouse came from outside the State of Maryland. A substantial portion of the food, liquor and other items which the plaintiff Yesteryears served at the Penthouse moved in interstate commerce. The operations of The Penthouse affected travel, trade, commerce, transportation or communication among, between and through several states and the District of Columbia.

During the course of its business operations, Yesteryears engaged and booked bands with black

musicians to perform at the nightclub. [**4] These bands appealed to and drew black patrons. On numerous occasions, the majority of patrons at the nightclub were of the black race.

All defendants expressed strong displeasure and disapproval of Yesteryears' policy of booking bands with black musicians and bands which appealed to black patrons. These defendants referred to the plaintiff's patrons in derogatory and insulting terms. All defendants took action to prevent Yesteryears from operating its business to serve black patrons, to prevent plaintiff from booking bands with black musicians, or in the alternative, to prevent the plaintiff from continuing its business operations.

Among other things, all defendants took the following actions:

(1) The defendants made racially derogatory comments to Yesteryears' customers.

(2) The defendants would not permit Yesteryears' customers to park in the immediate vicinity of the restaurant building, but required that they park at distant locations on the property.

(3) The defendants required that bands playing at Yesteryears' nightclub enter and exit the nightclub by unsafe and dimly lit back stairs rather than through the main entrance.

(4) The defendants took steps to stop Yesteryears [**5] from selling alcoholic beverages as permitted under the lease until Yesteryears stopped booking bands with black musicians.

(5) The defendants refused to make repairs to the Waldorf Restaurant building which were required in order for Yesteryears to conduct its business operations.

(6) The defendants forcibly removed Yesteryears' agents and employees from the leased premises during the term of the lease and barred them from the premises.

The defendants stated their displeasure on many occasions that Yesteryears booked bands with black musicians and served black patrons. The actions taken by these defendants were with the express stated intention of having Yesteryears either change its format to appeal to a white clientele, to prevent Yesteryears from operating its business to service black patrons, or to cause Yesteryears to cease business operations.

The defendants acted to prevent Yesteryears from enjoying and enforcing its rights under the Lease and Assignment solely because Yesteryears in its operation of The Penthouse booked bands with black musicians and served black patrons.

As a result of the actions of the defendants, Yesteryears was required to close its nightclub and [**6] suffered economic loss. This economic loss included forfeiture of improvements to the leased premises, a loss of fixtures and equipment purchased for the leased premises, the loss of revenue and profits, and other damages.

In doing the above described unlawful acts, the defendants acted maliciously, with the intent of forcing Yesteryears to not book bands with black musicians, not cater to black patrons, and to cease business operations.

The plaintiff Joseph F. Mona had entered into an employment contract with Yesteryears and was at all times the chief operating officer of Yesteryears. As chief operating officer, Joseph F. Mona invested time [*1344] in the operation of the nightclub business conducted by Yesteryears with the expectation that he would receive income and bonuses.

As a result of an alleged conspiracy by the defendant, the nightclub business operated by Yesteryears ceased business operations. As a result of this, Joseph F. Mona was deprived of the income and profits for which he had contracted and expected from the successful operation of the nightclub business.

At all times during its operation, Yesteryears sold alcoholic beverages under the liquor license held by the defendants [**7] Brown. This was done in accordance with the terms of the lease and in accordance with the custom in Charles County.

In furtherance of their efforts to prevent Yesteryears from serving black patrons, the defendants Waldorf Restaurant, Inc., Francis Chaney, II, and Chaney Enterprises, Inc. conspired with the Charles County Liquor Board to prevent Yesteryears from selling alcoholic beverages. As a result of this conspiracy Yesteryears was not permitted to sell alcoholic beverages. As Yesteryears was unable to sell alcoholic beverages it ceased business operations and sustained losses.

The actions of Waldorf Restaurant, Inc., Francis Chaney, II, and Chaney Enterprises, Inc. were done for the purpose of depriving Yesteryears of its right to sell alcoholic beverages in accordance with the law and custom in Charles County.

On or about August 3, 1986, Waldorf Restaurant, Inc. and Chaney Enterprises, Inc., forcibly removed Yesteryears, its agents, servants and employees from the leased premises, prevented Yesteryears, its agents and employees from entering the leased premises, and barred Yesteryears, its agents and employees from entering the leased premises by locking all doors. As a result [**8] of the actions of Waldorf Restaurant, Inc. and Chaney Enterprises, Inc., Yesteryears was deprived of the use of the leased premises. As a further result, Yesteryears sustained the loss of its personal property, was unable to continue its business operations, and sustained permanent financial damage.

The actions of Waldorf Restaurant, Inc. and Chaney Enterprises, Inc. were done with full knowledge of the lease agreement between Yesteryears and defendants Brown, and were done intentionally for the purpose of interfering with that lease agreement and preventing Yesteryears from exercising its rights under that lease agreement.

In addition to the above facts taken from the complaint, copies of the papers in case no. E4-2-1983-86 in the District Court of Maryland for Charles County have been submitted to this Court. That action was brought by Waldorf Restaurant and the Browns against Jean F. Kingham, Valerie Ellsworth, Patricia Roberts and Joseph Mona. According to the papers, that action was commenced on July 29, 1986 by the filing of a Landlord's Complaint for Repossession of Rented Property. On July 30, 1986, the summons was issued. The only evidence submitted by defendants that shows [**9] service of any kind is a notation on the docket sheet of the state court case, dated August 1, 1986, which states "Posted as to all parties." Three days later, on August 4, 1986, trial was held.

This is the entire transcript of the August 4, 1986 hearing:

THE COURT: 86-1983, Waldorf Restaurant, Incorporated and Tim and Margaret Brown versus Kingham, Ellsworth, Roberts, Mona, Yesteryears, Incorporated.

MR. FITZGERALD: Good morning, Your Honor.

THE COURT: Yes, sir.

MR. FITZGERALD: Stephen Fitzgerald for the plaintiff. This is a complaint filed on behalf of Waldorf Restaurant, Inc. and Mr. and Mrs. Brown to (inaudible) to lease the top floor of the Maryland Waldorf Restaurant to the individuals listed in the Complaint, Jean Kingham, Valerie Ellsworth, Patricia Roberts, Joseph Mona, and to those tenants, assignee.

THE COURT: It would seem that nobody was served.

[*1345] MR. FITZGERALD: I don't believe anybody was served. There have been no payments and the amount that we claim is due is $43,000. The amount of the rent comes to around $1,750 per month.

THE COURT: All right. We will give you judgment by default for possession of the premises on Thursday of this week, if you are not paid the [**10] $43,000, plus costs. I assume, again, under the new system, the costs would be 15 that would be payable. Three dollars per name, as I understand it, and they made it back arrest.

MR. FITZGERALD: I have one question. Because of vacation schedules, the Complaint that was signed by myself, I have the three landlords here and if Your Honor wants to hear testimony -- I don't know that you have to.

THE COURT: No, I don't know that I have to either and I will not.

MR. FITZGERALD: All right. Thank you.

On the judgment form, the judge entered the amount of $43,800[.00] as due and unpaid, entered judgment in favor of landlord "by default" (not "after trial"), and ordered execution stayed until August 7. On August 6, 1986, a Petition for Warrant of Restitution was filed by the landlords. On August 7, 1986, the Notice of Eviction was issued, and on August 8 the tenants were evicted.

On February 17, 1988, plaintiffs instituted the present suit by filing a nine-count complaint. In the first count, Yesteryears, Inc. sues all defendants under *42 U.S.C. § 1981* for denial of equal rights, specifically the right to make and enforce contracts. The second count is essentially the same, with the Monas [**11] as plaintiffs. In Count 3, the Monas sue all defendants under *42 U.S.C. § 1982* for denial of property rights, specifically the right to lease and hold real and personal property. In Count 4, Yesteryears sues all defendants under *42 U.S.C. § 1985(3)* for conspiracy to interfere with civil rights. In Count 5, Joseph Mona, individually, brings a similar cause of action. In Count 6, Yesteryears brings suit against Waldorf Restaurant, Chaney Enterprises, and Francis H. Chaney, II under *42 U.S.C. § 1983* for deprivation of rights under color of law. In Counts 7, 8, and 9 Yesteryears asserts state-law claims, asking this Court to exercise its pendent jurisdiction. Counts 7 and 8 are actions for breach of lease against the Browns and

Page 10

730 F. Supp. 1341, *; 1989 U.S. Dist. LEXIS 16269, **

Waldorf Restaurant, respectively. Count 9 is an action against Waldorf Restaurant and Chaney Enterprises for intentional interference with contract.

Defendant Waldorf Restaurant responded by filing a counterclaim and motion for summary judgment thereon against all the plaintiffs for the amount of $43,003.00, based on the default judgment. In a supporting affidavit, defendant Chaney asserts that the plaintiffs breached the lease by: (1) failing to secure a letter [**12] of credit; (2) failing to pay rent from November, 1985 through the eviction date; (3) allowing liability insurance to be cancelled without renewal; and (4) because "noise, general disturbance and parking difficulties caused by Yesteryears, Inc. Penthouse nightclub were a continual problem."

On October 21, 1988 the defendants in the state court action moved to set aside the judgment that had been entered in August, 1986. On December 15, 1988 that motion was denied without written opinion by the District Court of Maryland for Charles County, and on December 29 the first-action defendants' Motion for Clarification and Reconsideration was similarly disposed of.

Meanwhile, on December 8, 1988 the plaintiffs, apparently operating under the mistaken belief that the case sub judice had been dismissed without prejudice, filed another complaint in this Court that repeated the federal civil rights counts, 1 through 6, word-for-word. n2 The Court has been advised by both sides that the state-law [*1346] counts were asserted in an action in the Circuit Court for Prince George's County. On March 1, 1989, this Court dismissed the duplicative federal suit.

------------------Footnotes------------------

n2 The second federal suit styled the corporate plaintiff as Yesteryears, Inc., while that plaintiff had previously been styled as Yesteryear, Inc. (singular) in the first suit. As this Court indicated in its March 1, 1989 Memorandum in that second action, the case sub judice will henceforth be treated as identifying that plaintiff as Yesteryears, Inc.

------------------End Footnotes------------------

[**13] II. Pendent and Ancillary Jurisdiction

As noted above, Yesteryears asks this Court to exercise its pendent jurisdiction over the three state-law claims. However, [HN1] "pendent jurisdiction is a doctrine of discretion, not of plaintiff's right." *Mine Workers v. Gibbs, 383 U.S. 715, 726, 16 L. Ed. 2d 218, 86 S. Ct. 1130 (1966).* The Supreme Court recently summarized the considerations which the trial court should weigh in the exercise of its discretion:

The Gibbs Court recognized that a federal court's determination of state-law claims could conflict with the principle of comity to the States and with the promotion of justice between the litigating parties . . . . Under Gibbs, a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims . . . . As articulated by Gibbs, the doctrine of pendent jurisdiction thus is a doctrine of flexibility, designed to allow courts to deal with cases involving pendent claims in the manner that most sensibly accommodates a range of concerns and values.

[**14] *Carnegie-Mellon University v. Cohill, 484 U.S. 343, 108 S. Ct. 614, 618-19, 98 L. Ed. 2d 720 (1988).*

This Court has determined that comity requires it to decline jurisdiction over the pendent state claims in the instant case. These claims are now being pursued in the Circuit Court for Prince George's County. Courts have regularly declined pendent jurisdiction over state-law claims that were the subject of concurrent litigation in the state courts. *Goldman v. First Federal Savings and Loan Assoc. of Wilmette, 518 F.2d 1247, 1253 (7th Cir. 1975); Pinkney v. Ohio Envtl. Protection Agency, 375 F. Supp. 305, 312 (N.D.Ohio 1974); Whalen v. Heimann, 373 F. Supp. 353, 359 (D.Conn. 1974).* [HN2] State courts are the preferred forum for resolution of state-law issues. The Court will therefore dismiss counts 7, 8 and 9 without prejudice to their pursuit in state court.

As defendant Waldorf Restaurant has no claim for which an independent basis for federal jurisdiction exists, this Court's jurisdiction over its state-law counterclaim for breach of lease is ancillary, rather than pendent. See generally, 13 C. Wright, A. Miller and E. Cooper, Federal Practice and Procedure § 3523 (1984). [**15] While the Supreme Court has declined to decide "whether there are any 'principled' differences between pendent and ancillary jurisdiction; or, if there are, what effect Gibbs had on such differences," *Owen Equipment and Erection Co. v. Kroger, 437 U.S. 365, 370 n. 8, 57*

*L. Ed. 2d 274, 98 S. Ct. 2396 (1978)*; *Aldinger v. Howard, 427 U.S. 1, 13, 49 L. Ed. 2d 276, 96 S. Ct. 2413 (1976)*, the lower courts have consistently held that [HN3] ancillary, like pendent, jurisdiction is a discretionary doctrine, in which the court should be guided by the principles enunciated in Gibbs. E.g., *Ambromovage v. United Mine Workers of America, 726 F.2d 972, 989-90 (3d Cir. 1984)*; *Birmingham Fire Ins. Co. of Pennsylvania v. Winegardner and Hammons, Inc., 714 F.2d 548, 550-51 (5th Cir. 1983)*; *Coleman v. Casey County Bd. of Educ., 686 F.2d 428, 430 (6th Cir. 1982)*; *United States v. City of Twin Falls, Idaho, 806 F.2d 862, 868 (9th Cir. 1986)*. Waldorf Restaurant's breach of lease claim is more properly a counterclaim to the plaintiffs' breach of lease claims, which are being pursued in state court, than to their federal civil rights claims. Comity, and common sense, therefore require dismissal of the counterclaim without prejudice, so that it may [**16] be pursued in state court.

III. Res Judicata

The defendants have moved for summary judgment on the remaining civil rights claims on two grounds: (1) res judicata; and (2) standing.

[*1347] The res judicata defense is predicated on [HN4] the full faith and credit statute, *28 U.S.C. § 1738*, which provides that "judicial proceedings [of any State, Territory or Possession of the United States] . . . shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken." Thus, *"section 1738* requires federal courts to give the same preclusive effect to state court judgments that those judgments would be given in the courts of the State from which the judgments emerged." *Kremer v. Chemical Construction Corp., 456 U.S. 461, 466, 72 L. Ed. 2d 262, 102 S. Ct. 1883 (1982)*. Federal courts are required to give preclusive effect both to particular issues that have been determined by the state courts, under the doctrine of collateral estoppel or issue preclusion, e.g., *Allen v. McCurry, 449 U.S. 90, 66 L. Ed. 2d 308, 101 S. Ct. 411 (1980)* (adjudication of *Fourth Amendment* search and seizure issue in state [**17] criminal case binding on federal court in civil action under *§ 1983*), and to whole controversies decided by state courts, under the doctrine of res judicata or claim preclusion, *Migra v. Warren City School Dist. Bd. of Ed., 465 U.S. 75, 79 L. Ed. 2d 56, 104 S. Ct. 892 (1984)*. Moreover, this preclusive effect can apply even when an issue arises under the federal constitution, Allen v. McCurry , even though it wasn't raised in the state court proceedings, Migra, or even if the state court decided the federal issue erroneously, n3 *Allen v. McCurry, 449 U.S. at 101*; *Angel v. Bullington, 330 U.S. 183, 187, 91 L. Ed. 832, 67 S. Ct. 657 (1947)*.

------------------Footnotes---------------

n3 This last doctrine is logically necessary if state court decisions of federal law are to be final, as any litigant seeking re-determination of a federal issue by a federal court would of course contend that the state court's decision was erroneous.

----------------End Footnotes-------------

The Supreme Court has made it abundantly clear that [HN5] the extent of the preclusive effect in federal court of a state court adjudication is to be determined by examining the law of former adjudication as it stands in the particular state where the judgment arose, and not by reference to general principles of res judicata or collateral estoppel. [**18] E.g., *Marrese v. American Academy of Orthopaedic Surgeons, 470 U.S. 373, 84 L. Ed. 2d 274, 105 S. Ct. 1327 (1985)* (reversing lower court decision which relied on federal preclusion law, and remanding with instructions to apply Illinois preclusion law); *Migra, supra*, (as it was unclear whether the District Court had applied Ohio preclusion law, case was remanded to that court to interpret and apply such law).

However, a federal court will not apply the doctrines of issue and claim preclusion against a litigant unless that litigant had a "full and fair opportunity" to litigate the issue or claim in state court. *Kremer, 456 U.S. at 480-81*. To satisfy this requirement, "state proceedings need do no more than satisfy the minimum procedural requirements of the *Fourteenth Amendment's Due Process Clause.*" Ibid.

With these general principles in mind, then, the Court must examine Maryland law to determine what preclusive effect, if any, the eviction action has upon plaintiffs' civil rights claims.

It is first necessary to determine the legal relationship between the first action and the present one. The first action was a landlord's suit for repossession of rented property for failure to pay rent, under [**19] *Md. Real*

*Prop.Code Ann. § 8-401*. The present action is a suit by the tenants, defendants in the first action, for civil rights violations by the landlords which occurred during the course of the tenancy. It does not appear that civil rights violations constitute a defense under Maryland property law to an eviction action for failure to pay rent, and the defendants herein do not contend that they do. Rather, such a civil rights claim, had it been asserted in the first suit, would have been cognizable as a counterclaim, not a defense. n4 Moreover, such a counterclaim [*1348] was merely a permissive one, as the Maryland Rules do not, of their own force, make any counterclaims compulsory. n5 E.g., *Higgins v. Barnes, 310 Md. 532, 549, 530 A.2d 724 (1987); Harbin v. H.E.W.S., Inc., 56 Md.App. 72, 78, 466 A.2d 879 (1983); World Wide Imported Car Co. v. Savings Bank of Baltimore, 41 Md.App. 263, 272-273, 396 A.2d 547 (1979)*. Thus, the defendants contend that the plaintiffs should have asserted their civil rights claims as counterclaims in the first action, and are now precluded by their failure to do so.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n4 The district court's jurisdiction over such a counterclaim would have been circumscribed by the monetary limits of *Md.Cts. & Jud. Proc. Code Ann. § 4-401*. Maryland Rule 3-331(f); see also *Greenbelt Consumer Services v. Acme Markets, 272 Md. 222, 322 A.2d 521 (1974)*. The Court assumes arguendo that the District Courts of Maryland have jurisdiction over claims under the Reconstruction Civil Rights Acts. See *DeBleecker v. Montgomery County, 48 Md.App. 455, 427 A.2d 1075 (1981)* (Circuit Courts of Maryland have jurisdiction over claims under *42 U.S.C. §§ 1983* and *1985*), rev'd on other grounds, *292 Md. 498, 438 A.2d 1348, 115 L.R.R.M. 4461 (1982)* (jurisdiction affirmed sub silentio as case was remanded for a new trial); *Mears v. Town of Oxford, 762 F.2d 368 (4th Cir. 1985)* (§ 1983 claim could have been litigated in action in a Circuit Court of Maryland).

[**20]

n5 The applicable rule in the District Courts of Maryland at the time of the previous suit was Maryland Rule 3-331, Counterclaim and Cross-Claim, § 9, Counterclaim Against Opposing Party:

[HN6] A party may assert as a counterclaim any claim that party has against any opposing party, whether or not arising out of the transaction or occurrence that is the subject matter of the opposing party's claim. A counterclaim may or may not diminish or defeat the recovery sought by the opposing party. It may claim relief exceeding in amount or different in kind from that sought in the pleading of the opposing party. (Emphasis added).

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -

However, the Court concludes that Maryland courts would not give preclusive effect to the unasserted counterclaims in the circumstances of the present case. In *Singer v. Steven Kokes, Inc., 39 Md.App. 180, 384 A.2d 463 (1978)*, the Court of Special Appeals of Maryland, in discussing the claim preclusive effect of defenses and counterclaims that were available in the first lawsuit, stated:

[HN7] If a matter is not in the nature of a defense but constitutes a counterclaim, the general rule is that the party is not required to assert the claim unless the subject matter is such [**21] an integral part of the issue being litigated that a judgment would necessarily negate the existence of facts essential to its maintenance. See *Maxcy v. Twilley, 289 Ala. 681, 271 So.2d 243, 245 (1972); Meyer v. Vance, 406 P.2d 996, 1001 (Okl. 1965); Gwynn v. Wilhelm, 226 Ore. 606, 360 P.2d 312, 314 (1961)*.

*39 Md.App. at 182-183*. In that case, the Court of Special Appeals went on to find claim preclusion in the later action because the same cause of action asserted by the plaintiffs in the second suit had been actually litigated by them in their posture as defendants in the first suit.

In the subsequent case of *World Wide Imported Car Co. v. Savings Bank of Baltimore, 41 Md.App. 263, 396 A.2d 547 (1979)*, the Court of Special Appeals discussed the above-quoted principle more fully:

Had [the second-suit plaintiff] raised this issue in the first action, as a counterclaim, the evidence necessary to support it in that form would have been the same as that necessary to support it in this action. Thus, on the one hand, it appears that, because there is the sameness of actions regarding the reserve account and because this

Page 13

730 F. Supp. 1341, *; 1989 U.S. Dist. LEXIS 16269, **

issue could have been raised, it too is precluded by [**22]direct estoppel.

It has been generally, if not universally, recognized, however, that this aspect of direct estoppel does not apply with respect to a counterclaim arising from an independent cause of action not raised and not required to be raised in defense of the earlier action. A succinct statement of this principle was provided in *8 A.L.R. 694, 695* (Anno.- Failure to Assert Claim by Set-Off, Etc.):

[HN8] The general rule is that a defendant, having a claim available by way of set-off, counterclaim, or cross petition, has an election so to plead it, or to reserve it for a future independent action, and a prior action in which a claim [*1349] might have been asserted as a set-off, counterclaim, or cross petition is no bar to a subsequent independent action thereon.

See also Restatement of the Law of Judgments, § 58, p. 230:

Where the defendant does not interpose a counterclaim although he is entitled to do so, he is not precluded thereby from subsequently maintaining an action against the plaintiff on a cause of action which could have been set up as a counterclaim.

Another expression of the rule, indicating more clearly the rationale behind it, is found in 2 Freeman on Judgments, [**23] § 786 (5th Ed.), pp. 1665-66:

It has already been noticed that while a defendant must bring forward all purely defensive matter, he is not barred by a former judgment against him as to any matter which he was not bound to present and which was not in fact litigated. A judgment is not conclusive of those matters as to which a party had the option to but did not in fact put in litigation in the action. The statutes of set-off and counterclaim are for the benefit of defendants, and plaintiffs cannot compel defendants to avail themselves of those benefits. Everyone should have the right to try his own case in his own way. It may require time for the development and discovery of the nature and extent of the damage arising from a cross-demand, and a rule requiring him to litigate it at the option of his adversary might deprive him of the value of it. The general rule, therefore, [HN9] in the absence of a contrary statute, is that a defendant having an independent claim available as a cross-demand, whether in contract or tort, has the option either to plead it as such or to reserve it for a future independent action, and in the latter event the former judgment will not operate as a bar or estoppel. [**24](footnotes omitted).

See, as well, 50 C.J.S. Judgments, § 684b.(3), p. 136.

This principle, as expressed in these treatises, has been followed by courts throughout the country, apparently without exception. The Maryland Court of Appeals, without stating the rule quite so directly as these other courts, nevertheless gave recognition to it in *Davidson Chem. Co. v. Miller Co., 122 Md. 134 [89 A. 401]* (1913); cf. *Impervious Products Co. v. Gray, 127 Md. 64, 96 A. 1 (1915)*.

*41 Md.App.* at 273-274 (original emphasis; footnote omitted). The Court of Special Appeals concluded by repeating the above-quoted portion of Singer.

In the recent case of *Higgins v. Barnes, 310 Md. 532, 530 A.2d 724 (1987)*, which was principally concerned with the right to a jury trial on a legal counterclaim raised in an equitable action, the Court of Appeals of Maryland noted that "it has not had to confront the effect of res judicata on the assertion of counterclaims," *310 Md. at 549*, and subsequently repeated the Singer quotation without either approving or disapproving it. *310 Md. at 550, n. 11*. World Wide Imported Car was not mentioned in the Higgins opinion.

The Court also notes that the United States Court [**25] of Appeals for the Fourth Circuit, in an appeal from this Court that was not grounded in Maryland law, nevertheless expressed its approval of the principle contained in Singer and World Wide Imported Car: "The better and decidedly majority view is that the failure to interpose such an available 'counterclaim' does not, as a matter of res judicata, bar its subsequent assertion as an independent claim for relief. See *Restatement (Second) Judgments § 22(a)*." n6 *County Fuel v. Equitable Bank, 832 F.2d 290, 292 (4th Cir. 1987)* (original footnote omitted).

------------------Footnotes-------------------

n6 This is the successor provision to § 58 of the first Restatement of the Law of Judgments, which was relied on by the court in World Wide Imported Car.

----------------End Footnotes-------------

The Court therefore concludes that the rule of Singer and World Wide Imported Car is the applicable law in Maryland, [*1350] as the Court of Appeals has not set it aside and it comports with the vast weight of general authority. In the present case, then, the plaintiffs are not precluded from now asserting their civil rights claims by their previous failure to raise them as counterclaims, unless the judgment in the previous eviction action necessarily negates [**26] the existence of facts essential to a judgment on the civil rights claims. n7 Only two facts were necessary to support the previous judgment: (1) the tenants had an obligation to pay a certain amount of rent to the landlords at certain time intervals; and (2) the tenants failed to do so. Assuming these facts to be true, it is still entirely possible that the present defendants conspired to and did interfere with and deprive the plaintiffs of various of their civil rights. The Court finds the present circumstances analogous to those in *Gwynn v. Wilhelm, 226 Ore. 606, 360 P.2d 312 (1961)*, which was relied on by the court in Singer. In Gwynn, a physician obtained a default judgment against her patient for the value of her professional services, and the patient subsequently sued the physician for malpractice. The Supreme Court of Oregon held that the malpractice action was not precluded by the default judgment for nonpayment. The identical fact pattern is contained in illustration 3 to the Restatement of the Law of Judgments § 58, relied on by the court in World Wide Imported Car, and in *illustration 2 to § 22 of Restatement (Second) Judgments*, with the same result. This [**27] example demonstrates that, as in the present case, a suit for payment arising out of a contractual or quasi-contractual relationship is a separate cause of action from a suit for a tort committed in the course of that relationship. The Court will therefore deny defendants' motion for summary judgment on grounds of res judicata.

------Footnotes------

n7 Interestingly, the *Restatement (Second) Judgments § 22(2)(b)* frames this inquiry in the converse, looking to whether the second judgment would negate the first, rather than whether the first judgment negates the second:

A defendant who may interpose a claim as a counterclaim in an action but fails to do so is precluded, after the rendition of judgment in that action, from maintaining an action on the claim if the relationship between the counterclaim and the plaintiff's claim is such that successful prosecution of the second action would nullify the initial judgment or would impair rights established in the initial action.

However, the approach taken in Singer looks at the effect of the first judgment on the foregone counterclaim(s), as is made clear by examination of the authorities cited at the end of the Singer quotation.

------End Footnotes------

Because of the [**28] Court's holding that the unasserted counterclaim in the first action does not preclude plaintiffs' present civil rights claims, it is unnecessary for the Court to address the very serious questions that have been raised regarding notice and service in the first action, and the Court refrains from doing so. n8

------Footnotes------

n8 Shortly before the completion of this Memorandum, the Circuit Court for Charles County decided the appeal in the first state court eviction action. That court held that the district court had no in personam jurisdiction over the tenants, but it did have in rem jurisdiction over the property. In light of the legal analysis set forth supra, this ruling has no effect on this Court's disposition of summary judgment.

------End Footnotes------

IV. Standing

The defendants have launched a generalized attack on plaintiffs' standing to bring Counts 1 through 6 of the complaint, the civil rights counts, without differentiating between the different statutes involved. The defendants

have not otherwise asserted that plaintiffs fail to state claims under any of these statutes, so the Court expresses no opinion on such questions apart from standing.

The defendants contend that the plaintiffs [**29] lack standing to vindicate the civil rights of third party black patrons and black musicians. In support of this proposition, defendants recite the following general propositions of standing: [HN10] the plaintiffs must personally have suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendants, *Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99, 60 L. Ed. 2d 66, 99 S. Ct. 1601 (1979)*, which likely will be redressed by a favorable decision, *Valley Forge Christian College v. Americans United for Separation of Church [*1351] and State, 454 U.S. 464, 472, 70 L. Ed. 2d 700, 102 S. Ct. 752 (1982)*, and they may not assert the legal rights or interests of third parties so as to obtain relief from injury to themselves, *Secretary of State of Md. v. J.H. Munson Co., 467 U.S. 947, 955, 81 L. Ed. 2d 786, 104 S. Ct. 2839 (1984)*; an abstract, generalized grievance will not suffice, *J.H. Munson, supra*, and plaintiffs' injury must fall within the zone of interests protected by the statute in question, *Valley Forge College, supra*.

The plaintiffs respond by asserting in conclusory terms that they have personally suffered injury, which they will prove at trial, and that the defendants have violated the plaintiffs' own civil rights as well as [**30] those of black individuals, citing merely *Gladstone, Realtors, supra*.

Once again, as with the res judicata dispute, all counsel have failed to cite or discuss the most pertinent legal authorities, leaving this task to the Court.

A. *Section 1982*

An analysis of standing in this case must start with the seminal case of *Sullivan v. Little Hunting Park, 396 U.S. 229, 24 L. Ed. 2d 386, 90 S. Ct. 400 (1969)*. In that case, Sullivan, a white man, was a member of the defendant corporation, which operated a community park and playground for the benefit of residents in a particular area. Sullivan bought another house in the same area and leased his first house, along with its membership rights in the park corporation, to Freeman, a black man. The board of the corporation refused to approve Freeman's membership, and expelled Sullivan after he protested that action. Sullivan and Freeman then brought suit under *42 U.S.C. §§ 1981* n9 and *1982*. n10 The Supreme Court upheld Sullivan's standing to sue under *§ 1982*: n11

We turn to Sullivan's expulsion for the advocacy of Freeman's cause. If that sanction, backed by a state court judgment, can be imposed, then Sullivan is punished for trying to vindicate the rights of minorities [**31] protected by *§ 1982*. Such a sanction would give impetus to the perpetuation of racial restrictions on property. That is why we said in *Barrows v. Jackson, 346 U.S. 249, 259, [97 L. Ed. 1586, 73 S. Ct. 1031 (1953)]*, that the white owner is at times "the only effective adversary" of the unlawful restrictive covenant. Under the terms of our decision in Barrows, there can be no question but that Sullivan has standing to maintain this action.

*396 U.S. at 237.*

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -

n9 Equal rights under the law [HN11]

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

n10 Property rights of citizens [HN12]

All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

n11 The Supreme Court did not specifically address the *§ 1981* claims of either Sullivan or Freeman.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - -

730 F. Supp. 1341, *; 1989 U.S. Dist. LEXIS 16269, **

Page 16

[**32] B. *Section 1981*

Sullivan has spawned a long line of progeny, extending standing under the other Reconstruction Civil Rights Statutes to non-minority plaintiffs who seek to remedy injuries suffered as a result of a defendant's invidious discrimination against a minority class. The first such case in the Circuit Courts was *DeMatteis v. Eastman Kodak Co., 511 F.2d 306 (2d Cir. 1975)*. DeMatteis, a white man, brought suit under *42 U.S.C. § 1981*, alleging that his employer had forced him out of his job because he had sold his house, located in a neighborhood inhabited primarily by white Kodak employees, to a black fellow employee. The Second Circuit, relying on Sullivan, upheld DeMatteis' standing.

The Fifth Circuit in *Faraca v. Clements, 506 F.2d 956 (5th Cir. 1975)*, allowed a *§ 1981* suit by a white man who had not been hired by the defendant because his [*1352] wife was black. Faraca was explicitly adopted by the Fifth Circuit as a standing decision in *Goff v. Continental Oil, 678 F.2d 593, 598, n. 7 (5th Cir. 1982)*, which recognized Faraca and Sullivan as "holding that [HN13] white people can assert civil rights claims when they are harmed by someone's discrimination [**33] against blacks."

The Sixth Circuit extended Sullivan to *§ 1981* suits in *Winston v. Lear-Siegler, Inc., 558 F.2d 1266 (6th Cir. 1977)* (suit against employer by white man who was fired for protesting racially discriminatory discharge of black fellow employee), recognizing that "both *[§ 1981* and *§ 1982]*, originally enacted as part of the Civil Rights Act of 1866, were intended to uproot the institution of slavery and to eradicate its badges and incidents." *558 F.2d at 1270* (citations omitted).

In *Des Vergnes v. Seekonk Water District, 601 F.2d 9 (1st Cir. 1979)*, a corporation wished to construct a low-income housing project, but the defendant refused to extend its water services to the site of the project, allegedly because the project would attract black persons to the area, and the corporation brought suit under *42 U.S.C. §§ 1981, 1983* and *1985(3)*. The First Circuit briefly reviewed Sullivan, DeMatteis, Faraca and Winston, and found that

those cases stand for two propositions: to invoke *§ 1981* or *§ 1982* one need not be a member of the racial class protected by the statute and one need not even be able to identify any specific member of the class who suffered [**34] or may suffer discrimination . . . . We conclude that, [HN14] in order to effectuate the public policy embodied in *§ 1981*, and in order to protect the legal rights of non-whites expressly created by *§ 1981*, a person has an implied right of action against any other person who, with a racially discriminatory intent, interferes with his right to make contracts with non-whites. A fortiori a person has an implied right of action against any other person who, with a racially discriminatory intent, injures him because he made contracts with non-whites.

*601 F.2d at 14* (original emphasis).

Thus, when a white family in Virginia sued a school under *§ 1981* for expelling its children because of the social relationship between the elder daughter and a black boy, the Fourth Circuit held, "it is settled that the nature of the discrimination in this case -- taking adverse action against a white person because of his association with blacks -- falls under *§ 1981*," citing, inter alia, DeMatteis, Faraca, and *Sullivan. Fiedler v. Marumsco Christian School, 631 F.2d 1144, 1150 (4th Cir. 1980)*.

Since Fiedler, similar actions by non-minority plaintiffs under *§ 1981* have been recognized [**35] by the United States Court of Appeals for the Tenth Circuit, *Skinner v. Total Petroleum, 859 F.2d 1439 (10th Cir. 1988)* (suit by white employee who was fired in retaliation for assisting black fellow employee with the latter's EEOC claim), and the Eleventh Circuit, *Parr v. Woodmen of the World Life Ins. Co., 791 F.2d 888 (11th Cir. 1986)* (white man not hired because of his interracial marriage).

C. *Section 1983*

While *§ 1981* has provided the most frequent occasion for application of the Sullivan principle of standing, several Courts of Appeals, including the Fourth Circuit, have extended the Sullivan principle to standing under *§ 1983* n12 as well. As noted above, the plaintiff corporation in Des Vergnes also brought suit under *§ 1983*. While noting that there was "not a perfect parallel" between standing under *§ 1981* and *§ 1983*, the First Circuit nevertheless upheld the corporation's standing under *§ 1983*, noting:

"Few principles of law are more firmly stitched into our constitutional fabric [*1353]than the proposition that [HN15] a State must not discriminate against a person because of his race or the race of his companions, or in any way to compel or encourage racial segregation." [**36] *Adickes v. Kress & Co., 398 U.S. 144, 151-152, 90 S. Ct. 1598, 1605, 26 L. Ed. 2d 142 (1970)*. Therefore a State may not punish a non-white for having social contacts with a black. Ibid. Likewise it may not through one of its creatures, punish or discriminate against a corporation for its willingness, past or present, to make contracts with blacks. And if it does so, then the person so punished or discriminated against has a *§ 1983* right of action. *Crow v. Brown, 457 F.2d 788 (5th Cir. 1972)*

730 F. Supp. 1341, *; 1989 U.S. Dist. LEXIS 16269, **

Page 17

aff'g *332 F. Supp. 382, 384 (N.D.Ga. 1971)*; *Dailey and Columbia Sq. Inc. v. City of Lawton Okl., [425 F.2d 1037, 1038 (10th Cir. 1970)]*.

*601 F.2d at 17*. Accord *Cutting v. Muzzey, 724 F.2d 259 (1st Cir. 1984)* (plaintiff developer given standing under *§§ 1983, 1985*, and *1988* to challenge planning board's imposition of "outrageous conditions" on project because customers were Italian-surnamed).

------------------Footnotes------------------

n12 Civil action for deprivation of rights [HN16]

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

----------------End Footnotes---------------

[**37] In *Hudson Valley Freedom Theater v. Heimbach, 671 F.2d 702 (2d Cir. 1982)*, the plaintiff corporation produced theatrical productions to reach and involve the local black and Hispanic communities. The plaintiff alleged that the defendant government agencies and officials had taken various racially-motivated adverse actions against it. The district court dismissed the plaintiff's suit under the *Fourteenth Amendment* and *42 U.S.C. §§ 1981, 1983, 1985* and *2000d* because a corporation, not having a racial identity, lacked standing to assert racial discrimination. The Second Circuit, per Friendly, J., reversed, holding that prudential considerations supported allowing the corporation standing, and observing that:

[The plaintiff corporation] has a far more solid claim of injury in fact than would any resident who would have to allege an interest in attending as yet unannounced productions, or a prospective employee who might be only one of many that would seek to apply for positions not yet offered as a result of [the government]'s denial of the grant.

*671 F.2d at 706*. The same can be said of Yesteryears and the black patrons of the Penthouse nightclub in the case sub judice.

[**38] *Scott v. Greenville County, 716 F.2d 1409 (4th Cir. 1983)* presented a similar factual situation to Des Vergnes. Scott, a real estate developer, sought to develop low-income apartments, but the defendant county rezoned the building site to prevent this construction, allegedly because the project would attract minority residents. The Fourth Circuit squarely upheld Scott's standing to sue under *§ 1983*:

Standing to assert that discriminatory government action violated the *equal protection clause* is not lacking simply because the plaintiff is not a member of a minority. In the first place, Scott as the developer is a proper plaintiff to assert the rights of prospective minority tenants victimized by the alleged racial discrimination. See *Fralin & Waldron, Inc. v. County of Henrico, Va., 474 F. Supp. 1315, 1321-22 (E.D.Va. 1979)*; *Park View Heights Corp. v. City of Black Jack, 467 F.2d 1208, 1213 (8th Cir. 1972)*.

More importantly, if defendants singled out Scott for disadvantageous treatment because of his willingness to house minority tenants, then Scott in his own stead suffered injury to his right to be free from official discrimination.

*716 F.2d at 1415* (footnote [**39] omitted). The Scott court then discussed Des Vergnes and cited Winston, DeMatteis, and Faraca to underscore Scott's standing.

Another white plaintiff was granted standing under *§ 1983* to challenge injurious actions that were motivated by discrimination against blacks in *Wilson v. City of North Little Rock, 801 F.2d 316 (8th Cir. 1986)*. In that case, the plaintiff operated a roller skating rink which attracted a predominantly black clientele, just as the Penthouse is alleged to have done in the instant case. The defendant police officers set up a roadblock outside the rink one night, with the alleged purpose of harassing the rink's black patrons, which resulted in a [*1354] decrease in the plaintiff's business. The Eighth Circuit, in a footnote, held, "There is no question that Wilson has standing to assert a claim bottomed on alleged racial discrimination suffered by his black clientele. As the Supreme Court stated in *Craig v. Boren, 429 U.S. 190, 97 S. Ct. 451, 50 L. Ed. 2d 397 (1976)*: 'Vendors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access [**40] to their market or function.'" *801 F.2d at 321, n. 2* (additional citations omitted).

730 F. Supp. 1341, *; 1989 U.S. Dist. LEXIS 16269, **

Page 18

D. *Section 1985(3)*

Courts have also granted standing under *42 U.S.C. § 1985(3)* n13 to majority plaintiffs who seek to remedy injuries suffered as a result of an alleged conspiracy motivated by discrimination against a minority. In *Richardson v. Miller, 446 F.2d 1247 (3d Cir. 1971),* the Third Circuit held that a white plaintiff who claimed his employer fired him because of his opposition to their racially discriminatory employment practices stated a cause of action under *§ 1985(3)*. In *Cutting v. Muzzey, supra,* the First Circuit found that its previous opinion in Des Vergnes, although based on *§ 1981,* was dispositive, holding that "the fact that the present action is based on *42 U.S.C. §§ 1983, 1985,* and *1988* does not present a meaningful distinction." *724 F.2d at 260* (citation omitted). Accord *Hudson Valley Freedom Theater, supra,* (2d Cir.) (standing upheld under *§ 1985(3)* as well as *§§ 1981, 1983,* and *2000d* and the *Fourteenth Amendment*).

- - - - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - - -

n13 Conspiracy to interfere with civil rights

Depriving persons of rights or privileges

(3) [HN17] If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the law, or of equal privileges and immunities under the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

- - - - - - - - - - - - - - - - - End Footnotes - - - - - - - - - - - - - - - - -

[**41] A pair of ill-fated en banc Circuit Court opinions also upheld *§ 1985(3)* standing in analogous circumstances. In *Scott v. Moore, 680 F.2d 979, 995 (5th Cir. 1982),* a majority of the en banc Fifth Circuit held that a corporation had standing under *§ 1985(3)* to sue for injuries suffered as the result of an assault that was motivated by animosity against the class of non-union employees, despite the fact that the corporation was not itself a member of the class, citing, inter alia, Sullivan. The Supreme Court reversed on the ground that *§ 1985(3)* does not extend to "conspiracies motivated by . . . economic or commercial animus," and therefore did not reach the standing question. *United Brotherhood of Carpenters and Joiners of America, Local 610, AFL-CIO v. Scott, 463 U.S. 825, 837-838, 103 S. Ct. 3352, 77 L. Ed. 2d 1049 (1983).* And in *Novotny v. Great American Federal Savings and Loan Assoc., 584 F.2d 1235 (3d Cir. 1978),* the unanimous en banc Third Circuit held that a male plaintiff who was fired because of his opposition to his employer's discrimination against women had standing under *§ 1985(3)*. In so holding, the court relied on legislative history which indicated that the statute was intended [**42] to protect white people who were conspired against because of their support of blacks, and on Sullivan, Richardson, and *Griffin v. Breckenridge, 403 U.S. 88, 29 L. Ed. 2d 338, 91 S. Ct. 1790 (1971). 584 F.2d at 1244-1245.* Although the Supreme Court reversed on the ground that *§ 1985(3)* did not provide a remedy for violations of rights created by Title VII, such as the right to be free of sex discrimination in employment, *442 U.S. 366, 99 S. Ct. 2345, 60 L. Ed. 2d 957 (1979),* the Novotny [*1355] circuit court opinion has still been relied upon as authority for the standing question. E.g., Cutting v. Muzzey, and Wilson v. City of North Little Rock.

Although the Fourth Circuit has not specifically addressed application of the Sullivan principle to a case under *§ 1985(3)*, one sister court in this circuit has. *Fralin and Waldron v. County of Henrico, Virginia, 474 F. Supp. 1315 (E.D.Va. 1979)* was another case in which a low-income housing developer brought suit because the proposed site of the project was re-zoned. The court reviewed Sullivan, Winston and Richardson v. Miller, inter alia, and upheld the developer's standing to sue under *§ 1985(3)*. Moreover, the Fourth Circuit cited Fralin to support its decision in [**43] Scott v. Greenville County, noting "Fralin carefully analyzed this

issue of third-party standing . . . The Fralin analysis is convincing on the issue . . ." *716 F.2d at 1415.*

Thus, the lesson from all these cases is clear: [HN18] a non-minority plaintiff, be it a corporation or an individual, has standing to bring suit under the Reconstruction Civil Rights Acts when racially discriminatory actions have injured plaintiff due to plaintiff's relationship with minority citizens. This relationship may be social, e.g. Fiedler and Faraca, contractual, e.g. Sullivan and DeMatteis, commercial, e.g. Wilson v. City of North Little Rock, ideological, e.g. Winston and Skinner, or even prospective, e.g. Des Vergnes and Scott.

Turning more closely to the present case, it is clear that the constitutional requirements for standing have been met. The plaintiffs have plainly alleged injury in fact by reason of defendants' conduct: the defendants' racially discriminatory actions drove away black patrons and hampered the plaintiffs' efforts to conduct their business, which ultimately resulted in the demise of the Penthouse nightclub, causing economic loss to the [**44] plaintiffs. A favorable verdict in this case would redress this injury, as an award of damages would compensate for the economic loss.

The cases analyzed above make it clear that the plaintiffs have statutory standing as well. The commercial relationship between the plaintiffs and the nightclub's black patrons and musicians is especially closely analogous to that between the plaintiff roller skating rink owners and the black patrons of those rinks in Wilson v. *City of North Little Rock and Riccobono v. Whitpain Township, 497 F. Supp. 1364 (E.D.Pa. 1980),* the latter of which which was relied upon by the Fourth Circuit in *Scott, 716 F.2d at 1416.*

Prudential considerations, too, counsel in favor of allowing standing. A divided panel of the Fourth Circuit held in *Mackey v. Nationwide Ins. Co., 724 F.2d 419 (4th Cir. 1984)* that prudential considerations counselled against standing where a black insurance agent sought recovery under *§§ 1981* and *1982* for lost business due to the defendant's refusal to insure homes in a predominately black neighborhood (known as "redlining"), because the black homeowners were the persons best suited to challenge that practice. However, the [**45] Court finds that the situation presented by the instant case is more like those in the Fourth Circuit's Scott case and in Wilson v. City of North Little Rock, Riccobono, and Hudson Valley Freedom Theater. The black patrons and musicians that are involved here, like black roller skating rink patrons, theater patrons, and prospective tenants, have a more transient interest in the Penthouse nightclub than a black homeowner has in his home as in Mackey. Without such a fixed, continuous interest, the black victims of discrimination are very unlikely to bring suit. However, this does not make the civil rights violation inflicted any less real. In such circumstances, the most appropriate and feasible course of action is to allow the provider of the commercial function to bring suit. See *Craig v. Boren, 429 U.S. 190, 50 L. Ed. 2d 397, 97 S. Ct. 451 (1976).* Even more importantly, prudential considerations support plaintiffs' standing to vindicate violations of their own right to be free from discrimination. *Scott at 1415.*

Thus, for all the foregoing reasons, the Court will deny the defendants' motion for summary judgment on standing grounds.

[*1356] Finally, the defendants have criticized the plaintiffs [**46] for not naming any specific black musicians or patrons in their complaint. However, they have not contended that such persons do not exist. Under the system of notice pleading adopted by the Federal Rules, it was not necessary for the plaintiffs to name specific individuals, and no amendment to the complaint is necessary. Cf., *Scott at 1415-16; Des Vergnes at 14.*

The Court will incorporate its ruling in a separate Order.

Dated: June 28, 1989