# EXHIBIT 2

# MANAGEMENT AGREEMENT

THIS MANAGEMENT AGREEMENT (this "Agreement") is made as of _June 20_, 2002 by and between Phase II Chin-LV, LLC, a Delaware limited liability company ("Owner"), and O.P.M.L.V., a Nevada limited liability company ("Manager"), with reference to the following background facts:

## RECITALS

A.    Pursuant to that certain Lease ("Lease") dated March 18, 1997, by and between Owner's predecessor-in-interest, GGH Restaurant, L.L.C., as lessee, and Forum Developers Limited Partnership, a Nevada Limited Partnership, as landlord ("Landlord"), Owner owns and operates a restaurant and bar, with banquet facilities, known as "Chinois - Las Vegas" (the "Restaurant"), located in the Forum Shoppes at Caesars Palace Las Vegas, Nevada (the "Forum").

B.    The Restaurant is located on two levels, consisting of a dining room and kitchen located on the ground floor (the "Ground Floor Premises") and a banquet room, dining room, kitchen, restrooms and ancillary areas located on the second floor (the "Upstairs Premises") (the Ground Floor Premises and the Upstairs Premises is collectively referred to herein as the "Premises").

C.    Subject to the terms of the Lease, Manager desires to operate and manage a nightclub and bar in certain portions of the Upstairs Premises during certain periods that such portions are not being otherwise utilized by Owner.

D.    The principals of Manager are experienced in the management and operation of such nightclub and bar facilities.

E.    Owner is willing to permit Manager to operate and manage such nightclub and bar, subject to all of the terms and conditions set forth below and in the Lease.

NOW THEREFORE, for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    Facilities.  During the term of this Agreement, and subject to the provisions herein, Owner shall permit Manager to utilize a portion of the Upstairs Premises consisting of approximately 10,000 square feet, as more particularly described in Exhibit "A" attached hereto (the "Facilities") solely for the Permitted Use, as defined in Section 3 below.

2.    Term.  The initial term ("Initial Term") of this Agreement shall commence ("Commencement Date") on the date of full execution of this Agreement and shall

00061

terminate on the fifth (5th) anniversary date of the Management Fee Commencement Date. Manager shall have the right to extend the Initial Term for one (1) additional five (5) year period ("Option Term") by notifying Owner in writing, no less than six (6) months prior to the commencement of the Option Term, of Manager's exercise of such option (the "Option Notice"); provided, however, that if Manager fails to deliver the Option Notice to Owner prior to such six (6) month period (the "First Notice Period"), Manager may nevertheless exercise such option by notifying Owner in writing of Manager's exercise of such option within ten (10) days after notice from Owner (the "Second Notice Period") that Manager has failed to exercise such option within the First Notice Period. If Manager fails to exercise the Option Term prior to the expiration of the Second Notice Period, the Manager's option to extend shall become null and void. The terms and conditions of the Option Term shall be the same as the terms and conditions of this Agreement for the Initial Term, provided that the Minimum Management Fee, as defined below, shall be adjusted in accordance with Section 10.2 below. The term "Term" as used herein shall refer to the Initial Term and, if exercised by Manager, the Option Term. Notwithstanding anything to the contrary contained herein, in no event shall Owner be obligated to extend the term of the Lease, which extension shall be made by Owner in its sole and absolute discretion, regardless of whether such extension of the Lease may be necessary for Manager to enjoy the full Term of this Agreement. Accordingly, if the term of the Lease expires, regardless of whether Owner has any extension options remaining thereunder at the time of such expiration, the Term of this Agreement shall expire concurrently with the expiration of the Lease, and such expiration of this Agreement shall not be deemed a default of this Agreement by Owner.

3. Permitted Use. Manager shall use the Facilities solely for the operation and management of a first-class nightclub and bar ("Permitted Use"), with standards of service and quality comparable to the Chinois - Las Vegas Restaurant. Manager acknowledges that certain tenants in the Forum may have been granted the exclusive right within the Forum to sell certain products or provide certain services and that the use of the Facilities by Manager for any unauthorized purposes may, among other things, cause Owner to be in default under the terms of the Lease. Manager hereby agrees that it shall not use, or permit the use of, the Facilities for any such unauthorized purposes, nor for any use in violation of any applicable restrictive covenant affecting the Premises, any governmental code, ordinance, law or regulation, or the Rules and Regulations, as defined below. If any governmental license or permit shall be required for the lawful conduct of Manager's operations in the Facilities, or if the failure to obtain any such license or permit might or would, in any way, adversely affect Owner, the Premises, or the Forum, then Manager, at Manager's sole cost and expense, shall obtain and thereafter maintain all such licenses and permits.

4. Shared Use of Facilities. Subject to the terms and restrictions of the Lease and this Agreement, Manager shall have the right to use the Facilities. fifty-two (52) weeks per year, for its Permitted Use during the following times: Wednesday

through Saturday, from 8:00 p.m. on such days to 7:00 a.m. the following day, and, for Private Entertainers Party Night solely for invited guests and VIPs, 10:00 p.m. on Sunday to 6:00 a.m. the following Monday (the "Primary Hours of Operation"). Manager acknowledges and agrees that except as to the Primary Hours of Operation, Owner reserves the right to use the Facilities at all other times, including, without limitation, from 7:01 a.m. to 7:59 p.m., seven (7) days a week, fifty-two (52) weeks per year. Notwithstanding Manager's Primary Hours of Operation, Owner shall be permitted to use the Facilities until 11:00 p.m. on any Friday, Saturday or Sunday upon providing no less than thirty (30) days' written notice prior to the scheduled date on which Owner desires to use the Facilities for such extended time; provided, however, that Owner's use of the Facilities for such extended time shall be limited to four (4) occurrences per calendar month. Subject to Owner's prior approval thereof, which approval may be withheld in Owner's sole discretion, Manager may, from time to time, use the Facilities on Mondays or Tuesdays to host special events (the "Special Event Hours"). Manager shall submit any requests for such Special Event Hours to Owner no less than thirty (30) days prior to the scheduled special event, which request shall specify the proposed date and hours, and shall provide a detailed description of the nature of such special event. As used herein, the phrase "Hours of Operation" shall refer to the Primary Hours of Operation and any Special Event Hours approved by Owner.

4.1    Shared Areas. At all times during the Hours of Operation, Manager, its employees, agents and customers (collectively, "Manager Parties"), shall have the right to utilize in common with Owner, its employees, agents and customers (collectively, "Owner Parties"), on a non-exclusive basis, certain areas adjacent to the Facilities, including the restroom, employee restroom/changing rooms, the area between the entrance to the Restaurant and the interior stairway, the interior stairway, and delivery areas, all as more particularly described in Exhibit "B" (the "Shared Areas"). Manager Parties shall also have the right, during the Hours of Operation, to utilize on a non-exclusive basis, the elevator located within the Premises, and the service corridor located next to the premises currently occupied by Alfred Dunhill, which service corridor is described on Exhibit "B" attached hereto. Manager Parties' use of the Shared Areas, the elevator, the service corridor, and any other areas within the Premises, shall be subject to the provisions of the Lease, this Agreement, and the Rules and Regulations (as defined below), and all applicable laws, codes and ordinances.

4.2    Owner's Furniture. Owner and Manager shall mutually be responsible for the set up and clearance of any banquet or dining furniture and facilities, including, but not limited to tables, chairs and sidebars (collectively, the "Owner's Furniture"), utilized by Owner during the use of the Facilities by Owner, and to store the Owner's Furniture in a storage area designated on Exhibit "B" attached hereto (such set up, clearance and storage work are collectively referred to herein as the "Set Up Work"). The costs incurred in performing the Set Up Work (the "Set-Up Costs") shall be shared equally by the Owner and Manager. Notwithstanding the foregoing, if Manager fails to

00063

be responsible for its share of the Set Up Work, Owner may elect to perform the Set Up Work itself, in which case Manager shall pay to Owner on a monthly basis, within ten (10) days after invoice therefor, one-half of the Set-Up Costs incurred by Owner during the prior calendar month, which Set-Up Costs shall include the pro-rata portion of the wages of all employees of Owner involved in the Set-Up Work.

5.    Condition of Facilities.

5.1    As-Is Condition.  Manager acknowledges and agrees that: (i) it is taking and using the Facilities in its "As-Is" condition, including, but not limited to all existing improvements, decorations, and defects, and (ii) neither Owner, nor any agent of Owner, has made any representation or warranty to Manager with respect to the condition of the Facilities or to the suitability of the Facilities for the conduct of Manager's business therein.  Notwithstanding anything to the contrary contained herein, all of Owner's artwork and other removable property located from time to time in the Facilities shall remain Owner's property, shall not be deemed to be part of the Facilities for any reason, and shall be subject to removal by Owner at any time and from time to time during the Term; provided however, that the four (4) booths currently located near the stairway as indicated on Exhibit "A" shall not be removed by Owner during the Term.

5.2.    Alterations.

(a)    Structural Alterations.  Prior to commencing any alterations which affect the electrical, mechanical, plumbing, or HVAC systems of the Premises (the "Systems"), or any alterations, additions, improvements, modifications, or any other changes to the Facilities which affect the structural aspects of the Facilities or the Premises (collectively, "Structural Alterations"), Manager shall (i) submit plans, specifications and other documents (collectively, "Structural Plans") relating to such Structural Alterations to Owner for Owner's approval thereof, which approval may be withheld in Owner's sole discretion, and (ii) comply with any and all requirements under the Lease relating to such Structural Alterations, including, but not limited to, the submission of any plans, specifications or other documents required to be submitted to Landlord in accordance with the terms of the Lease, and obtaining any approvals from Landlord.

(b)    Non-Structural Alterations.  Prior to commencing any alterations, design modifications or any other changes to the Facilities (including, but not limited to changes to the furniture, fixtures or equipment located in the Facilities) that are not Structural Alterations (collectively, "Non-Structural Alterations"), Manager shall (i) submit plans, specifications and other documents (collectively, "Non-Structural Plans") relating to such Non-Structural Alterations to Owner for Owner's approval thereof, which approval shall not be unreasonably withheld, and (ii) comply with any and all requirements under the Lease relating to such Non-Structural Alterations, including,

Original and final OPM.ManagementAgmt5.doc  Page 4

but not limited to, the submission of any plans, specifications or other documents required to be submitted to Landlord in accordance with the terms of the Lease, and obtaining any approvals from Landlord.

(c)     Plan Approval.  The terms "Non-Structural Plans" and "Structural Plans" are collectively referred to herein as "Plans." Owner shall have a period of ten (10) business days after receipt of Manager's Plans within which to either approve such Plans or to make comments and changes thereto.  Owner shall exercise the applicable standard of discretion in reviewing and approving such Plans as set forth in Sections 5.2(a) and 5.2(b) above.  If Owner does not respond to Manager's submission of the Plans within such ten (10) business day period, Owner shall be deemed to have approved such Plans.  If Owner responds with comments as described above, then Manager shall revise the Plans taking into consideration Owner's comments and resubmit them to Owner for approval within fifteen (15) days from the date of receipt of such comments.  Owner shall then have ten (10) days to approve such revised Plans.  If Owner does not respond to the resubmission of the Plans within such ten (10) day period, Owner shall be deemed to have approved the same.  If Owner disapproves any Plans submitted by Manager, the Owner and Manager shall arrange for a meeting to be held no less than ten (10) business days following the date of Owner's notice of such disapproval, at a time and location mutually agreed to by the parties, at which time the parties shall meet to discuss the submitted Plans and the respective parties' concerns regarding such Plans.  Notwithstanding anything to the contrary contained herein, Owner shall not have any obligation to provide any improvements, modifications or any other changes to the Facilities.

(d)     Manager's Work.  Subject to the terms of the Lease and to this Agreement, including, but not limited to the provisions of Sections 5.2(a) and 5.2(b), as applicable, Manager shall, at Manager's sole cost and expense, perform the following interior work to the Facilities (collectively, the "Manager's Work"): (i) remodel and transform the display kitchen existing as of the Commencement Date into a customer service bar; (ii) remodel and transform the two adjacent subdivided banquet rooms existing as of the Commencement Date into "private" rooms for private parties and other similar functions; (iii) install new carpeting throughout the Facilities; and (iv) install a state-of-the-art lighting, sound and video surveillance system.  Manager shall complete its initial buildout of the Facilities, including, but not limited to the Manager's Work and all other Alterations approved in accordance with this Agreement and the Lease, on or before December 31, 2002.  Manager shall submit all Plans for Manager's initial buildout of the Facilities to Owner for Owner's approval thereof no later than July 20, 2002.  In the event Owner and Manager are unable to agree upon the Plans for Manager's initial buildout of the Facilities in accordance with Section 5.2(c) above by August 20, 2002, this Agreement shall terminate and the Contingency Fee shall be refunded to Manager within ten (10) days after such termination; provided, however, that Owner shall be entitled to keep the Contingency Fee if the termination of the

Original and final OPM.ManagementAgmt5.doc  Page 5

00065

Agreement resulted from Manager's failure to use its best commercial efforts to submit and revise Plans to satisfy Owner's concerns regarding such Plans.

(e)　Alteration Expenses.  Subject to the terms and conditions hereof, and except as provided herein, Manager shall, at its sole cost and expense, bear and pay all costs and expenses of every kind and nature in connection with, arising from and/or pertaining to the construction and operation of the Facilities, including, but not limited to the Manager's Work, the Non-Structural Alterations, and the Structural Alterations.  Without limitation on the foregoing, Manager shall, at its sole cost and expense, install, equip and provide all furniture, fixtures, furnishings, equipment, systems, supplies and decorations required for the operation of the Nightclub, as defined below.

6.　Security Deposit.  Commencing on the expiration of the Contingency Periods, as defined in Section 11 below, and continuing throughout the Term of this Agreement, the Security Deposit, as specified in Section 11.2 below, shall be held by Owner as security for the faithful performance of its obligations relating to Management Fees, Percentage Fees, repairs, or other charges due from Manager or to cure any other defaults of Manager.  If Owner uses any portion of the Security Deposit, Manager shall restore the Security Deposit to its full amount within ten (10) days after receipt of Owner's written notice.  If on the expiration of the Term, Manager shall have fully performed all of Manager's obligations hereunder and shall not be in default hereunder, then the unused portion of the Security Deposit, to the extent actually received by Owner, shall be returned to Manager, without interest.

7.　Management.

7.1　Management Services by Manager.  Subject to the terms and conditions hereof, Manager shall, at its sole cost and expense, operate and manage the Facilities for the Permitted Use during the Hours of Operation (Manager's operations in the Facilities during the Hours of Operation referred to herein as the "Nightclub"), which shall include overseeing and supervising all aspects of the day to day operation of the Nightclub, including, without limitation, (a) hiring, training and overseeing all security, waitpersons, bartenders, entertainers, other operational and purchasing personnel, and all other employees and personnel of the Nightclub, (b) overseeing compliance with all contractual obligations of the Nightclub, (c) schedule, direct and supervise all work and the supply of all materials, labor and any other services in connection with the operation of the Nightclub, (d) address and respond to complaints and requests concerning the Nightclub, and (e) perform other services and acts, in addition to the foregoing but exclusive of any acts or services to be provided by Owner pursuant to the terms hereof, necessary for the proper operation and management of the Nightclub.  Manager shall perform its services hereunder so as to cause the Nightclub to be operated at a standard of service and quality comparable to the Restaurant, subject to such variations

Original and final OPM.ManagementAgmt5.doc  Page 6

in service and quality as may be required to reflect the market conditions, clientele and competition which may exist from time to time in Las Vegas, Nevada. Manager shall utilize commercially best efforts and devote such time to the Nightclub as is required to fully perform its services hereunder, and shall, subject to the express requirements hereof, determine the method, details and means of performing such services in its reasonable discretion. Manager and Owner shall regularly consult with each other and keep the other advised as to all matters relating to the Nightclub. Except as otherwise expressly set forth herein, Owner shall have no obligation to perform, supervise or oversee any acts or obligations whatsoever in connection with or pertaining to the management of the Nightclub.

      7.2   <u>Manner of Performance</u>. Manager shall perform all of its obligations hereunder with due care and in compliance with all applicable laws, codes, ordinances, rules, regulations, insurance policies, the terms of the Lease, and the Rules and Regulations. Since Manager's practices and behavior will reflect on Owner, Manager agrees that it shall (i) conduct its activities so as to maintain, rather than diminish, the goodwill and reputation of Owner and the Restaurant, and (ii) not tolerate or condone in any manner any action or conduct which is or appears improper, immoral, illegal or harmful. Manager acknowledges that the Nightclub is intended to be operated as a first class facility and that the maintenance of Owner's reputation and the reputation of the Nightclub and the Restaurant, as well as the goodwill of all of Owner's guests and invitees, is absolutely essential to Owner and that any impairment thereof whatsoever will cause great damage to Owner. Manager therefore covenants that it shall operate the Nightclub in a first class and orderly manner and in accordance with the highest standards of honesty, integrity, quality and courtesy so as to maintain the reputation and goodwill of Owner, the Restaurant and the Nightclub. Manager shall further use its best efforts to prevent its customers, patrons and employees from annoying, disturbing or offending any customers, patrons or others on the Premises. Manager shall monitor the performance of the Nightclub and the patrons, customers and employees at the Nightclub and otherwise use its best efforts to ensure that such standards are consistently maintained. Manager therefore further agrees, as a material inducement to Owner, that repeated failure to maintain such standards or multiple complaints from customers or guests of the Nightclub or the Restaurant shall be an event which may be grounds for an Event of Default by Manager if not rectified or cured after notice and within the time periods set forth in Section 25 below.

      8.   <u>Food and Beverage</u>.

      8.1   <u>Food</u>. Owner shall be responsible for the preparation (but not service) of all food to be served at the Nightclub. Owner shall perform such culinary services to be rendered pursuant to this Agreement in a manner consistent with Owner's customary standards for the Restaurant. Owner shall be responsible for providing all employees to provide the following food services: (i) obtaining all food and

Manager for any failure of, or delay in, delivery of any beverages, damage to the beverages, the delivery of erroneous items, or any other damage, injury or liability, suffered by Manager in connection with this subsection.

9.    <u>Shared Employees.</u> The parties acknowledge that certain agents, contractors or employees of Owner or Manager, or its affiliates, may perform services for both the Restaurant and the Nightclub. Owner shall take all necessary action to allocate any out-of-pocket expenses and apportion salaries of such employees or agents between the Restaurant and the Nightclub so as to cause the expenses and salaries of such employees and agents to be borne proportionately by the entities to which such employees and agents render services. Such allocation shall be based on the purpose(s) of the expenditure in question and a reasonable and good faith approximation of the time spent in service at the Restaurant and the Nightclub. To the extent Owner pays expenses or salaries which are properly allocable to Manager, Manager shall promptly reimburse Owner for such allocable portion of the expenses and/or salaries. To the extent Manager pays expenses or salaries which are properly allocable to Owner, Owner shall reimburse Manager for such allocable portion of such expenses and/or salaries. Owner may transfer employees of the Restaurant to or from other restaurants managed or owned by Owner or the principals thereof so long as such

foodstuffs reasonably necessary for the operation of the Nightclub, (ii) preparing all food for service in the Nightclub, (iii) "plating" or otherwise placing such prepared food on plates, serving dishes or other agreed-upon methods for service to the guests and customers of the Nightclub, (iv) providing all kitchen staff necessary to prepare such food, (v) developing a menu, (vi) pricing the food, and (vii) orientating Manager's staff and employees from time to time in order to familiarize Manager's servers with the food to be served at the Nightclub. Owner shall have no responsibility for the service to the guests, customers or patrons of the Nightclub of any food prepared or offered by Owner. Upon Owner's preparation of any food item for the Nightclub, Owner shall place such item in the pick-up line located in Owner's downstairs kitchen to be picked up by employees of Manager for service by such employees to the guests, customers and patrons of the Nightclub. Subject to licensing restrictions, Manager shall be permitted to use the existing POS system or other order coordinating system utilized by Owner to deliver food orders to the Restaurant's kitchen. Manager may, with the prior written approval of Owner (which approval shall not be unreasonably withheld), increase the food prices established by Owner when determining the food prices to be charged to Manager's guests, customers and patrons.

(a)    <u>Food Preparation Hours.</u> Subject to subsection 8.1(b) below, Owner shall provide the food preparation services described in this Section 8.1 until 3:00 a.m. on all days that the Nightclub is open for business; provided, however, that if the Nightclub closes for business earlier than 3:00 a.m. on any day, Owner's obligation to provide such food preparation services on such day shall end concurrently with the close of the Nightclub.

(b)    <u>Adjustment of Hours.</u> Notwithstanding anything to the contrary contained herein, if, during the first six (6) month period after the date Manager opens for business, the food sales volume by Owner does not exceed an average $750.00 per day on a weekly basis, Owner may adjust or eliminate the food service hours, as determined in Owner's reasonable discretion, upon notice to Manager of any such adjustment or elimination; provided, however, that Manager may, within five (5) days after such notice from Owner, request that Owner not adjust or eliminate such food service hours, in which case: (i) Owner shall not adjust or eliminate such food service hours; and (ii) Manager shall, within ten (10) days after invoice therefor, reimburse Owner for all labor costs incurred by Owner in providing food service during all such hours initially proposed to be adjusted or eliminated by Owner including, but not limited to, Owner's employees' wages, salaries, and other benefits. At any time after the sixth (6th) month anniversary date of the date Manager opens for business, if the food sales volume does not achieve such levels as Owner believes is necessary for the profitable operation of the Restaurant's kitchen, Owner may adjust or eliminate the food service hours, as determined in Owner's reasonable discretion. Owner shall promptly notify Manager of any such adjustment or elimination.

(c)     Exclusivity.  Except as otherwise provided in this subsection (c), Owner shall be the exclusive provider of all food preparation services to the Nightclub, and Manager shall not permit, provide or allow any other person, tenant, entity, licensee or occupant, other than Owner, the right to sell or provide any kind of food in or to the Nightclub or the patrons therein.  Notwithstanding the foregoing, in the event Manager desires to provide food service during times that Owner does not or cannot provide food service, Manager may, at its sole cost and expense, prepare its own food at the Facilities.

(d)     Payment.  Owner shall charge Manager the prices previously established by Owner (as such prices may be adjusted from time to time in Owner's sole discretion) and delivered to Manager for all food ordered by Manager or its patrons, customers or employees, from Owner in accordance with this Section 8.1.  All such food purchases by Manager, together with all applicable sales tax thereon, shall be payable by Manager to Owner on a weekly basis, within three (3) days after invoice therefor.

8.2     Beverages.

(a)     Beverage Service.  Manager and its employees shall be solely responsible for ordering, inventorying preparing and serving all beverages at the Nightclub; provided, however, that if and to the extent applicable liquor license laws or regulations require that the personnel serving the beverages be employees of Owner, Owner shall provide such employees to serve such beverages at the Nightclub.  All costs associated with such employees provided by Owner, including, but not limited to, wages, salaries, and other benefits, shall be reimbursed by Manager to Owner within ten (10) days after invoice therefor.

(b)     Purchase and Payment.  Manager shall either (i) purchase all beverages, alcoholic and otherwise, directly from the vendors of such beverages after obtaining all necessary permits, licenses or approvals required by applicable law or regulations, including, but not limited to, the Alcohol Approvals, as defined below, to purchase such beverages directly from such vendors, or (ii) purchase all such beverages from Owner, in which case Owner shall purchase such beverages on behalf of Manager, at Manager's request.  In the event Manager purchases such beverages from Owner: (a) Manager shall provide Owner with a written list of requested beverages and the amounts thereof no less than three (3) days prior to the date Manager requires such beverages, (b) Owner shall notify Manager upon receipt of delivery of such requested beverages, and Manager shall thereafter immediately pick up such beverages from a location specified by Owner, and (c) Manager shall reimburse Owner for the cost of such beverages within ten (10) days after invoice therefor. Notwithstanding anything to the contrary contained herein, except to the extent caused by Owner's willful misconduct, in no event shall Owner be liable or responsible to

Original and final OPM.ManagementAgmt5.doc  Page 9

00069

Manager for any failure of, or delay in, delivery of any beverages, damage to the beverages, the delivery of erroneous items, or any other damage, injury or liability, suffered by Manager in connection with this subsection.

9.  **Shared Employees**. The parties acknowledge that certain agents, contractors or employees of Owner or Manager, or its affiliates, may perform services for both the Restaurant and the Nightclub. Owner shall take all necessary action to allocate any out-of-pocket expenses and apportion salaries of such employees or agents between the Restaurant and the Nightclub so as to cause the expenses and salaries of such employees and agents to be borne proportionately by the entities to which such employees and agents render services. Such allocation shall be based on the purpose(s) of the expenditure in question and a reasonable and good faith approximation of the time spent in service at the Restaurant and the Nightclub. To the extent Owner pays expenses or salaries which are properly allocable to Manager, Manager shall promptly reimburse Owner for such allocable portion of the expenses and/or salaries. To the extent Manager pays expenses or salaries which are properly allocable to Owner, Owner shall reimburse Manager for such allocable portion of such expenses and/or salaries. Owner may transfer employees of the Restaurant to or from other restaurants managed or owned by Owner or the principals thereof so long as such transfers are not materially detrimental to the business and operation of the Nightclub. Each party shall be responsible for its own employees, including the payment of all compensation and benefits, providing worker's compensation and other insurance, and supervision of such party's employees.

10.  **Management Fee**.

10.1  **Conditions Precedent**. Owner and Manager's obligations under this Agreement are expressly conditioned upon the satisfaction by Manager of the following conditions precedent within the applicable time periods (individually, the "**Contingency Period**," and collectively, the "**Contingency Periods**") set forth below. Manager shall use its best commercial efforts and shall proceed with due diligence in attempting to satisfy all conditions precedents within the applicable Contingency Period. In the event that all conditions precedent are not satisfied by Manager within the applicable Contingency Period notwithstanding Manager's best commercial efforts, this Agreement shall become null and void and of no force and effect.

(a)  On or before December 1, 2002, Manager shall have procured all liquor and alcoholic beverage permits or approvals (collectively, the "**Alcohol Approvals**") required by all agencies which regulate the sale and service of alcoholic beverages in Clark County, Nevada (the "**Alcohol Agencies**"), so as to permit the purchase and sale of alcoholic beverages by Manager in accordance Section 8.2(b) above. Manager shall submit all applications and other documents necessary to

00070

procure the Alcohol Approvals to the appropriate Alcohol Agencies no later than July 20, 2002.

(b)　　On or before December 1, 2002, Manager shall have procured (i) all building licenses or permits necessary to construct Manager's Work and all other Alterations approved in accordance with this Agreement, and (ii) all state and federal business licenses required for Manager's Permitted Use (collectively, the "General Permits").

10.2　Initial Term. Commencing on the date (the "Management Fee Commencement Date") that is the earlier of: (i) the date Manager opens for business, or (ii) January 1, 2003, and continuing throughout the Initial Term, Manager shall pay to Owner, the annual management fee of Three Hundred Thousand Dollars ($300,000.00) (the "Minimum Management Fee"), payable in advance on the first day of each calendar month in equal monthly installments of Twenty-Five Thousand Dollars ($25,000.00) (the "Monthly Management Fee"). If the Management Fee Commencement Date occurs on a day other than the first day of a calendar month, the Monthly Management Fee shall be prorated on the basis of a 30-day calendar month. Notwithstanding the foregoing, in the event Manager opens the Nightclub for business to the public on or before January 1, 2003, Manager shall receive a one month abatement of the Monthly Management Fee for the first full calendar month immediately following the month in which Manager opens for business. In the event any installment of any Monthly Management Fee is not received by Owner by the fifth (5th) day of each calendar month, Manager shall pay to Owner a late charge in the amount of five percent (5%) of such overdue amount. Acceptance of late charges by Owner shall not constitute a waiver of Owner's default with respect to the overdue amount, nor prevent Owner from exercising any of the other rights and remedies granted hereunder, at law or in equity.

10.3　Option Term. The Minimum Management Fee for the first year of the Option Term shall be Three Hundred Thirty Thousand Dollars ($330,000.00). Commencing with the second (2nd) year of the Option Term and for every Option Term year thereafter, the Minimum Management Fee shall be subject to adjustment by the percentage increase in the Consumer Price Index for All Urban Consumers, 1982-1984=100 (U.S. City Average) (the "CPI") over the prior twelve (12) month period. Upon the commencement of the second (2nd) year of the Option Term and on each anniversary thereof, the parties shall calculate the percentage increase, if any, in the CPI for the previous twelve (12) month period. Upon determination of the percentage increase, the Minimum Management Fee shall be adjusted by multiplying such Minimum Management Fee by such percentage; provided, however, in no event shall the Minimum Management Fee be less, in any Option Term year, than the Minimum Management Fee payable in the prior Option Term year. If the Option Term year has already commenced prior to the calculation of the percentage increase, if any, then, following such calculation, the Minimum Management Fee shall be adjusted

Original and final OPM.ManagementAgrm5.doc  Page 11

retroactively to the commencement of the applicable Option Term year. If the applicable CPI is no longer published, then the parties shall use a nationally recognized guide for the measurement of inflation as a substitute. .

11.    Contingency Fee. Upon the full execution of this Agreement, Manager shall deposit with Owner, by way of a cashier's check, the sum of Seventy-Five Thousand Dollars ($75,000.00) (the "Contingency Fee"). Manager and Owner acknowledge and agree that  (i) Owner will be foregoing other opportunities to utilize the Facilities to generate revenue during the Contingency Periods, and (ii) the Contingency Fee is intended to compensate Owner for Owner foregoing such other opportunities during the Contingency Periods under specified conditions, as described below.

11.1    Termination of Agreement. In the event this Agreement terminates prior to the expiration of the Contingency Periods as a result of Manager's inability to satisfy all conditions precedent within the applicable Contingency Period notwithstanding Manager's best commercial efforts to timely satisfy all such conditions precedent, the Contingency Fee shall be refunded to Manager within ten (10) days after such termination; provided, however, that Owner shall be entitled to keep the Contingency Fee if the termination of the Agreement resulted from: (a) Manager's breach or default of this Agreement, or (b) Manager's failure to obtain all necessary Alcohol Approvals due to (i) any malfeasance by any individual employed by, acting on behalf of, or otherwise associated with Manager or (ii) any status of Manager or its affiliates in any jurisdiction relating to any alcohol permits or licenses.

11.2    Non-Termination of Agreement. In the event this Agreement remains in effect as of the expiration of the Contingency Periods, Owner shall: (i) retain Sixty Thousand Dollars ($60,000.00) of the Contingency Fee as a security deposit (the "Security Deposit") to be held, applied and distributed in accordance with Section 6 above, and (ii) apply and credit any remaining amount of the Contingency Fee to the first installment of the Minimum Management Fee payable by Manager hereunder.

12.    Percentage Fee. In addition to the Minimum Management Fee, commencing upon Manager's opening for business, Manager shall pay to Owner, on a monthly basis, an amount (the "Percentage Fee") equal to seven percent (7%) of the amount by which Manager's monthly Gross Sales exceed the Breakpoint Amount, both as defined below. The "Breakpoint Amount" shall be the quotient of (i) the applicable Monthly Management Fee for such month for which such percentage fee is to be calculated divided by .07, (ii) divided by twelve (12). All Percentage Fee shall be payable monthly by the fifteenth (15th) day of the month immediately following the month for which such Percentage Fee based on Gross Sales is to be calculated.

Original and final OPM.ManagementAgmt5.doc  Page 12

12.1 <u>Gross Sales</u>. As used herein, "<u>Gross Sales</u>" shall mean all revenue, income and receipts derived from any and all business conducted in and from the Nightclub, whether the same concerns sales of food, beverages, cover charges, entrance fees, or services, and whether the same be for cash, barter, complementaries or other items provided without charge to guests or employees of the Nightclub, credit, check, charge account or other disposition of value, regardless of collection in the event of sale upon credit or charge account. The value of each sale shall be reported in full in the month that the transaction occurs, irrespective of when, or if, payment is received. Notwithstanding the foregoing, Gross Sales shall not include: (i) sales of food purchased from Owner and resold to customers or patrons of the Nightclub, except to the extent that the resale price to the Nightclub's customers or patrons exceed the sales price of the food from Owner, (ii) returns or refunds provided that the sales price of such item was originally included in Gross Sales, (iii) the amount of any city, county, state or federal sales, use, gross receipts; luxury or excise tax imposed by governmental authority, (iv) complimentary meals and drinks (but only to the extent the value of such meals and drinks do not exceed one-half percent (½%) of Gross Sales), (v) employee meals, (vi) returns of merchandise, food, beverages or other items to shippers, purveyors and manufacturers, (vii) sales of trade and decorative fixtures and equipment owned by Manager; (viii) credit and debit card issuer and electric payment facility interest, service and credit charges, (ix) gratuities and tips paid by customers, whether cash or credit, (x) insurance proceeds and sums and credits received in settlement of claims for loss or damage to merchandise; or (xi) the sale of gift certificates at the Facilities, provided that the redemption of gift certificates shall be included in Gross Sales.

12.2 <u>Statement</u>. Manager shall furnish to Owner, together with the payment of each installment of the monthly Percentage Fee, a statement certified by an officer of Manager, or a certified public accountant employed by Manager, if any, of Gross Sales and the Percentage Fee for the preceding calendar month (or portion thereof) to which such payment relates.

12.3 <u>Annual Adjustments</u>. Within forty-five (45) days after the close of each calendar year, Manager shall provide Owner with a statement of Gross Sales for the preceding calendar year certified by an officer of Manager as correct and accurate. In the event that the annual statement reveals additional Percentage Fees due for the prior calendar year, then Manager shall pay such additional Percentage Fee concurrently with the delivery of such annual statement. In the event that such annual statement shall reveal an overpayment of Percentage Fee for the prior calendar year, then such overpayment shall be credited against the next installment(s) of the Monthly Management Fee due (or, if at the end of the Term of this Agreement, Owner shall pay such amount to Manager within thirty [30] days after Manager has delivered its certified statement of Gross Sales and Percentage Fee to Owner).

Original and final OPM.ManagementAgmt5.doc  Page 13

00073

**12.4** <u>Books and Records.</u> Manager agrees to keep at its principal office accurate books and records of all Gross Sales in accordance with generally accepted accounting practices consistently applied, and such books and records shall be open and available for examination to Owner, or its authorized representative, at the Nightclub at all reasonable times, upon reasonable notice to Manager, for the purpose of ascertaining or verifying Gross Sales. All such books and records shall be retained by Manager for examination by Owner for a period of at least three (3) years following the end of the calendar year for which such books and records apply. If an examination of the books and records of Manager to verify Gross Sales shall disclose an understatement in the payment of Percentage Fee, then Manager shall pay the amount of such deficiency within fifteen (15) days following written demand therefor, and, in the event that such examination discloses an understatement in excess of three percent (3%) of the Gross Sales reported for any calendar year, then Manager agrees to pay to Owner the reasonable costs and expenses of such audit. In the event Owner is notified by Landlord of Landlord's request to audit such books and records, Owner shall notify Manager of Landlord's request and Manager shall make such books and records available to Landlord. Manager shall cooperate with all audits conducted under the Lease.

**13.** <u>Utilities.</u> Commencing as of the Commencement Date, Owner shall provide the following utilities to the Facilities at levels reasonably required for a typical nightclub/bar use: electricity, gas, HVAC, water and refuse. Manager shall pay its pro rata share of all utilities except gas, such pro rata share to equal an amount equal to the product of (i) 65% multiplied by (ii) a fraction, the numerator of which shall be the number of hours per month Manager is open to the public at the Facilities, and the denominator of which shall be the number of hours per month Owner is open to the public at the Facilities, but which fraction shall never exceed 1. Notwithstanding the foregoing, Manager shall pay for its pro rata share of gas (as determined in accordance with the foregoing formula) supplied to the Facilities for any calendar month in which Manager prepares food within the Facilities in accordance with Section 8.1(c) above. Manager shall pay to Owner, on the first day of each month, one-twelfth (1/12th) of the Manager's pro rata share of utility expenses which have been estimated in advance by Owner for the then current calendar year (which annual estimate is subject to adjustment by Owner once during each year in an attempt to diminish any difference between the estimated and actual annual utility expenses). Subsequent to the end of each calendar year, Owner shall notify Manager of Manager's actual pro rata share of such utility expenses for such calendar year. If the total utility expenses paid by Manager for any calendar year are less than Manager's actual pro rata share of such expenses, then Manager shall pay to Owner the difference within thirty (30) days after receipt of such notice. If the total utility expenses paid by Manager for any calendar year exceeds Manager's actual pro rata share of such expenses, Owner shall retain such excess and credit it to the next amount of such expenses due to Owner, except that in the last year of the Term, such overpayment shall be refunded to Manager within

00074

thirty (30) days after the expiration of this Agreement. If the Commencement Date is a day other than the first day of the calendar year, or if the Term of this Agreement should end on a day other than the last day of the calendar year, then Manager's actual pro rata share of such utility expenses shall be prorated and adjusted on the basis of such fraction of a calendar year. Owner shall not be liable to Manager for damages or otherwise if any one or more of such utilities is interrupted or terminated because of necessary repairs, installations, construction or expansion, or by reason of any governmental law, rule or regulation, or any other cause beyond Owner's reasonable control.

14.     Going Dark. In the event Owner ceases all of its normal operations at the Premises for a continuous period of more than six (6) months other than as expressly permitted in this Agreement or the Lease, or on account of a casualty, condemnation, approved alteration or remodeling, or causes in the nature of a Force Majeure (as defined below), the Manager may, in Manager's sole discretion, terminate this Agreement upon providing sixty (60) days' notice to Owner; provided, however, that Owner may nullify and cancel Manager's election by resuming business operations in the Forum within thirty (30) days after receipt of Manager's notice. In the event this Agreement terminates in accordance with this Section 14 within the first twelve (12) months following the full execution date of this Agreement, then Owner shall reimburse Manager for the reasonable and actual out-of-pocket costs incurred by Manager for any items of Manager's Work, Non-Structural Alterations, and Structural Alterations previously made by Manager to the Facilities in accordance with this Agreement and the Lease that cannot be removed without substantial damage to the Facilities. In the event of such termination of this Agreement, all of the parties' obligations hereunder shall cease and be without further force or effect as of the effective date of such termination, except as otherwise expressly set forth herein.

15.     Insurance. At all times during the Term, Manager shall carry and maintain:

(a)     Commercial General Liability Insurance with a limit of not less than Five Million Dollars ($5,000,000) Combined Single Limit covering Bodily Injury, Property Damage, and Personal Injury Liability which shall also insure against the negligence of Owner and Owner's employees during Manager's Hours of Operation and shall protect against premises liability, product liability and liquor/dram shop liability. Owner shall be a named insured on Manager's Liability Insurance policies and all lessors or other interests with which Owner has an obligation to provide insurance coverage for shall be additional insureds thereunder. Said policies shall be primary and non-contributing coverage and shall respond first and fully prior to involving any coverage maintained by Owner;

(b)     Statutory Workers Compensation coverage as required by the State of Nevada containing a waiver of subrogation against Owners and all lessors;

(c)     All Risk Property Insurance covering all improvements made by Manager and all property of Manager for the full 100% replacement value with loss payable to Manager and Owner.  In addition, Manager shall maintain one year's business interruption insurance which shall define as a continuing ongoing expense all sums that would have been earned or payable to Owner had the loss not occurred. Loss thereunder shall be payable solely to Owner as respects sums due Owner; and

(d)     Employment Practices Liability with coverage of not less than Two Million Dollars ($2,000,000) including third party coverage.

All policies shall be issued with insurers rated not less than B+:X in the most recent Bests' Rating Guide and that are qualified to do business in Nevada.  All insurance policies to be maintained by Manager hereunder shall (i) provide for at least thirty (30) days' prior notice to Owner of the cancellation thereof, (ii) be primary and noncontributing to any insurance maintained by Owner, and (iii) to the extent permitted by law, contain a clause whereby the insurer waives all rights of recovery by way of subrogation against the Owner.  Manager shall deliver to Owner, within ten (10) days after request therefor, certificates of insurance or copies of the insurance policies evidencing the insurance required herein.  If Manager fails to obtain or maintain the insurance required herein, Owner may, but shall be under no obligation to, obtain and maintain such insurance and keep the same in effect during the Term, and Manager shall pay to Owner the cost of obtaining and maintaining such insurance, together with an administrative fee equal to ten percent (10%) of such costs, within ten (10) days after invoice therefor.  Notwithstanding anything to the contrary contained herein, Manager assumes all responsibility and liability for injuries occurring in or on the Premises or the Shared Areas during Manager's Hours of Operation.

16.     Signage.  Manager shall, at its sole cost and expense, be responsible for all signage for the Nightclub.  All signage proposed by Manager and all proposed locations therefor shall be subject to the prior written approval thereof by Owner and Landlord.  Owner shall not unreasonably withhold consent to any such proposed signage and shall, at no cost to Owner, reasonably cooperate with Manager in requesting the approval of Landlord.  To the extent Manager obtains the consent of both Owner and Landlord, Manager shall be entitled to install such approved signage as may be permitted pursuant to Landlord's sign criteria and applicable governmental regulations.  Except for those signs which are approved in writing by Owner and Landlord, and are in compliance with all governmental requirements, Manager shall not erect, place, paint, or maintain in or on the Facilities, the Premises, or the Forum, any signs or other advertising devices.

Original and final OPM.ManagementAgmt5.doc  Page 16

17.   Marketing.  Manager acknowledges and agrees that the following names and brands shall not be used by Manager to publicize, promote, market or in any way be used in connection with the Nightclub without the prior written consent of Owner, which consent may be withheld in Owner's sole and absolute discretion:  Chinois, Chinois - Las Vegas, Wolfgang Puck, Wolfgang, Puck, Spago, Postrio, Trattoria del Lupo, Barbara Lazaroff, Wolfgang Puck Café, or the names of any of the directors or officers of any of the above, or any combination of the foregoing.  The parties anticipate that the name of the Nightclub may utilize the name "Chinois" for identification purposes, and pursuant to the provisions of this section, any such use shall be subject to Owner's prior consent thereto.

18.   Rules and Regulations.  Owner reserves the right at any time, and from time to time, for the general  welfare of the Restaurant and the maintenance of the Premises, and for the good reputation, safety, order and cleanliness thereof, to impose reasonable rules and regulations ("Rules and Regulations") governing the conduct of Manager, its patrons, customers and employees in the Premises.  Upon receipt of notice thereof, Manager shall comply with such Rules and Regulations as if they had existed and been attached hereto on the Commencement Date.  A breach by Manager of any of the terms contained in such Rules and Regulations shall be deemed a default under this Agreement.  To the extent any such Rules or Regulations conflict with any of the terms of this Agreement, the terms of this Agreement shall control.

19.   Terrorism.  In the event the United States suffers another terrorist attack within the geographical borders of the United States of a magnitude similar to the events of September 11, 2001, then Manager shall have the right, in its sole discretion, to terminate this Agreement effective on the date notice of such termination is delivered to Owner.  In the event of such termination of this Agreement:  (i) all of the parties' obligations hereunder shall cease and be without further force or effect as of the effective date of such termination (except as otherwise expressly set forth herein), (ii) all improvements in the Facilities (exclusive of Manager's trade fixtures) shall be and remain the property of Owner as of the termination date, and (iii) Owner shall either release the letter of credit referenced in Section 29 below, or notify the bank issuing such letter of credit that Manager shall be entitled to cancel such letter of credit.

20.   Other Activities.  Manager acknowledges and agrees that Owner, its members, officers, directors, employees and affiliates, have other interests and may engage in other activities of any type, including without limitation the management, ownership and operation of other food or beverage related activities, endeavors and businesses.  Any or all of these activities may be competitive with the business of the Nightclub and may include, without limitation, activities in connection with the ownership, construction, development, marketing, management of restaurants, bars and other food and beverage related enterprises, it being expressly acknowledged by Manager that the members of Owner and their affiliates and employees already own or

Original and final OPM.ManagementAgmt5.doc  Page 17

have interests in various restaurants which do and will compete with the Nightclub and the business of the Nightclub. Owner and its members and their affiliates may engage in such activities for their own account, and neither Manager nor the Nightclub shall have any rights in connection with such activities or any income or profits therefrom.

21.     Taxes. Manager shall be responsible for paying all taxes assessed or incurred in connection with its use of the Facilities or its operation of the Nightclub, including, but not limited to, all federal and state business, employer, wage, use and sales taxes.

22.     Default Interest. Notwithstanding anything in this Agreement to the contrary, and without limiting Owner's rights and remedies available under this Agreement, at law or in equity, if Manager fails to pay any amounts due to Owner within five (5) days following notice of such failure, then such amount past due shall bear interest from the due date until paid at the annual rate of the greater of: (i) the maximum rate permitted by law, or (ii) twelve percent (12%) per annum.

23.     Indemnity.

23.1    Manager. To the extent not covered by the insurance required to be maintained by Owner or Landlord herein, Manager shall indemnify, hold harmless and defend Owner and its officers, directors, shareholders, employees, agents, members, managers, affiliates, representatives, successors and assigns ("Owner Indemnitees") from and against any and all losses, liabilities, damages, penalties, lawsuits, claims, actions, proceedings, costs and expenses (including without limitation, any amounts paid in connection with the investigation, defense or settlement of any such matters, court costs and reasonable attorneys' fees) (collectively, "Damages") incurred in connection with, based upon, arising out of, or in any way related to (i) the breach or default by Manager of any covenant or obligation of this Agreement, or the inaccuracy of any representation or warranty made by Manager hereunder, and (ii) any act, error or omission by Manager or any of its officers, directors, agents, contractors, servants, employees, members, managers or licensees ("Manager Representatives"), constituting fraud, negligence, or willful misconduct.

23.2    Owner. To the extent not covered by insurance maintained by Manager or Owner, Owner shall indemnify, hold harmless and defend Manager and its officers, directors, shareholders, employees, agents, members, managers, affiliates, representatives, successors and assigns ("Manager Indemnitees") from and against any and all Damages incurred in connection with, based upon, arising out of, or in any way related to (i) the breach or default by Owner of any covenant or obligation of this Agreement, or the inaccuracy of any representation or warranty, made by Owner hereunder, and (ii) any act, error or omission by Owner or any of its officers, directors, agents, contractors, servants, employees, members, managers or licensees, excepting

00078

therefrom Manager and any employees of Manager ("Owner Representatives"), constituting fraud, gross negligence or willful misconduct to the extent not caused by Manager Representatives.

24.    Assignment.  Except as provided herein to the contrary, neither this Agreement nor any duties or obligations under this Agreement may be assigned by Owner or Manager without the prior written consent of the other party hereto, which consent may be granted or withheld in the sole discretion of such other party. Notwithstanding the foregoing, Owner shall have the right, without Manager's consent, to assign this Agreement and any duties or obligations hereunder to a parent, subsidiary, parent's subsidiary, or other affiliate of Owner.  As used in this Section 24, "affiliate" shall mean a person or entity which controls, is controlled by, or is under common control, with Owner.

25.    Defaults.

25.1    Events of Default.  Each of the following shall be considered an "Event of Default":

(a)    A party shall default in the payment of any sums of money required to be paid to the other party under this Agreement, and such default is not cured within five (5) days after receipt of written notice thereof from the other party.

(b)    A violation by Manager of (i) any laws, regulations, or rules regulating drugs or the sale and service of alcoholic beverages (collectively, the "Permit Laws"), or (ii) any of the provisions of Section 8.10 of the Lease regarding gaming authorities (the "Gaming Provisions"), shall be an immediate and incurable default under this Agreement, and Owner shall be entitled to immediately exercise any and all remedies available under this Agreement, at law or in equity relating to such violation, including, but not limited to, the termination of this Agreement.  Without limiting the foregoing, if any investigation by any governmental agency commences regarding a possible or alleged violation of any Permit Laws or Gaming Provisions by Manager, Owner shall be entitled to immediately suspend Manager's operations in the Facilities upon written notice to Manager, and such suspension shall remain effective until such time that a final determination as to any such possible or alleged violation is made by such agency.  If the agency determines that there was a violation of the Permit Laws or Gaming Provisions, such violation shall be deemed to be an immediate and incurable default under this Agreement, and Owner shall be entitled to immediately exercise any and all remedies available under this Agreement, at law or in equity relating to such violation, including, but not limited to, the termination of this Agreement.  If the agency determines that there was no violation of the Permit Laws or Gaming Provisions, Manager shall be entitled to immediately recommence its operations in the Facilities. Notwithstanding anything to the contrary contained herein, all other obligations of

00079

Owner and Manager under this Agreement shall continue in full force and effect during any period of suspension of operations, as described above.

(c)    A party shall default in the performance of any other covenant, term or provision of this Agreement, and such default is not rectified or cured within thirty (30) days after receipt of written notice from the other party specifying the default, provided that if the default complained of is of such a nature that the same can be rectified or cured, but cannot with reasonable diligence be rectified or cured within such thirty (30) day period, then such party shall not be deemed to be in default if such party commences the rectification or curing thereof within such thirty (30) day period and thereafter continues with all due diligence to cause such rectification or curing to proceed to completion.

(d)    If either party makes any assignment of assets or business for the benefit of creditors, or a trustee or receiver is appointed to administer or conduct the business or affairs of such party and such trustee or receiver is not discharged within thirty (30) days after its appointment, or if such party is adjudged in any legal proceeding to be either a voluntary or involuntary bankrupt, and such bankruptcy is not discharged within sixty (60) days after its filing.
All cure periods provided in this Agreement shall run concurrently with any periods provided by law.

25.2    Remedies and Damages . Upon the occurrence of any Event of Default, the nondefaulting party may terminate this Agreement upon written notice to the other party, or may elect to continue this Agreement in full force and effect, and in either event the nondefaulting party shall have the right to recover any damages arising from the Event of Default. The various rights and remedies of the parties contained in this Agreement shall be cumulative and no one of them shall be construed as exclusive of any other, or of any right or remedy allowed or provided for by law or in equity.

26.    Notices. Any notice, demand or communication required or permitted to be given by any provision of this Agreement shall be in writing and shall be deemed to have been delivered and given for all purposes: (a) if delivered personally to the party or to an officer of the party to whom it is directed; (b) if sent by registered or certified mail, return receipt requested, postage and charges prepaid; (c) if delivered by nationally recognized overnight courier such as DHL or Federal Express; or (d) by facsimile with confirmation copy to follow by overnight delivery; in each case addressed as set forth or to such other address as either party may from time to time specify by written notice to the other party. Any such notice, demand or communication shall be deemed to have been delivered and given on the date delivered, if delivered personally, or three (3) days after the date on which it was deposited for delivery by registered or certified mail, or upon receipt if sent by overnight courier, or upon receipt by facsimile, addressed and sent as aforesaid. The following addresses are the current addresses of the parties:

00080

If to Owner:               c/o Spago-Las Vegas
                           The Forum at Caesars
                           3500 Las Vegas Boulevard South
                           Las Vegas, Nevada 89109
                           Attn:  Mr. Thomas Kaplan

with copies to:            Rosenfeld, Wolff, Aronson & Klein
                           2049 Century Park East
                           Suite 3090
                           Los Angeles, California 90067
                           Attn: Steven G. Wolff, Esq.

If to Manager:             O.P.M.L.V.
                           211 Gold Avenue SW
                           Albuquerque, New Mexico 87102
                           Attn: Mr. Mike Goodwin
                           (505) 328-7757

with courtesy copies to:   Leader Technology
                           P.O. Box 67515
                           Albuquerque, New Mexico 87193
                           Attn: Mr. Dana Wood
                           (505) 856-6400

27.    Full Authority.  Each of the parties and signatories to this Agreement
represents and warrants that it has the full right, power, legal capacity and authority to
enter into and perform the parties' respective obligations hereunder and that such
obligations shall be binding upon such party without the requirement of the approval or
consent of any other person or entity in connection herewith.  Each person signing this
Agreement on behalf of an entity represents and warrants that he has the full right,
power, legal capacity and authority to sign this Agreement on behalf of such entity.

28.    Attorneys' Fees.  Should any party hereto engage an attorney or institute
any action or proceeding at law or in equity, or in connection with an arbitration, to
enforce any provision of this Agreement, including an action for declaratory relief, or for
damages by reason of an alleged breach of any provision of this Agreement, or other-
wise in connection with this Agreement, or any provision thereof, the prevailing party or
parties shall be entitled to recover from the losing party or parties reasonable attorneys'
fees and costs for services rendered to the prevailing party in such action or
proceeding.

Original and final OPM.ManagementAgmt5.doc  Page 21

00081

29.    Letter of Credit.  In addition to, and not in lieu of, the Security Deposit, Manager shall deliver to Owner, as additional security for the Manager's faithful performance of all of Manager's obligations during the Term of this Agreement, the letter of credit described in Exhibit "C" attached hereto and incorporated herein.

30.    Survival of Representations and Warranties.  All representations, warranties, covenants and agreements of the parties contained in this Agreement, or in any instrument or other writing provided for herein, shall survive the execution and delivery of this Agreement.

31.    Time of the Essence.  Time is of the essence of this Agreement, and in all the terms, provisions, covenants and conditions hereof.

32.    Applicable Law.  This Agreement shall, in all respects, be governed by the laws of the State of Nevada applicable to agreements executed and to be wholly performed within Nevada.

33.    Severability:  Nothing contained herein shall be construed so as to require the commission of any act contrary to law; and wherever there is any conflict between any provisions contained herein and any present or future statute, law, ordinance or regulation, the latter shall prevail; but the provision of this Agreement which is affected shall be curtailed and limited only to the extent necessary to bring it within the requirements of the law.

34.    Further Assurances.  Each of the parties hereto shall execute and deliver any and all additional papers, documents and other assurances, and shall do any and all acts and things reasonably necessary in connection with the performance of their obligations hereunder to carry out the intent of the parties hereto.

35.    Modifications or Amendments.  No amendment, change or modification of this Agreement shall be valid, unless in writing and signed by all of the parties hereto.

36.    Successors and Assigns.  All of the terms and provisions contained herein shall inure to the benefit of and shall be binding upon the parties hereto and their respective heirs, legal representatives, permitted successors and assigns.

37.    Entire Agreement.  This Agreement constitutes the entire understanding and agreement of the parties with respect to its subject matter and any and all prior agreements, understandings or representations with respect to its subject matter are hereby terminated and canceled in their entirety and are of no further force or effect.

38.    Non-Waiver.  No waiver by any party hereto of a breach of any provision of this Agreement shall constitute a waiver of any preceding or succeeding breach of the same or any other provision hereof.

39.    The Lease.  Manager acknowledges that Owner has delivered to Manager a full and complete copy of the Lease.  This Agreement and all of the rights of the parties hereto are subject and subordinate to the Lease.  Each party agrees that it will use its best commercial efforts to not, by its act or omission to act, cause a default under the Lease.  In the event the Lease terminates or is terminated for any reason, this Agreement shall automatically terminate and both parties shall be released from all obligations and liabilities hereunder, except as may be otherwise specifically provided herein.

40.    Force Majeure.  Owner and/or Manager shall be excused for the period of delay in the performance of any of their respective obligations hereunder, except their respective obligation to pay any sums of money due under the terms of this Agreement, and shall not be considered in default, when prevented from so performing by a cause or causes beyond Owner's or Manager's reasonable control, including, but not limited to, labor disputes, civil commotion, war, fire or other casualty, governmental regulations, statutes, ordinances, restrictions or decrees, or acts of God (individually and collectively, "Force Majeure").

41.    Radius Restriction.  Manager agrees that throughout the Initial Term of this Agreement, Manager, its subsidiaries, parents, parents' subsidiaries, and affiliates, and the officers or directors of any of them, shall not directly or indirectly operate, or enter into a contract for the operation of, any nightclub or bar within three (3) miles of the Premises.  This covenant may not be waived without Owner's express written consent.  Anything in this Agreement to the contrary notwithstanding, Owner may enforce this covenant by injunctive and/or other equitable relief, and, in addition, may seek damages, at law or in equity, arising from a violation thereof.  As used in Section 6.1 and this Section 41, "affiliate" shall mean a person or entity which controls, is controlled by, or is under common control, with Manager.

42.    Drafting.  This Agreement shall not be construed either for or against Owner or Manager, but shall be interpreted in accordance with the general tenor of its language.

43.    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

00083

44.  <u>Number and Gender</u>.  In this Agreement, the masculine, feminine or neuter gender, and the singular or plural number, shall each be deemed to include the others whenever the context so requires.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and at the place first above written.

O.P.M.L.V.,
a Nevada limited liability company
("Manager")

Phase II Chin-LV, LLC,
a Delaware limited liability company,
d/b/a Chinois Las Vegas ("Owner")
("Owner")
BY: CHIN -LV, L.L.C
    A DELAWARE LIMITED LIABILITY COMPANY
    ITS MANAGER

By: _____        By: _____

Its: _____        Its: _____

00084

EXHIBIT "A"

<u>Facilities</u>

Original and final OPM.ManagementAgmt5.doc



CHINOIS - Las Vegas

Exhibit A

2 Area's are included.

00086

# EXHIBIT "B"

## Shared Areas

Original and final OPM.ManagementAgmt5.doc



CHINOIS - Las Vegas
THE FORUM SHOPS AT CAESARS - SPACE #108

FEB 27 2003 15:11    3135561413    PAGE.27

Exhibit B

new areas
marked in
red.

00088

paying the amount so applied to Owner in cash or delivering to Owner a new LOC in the amount so applied. If the Premises is assigned or otherwise transferred to a transferee, Owner shall have the right to transfer the LOC to such transferee, by which transfer Owner shall be released from all liability for the return thereof, and Manager shall look solely to the new transferee for the return thereof. Owner shall give Manager a written notice of any such transfer promptly thereafter, together with an acknowledgment from the transferee of its receipt thereof.

## EXHIBIT "C"

### Letter of Credit

Prior to the date (the "Work Commencement Date") on which Manager commences any work in the Facilities, including, but not limited to the Manager's Work, Manager shall deliver to Owner an unconditional, irrevocable letter of credit in Owner's favor in the amount of Six Hundred Thousand Dollars ($600,000.00) (the "LOC"), which LOC shall (i) be freely assignable by Owner; (ii) be issued by a "Qualified Issuer" (as defined below) approved by Owner; (iii) be subject to reduction by the amount of the Monthly Management Fees actually paid by Manager from time to time in accordance with the terms of the Agreement; and (iv) shall provide that it is payable upon presentation of sight draft accompanied by a written statement from Owner stating that a default has occurred under the Agreement and shall otherwise be in a form reasonably satisfactory to Owner. Manager's failure to deliver the LOC within ten (10) days after the Work Commencement Date shall be an event of default under the Agreement.

The LOC shall be retained by Owner as security for the faithful performance and observance by Manager of the covenants, agreements and conditions of this Agreement in addition to, and not in lieu of, Manager's Security Deposit, if any. Owner shall have the right from time to time to draw from the LOC any amounts of the Minimum Management Fee that remains unpaid for a period of five (5) days after such amounts were due and payable under the terms of the Agreement.

Owner shall be entitled to draw upon the LOC in whole or in part in the event of default by Manager under the Agreement, or if Manager fails to renew the LOC or deliver a new LOC by that date which is at least thirty (30) days prior to the expiration of the term of the then-current LOC. If Owner draws upon the entirety of the LOC, any portion of the LOC funds which are not so applied by Owner shall be retained by Owner in cash as security for Manager's performance under the Agreement. In the event of a partial drawing under the terms of the LOC (which shall provide that such partial drawings shall not preclude Owner from making subsequent draws on the LOC up to the amount of the LOC) then Owner may, at its election, draw upon the LOC to the extent required for the payment of any Management Fee or any other sum payable hereunder as to which Manager is in breach or default or to the extent required for the reimbursement to Owner of any sum which Owner may expend by reason of Manager's breach or default with respect to any of the covenants, agreements or conditions of this Agreement or to compensate Owner for any loss or damage Owner may suffer by reason of Manager's default. Upon notice by Owner of Owner's application of all or any portion of the LOC as aforesaid, Manager shall replenish the LOC in full by promptly

Original and final OPM.ManagementAgmt5.doc

# FIRST AMENDMENT TO MANAGEMENT AGREEMENT

This First Amendment to Management Agreement (this "Amendment"), is made and entered into as of November 30, 2002, by and between Phase II Chin-LV, LLC, a Delaware limited liability company d/b/a Chinois Las Vegas ("Owner") and O.P.M.L.V., a Nevada limited liability company ("Manager").

## RECITALS

A.     Owner and Manager previously entered into that certain Management Agreement dated as of June 20, 2002 (the "Agreement"), regarding the operation and management of a night club and bar located in certain portions of the second floor of the restaurant owned by the Owner known as Chinois-Las Vegas, located in the Forum Shoppes at Caesars Palace Las Vegas, Nevada.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

B.     The Agreement provides, among other matters, that the Manager shall have the certain specified time periods to satisfy or waive certain of conditions precedent to the effectiveness of the Agreement.

C.     The parties hereto now desire to extend the time period for satisfaction of certain of the contingency periods set forth in the Agreement and to amend the Agreement as more fully set forth in this Agreement.

## AGREEMENT

1.     Recitals.  All of the recitals set forth above are hereby fully incorporated herein as if set forth in full.

2.     Amendment of the Agreement.

(a)     Contingency Period.  Notwithstanding anything to the contrary contained in the Agreement, the time period for the Manager's satisfaction of the conditions precedent set forth in Sections 10.1(a) and 10.1(b) are hereby extended to expire on or before March 1, 2003.

(b)     Management Fee Commencement Date.  The first sentence of Section 10.2 of the Agreement is hereby amended by deleting the date "January 1, 2003" in Subsection 10.2(ii) thereof and replacing the same with "May 15, 2003."

(c) Completion Date for Manager's Work.  The date by which the Manager shall be obligated to complete the Manager's Work, in accordance with Section 5.2(d) of the Agreement, is hereby extended to May 15, 2003.

00090

(d) <u>Construction and Equipment Expenditures.</u> Prior to commencement of the Manager's Work, the Manager shall provide the Owner with evidence reasonably satisfactory to the Owner in order to confirm that the Manager has deposited funds necessary for the completion of the Manager's Work with a third party construction disbursement company who will hold the construction funds and disburse the same in accordance with standard commercial construction disbursement procedures. In addition, within ten (10) days following the Owner's request, the Manager shall provide (or cause the construction disbursement company to provide) the Owner with copies of invoices marked paid, unconditional lien releases and any other documentation reasonably requested by the Owner to confirm that the Manager's Work (or the portion completed as of the date of the Owner's request) has been paid for in full and that no contractor, subcontractor or materialmen has any outstanding claim or lien right with respect to the work performed by such party for the benefit of the Manager. In addition, with respect to furniture, fixtures and equipment ("FF&E") ordered by the Manager for use at the Premises, the within ten (10) days following the Owner's request, the Manager shall provide evidence that such FF&E have been paid for in full and delivered to the Premises (or the expected date of delivery if any item has yet to be delivered at the time the Owner's request).

(e) Notwithstanding anything to the contrary contained in the Agreement or Exhibit "C" thereto, the letter of credit referenced in paragraph 29 of the Agreement and more fully described in Exhibit "C" of the Agreement shall be delivered by Manager to Owner not later than the day prior to the Work Commencement Date.

3. <u>Successors.</u> The provisions of this Amendment shall be binding upon, and shall inure to the benefit of, each of the parties hereto and to their respective successors, transferees and assigns.

4. <u>Counterparts.</u> This Amendment may be executed in any number of counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute but one and the same agreement.

5. <u>Entire Agreement.</u> This Amendment sets forth the entire agreement between the parties with respect to the matters set forth herein. Except as otherwise set forth herein, all terms and conditions contained in the Agreement shall continue to apply with full force and effect. In case of any inconsistency between the provisions of the Agreement and this Amendment, the provisions of this Amendment shall govern and control. This Amendment may not be altered, amended, changed, terminated or modified in any respect or particular, unless the same shall be in writing and signed by the party to be charged.

[continued on next page]

00091

IN WITNESS WHEREOF, Owner and Manager have caused their duly authorized representatives to execute this Amendment as of the date first above written.

"OWNER"

Phase II Chin-LV, LLC,
a Delaware limited liability company,
d/b/a Chinois Las Vegas

By:     Chin-LV, LLC,
        a Delaware limited liability company

Its:    Manager
        By:    _____
        Its:   _Member_____

"MANAGER"

O.P.M.L.V.,
a Nevada limited liability company

By:    _____
Its:   _____

00092

# SECOND AMENDMENT TO MANAGEMENT AGREEMENT

This Second Amendment to Management Agreement (this "**Amendment**"), is made and entered into as of October 1, 2004, by and between Phase II Chin-LV, LLC, a Delaware limited liability company d/b/a Chinois Las Vegas ("**Owner**") and O.P.M.L.V., a Nevada limited liability company ("**Manager**").

## RECITALS

A. Owner and Manager previously entered into that certain Management Agreement dated as of June 20, 2002 (the "**Management Agreement**") and that certain First Amendment to Management Agreement dated as of November 30, 2002 (the "**First Amendment**"; the Management Agreement and the First Amendment are collectively referred to herein as the "**Agreement**"), regarding the operation and management of a night club and bar located in certain portions of the second floor of the restaurant operated by the Owner known as Chinois-Las Vegas, located in the Forum Shoppes at Caesars Palace Las Vegas, Nevada. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

B. The parties hereto desire to increase the amount of space used by Manager, the time periods during which such space may be used by Manager and to provide a referral fee to Manager for catering service referrals in certain situations.

C. The parties hereto now desire to amend the Agreement as more fully set forth in this Agreement.

## AGREEMENT

1. <u>Recitals</u>. All of the recitals set forth above are hereby fully incorporated herein as if set forth in full.

2. <u>Primary Hours of Operation</u>. Effective as of October 5, 2004 and continuing through December 21, 2004 (the "**Trial Period**"), the parties hereby increase the time periods during which Manager may use the Facilities by including the period from 8 p.m. on Tuesday until 7:00 a.m. on Wednesday in the Primary Hours of Operation.

3. <u>Monthly Management Fee</u>. In consideration for the expansion of the Primary Hours of Operation during the Trial Period, the Manager shall pay to Owner an additional Two Thousand Five Hundred Dollars ($2,500.00) per month (the "**Additional Management Fee**"). Accordingly, the Minimum Management Fee for the year inclusive of the Trial Period shall increase to Three Hundred Seven Thousand Five Hundred Dollars ($307,500.00) and the Monthly Management Fee for each of the months of October, November and December 2004 shall increase to Twenty-Seven Thousand Five Hundred Dollars ($27,500.00).

4.    Utilities During Trial Period.  Manager acknowledges that during the Trial Period, the amount of utilities paid by Manager will increase proportionally with the increased Primary Hours of Operation pursuant to Section 13 of the Agreement.

5.    Trial Period.  Notwithstanding anything contained herein to the contrary, Manager acknowledges and agrees that the additional usage of the Facilities provided for herein may place additional strain on the Premises that is difficult to measure. Therefore, the Manager and Owner agree that upon the expiration of the Trial Period, they will review the effect of the increase in usage, the revised Primary Hours of Operation and the Additional Management Fee and attempt to agree on terms and conditions for the extension of the addition to the Primary Hours of Operation.  If Owner and Manager do not agree on the terms and conditions of such extension, then the terms of the Agreement shall control the terms of the Primary Hours of Operation and the Additional Management Fee shall terminate effective ___Dec  28th 2004___.

6.    Expansion of Office Space.  Owner and Manager agree that Manager shall have exclusive use of the office space currently being used by Owner which abuts the Manager's current bar area, located on the second floor of the building and more accurately depicted on Exhibit "A" attached hereto (the "Office Space").  Manager shall pay all costs and expenses of changing the locks on the Office Space, its pro rata share of the costs and expenses of the copy machine and water service located in the Shared Areas, and moving any and all equipment and belongings (i) of Owner, including, but not limited to moving the safe, cameras and security system from the Office Space to any location in the building requested by Owner, and (ii) of Manager into the Office Space.  Manager shall provide a key to Owner within one (1) day after changing the locks on the Office Space so that Owner may enter the Office Space in case of an emergency.

7.    Referrals.

   a. Qualifying Event.  Owner and Manager wish to provide Manager a Referral Fee (as defined below) for all referrals for catering of private events, parties, banquets, meetings, and conferences (each, an "Event") provided to Owner which meet all of the criteria described below:

      i. Manager provides notice (with all available information, including but not limited to the requested Event date if known, name and contact information for the group requesting catering services ("Requesting Party") and estimated number of attendees) which notice shall be provided to [Wolfgang Puck Private Events Group] ("Private Events Group") via facsimile to:

         Wolfgang Puck Private Events Group
         Attention: Director of Catering

00094

Facsimile: (____) _____

Owner may provide different referral contact information at any time
by providing notice to Manager.

ii. The date and time requested by the Requesting Party is a time that
Manager has use of the Facilities pursuant to the Agreement as
amended hereby, has adequate space in the Facilities to
accommodate such Event and has no other event booked which
would restrict use by the Requesting Party.

iii. The Private Events Group has agreed, in its sole and absolute
discretion, to provide catering services to the Event.

iv. The Event meets the appropriate Food Minimum. The **"Food
Minimum"** shall mean an Event which, upon completion, provides
for (i) One Thousand Five Hundred Dollars ($1,500.00) in total food
and beverage charges for an Event commencing at or before 8:00
p.m., and (ii) Five Hundred Dollars ($500.00) in total food and
beverage charges for an Event commencing after 8:00 p.m. [The
Food Minimum shall not include taxes or gratuity.]

b. Referral Fee. The **"Referral Fee"** for an Event shall mean a fee paid by
Owner (or an affiliate of Owner) to Manager of (i) ten percent (10%) of the
food and beverage revenue for Events scheduled to begin at or before
8:00 p.m., or (ii) five percent (5%) of the food and beverage revenue for
Events scheduled to begin after 8:00 p.m. The food and beverage
revenue from the Event shall exclude all taxes, gratuities, service fees and
the cost of any third party services such as flowers, decorations or
extraordinary services provided only for such Event. Such Referral Fee
shall be paid to Manager within ten (10) days after receipt of payment from
the Event.

c. Private Events Group. Notwithstanding anything to foregoing contained
herein, for any Event referral provided by Manager to the Private Events
Group, the Private Events Group shall negotiate all aspects of the Event
within the normal private events practices of the Private Events Group
without the input or consent of the Manager. The Private Events Group
shall discuss and negotiate the prices, menu, hours, number of guests,
staffing, deposits, costs and any other specific needs of the Event with the
patron. The Private Events Group shall decide, in its sole and absolute
discretion, whether to agree to provide catering services to any Event.

00095

8. <u>Relationship of the Parties</u>. Nothing contained in this Amendment shall be construed to create a partnership, agency, joint venture or employer/employee relationship between the parties hereto.

9. <u>Successors</u>. The provisions of this Amendment shall be binding upon, and shall inure to the benefit of, each of the parties hereto and to their respective successors, transferees and assigns.

10. <u>Counterparts</u>. This Amendment may be executed in any number of counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute but one and the same agreement.

11. <u>Entire Agreement</u>. This Amendment sets forth the entire agreement between the parties with respect to the matters set forth herein. Except as otherwise set forth herein, all terms and conditions contained in the Agreement shall continue to apply with full force and effect. In case of any inconsistency between the provisions of the Management Agreement, the First Amendment and this Amendment, the provisions of this Amendment shall govern and control. This Amendment may not be altered, amended, changed, terminated or modified in any respect or particular, unless the same shall be in writing and signed by the party to be charged.

12. <u>Severability</u>. If any term, covenant or condition of this Agreement is held to be invalid, illegal or unenforceable in any respect, this Agreement shall be construed without such provision.

13. <u>Further Assurances</u>. Each of the parties hereto shall execute and delivery any and all additional papers, documents and other assurances, and shall do any all acts and things reasonably necessary in connection with the performance of their obligations hereunder to carry out the intent of the parties hereto.

[signatures on next page]

00096

IN WITNESS WHEREOF, Owner and Manager have caused their duly authorized representatives to execute this Amendment as of the date first above written.

"OWNER"

Phase II Chin-LV, LLC,
a Delaware limited liability company,
d/b/a Chinois Las Vegas

By:    Chin-LV, LLC,
       a Delaware limited liability company

Its:    Manager

      By:  _____

      Its:  _____

"MANAGER"

O.P.M.L.V.,
a Nevada limited liability company

By: _____

Its: _____

00097

## EXHIBIT A

OFFICE SPACE

00098

# THIRD AMENDMENT TO MANAGEMENT AGREEMENT

This Third Amendment to Management Agreement (this "**Amendment**"), is made and entered into as of January 1, 2005, by and between Phase II Chin, LLC, a Delaware limited liability company d/b/a Chinois Las Vegas ("Owner") and O.P.M.L.V., a Nevada limited liability company ("**Manager**").

## RECITALS

A.     Owner and Manager previously entered into that certain Management Agreement dated as of June 20, 2002 (the "**Management Agreement**") certain First Amendment to Management Agreement dated as of November 30, 2002 (the "First Amendment" and that certain Second Amendment to Management Agreement dated as of October 1, 2004 (the "Second Amendment") the Management Agreement the First Amendment and Second Amendment are collectively referred to herein as the "**Agreement**"), regarding the operation and management of a night club and bar located in certain portions of the second floor of the restaurant operated by the Owner known as Chinois Las Vegas, located in the Forum Shoppes at Caesars Palace Las Vegas, Nevada.     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

B.     The parties hereto desire to increase the amount of office space used by Manager and to provide a referral fee to Manager for catering service referrals in certain situations.

C.     The parties hereto now desire to amend the Agreement as more fully set forth in this Agreement.

## AGREEMENT

1.     **Recitals.** All of the recitals set forth above are hereby fully incorporated herein as if set forth in full.

2.     **Monthly Management Fee.**  In consideration for the expansion of the Office Space, the Manager shall pay to Owner an additional Five Hundred Dollars ($500.00) per month (the "**Additional Management Fee**"). Accordingly, the Minimum Management Fee for the year inclusive shall increase to Three Hundred Six Thousand Dollars ($306,000.00).

3.     **Expansion of Office Space.**  Owner and Manager agree that Manager shall have exclusive use of the office space currently being used by Owner which abuts the Manager's current bar area, located on the second floor of the building and more accurately depicted on Exhibit "A" attached hereto (the "Office Space").  Manager shall pay all costs and expenses of changing the locks on the Office Space, its pro rata share of the costs and expenses of the copy machine and water service located in the Shared

00099

Areas, and moving any and all equipment and belongings (i) of Owner, including, but not limited to moving the safe, cameras and security system from the Office Space to any location in the building requested by Owner, and (ii) of Manager into the Office Space. Manager shall provide a key to Owner within one (1) day after changing the locks on the Office Space so that Owner may enter the Office Space in case of an emergency.

4. <u>Referrals</u>.

a. <u>Qualifying Event</u>. Owner and Manager wish to provide Manager a Referral Fee (as defined below) for all referrals for catering of private events, parties, banquets, meetings, and conferences (each, an "**Event**") provided to Owner which meet all of the criteria described below:

i. Manager provides notice (with all available information, including but not limited to the requested Event date if known, name and contact information for the group requesting catering services ("**Requesting Party**") and estimated number of attendees) which notice shall be provided to [Wolfgang Puck Fine Dining Group] ("**Private Events Group**") via facsimile to:

> Wolfgang Puck Fine Dining Group
> Attention: Director of Catering
> Facsimile: (702) 737-5760

Owner may provide different referral contact information at any time by providing notice to Manager.

ii. The date and time requested by the Requesting Party is a time that Manager has use of the Facilities pursuant to the Agreement as amended hereby, has adequate space in the Facilities to accommodate such Event and has no other event booked which would restrict use by the Requesting Party.

iii. The Private Events Group has agreed, in its sole and absolute discretion, to provide catering services to the Event.

iv. The Event meets the appropriate Food Minimum. The "**Food Minimum**" shall mean an Event which, upon completion, provides for (i) One Thousand Five Hundred Dollars ($1,500.00) in total food and beverage charges for an Event commencing at or before 8:00 p.m., and (ii) Five Hundred Dollars ($500.00) in total food and beverage charges for an Event commencing after 8:00 p.m. [The Food Minimum shall not include taxes or gratuity.]

00100

b. <u>Referral Fee</u>. The "Referral Fee" for an Event shall mean a fee paid by Owner (or an affiliate of Owner) to Manager of (i) ten percent (10%) of the food and beverage revenue for Events scheduled to begin at or before 8:00 p.m., or (ii) five percent (5%) of the food and beverage revenue for Events scheduled to begin after 8:00 p.m. For purposes of determining the Referral Fee, the food and beverage revenue from the Event shall exclude all taxes, gratuities, service fees and the cost of any third party services such as flowers, decorations or extraordinary services provided only for such Event. Such Referral Fee shall be paid to Manager within ten (10) days after receipt of payment from the Event.

c. <u>Private Events Group</u>. Notwithstanding anything to foregoing contained herein, for any Event referral provided by Manager to the Private Events Group, the Private Events Group shall negotiate all aspects of the Event within the normal private events practices of the Private Events Group without the input or consent of the Manager. The Private Events Group shall discuss and negotiate the prices, menu, hours, number of guests, staffing, deposits, costs and any other specific needs of the Event with the patron. The Private Events Group shall decide, in its sole and absolute discretion, whether to agree to provide catering services to any Event.

5.    <u>Relationship of the Parties</u>. Nothing contained in this Amendment shall be construed to create a partnership, agency, joint venture or employer/employee relationship between the parties hereto.

6.    <u>Successors</u>. The provisions of this Amendment shall be binding upon, and shall inure to the benefit of, each of the parties hereto and to their respective successors, transferees and assigns.

7.    <u>Counterparts</u>. This Amendment may be executed in any number of counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute but one and the same agreement.

8.    <u>Entire Agreement</u>. This Amendment sets forth the entire agreement between the parties with respect to the matters set forth herein. Except as otherwise set forth herein, all terms and conditions contained in the Agreement shall continue to apply with full force and effect. In case of any inconsistency between the provisions of the Management Agreement, the First Amendment, the Second Amendment and this Amendment, the provisions of this Amendment shall govern and control. This Amendment may not be altered, amended, changed, terminated or modified in any respect or particular, unless the same shall be in writing and signed by the party to be charged.

9.     <u>Severability</u>. If any term, covenant or condition of this Agreement is held to be invalid, illegal or unenforceable in any respect, this Agreement shall be construed without such provision.

10.     <u>Further Assurances</u>. Each of the parties hereto shall execute and delivery any and all additional papers, documents and other assurances, and shall do any all acts and things reasonably necessary in connection with the performance of their obligations hereunder to carry out the intent of the parties hereto.

IN WITNESS WHEREOF, Owner and Manager have caused their duly authorized representatives to execute this Amendment as of the date first above written.

"OWNER"

Phase II Chin, LLC,
a Delaware limited liability company,
d/b/a Chinois Las Vegas

By:    Phase II Chin, LLC,
       a Delaware limited liability company

Its:    Manager

       By: _____

       Its: _Managing Member_____

"MANAGER"

O.P.M.L.V.,
a Nevada limited liability company

By: _____

Its: _Managing Member_____

# EXHIBIT A

## OFFICE SPACE

00103

# FOURTH AMENDMENT TO MANAGEMENT AGREEMENT

This Fourth Amendment to Management Agreement (this "Amendment"), is made and entered into as of September 1, 2005 (the "Effective Date"), by and between Phase II Chin, LLC, a Delaware limited liability company d/b/a Chinois Las Vegas ("Owner") and O.P.M.L.V., a Nevada limited liability company ("Manager").

## RECITALS

A.    Pursuant to that certain lease ("Lease") dated March 18, 1997, by and between Owner's predecessor-in-interest, GGH Restaurant, LLC, as tenant, and Forum Developers Limited Partnership, a Nevada limited partnership, as landlord ("Landlord"), Owner owns and operates a restaurant and bar, with banquet facilities, known as "Chinois-Las Vegas," located in the Forum Shoppes at Caesars Palace Las Vegas, Nevada ("Restaurant").

B.    Owner and Manager previously entered into that certain Management Agreement dated June 20, 2002 (the "Management Agreement"), that certain First Amendment to Management Agreement dated November 30, 2002 (the "First Amendment"), that certain Second Amendment to Management Agreement dated October 1, 2004 (the "Second Amendment"), and that certain Third Amendment to Management Agreement dated January 1, 2005 (the "Third Amendment"), regarding the operation and management of a night club and bar located in certain portions of the second floor of the Restaurant. The Management Agreement, First Amendment, Second Amendment and Third Amendment are collectively referred to herein as the "Agreement." Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

C.    The parties hereto desire to modify the calculation of both the Minimum Management Fee and the Percentage Fee payable by Manager to Owner under the Agreement.

D.    The parties hereto now desire to amend the Agreement as more fully set forth in this Amendment.

## AGREEMENT

1.    **Recitals.** All of the recitals set forth above are hereby fully incorporated herein as if set forth in full.

2.    **Minimum Management Fee.** As of February 1, 2005, the Minimum Management Fee shall be increased by an additional Sixty-Six Thousand Dollars ($66,000) per year to Three Hundred Seventy-Two Thousand Dollars ($372,000) per year. As such, the current Monthly Management Fee shall be Thirty-One Thousand Dollars ($31,000). On or before November 15, 2005, the Manager shall pay to Owner the Retroactive Management Fee (as defined below). Commencing on October 1, 2005, the Manager shall pay to Owner the new Monthly Management Fee of Thirty-One Thousand Dollars ($31,000) per month. Commencing on February 1, 2006, the Minimum Management Fee shall be increased to Three Hundred Eighty-One Thousand Dollars ($381,000) per year and the Monthly Management Fee shall be increased to Thirty-One Thousand Seven Hundred Fifty Dollars ($31,750). Commencing on February 1, 2007 and continuing throughout the Initial Term and the Option Term, if Manager properly exercises its option to extend the Initial Term, the Minimum Management Fee shall be increased by Nine Thousand Dollars ($9,000) per year each February 1st of the Initial Term and Option Term, which increased amount shall be payable in monthly installments.

3. **Percentage Fee**. As of the Effective Date, the annual Percentage Fee paid by Manager to Owner shall be deleted, so that Manager no longer pays any Percentage Fee to Owner, regardless of Gross Sales. Notwithstanding the foregoing, the Manager shall continue to deliver monthly and annual statements of Gross Sales to Owner of the type and in the manner described in Section 12 of the Agreement.

4. **Retroactive Management Fee**. On or before the Effective Date, the Manager shall pay to the Owner in immediately available funds the "Retroactive Management Fee." The Retroactive Management Fee shall mean Thirty-Eight Thousand Five Hundred Dollars ($38,500), consisting of the increase in the Monthly Management Fee of Five Thousand Five Hundred Dollars ($5,500) per month from February 1, 2005 through August 31, 2005.

5. **Indemnity**. Section 23.1 of the Agreement is hereby deleted in its entirety and replaced with the following:

"**Manager**. To the extent not covered by the insurance required to be maintained by Owner or Landlord herein, Manager shall indemnify, hold harmless, protect and defend Owner and its officers, directors, shareholders, employees, agents, members, managers, affiliates, representatives, successors and assigns ("Owner Indemnitees") from and against any and all losses, costs, liabilities, damages, penalties, lawsuits, claims, actions, proceedings, costs and expenses (including without limitation, any amounts paid in connection with the investigation, defense or settlement of any such matters, court costs and reasonable attorneys' fees) (collectively, "Damages") incurred in connection with, based upon, arising out of, or in any way related to (i) the breach or default by Manager of any covenant or obligation of this Agreement, or the inaccuracy of any representation or warranty made by Manager hereunder, (ii) any act, error or omission by Manager or any of its officers, directors, agents, contractors, servants, employees, members, managers or licensees ("Manager Representatives"), constituting fraud, negligence, or willful misconduct, (iii) any damage either to person or property or resulting from the loss of use thereof, which damage is sustained by the Manager, or customers, guests, employees or invitees of Manager, or by other persons claiming through the Manager," (iv) any act, condition or occurrence related to the alcoholic beverage operations by Manager at the Premises, or (v) any act, condition or occurrence at or in connection with or any claim arising from the operation of the business of Manager in, on or about the Premises.

6. **Relationship of the Parties**. Nothing contained in this Amendment shall be construed to create a partnership, agency, joint venture or employer/employee relationship between the parties hereto.

7. **Successors**. The provisions of this Amendment shall be binding upon, and shall inure to the benefit of, each of the parties hereto and to their respective successors, transferees and assigns.

8. **Counterparts**. This Amendment may be executed in any number of counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute but one and the same agreement.

9. **Entire Agreement**. This Amendment sets forth the entire agreement between the parties with respect to the matters set forth herein. Except as otherwise set forth herein, all terms and conditions contained in the Agreement shall continue to apply with full force and effect. In case of any inconsistency between the provisions of the Management Agreement, the First Amendment, the Second Amendment, the Third Amendment, and this Amendment, the

provisions of this Amendment shall govern and control. This Amendment may not be altered, amended, changed, terminated or modified in any respect or particular, unless the same shall be in writing and signed by the party to be charged.

10.  Severability.  If any term, covenant or condition of this Amendment is held to be invalid, illegal or unenforceable in any respect, this Amendment shall be construed without such provision.

11.  Further Assurances.  Each of the parties hereto shall execute and deliver any and all additional papers, documents and other assurances, and shall do any and all acts and things reasonably necessary in connection with the performance of their obligations hereunder to carry out the intent of the parties hereto.

IN WITNESS WHEREOF, Owner and Manager have caused their duly authorized representatives to execute this Amendment as of the date first written above.

OWNER:

Phase II Chin, LLC,
a Delaware limited liability company,
d/b/a Chinois Las Vegas

By:      Phase II Chin, LLC,
         a Delaware limited liability company

Its:     Manager

         By: _____

         Name: _____

         Its: _____

MANAGER:

O.P.M.L.V.,
a Nevada limited liability company

By: _____

Name: _____

Its: _____