UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | | |
|---|---|---|
| PHASE II CHIN, LLC, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No.  2:08-cv-00162-JCM-GWF |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| FORUM SHOPS, LLC, *et al.*, | ) | **Motion to Compel Discovery - #186** |
| | ) | |
| Defendants. | ) | |

This matter is before the Court on Plaintiff Love & Money, LLC's First Motion to Compel Discovery from the Forum Defendants (#186), filed on January 19, 2010; Caesars Palace Corporation and Caesars Palace Realty Corporation's Opposition to Motion to Compel Discovery From Pure Management Group (#190), filed February 1, 2010; and Defendants' Opposition to Love & Money, LLC's First Motion to Compel Discovery From the Forum Defendants (#192), filed February 2, 2010.   The Court conducted a hearing in this matter on February 16, 2010.

## BACKGROUND

Plaintiffs Phase II Chin, LLC (hereinafter "Chinois") and Love & Money, LLC (formerly d/b/a O.P.M.L.V., LLC) filed this action in the Nevada District Court on January 3, 2008 against Defendants Forum Shop, LLC, Forum Developers Limited Partnership, Simon Property Group Limited Partnership and Simon Property Group, Inc. (hereinafter the "Forum Defendants"), the owners and operators of the Forum Shops Mall, and against Caesars Palace Corp. and Caesars Palace Realty Corp. (hereinafter the "Caesars Defendants"), the owners and operators of Caesars Palace Hotel and Casino and the lessor(s) of the property on which the Forum Shops Mall is located. *Petition for Removal ( #1); Exhibit "A", Complaint*.

According to the Complaint, Plaintiff Chinois' predecessor entered into a lease of restaurant premises in the Forum Shops Mall in 1997. *Complaint* ¶14. In March 2002, Chinois notified the Forum Defendants of its intent to enter into an agreement with third parties to operate a "first-class lounge on the second floor of Chinois." Chinois requested that the Forum Defendants give their preliminary approval to such use. In June 2002, Chinois entered into a management agreement with O.P.M.L.V. to operate an after hours nightclub on the second floor of Chinois. Plaintiffs allegedly informed the Forum Defendants about the management agreement with O.P.M.L.V. in November 2002 and were notified by the Forum Defendants in December 2002 that they approved the proposed club. The nightclub, which was initially named OPM and later named Poetry, opened for business on May 23, 2003. Pursuant to an amendment to the lease which became effective on October 9, 2003, Chinois was permitted to operate OPM Wednesday through Sunday, from 10:00 p.m. until 6:00 a.m. Plaintiffs allege that Defendants were aware at all times of the nature of OPM's business and approved of its operation. *Id.*, ¶¶ 17- 25.

Plaintiffs allege that in January 2005, Defendants began a concerted campaign of harassment and misconduct intended to drive the Plaintiffs' nightclub out of business.[1] *Complaint*, ¶ 27. They allege that there were two motives for Defendants' harassment campaign. One of the alleged motives was Defendants' hostility toward, and prejudice against, African-Americans, who comprised a majority of OPM's clientele. *Id.* The other alleged motive was that Chinois' rent was "below market" and that Defendants could charge a new tenant substantially higher rent if Plaintiffs were forced out of the lease. *Id.*, ¶29. Plaintiffs allege that as part of the campaign to drive them out of business, Defendants blamed them for altercations or incidents involving disorderly conduct that occurred in the Forum Shops Mall or Caesars Palace even though there was no evidence that the individuals involved in the incidents were customers of Plaintiffs. Plaintiffs allege that the Forum Defendants began serving Chinois with notices of default under the lease "for even the most minor perceived transgression." *Id.*, ¶¶ 31-32. Plaintiffs cite various incidents that occurred in

---

[1] Plaintiffs' reference to "defendants" in the plural indicates that the allegations are directed against both the Forum Defendants and the Caesars Defendants.

1   Caesars Palace or the Forum Shops Mall on and after December 25, 2004 that Defendants blamed
2   on OPM customers despite the alleged lack of information to support such accusations. *Complaint*,
3   ¶¶ 33-42.
4        On March 6, 2006, the Forum Defendants sent a letter to Chinois stating that it was in
5   breach of the lease for having possibly entered into a sublease for the portion of its premises on
6   which the nightclub was operated without obtaining the landlord's prior consent to do so.
7   Secondly, the Forum Defendants stated that Chinois was in breach of the provision of the lease
8   which required the tenant to operate the club "in a first class manner in keeping with the standards
9   of the Center . . . ." In support of this statement, the Forum Defendants cited numerous fights and
10  other altercations or incidents involving the nightclub and its patrons. *Id.*, ¶¶ 43-46. Chinois
11  responded to the Forum Defendants' notice of default by challenging the assertion that it had sublet
12  the premises in violation of the lease or that Plaintiffs had failed to operate the OPM nightclub in a
13  manner consistent with the standards of the lease. *Id.*, ¶¶ 47-48. Following this exchange,
14  additional altercations or security related incidents occurred which Plaintiffs allege were also
15  falsely blamed on OPM and/or its patrons. The Forum Defendants sent further notices of default to
16  Chinois based on these incidents which Plaintiffs again disputed. *Id.*, ¶¶51-57.
17       Following a shooting incident inside the Caesars Palace casino in August, 2007, the Caesars
18  Defendants began closing the entrance door between the Forum Shops Mall and Caesars Palace at
19  1:00 a.m. and reopening the entrance at 8:00 a.m. This closure did not affect other mall tenants
20  whose businesses closed prior to 1:00 a.m. Plaintiffs allege that the closure severely harmed their
21  business because their patrons were only able to enter the mall and nightclub through a circuitous
22  and somewhat hidden route. The closure also allegedly caused Plaintiffs' customers to believe that
23  the nightclub was no longer in business. *Complaint*, ¶¶ 58-64.
24       Plaintiffs' Complaint alleges claims against the Forum Defendants and/or the Caesars
25  Defendants for declaratory relief, intentional interference with contractual relations, interference
26  with prospective business advantage, violation of 42 U.S.C. §1981 based on Defendants' alleged
27  hostility toward African-Americans, breach of lease, conspiracy, and breach of the covenant of
28  good faith and fair dealing. The Forum Defendants have counterclaimed against Plaintiffs. As part

of their counterclaim, the Forum Defendants allege that Plaintiffs permitted the OPM/Poetry nightclub to be operated in a manner that creates an environment that results in rowdy and unruly behavior, including fights, assaults and batteries on customers and security personnel and disorderly behavior requiring the repeated attention of security personnel and the police. *Second Amended Counterclaim (#140)*, ¶7.  The Forum Defendants assert causes of action for damages against Chinois and Love & Money, LLC for breach of contract, fraud, and conspiracy. *Id.*, ¶¶ 21-46.[2]

Plaintiff Love & Money, LLC's motion to compel requests that the Forum Defendants be ordered to produce four categories of documents or information.  First, Plaintiffs seek to compel Defendants to answer interrogatories and produce documents identifying any racially disparaging remarks that Defendants' employees, whether executive, managerial or otherwise, have made about the OPM/Poetry nightclub, its patrons, employees, or associations.  The Forum Defendants objected to these discovery requests on the grounds that they are vague, ambiguous, unintelligible, overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. *Defendants' Opposition to Motion to Compel (#192)*, p. 2 (quoting Defendant's responses to Interrogatory No. 13 and Request for Production No. 50.)

Second, Plaintiffs seek to compel the Forum Defendants to produce all documents or things generated, reviewed or circulated by or among the legal departments of the Forum Defendants and the Caesars Defendants related to or involving the removal of the OPM/Poetry nightclub from the Forum Shops or any alleged default by Chinois under the lease relating to the operation of the OPM/Poetry nightclub.  The Forum Defendants stated that they had produced documents relevant to these requests except for documents containing privileged information which are listed on the Defendants' privilege logs. *Opposition (#192)*, pp. 2-3, (quoting Defendants' response to Request No. 56.).  The Defendants also assert that certain documents exchanged between the Forum and Caesars Defendants contain confidential attorney-client communications or attorney work product

---

[2] The Court was advised during the February 16th hearing that Chinois filed for bankruptcy in or about July 2010 and that Plaintiffs ceased operations in the Forum Shops at the end of July.

that are protected from disclosure pursuant to the joint defense agreement between the Defendants. Plaintiffs also seek production of any and all documents reflecting or concerning a joint defense agreement between the Forum Defendants and the Caesars Defendants. Defendants objected to Plaintiffs' request for production of the agreement on the grounds of burdensomeness, lack of relevance and that the documents are "protected from discovery by the joint defense doctrine." *Opposition (#192)*, p. 2 (quoting Defendants' response to Request for Production No. 17).

Finally, Plaintiffs seek to compel the Forum Defendants to produce "all manuals, policies, procedures, journals, logs, records, notes, telephone logs, or records, emails, memoranda, repair records, inspection records, engineering records, system evaluations, certifications, and any other documents or things related to the design, operation, function, and/or use of the Life Safety System in operation at the Forum Shops at Caesars Palace from 2003 to August 2009, specifically including but not limited to the function and utility of the Won door." *Motion to Compel (#186), Exhibit "F", Request for Production No. 60.* Defendant objected to this request on the grounds that it over broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. *Opposition (#192)*, p. 2 (quoting Defendants' response to Request for Production No. 60). Plaintiff's ground for requesting this information is apparently based on a December 22, 2007 email that the Forum Shops' director of security sent to Caesars Palace regarding a malfunction in the operation of the "Won door" between Caesars Palace and the Forum Shops. The email indicates that the malfunction may have been due to Caesars' decision to use the door as a control point, i.e., to close the door on a nightly basis because of the alleged security issues involving the OPM/Poetry nightclub. *Motion (#186), Exhibit "H"*.

**DISCUSSION**

**1.    Plaintiff's Failure to Comply with Fed.R.Civ.Pro. 37(a)(1) and Local Rule (LR) 26-7**.

Before discussing the substantive discovery issues in this matter, the Court first addresses the procedural deficiencies in Plaintiff's motion to compel. Local Rule (LR) 26-7(a) of this district states that all motions to compel discovery or for protective order shall set forth in full the text of the discovery originally sought and the response thereto, if any. Plaintiff's motion to compel did

5

not comply with this requirement.  As a result, it was difficult for the Court to determine from the motion which specific discovery requests Plaintiff was seeking to enforce.  The Court, instead, had to rely on Defendants' Opposition (#192) which sets for the text of the discovery requests and responses in dispute.  (Plaintiff did not contest the accuracy of Defendants' statement as to which discovery requests are at issue).  Plaintiff's counsel are cautioned that they are required to comply with LR 26-7(a), the obvious purpose of which is to allow the Court, as well as the opposing party, to readily identify the discovery requests and responses in dispute.

A more significant deficiency relates to Plaintiff's counsels' certification pursuant to LR 26-7(b) that they "personally consulted with counsel for the Forum Defendants and that despite a sincere and good faith effort on the part of undersigned counsel, this matter could not be resolved without court action." *Motion to Compel (#186)*, p.4, ¶ 12.  LR 26-7(b) states that discovery motions will not be considered unless a statement of moving counsel is attached to the motion certifying that after sincere effort to do so, counsel have been unable to resolve the matter without court action.  The local rule is in addition to the requirement in Rule 37(a)(1) of the Federal Rules of Civil Procedure which requires "a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action."

*Shuffle Master, Inc. v. Progressive Games, Inc.*, 170 F.R.D. 166, 170 (D. Nev. 1996) states that Rule 37(a)(1) requires the moving party to adequately set forth in the motion essential facts sufficient to enable the court to pass a preliminary judgment on the adequacy and sincerity of the good faith conferment between the parties.  This includes the names of the parties who conferred or attempted to confer, the manner by which they communicated, the dispute at issue, as well as the dates, times, and results of their discussions, if any.  In addition to providing the certification required by Rule 37(a)(1), the movant must, of course, have actually performed as required by the rule.  "Good faith" is not shown merely through the perfunctory parroting of the certification language.  Instead, the rule mandates a genuine attempt to resolve the discovery dispute through non-judicial means.  This generally requires a face-to-face or telephonic conference between the parties' counsel to discuss and attempt to resolve the dispute.  *Shuffle Master*, *supra.*

In *Cotacom Commodity Trading Co. v. Seaboard Corp.*, 189 F.R.D. 456, 459 (D.Kan. 1999), the court described what should occur in a meaningful meet and confer conference:

> When the dispute involves objections to requested discovery, parties do not satisfy the conference requirements simply by requesting or demanding compliance with the requests for discovery. The parties need to address and discuss the propriety of asserted objections. They must deliberate, confer, converse, compare views, or consult with a view to resolve the dispute without judicial intervention. They must make genuine efforts to resolve their dispute by determining precisely what the requesting party is actually seeking; what responsive documents or information the discovering party is reasonably capable of producing; and what specific, genuine objections or other issues, if any, cannot be resolved without judicial intervention.

*See also Koninklijke Philips Electronics v. KXD Technology, et.al.*, 2007 WL 631950 (D.Nev. 2007) *2.

Defendant's Opposition (#192) did not address Plaintiff counsels' certification regarding efforts to meet and confer. In response to a question from the Court during the hearing, however, Defendants' counsel indicated that Plaintiff's counsel had not attempted to meet and confer in regard to the issues raised in the motion. The Plaintiff's attorney who allegedly conducted the meet and conference, Louren Oliveros, was not present at the hearing and Plaintiff's other counsel, Mr. Gorence, was unable to state whether there had, in fact, been an actual effort to confer with Defendants' counsel prior to filing the motion. If there was such a conference, it does not appear that Plaintiff's counsel offered to narrow the over broad discovery requests. Nor does it appear that there was any meaningful discussion by the parties' counsel regarding the extent or validity of Defendants' privilege objections. The Court therefore concludes that Plaintiff has not complied with the requirements of Rule 37(a)(1) and LR 26-7(b) and on that ground alone, the motion to compel could be denied. The Court will, however, address the merits of the Plaintiffs' motion in regard to the issues relating to privilege, because the issues are not likely to be resolved through a dispute resolution conference between the parties.

. . .

. . .

. . .

> **2.   Plaintiff's Requests for Production of Documents Containing Communications Allegedly Protected Under the Attorney-Client Privilege and/or Work Product Doctrine.**

Plaintiff's Request for Production No. 56 requests documents that were generated, reviewed, or circulated by or among the legal departments of the Forum and Caesars Defendants. This request, by its nature, seeks information that is likely to be within the scope of the attorney-client privilege or the work-product doctrine. It is not unusual that in response to such a broad request, Defendants would identify numerous documents in a privilege log based on the assertion of the attorney-client privilege or work-product doctrine. This is especially true in view of the fact that the dispute between Plaintiffs and Defendants was ongoing for approximately three years before the lawsuit was filed. Thus, Plaintiff's argument that Defendants have asserted the attorney-client privilege in an excessive manner is not persuasive.

The attorney-client privilege protects confidential disclosures made by a client to an attorney in order to obtain legal advice, as well as an attorney's advice in response to such disclosures. *In re Grand Jury Investigation,* 974 F.2d 1068, 1070 (9th Cir.1992). Because it impedes the full and free discovery of the truth, the attorney-client privilege is strictly construed. *Weil v. Investment/Indicators, Research and Management, Inc.*, 647 F.2d 18, 24 (9th Cir. 1981); *United States v. Ruehle*, 583 F.2d 600, 607 (9th Cir. 2009). This does not mean, however, that the privilege is disfavored. Within its confines, the privilege serves an important purpose of encouraging full and frank communication between the attorney and the client and thereby promotes broader public interests in the observance of law and administration of justice. *In re Teleglobe Communications Corporation,* 493 F.3d 345, 360, 361 n. 13 (3rd Cir. 2007), citing *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 682 (1981). The burden is on the party asserting the attorney-client privilege to show that it applies to a given set of documents or communications. The party must demonstrate that its documents adhere to the essential elements of the attorney-client privilege, which the court has defined as follows: (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the

1 protection be waived. *In re Grand Jury Investigation,* 974 F.2d at 1071 n. 2.

2       The party asserting the attorney-client privilege must make a *prima facie* showing that the privilege protects the information the party intends to withhold. One method for establishing the privilege is the submission of a privilege log which identifies (a) the attorney and client involved, (b) the nature of the document, (c) all persons or entities shown on the document to have received or sent the document, (d) all persons or entities known to have been furnished the documents or informed of its substance, and (e) the date the document was generated, prepared, or dated. *See Diamond State Ins. Co. v. Rebel Oil Co.*, 157 F.R.D. 691, 698 (D. Nev. 1994), citing *In re Grand Jury Investigation,* 974 F.2d at 1071 and *Dole v. Milonas,* 889 F.2d 885, 888 n. 3, 890 (9th Cir.1989). Parties sometimes assume that a privilege log that complies with items (a)-(e) is all that is required to make the *prima facie* showing. While this may often be true, in some cases a privilege log, alone, does not establish the existence of the privilege. In those instances, affidavits may also be required to answer any necessary questions left open by the log.

14       In this case, the Forum Defendants served Plaintiff with privilege logs identifying the documents as to which Defendants assert the attorney-client privilege, the work-product doctrine and/or the joint defense agreement. Defendants also provided Plaintiff with an amended privilege log shortly before the February 16th hearing and they have since provided a copy of the amended privilege log to the Court, together with a list identifying the individuals listed in the log and their employers and whether they are attorneys. The Forum Defendants also state that they entered into a joint defense agreement with the Caesars Defendants on June 10, 2009, but it is their position that the effective date of the joint defense agreement is March 6, 2006 which was the date that the Forum Defendants sent notice of default to Plaintiff Chinois under the terms of the lease. *See Complaint*, ¶¶43-48. Defendants have also provided the Court with a copy of the March 6, 2006 notice of default letter.

25 . . .

26 . . .

27 . . .

28 . . .

1    Plaintiff makes various arguments as to why the attorney-client privilege should not apply
2 in this case.[3] First, Plaintiff asserts that Defendants' privilege objections should be overruled
3 because the requested documents are highly relevant. This argument is without merit. Confidential
4 communications between a client and his attorney concerning the facts or legal issues in the case
5 are by their nature relevant and, if disclosed, may constitute material admissions. The attorney-
6 client privilege, however, protects such communications from disclosure in order to serve other
7 legitimate interests. *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 682. Next,
8 Plaintiff argues that the attorney-client privilege should be overruled because this case involves
9 allegations of egregious racial discrimination. This argument is also without merit. The privilege
10 applies to all variety of matters upon which a client may seek confidential legal advice. This
11 includes cases in which the client is accused of the most serious criminal misconduct. Needless to
12 say, Plaintiff has not provided any legal authority that the privilege does not apply in cases
13 involving allegations of racial discrimination.[4]

14    Plaintiff also argues that the attorney-client privilege or work-product doctrine may not be
15 used as both a shield and a sword. In support of this assertion, Plaintiff cites *Chevron Corp. v.*
16 *Pennzoil Co.*, 974 F.2d 1156, 1162-63 (9th Cir. 1992). *Chevron*, however, dealt with the situation
17 in which a party affirmatively places the advice of his attorney in issue by relying on it to support
18 the party's claim or defense. In such circumstances, the party impliedly waives the attorney-client
19 privilege in regard to communications relating to the subject matter of the attorney's advice.
20 Before waiver of the privilege is imposed, however, the court is required to give the holder of the

---

[3] Plaintiff has not challenged Defendants' objections based on the work-product doctrine, except to the extent that work-product protection may have been waived by disclosure of the documents to the Caesars Defendants. Accordingly, the Court will not address whether the work-product doctrine has been validly asserted, other than to note that it generally protects the mental impressions or thought process of a party's attorney made in anticipation of litigation.

[4] Plaintiff has not asserted that the crime-fraud exception to the attorney-client privilege applies in this case. *See In re Napster, Inc. Copyright Litigation*, 479 F.3d 1078 (9th Cir. 2007). The party asserting the crime-fraud exception has the burden of proving by a preponderance of the evidence that the exception applies.

1  privilege the choice of either waiving the attorney-client privilege or withdrawing the assertion of
2  advice of counsel as a basis for its claim or defense. *Bittaker v. Woodford*, 331 F.3d 715, 720 (9th
3  Cir. 2003). In this case, the Forum Defendants have not alleged reliance on the advice of counsel
4  as a defense to Plaintiff's claims. Accordingly, the Forum Defendants have not waived the
5  attorney-client privilege on this basis.

### 3. Joint Defense or Common Interest Privilege or Doctrine.

The attorney-client privilege is generally waived if the communication is voluntarily disclosed to a third person. The party asserting the privilege has the burden of showing that the privilege has not been waived. *Weil v. Investment/Indicators, Research and Management, Inc.*, 647 F.2d at 24. In this case, the Forum Defendants assert that certain communications between the Forum and Caesars Defendants are protected from disclosure pursuant to the joint defense agreement between the Defendants. In *Waller v. Financial Corp. of America*, 828 F.2d 579, 583 n. 7 (9th Cir. 1987), the Ninth Circuit noted that the joint defense privilege, which is an extension of the attorney-client privilege, has long been recognized by this circuit. *Waller* further stated that confidential communications between a client and his own lawyer remain privileged when the lawyer subsequently shares them with the co-defendants' lawyers for purposes of pursuing a common defense. *Id.*, citing *U.S. v. McPartlin*, 595 F.2d 1321, 1226 (7th Cir. 1979).

As *Waller* indicates, the joint defense privilege originated in criminal prosecutions. In *In re Teleglobe Communications Corporation*, 493 F.3d 354, 364 (3rd Cir. 2007), the Third Circuit noted that the joint defense privilege has since been replaced by a broader privilege that protects confidential attorney-client communications shared within a "community of interest" in civil and criminal litigation and even in purely transactional contexts. Although characterized by some courts as a privilege, the common interest privilege or doctrine is not an independent privilege, but is, instead, an exception to the general rule that the attorney-client privilege is waived when privileged information is disclosed to a third party.[5] *Broessel v. Triad Guaranty Ins. Corp.*, 238

---

[5] For simplicity, the Court uses the term "common interest privilege," although it may be more proper to refer to it as a doctrine or as an exception.

F.R.D. 215, 219 (W.D.Ky. 2006); *Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D. 575, 579 (N.D.Cal. 2007); *North American Rescue Products v. Bound Tree Medical, LLC*, 2009 WL 4110889 (S.D. Ohio 2009) at *7.

The elements of the common interest privilege require (1) that both parties' interests be identical, not similar, (2) that the common interest is legal, not solely commercial, and (3) that the communication is shared with the *attorney* of the member of the community of interest. *Carl Ziess Vision Intern'l GMBH v. Signet Armorlite*, 2009 WL 4642388 (S.D. Cal. 2009) at *7. The Third Circuit, in *Teleglobe*, explained that "[t]he requirement that the clients' separate attorneys share information, and not the clients themselves, derives from the privilege's roots in the old-joint defense privilege which was developed to allow attorneys to coordinate their clients' criminal defense strategies." *Teleglobe*, 493 F.3d at 364-65. The court stated that the attorney-sharing requirement helps prevent abuse of the privilege by ensuring that the common-interest privilege only supplants the disclosure rule when attorneys, not clients, decide to share information in order to coordinate legal strategies. *Id.* The Third Circuit did not specify, however, whether the common interest privilege applies when the communication is between a party and the attorney for the other party in the community of interest.

Most courts require that the common interest be a legal rather than a solely business interest. *Broessel*, 238 F.R.D. at 220, citing *Libbey Glass, Inc. v. Oneida, Ltd.*, 197 F.R.D. 342, 348 (N.D. Ohio 1999) and *Bank Brussels Lambert v. Credit Lyonnais*, 160 F.R.D. 437, 447 (S.D.N.Y. 1995). The fact that a business interest overlaps with the common legal interest, however, does not defeat the common interest privilege. *Teleglobe*, 493 F.3d at 365, citing *Duplan Corp. v. Deering Milliken, Inc.*, 397 F.Supp. 11466, 1174 (D.S.C. 1974). The view that purely commercial or business interests may be sufficient to support application of the common interest privilege is represented by *Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 115 F.R.D. 308 (N.D.Cal. 1987). In that case, the defendant disclosed, to a prospective purchaser of a division of its business, a confidential attorney opinion letter regarding whether a product manufactured by the division infringed on plaintiff's patent. The court believed that defendant and the prospective purchaser had a common legal interest in the subject matter of the letter based on the likelihood that they would

12

both be sued for patent infringement by the plaintiff if the purchase was consummated. Because the court was not completely convinced that a common legal interest existed, however, it also justified the application of the common interest privilege on policy grounds to promote reasonable and necessary disclosures in business transactions.

Although some courts have followed *Hewlett's* broader view of the scope of the common interest privilege, other courts have rejected such an expansion. *See Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D. 575, 579 (N.D.Cal. 2007) (citing cases both in support of and against an expanded scope of the privilege). *Nidec* stated, however, that "[p]roperly read, *Hewlett* did not take issue with the basic requirement of the common interest exception that the parties must have 'a common legal, as opposed to commercial interest.'" *Id*. The court noted that the parties in *Hewlett* did, in fact, have a common legal interest regarding possible infringement of plaintiff's patent, based on the likelihood that they would both be sued if the sale was consummated.

In determining whether the common interest privilege applies, *Nidec* also states:

> [E]ven if there were a common legal interest, the common interest exception requires that the communication at issue be "designed to further *that* [legal] effort." *Bergonzi,* 216 F.R.D. at 495 (emphasis added). In context of the instant case, the disclosures which concern the instant litigation, to be protected, must be made in the course of "formulating a *common legal strategy, Libbey Glass, Inc.,* 197 F.R.D. at 348, or otherwise furthering the parties' joint interest in this litigation. *See also In re Bevill, Bresler & Schulman Asset Mgmt. Corp.,* 805 F.2d 120, 126 (3d Cir.1986) (stating that joint defense privilege requires that "the statements were designed to further the [joint defense] effort"); *Lectrolarm Custom Systems, Inc. v. Pelco Sales, Inc.,* 212 F.R.D. 567, 572 (E.D.Cal.2002) (noting that "doctrine only protects communication when they are part of an ongoing and joint effort to set up a common defense strategy"); *accord United States ex rel., Burroughs v. DeNardi Corp.,* 167 F.R.D. 680, 685 (S.D.Cal.1996).

*Nidec*, 249 F.R.D. at 579-80.

Other courts have stated that there must also be an actual agreement between the parties to pursue a common legal strategy and share confidential attorney-client information. Although a written agreement is the most effective method of establishing a common interest agreement, an oral agreement whose existence, terms and scope are proved by the party asserting it, may provide a basis for the requisite showing. *Intex Recreation Corp. v. Team Worldwide Corp.*, 471 F.Supp.2d

13

11, 16 (D.D.C. 2007), citing *Minebea Co. v. Papst*, 228 F.R.D. 13, 16 (D.D.C. 2005).  A written agreement does not avoid waiver, however, if a common legal interest does not, in fact, exist between the sharing parties.  *See United States v.Bergonzi*, 216 F.R.D. 487, 496 (N.D.Cal. 2003). Finally, it is not necessary that the parties have a common legal interest or strategy in regard to all matters involved in the dispute or transaction.  *See Perry v. Televisa S.A.*, 2009 WL 2876198 (C.D.Cal. 2009) at *2 (plaintiff and third party had a common legal interest "even if, at times, they may have had differing strategic aims or tactics.")

      In this case, the Forum Defendants state that they entered into a written Joint Defense Agreement on June 10, 2009.  Defendants assert, however, that the "effective date" of the agreement was March 6, 2006, which is the date that the Forum Defendants sent notice of default to Plaintiff Chinois.  By this statement, the Forum Defendants are apparently contending that the Forum and Caesars Defendants entered into an oral agreement to share privileged attorney-client information on or before March 6, 2006.  According to the amended privilege log, most, if not all, of the communications for which the common interest privilege is asserted, occurred in the year 2007.

      It is plausible that on or about March 6, 2006, counsel for the Forum and Caesars Defendants agreed to engage in a joint legal strategy to deal with the problems allegedly resulting from Plaintiff's nightclub operation.  The Forum Defendants have not, however, provided sufficient evidence to show that there was, in fact, a joint defense or common interest agreement between them and the Caesars entities as of March 6, 2006.  Defendants' bare assertion regarding the "effective date" of the joint defense agreement does not satisfy Defendants' burden. Defendants must submit  affidavits or other evidence that establish the existence and terms of an oral agreement to engage in a joint legal strategy at the time that Defendants exchanged otherwise privileged information.  *Intex Recreation Corp. v. Team Worldwide Corp.*, 471 F.Supp.2d at 16.

      Assuming that such an agreement is shown to exist, Defendants' privilege logs, standing alone, also do not show that the communications between the Forum and Caesars Defendants were in furtherance of the parties' joint legal strategy.  The Court recognizes, however, that it is difficult to make such a showing without disclosing the substance of the communications themselves.

1   Accordingly, it is appropriate for the Court to review the documents *in camera* to determine
2   whether they are within the scope of the common interest privilege. The contents of the withheld
3   communications may also be relevant to whether there was an agreement to pursue a joint legal
4   strategy prior to June 10, 2009.

5   In advance of conducting the *in camera* review, the Court offers some comments regarding
6   the information provided in Defendants' amended privilege log. Several of the communications
7   are between attorneys for Caesars Palace and the Forum Defendants and are therefore likely to be
8   within the scope of the common interest privilege, assuming that it otherwise applies. Some of the
9   communications, however, appear to be between Forum employees and Forum attorneys. *See e.g.*
10  Document Nos. 0000110, 0001266 and 001269. While these communications are presumably
11  protected by the attorney-client privilege, the common-interest privilege does not apply to them if
12  they were not shared with the Caesars Defendants. Defendants have also asserted the joint defense
13  privilege to at least one communication on which Tom Kaplan, a representative of Plaintiff
14  Chinois, is listed as a recipient. *See* Document No. 000082. A document sent to the adverse party
15  is not within the common-interest privilege. Finally, there may be some listed communications
16  between Forum and Caesars employees that did not include an attorney for either party. *See*
17  Document Nos. 0001277 and 0001279. As *Teleglobe, supra*, indicates, the common-interest
18  privilege does not apply to communications between parties that do not involve at least one of the
19  attorneys for the community of interest. Therefore, Defendants must provide additional
20  information to show why such documents are protected under the common interest privilege. The
21  foregoing references to specific document numbers are not intended to be an exhaustive list of the
22  documents as which there is or may be a legitimate question regarding application of the common-
23  interest privilege.

24  The Court will therefore order the Forum Defendants to submit the documents to which it
25  asserts the joint defense or common-interest privilege for *in camera* review by the Court.
26  Defendants are also required to further review their privilege log and identify any and all
27  communications that were disclosed to persons other than Forum or Caesar employees and
28  attorneys. If such documents exist, then they shall be produced to Plaintiff. Likewise,

communications between employees or agents of the Forum and Caesars Defendants, that did not involve communications with an attorney for either party, shall be produced to the Plaintiff.[6]

### 4. Plaintiffs' Request for Production of the Joint Defense Agreement.

Plaintiff also seeks to compel production of the Joint Defense Agreement between the Forum and the Caesars Defendants. Federal courts have generally declined to order production of a joint defense agreement on the grounds that it is not relevant to the claims or defenses in the lawsuit and is therefore not discoverable under Rule 26(a). *Ford Motor Co. v. Edgewood Properties, Inc.*, 257 F.R.D. 418, 428 (D.N.J. 2009); *Warren Distributing Co. v. InBev USA L.L.C.*, 2008 WL 4371763 (D.N.J. 2008). A party's mere characterization of a document as a joint defense agreement, however, is not controlling as to whether it is relevant. *Warren Distributing,* 2008 WL 4371763 at *3. It is possible, for example, that a joint defense agreement may serve more than one purpose and that some portions of the agreement may be relevant and discoverable. *Id.*, citing *Jeld-Wen, Inc. v. Nebula Glasslam International, Inc.*, 2008 WL 756455 (S.D. Fla. 2008). For this reason, the court in *Warren Distributing* ordered that the agreement be submitted for *in camera* review. It is also appropriate for the Court to review the agreement *in camera* to determine that such an agreement, in fact, exists and to also verify its effective date and the parties to the agreement. So long as such information is otherwise provided to the opposing party, it is unnecessary to order production of the agreement. *Ford Motor Co. v. Edgewood Properties, Inc.*,

---

[6] The Court will not grant Plaintiff's request that it conduct an *in camera* review of all of the documents to which Defendants have asserted the attorney-client privilege or work-product doctrine. Plaintiff has not made valid arguments to overcome Defendants' *prima facie* case for application of the attorney-client privilege or the work-product doctrine to confidential communications that were not disclosed to the Caesars Defendants. The Supreme Court has stated that a district court may, in appropriate circumstances, conduct *in camera* review of allegedly privileged documents. *See Diamond State Ins. Co. v. Rebel Oil Co.*, 157 F.R.D. 691, 700 n. 3 (D. Nev. 1994), citing *United States v. Zolin,* 491 U.S. 554, 571-72, 109 S.Ct. 2619, 2630-31 (1989). *Zolin* also states, however, that it is not proper for the court to conduct *in camera* review where the proponent of the privilege has made the required showing for its application and the party opposing the privilege has offered nothing to overcome the assertion of the privilege. In deciding whether to conduct *in camera* review of allegedly privileged documents, the district court may also consider the burden that such review places on the court. *Zolin*, 109 S.Ct. at 2631.

257 F.R.D. at 428.  *See also Fort v. Leonard*, 2006 WL 2708321 at *3 (D.S.C. 2006); *Broesel v. Triad Guaranty Insurance Corp.*, 238 F.R.D. 215, 217 (W.D.Ky. 2006); and *United States v. Int'l Longshoremen's Ass'n*, 2006 WL 2014093 (E.D.N.Y.2006) (which also held that joint defense agreements were not discoverable because they did not contain information relevant to the claims or defenses.)  The Court therefore directs the Forum Defendants to submit the June 10, 2009 Joint Defense Agreement for *in camera* review by the Court.  The Court will thereupon determine whether any portion of the agreement should be produced to Plaintiffs.

### 5. **Plaintiff's Discovery Requests Relating to Racially Disparaging Comments or Remarks and For Documents Relating to Defendants' Life Safety System**.

Plaintiff's Interrogatory No. 13 asked the Forum Defendants to identify any racially disparaging comments or remarks that any of Defendants' employees, whether executive, managerial or otherwise, made about the Poetry nightclub, its patrons, employees or associations. Request No. 50 calls for production of any documents related to such information.  Plaintiff asserts that these discovery requests are relevant to Defendants' alleged racially animus against Plaintiff's predominantly African-American clientele.

The Court finds that these discovery requests are unduly vague and overbroad.  First, Plaintiff has not provided any factual information suggesting that it has a reasonable basis to believe that any specific officer or managerial employee of the Forum Defendants, involved in dispute regarding Plaintiff's nightclub, made any racially disparaging comments about the Poetry nightclub, its patrons, employees or associations.  Plaintiff's request, therefore, appears to be a classic "fishing expedition."  Second, the discovery requests are not even limited to Defendants' officers or managerial employees, but would instead require Defendants to potentially interview everyone of their employees from 2003 or 2005 to the present to determine if they made such comments or remarks.  The meaning of the term "racially disparaging" is also vague.  These discovery requests are therefore facially overbroad and unduly burdensome.  *See Carlton v. Union Pacific RR Co.*, 2006 WL 2220977 (D.Neb. 2006) *5 (holding that similar requests were facially overbroad).

. . .

Plaintiff's Request for Production No. 60 seeks every document relating to "the Life Safety System in operation at the Forum Shops at Caesars Palace from 2003 to August 2009." This case does not involve any claim for bodily injury or property damage that would directly implicate the life safety system in the Forum Shops Mall. The alleged relevancy of this discovery request pertains to Defendant Caesars' decision in August 2007 to close the fire protection doors (the "Won doors") at the casino-mall entrance on a daily basis between the hours of 1:00 a.m. and 8:00 a.m. The door is designed to automatically close in the event of a fire alarm. As discussed above, Caesars began closing this door after a shooting incident. Prior to filing the motion to compel, Plaintiff took the deposition of the Clark County Fire Department engineer who testified that closing the door is not contrary to fire safety. He further testified that the Fire Department advised Caesars that it was permissible to close the door. *Opposition (#192), Exhibit "1"*, 1/12/10 Deposition of Stephen Digiovanni, pp. 13-19.

Notwithstanding the Fire Department engineer's testimony, Plaintiff argued that its request for documents relating to the Forum Shops life safety system is relevant to show Defendants' malicious intent toward Plaintiff. This is based on a December 2007 email from the Forum Shops' director of security to Caesars Palace regarding a malfunction in the door which prevented it from operating in the normal manner. The Forum Shops security director indicated that the nightly closing of the door by Caesars' personnel for "control purposes" had caused some unknown damage to the door and he inquired whether Caesars' representative would have some time to discuss discontinuing the closure of the door. *Motion (#186), Exhibit "H"*. Plaintiff's relevancy argument, at most, justified a discovery request for any documents regarding other communications between the Forum and Caesars Defendants relating to the closing of the fire door or documents relating to other possible malfunctions as a result of the Caesars' nightly closing of doors after August 2007. There was no relevant basis, however, for Plaintiff to request all records relating to the Forum Defendants' life safety system, including records that long pre-date the practice of closing the Won doors because of issues relating to Plaintiff's nightclub.

The Court strongly disapproves of Plaintiff's tactics in regard to these extremely overbroad and substantially irrelevant discovery requests. First, discovery requests, as initially served, should

be reasonably limited to obtaining relevant information and avoid imposing an undue burden on the responding party. Plaintiffs' overbroad requests failed that basic test. Second, prior to filing the motion, Plaintiff's counsel had an obligation to meet and confer with Defendants' counsel and explain the arguable relevancy of the discovery requests and, in this case, substantially narrow the scope of the requests. It was only at the hearing that Plaintiff's counsel, apparently for the first time, acknowledged the over breadth of the discovery requests and offered to substantially narrow them. The Court will not reward this noncompliance with the discovery rules by partly granting Plaintiff's motion to compel. The Court also finds that the relevancy of these discovery requests is remote, at best. The Court therefore denies Plaintiff's motion to compel Defendants to respond to Interrogatory No. 13 and Requests for Production Nos. 56 and 60. Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Motion to Compel Discovery from the Forum Defendants (#186) is **granted**, in part, and **denied**, in part as follows:

1. The Forum Defendants are ordered to submit for the Court's *in camera* review the documents listed on their amended privilege log to which they have asserted the joint defense or common interest privilege and the Joint Defense Agreement dated June 10, 2009.

2. The Forum Defendants are also ordered to file with the Court and to serve on Plaintiff, affidavit to support their assertion that the Forum and Caesars Defendants had entered into a "joint defense" agreement as of March 6, 2006.

3. The Forum Defendants shall produce to Plaintiff those documents listed on its privilege log that are not within the scope of the common interest privilege, because the communications were disclosed to the Plaintiff's representative or to third parties other than the Caesars Defendants. The Forum Defendants shall also produce any communications listed on the amended privilege log that was exchanged between employees of the Forum and Caesars Defendants, but in which no attorney for either Defendant participated.

4. The Forum Defendants shall comply with the foregoing provisions on or within fourteen (14) days from the filing of this order.

. . .

. . .

5. Plaintiff's motion to compel is otherwise denied.

DATED this 2nd day of March, 2010.

_____
GEORGE FOLEY, JR.
United States Magistrate Judge